FILED

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Mar 30   1 51 PM '04

U.S. DISTRICT COURT
NEW HAVEN, CONN.

| | | |
|---|---|---|
| SARAIYA SOLOMON, | : | |
| | : | |
| Plaintiff, | : | **SECOND AMENDED COMPLAINT** |
| | : | |
| -against- | : | CASE NO.: 3:02-CV-1116(GLG) |
| | : | |
| HARTFORD HOSPITAL, | : | |
| GLADYS M. CIASCHINI, | : | |
| SUSAN A. O'CONNELL, and | : | |
| SANDRA NILES, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants. | : | FEBRUARY 20, 2004 |

## PRELIMINARY STATEMENT

1.  This cause of action constitutes an individual complaint for money damages and other relief to redress defendants' unlawful acts under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e *et seq.*, the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981, the Connecticut Fair Employment Practices Act, §§ 46a-51 *et seq.*, and the common laws of the state of Connecticut.

2.  Plaintiff seeks, among other relief and damages allowed under the law, reinstatement of her status as an employee of defendant Hartford Hospital with the concomitant opportunities for internal transfer and promotion to fill new or open positions.

3.  Plaintiff was illegally and unlawfully:

    A.  discriminated against in the terms and conditions of her employment based on race;

    B.  denied transfer, promotion, or hire for new or open positions within Hartford Hospital based on race;

C.  classified as ineligible to interview for new or open positions within Hartford Hospital based on race which adversely affected plaintiff's status as an employee;

D.  subjected to a non-job related employment standard based on race;

E.  subjected to a communication policy that had a disparate impact on individuals of plaintiff's race;

F.  subjected to a job qualification requiring Spanish and English lingual skills that had a disparate impact on individuals of plaintiff's race.

## JURISDICTION

4.  The Court has jurisdiction of this cause of action under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 2000e-5(f)(3).

5.  The supplemental jurisdiction of the court over the claims arising under the Connecticut Fair Employment Practices Act, §§ 46a-51 *et seq.* and state common law claims is invoked pursuant to 28 U.S.C. § 1367.

## ADMINISTRATIVE PREREQUISITES

6.  On March 19, 2001, plaintiff filed an Affidavit of Illegal Discriminatory Employment Practices with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunity Commission (EEOC) charging defendant Hartford Hospital with discriminatory practices on the basis of race.

7.  Defendants O'Connell, Ciaschini, and Niles testified at a hearing held in the course of the Connecticut Commission on Human Rights and Opportunities' investigation of the complaint.

8.  On April 4, 2002, plaintiff received a Notification of Right to Sue from the EEOC. A copy of the notification is annexed hereto as Exhibit 1.

2

## PARTIES

9.    Plaintiff Saraiya Solomon is a black female who was employed by Hartford Hospital from August 9, 1997, through March 31, 2001.

10.    Plaintiff is a United States citizen and resides in Hartford, Connecticut.

11.    Defendant Hartford Hospital (or, the "hospital") is a nonprofit corporation organized under the laws of the State of Connecticut with its corporate headquarters in Hartford, Connecticut.

12.    The hospital engages in business affecting interstate commerce and employs approximately 5000 part-time and full-time employees, including fifteen (15) or more employees for each working day in each of the twenty (20) or more calendar weeks of the current or preceding year.

13.    Defendant Gladys M. Ciaschini, a hispanic female, is a citizen of the United States who was employed at all times relevant hereto from July 2000 in a managerial capacity as a Human Resources Consultant at Hartford Hospital

14.    Defendant Susan A. O'Connell, a white female, is a citizen of the United States who was employed at all times relevant hereto in a supervisory capacity as a Manager in the Radiation Oncology Department at Hartford Hospital.

15.    Defendant Sandra Niles, a white female, is a citizen of the United States who was employed at all times relevant hereto at the Gray Cancer Center of Hartford Hospital in an administrative capacity.

3

16.   Defendant Niles supervised, directed, and monitored plaintiff's work, assignments, and schedule on a daily basis and had the authority to grant plaintiff's requests for vacation requests or late arrival to work.

## VIOLATIONS AND CLAIMS

### COUNT I
### DISCRIMINATORY TERMS, CONDITIONS, AND PRIVILEGES OF EMPLOYMENT AGAINST DEFENDANT HARTFORD HOSPITAL
### 42 U.S.C. § 2000e-2(a)(1)

17.   Paragraphs 1 through 16 and 48 through 182 are incorporated herein by reference as though fully set forth herein.

18.   Defendant Hartford Hospital engaged in acts of discrimination against plaintiff with respect to the terms, conditions, and privileges of employment because of plaintiff's race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

19.   On or about August 9, 1997, plaintiff began her employment at Hartford Hospital as a part-time information desk receptionist with the title and grade of Administrative Associate I.

20.   Immediately prior to August 9, 1997, plaintiff worked as an unpaid volunteer at Hartford Hospital in a similar capacity as an information desk receptionist in the main lobby of the hospital.

21.   On or about February 22, 1999, plaintiff completed an application for promotion/transfer to a newly created full-time position at the Conklin Building of the hospital in the Radiation Oncology Department with the title and grade of Administrative Associate I.

4

22.   Defendant O'Connell was a manager in the Radiation Oncology Department and offered plaintiff the full-time Administrative Associate I position (internal hospital position code 100201) by reason of plaintiff's exceptional skills and interview.

23.   At the time of her transfer to the Administrative Associate I position in the Conklin Building, plaintiff possessed an Associate of Sciences Degree in Marketing, including human resources coursework, was proficient in Microsoft, had business work experience, possessed public relations skills, and was familiar with Excel spreadsheets.

24.   Plaintiff's starting salary in her Administrative Associate I position at the Conklin Building was $9.88 per hour.

25.   The Radiation Oncology Department was located in the Gray Cancer Center ("center") at the hospital.

26.   The construction of a new building at the hospital meant that the Gray Cancer Center entrance would be closed and patients would be required to detour through the Conklin Building entrance to reach the Gray Cancer Center.

27.   Plaintiff's position at the entrance to the Conklin Building was created to receive the detoured cancer center patients and direct them to the Gray Cancer Center.

28.   A summary of plaintiff's position duties required plaintiff to: (a) provide basic secretarial and clerical support to the work area by performing tasks that were routine and directed; (b) follow instructions and procedures to perform tasks as assigned; and (c) report to assigned supervisor.

29.   On or about March 22, 1999, plaintiff transferred from the main lobby of the hospital to begin work as an Administrative Associate I at the entrance to the Conklin Building.

30.   Defendant O'Connell, the Manager of the Radiation Oncology Department was plaintiff's manager and had been employed by the hospital since 1982.

31.   Defendant Niles, the receptionist for the Gray Cancer Center, acted in a supervisory capacity toward plaintiff, monitored plaintiff's work schedule and hours, and communicated with plaintiff by phone and at plaintiff's work location in the Conklin Building on a daily basis or more and had been employed by the hospital since 1990.

**Work Environment**

32.   Between March 1999 and March 2001, plaintiff was subjected to a work atmosphere pervaded by attitudes of racial discrimination:

    A.   Defendant Niles frequently referenced plaintiff's dark skin color;

    B.   Defendant Niles frequently referenced plaintiff's residence in Hartford commenting that, for defendant Niles, Hartford was just a place to work and defendant Niles could not personally live in Hartford;

    C.   Defendant Niles frequently referenced the fact that plaintiff rode the public busses and did not have a car;

    D.   Defendant Niles suggested that plaintiff should use a darker make-up foundation;

    E.   Defendant Niles, who is white, told plaintiff she wanted to be as dark as the plaintiff and plaintiff had reason to believe that defendant Niles did not, in fact, wish to be black;

    F.   In reference to a photograph of Tina Turner, a black female entertainer, defendant Niles said that Tina Turner could not be black;

6

G. Defendant Niles told plaintiff that the black characters in the musical "Porgy and Bess" looked ridiculous in the way they were dressed and dancing;

H. Defendant Niles commented that she preferred the appearance of the lighter skinned Arabic men who worked as valet parking attendants at the cancer center;

I. Defendant Niles commented on plaintiff's hair texture, asking plaintiff how plaintiff achieved her hair style because black people's hair is "kinky, you know, like Brillo";

J. Defendant Niles, in rejecting plaintiff's suggestion to use Jazz music at a Gray Cancer Center event, "Celebrate Life," commented to plaintiff that Jazz music was an "ethnic thing," that people with class did not like Jazz music, that most of the cancer center patients were white, and that defendant Niles did not like Jazz music.

33.  On or about January 18, 2001, plaintiff asked defendant Niles to refrain from speaking to plaintiff unless necessitated by work responsibilities.

34.  Plaintiff reported defendant Niles' harassing and discriminatory actions to defendant Ciaschini in a letter dated January 23, 2001.

**Job Assignments**

35.  On or about July 30, 1999, plaintiff received a memorandum from defendant O'Connell asking the three staff members assigned to the Conklin Building entrance to staff the three positions, two transport aide positions and one receptionist position, as needed.

36.   Plaintiff objected to the memorandum because her position as an Administrative Associate I did not include patient transport in the position summary and two transport aides, Kelvin Griffith and Virginia Hernandez-Green, were assigned to the entrance.

37.   Defendant O'Connell required that plaintiff obtain and plaintiff did obtain a physician's note excusing plaintiff from the additional physical duties.

38.   Plaintiff had not been informed during the interview process that she would be responsible for patient transport.

39.   The patient transport aides dressed in loose fitting, hospital wear appropriate for physical duty as compared to the professional, office dress plaintiff was expected to wear in her position as the receptionist to the entrance.

40.   In fact, defendant Niles told plaintiff that a receptionist was to be present at all times at the entrance to the Conklin Building.

41.   Defendant O'Connell implemented the hospital's Employee Performance Improvement Process (formerly the Discipline Policy) (hereinafter, "discipline policy") when plaintiff did not transport patients.

42.   The discipline policy states that it should be implemented when the conduct of an employee affects the efficient operation of the hospital or violates the rights of others.

43.   The discipline policy has four incremental steps:

A.   Step 1 is Verbal Counseling;

B.   Step 2 is Formal Improvement Documentation;

C.   Step 3 is Final Written Warning; and

D.   Step 4 is Suspension or Termination.

8

44.   Opportunities for pay increases, lump sum awards, promotion, transfer and tuition reimbursement are delayed while an employee is in Steps 2-4 of the discipline policy.

45.   Defendant O'Connell never informed plaintiff that plaintiff had been formally disciplined and had not previously referred plaintiff for counseling with Human Resources as required by the discipline policy.

46.   However, plaintiff was denied opportunities in her employment because of the July 30, 1999, memorandum from defendant O'Connell.

47.   Plaintiff was disciplined for failing to perform a duty that was not required in her position and such discipline was based on plaintiff's race.

**COUNT II**
**DISCRIMINATORY TERMS, CONDITIONS, AND PRIVILEGES OF EMPLOYMENT**
**AGAINST ALL DEFENDANTS**
**42 U.S.C. § 1981**

48. Paragraphs 1 through 47 and 50 through 182 are incorporated herein by reference as though fully set forth herein.

49. Defendant Hartford Hospital and defendant Ciaschini, acting as the hospital's agent and in her individual capacity, and defendant O'Connell, acting as the hospital's agent and in her individual capacity, and defendant Niles acting as the hospital's agent and in her individual capacity, engaged in acts of discrimination against plaintiff with respect to the terms, conditions, and privileges of employment because of plaintiff's race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## COUNT III
### FAILURE OR REFUSAL TO TRANSFER, PROMOTE OR HIRE
### AGAINST DEFENDANT HARTFORD HOSPITAL
### 42 U.S.C. § 2000e-2(a)(1)

50. Paragraphs 1 through 49 and 102 through 182 are incorporated herein by reference as though fully set forth herein.

51.   Defendant Hartford Hospital and defendant Ciaschini, acting as the hospital's agent, and defendant O'Connell, acting as the hospital's agent, failed or refused to hire or transfer plaintiff between February 2000 and March 2001, inclusive, because of plaintiff's race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

52.   In accordance with the hospital's stated policy of filling new and open positions from within by promoting qualified employees, and in consideration of the limited duration of plaintiff's assignment to the Conklin Building entrance, plaintiff applied for fifteen (15) positions at the hospital between February 2000 and March 2001, inclusive.

**Conklin Building Transport Aide Positions**

53.   Two transport aides, Kelvin Griffith and Virginia Hernandez-Green, were hired to transport the Gray Cancer Center patients from the Conklin Building entrance to the Gray Cancer Center.

54.   The transport aide positions, as well as plaintiff's position, were scheduled to end on March 31, 2001, upon the reopening of the entrance to the Gray Cancer Center.

55.   Virginia Hernandez-Green's transport aide position was filled by Juan Urena when Ms. Green was selected for internal transfer to an administrative, secretarial position in the Gray Cancer Center in 1999 or 2000.

10

56.    Upon information and belief, Ms. Hernandez-Green's prior experience and education had included a position within the hospital stocking supplies and attendance at business related courses.

57.    Upon information and belief, the hospital provided on the job training to Ms. Hernandez-Green when she internally transferred from a transport aide position in the Conklin Building to an administrative, secretarial position in the Gray Cancer Center.

58.    Juan Urena transferred to the transport aide position left vacant by Ms. Hernandez-Green.

59.    Upon information and belief, Mr. Urena was an internal transfer from a food and nutrition services position at the hospital and received on the job training in his new position at the Conklin Building as a transport aide.

60.    Mr. Urena was replaced by Alex Moreau after Mr. Urena was selected for internal transfer from the transport aide position at the Conklin Building to a position as a Patient Care Associate at the Conklin Building's Inpatient Cancer Unit.

61.    Upon information and belief, the hospital provided on the job training to Mr. Urena when he internally transferred from a transport aide position in the Conklin Building to a position as a Patient Care Associate in the Conklin Building's Inpatient Cancer Unit.

62.    Mr. Moreau was selected for internal transfer to another transport aide position within the hospital prior to March 31, 2001.

63.    Kelvin Griffith's employment at the hospital terminated prior to Mach 31, 2001.

64.    Of the five (5) employees working at the Conklin Building entrance whose employment was scheduled to end on March 31, 2001, plaintiff was the only employee whose attempts to transfer were unsuccessful.

**Job Performance and Training**

65.    Plaintiff received two (2) performance appraisals while she was employed as an Administrative Associate I at the Conklin Building entrance.

66.    Performance evaluation ratings include "exemplary," "effective," and "needs improvement."

67.    On October 21, 1999, after only even (7) months in the position, plaintiff received an "effective" rating and a hourly rate pay increase from $9.88 to $10.41.

68.    On October 24, 2000, plaintiff received an "exemplary" rating and a hourly rate pay increase from $10.41 to $11.01.

69.    Plaintiff's performance rating on October 24, 2000, was based in part on plaintiff's exemplary performance in instructing and monitoring the summer volunteers assigned to the Conklin Building entrance.

70.    While plaintiff worked at the Conklin Building, she attended non-mandatory, performance development workshops at the hospital including computer skills classes and public relations seminars.

71.    During this same period of employment at the Conklin Building, plaintiff attended classes, trained, and ultimately received certification as a phlebotomist through the American Society of Clinical Pathologists (ASCP).

12

**Eligibility for Transfer, Promotion, or Hire**

72.   On or about December 26, 2000, defendant Ciaschini, a hospital Human Resources Consultant, wrote a letter to plaintiff regarding the elimination of plaintiff's position at the hospital.

73.   Human Resources Consultants screened internal employee applicants for eligibility before referring them to managers for interviews.

74.   Pursuant to hospital policy, only qualified candidates received a referral to interview for a transfer or promotion.

75.   As plaintiff's Human Resources Consultant, in accordance with hospital policy, defendant Ciaschini screened applicants for eligibility prior to sending applicants for interviews.

76.   Plaintiff's applications for transfer were screened for such eligibility by designated Human Resources Consultants.

**Discrimination in Transfer, Promotion, or Hire**

77.   The hospital engaged in a pattern of intentionally acting to prevent plaintiff from transfer, promotion, or hire to any position in the hospital knowing that their actions would result in plaintiff's loss of employment at the hospital on March 31, 2001.

A.   Alex Moreau, a transport aide assigned to the Conklin Building entrance, told plaintiff that defendant O'Connell was the impediment to plaintiff's transfer.

B.   Mr. Moreau told plaintiff that defendant O'Connell had told Virginia Hernandez-Green that defendant O'Connell would not give plaintiff a favorable recommendation concerning plaintiff's transfer and that all defendant O'Connell had to do to help someone in the organization was pick up the phone.

C.  On or about January 2001, defendant Niles told the wife of a cancer center patient that plaintiff would not be working at the hospital after March 31, 2001, because it was "their" plan from a year ago not to recommend plaintiff for new or open positions within the hospital because "they" did not like plaintiff and thought she was "an uppity black bitch."

D.  In a letter dated February 2, 2001, plaintiff informed defendant Ciaschini of the remarks listed in 75(a) through (c), above.

78.    Defendant O'Connell participated by conference call in at least one meeting with defendant Ciaschini and plaintiff to discuss plaintiff's options for employment at the hospital and was kept appraised of plaintiff's employment status by defendant Ciaschini.

79.    Defendants Ciaschini and O'Connell discussed plaintiff's rejection for the position of Patient Administrative Associate in the Nursing Unit prior to plaintiff being informed that she would not be offered the job.

80.    Defendant O'Connell then informed plaintiff that plaintiff had not received an offer for the position of Patient Administrative Associate in the Nursing Department.

**Job Applications**
**A.  Discrete Discrimination**

Administrative Associate I in the Hemodialysis Department

81.    On or about June 26, 2000, plaintiff applied internally for the position of Administrative Associate I (internal hospital position code 100201) in the Hemodialysis Department.

14

82.   A summary of the position required the employee to: (a) provide basic secretarial and clerical support to the work area by performing tasks that were routine and directed; (b) follow instructions and procedures to perform tasks as assigned; and (c) report to assigned supervisor.

    A.   A summary of the position's duties were identical to the duties described under the plaintiff's Administrative Associate I position (internal hospital position code 100201) at the Conklin Building.

    B.   The minimum hourly rate was $10.01.

    C.   The plaintiff was qualified for the position and was rejected after an interview with department office manager Monica Kowalski.

    D.   Upon information and belief, the position remained unfilled and the hospital continued to look for an employee with plaintiff's qualifications until at least December 17, 2000, when a hispanic female was hired for the position.

    E.   The position remained unfilled subsequent to December 17, 2000, when the hispanic female failed the hospital's drug screening test.

Administrative Associate II in the Human Resources Department

83.   In August of 2000, plaintiff applied for a position as an Administrative Associate II in the Human Resources Department.

    A.   Plaintiff was absolutely qualified for the position.

    B.   The department manager William Bell interviewed and rejected plaintiff for the position.

    C.   The hospital hired a white female, external candidate for the position.

15

**B. Pattern of Discrimination**

<u>Patient Administrative Associate in the Women's Ambulatory Health Department</u>

84.   On or about February 17, 2000, plaintiff applied, and was rejected, for the position of

Patient Administrative Associate in the Women's Ambulatory Health Department of the hospital.

<u>Administrative Associate III in the Research Department</u>

85.   On or about March 10, 2000, plaintiff applied, and was rejected, for the position of

Administrative Associate III in the Research Department of the hospital.

<u>Administrative Associate II and Patient Administrative Associate in the Care Continuum
Department</u>

86.   On or about October 4, 2000, plaintiff applied, and was rejected, for at least four (4)

open positions of Administrative Associate II and Patient Administrative Associate in the Care

Continuum Department.

87.   A stated reason for hiring one candidate for one (1) of the four (4) positions was the

candidate's position with the hospital was scheduled to end on or about September 30, 2000.

<u>Administrative Associate II in the Public Relations Department of Connecticut Children's
Hospital</u>

88.   Between April 14, 2000, and April 18, 2000, plaintiff interviewed on three different

occasions and with three separate managers for the position of Administrative Associate II in the

Public Relations Department of Connecticut Children's Hospital and was rejected..

89.   Both Hartford Hospital and Connecticut Children's Hospital are members of the

Connecticut Health System (CHS).  CHS member hospitals allow member hospital employees to

interview within the CHS as internal candidates.

16

<u>Financial Counselor in the Patient Account Department</u>

90.   On or about April 19, 2000, plaintiff applied, and was rejected, for the position of Financial Counselor in the Patient Account Department.

<u>Financial Counselor in the Patient Account Department</u>

91.   On or about November 10, 2000, plaintiff applied, and was rejected, for the position of Financial Counselor in the Patient Account Department.

<u>Patient Administrative Assistant in the OPD/Adult Primary Department</u>

92.   Prior to January 31, 2001, defendant Ciaschini referred plaintiff to a Patient Administrative Associate position in the OPD/Adult Primary Department.

      A.  On or about January 31, 2001, defendant Ciaschini informed plaintiff that plaintiff was not qualified for the position because plaintiff was not bilingual in Spanish and English.

      B.  Plaintiff did not interview for the Patient Administrative Associate Position in the OPD/Adult Primary Department.

<u>Patient Administrative Associate in the Care Continuum Unit</u>

93.   On or about January 22, 2001, plaintiff applied, and was rejected, for the position of Patient Administrative Associate in the Care Continuum Unit.

<u>Patient Administrative Associate in the Cardiology Center</u>

94.   On or about February 2, 2001, plaintiff applied, and was rejected, for the position of Patient Administrative Associate in the Cardiology Center.

      A.  Plaintiff was qualified for the position.

17

B. The hospital did not consider plaintiff for the position because plaintiff, subsequent to her application, had received a written warning under Step 3 of the hospital's discipline policy.

<u>Patient Administrative Associate in the Nursing Unit (Bliss 10)</u>

95. Plaintiff applied for the position of Patient Administrative Associate in the Nursing Unit in January 2001 and was informed that the position was filled.

96. Defendant O'Connell told plaintiff that defendant Ciaschini had told defendant O'Connell that plaintiff had been rejected for the position.

97. Plaintiff called a Manager in the Nursing Unit, Lea Allard, and was informed by Ms. Allard that the Patient Administrative Associate position had not been filled.

98. The Human Resources Consultant, assigned to screen eligibility for the position, Ellen Vitale, did not respond to plaintiff's inquiries about the position and asked plaintiff if plaintiff was the "woman with the funny hair style."

99. On or about February 20, 2001, plaintiff was contacted by a Manager in the Nursing Unit, Lea Allard, to interview for the position of Patient Administrative Associate in the Nursing Unit.

100. Plaintiff informed Ms. Allard during the interview that plaintiff was subject to the discipline policy.

101. Plaintiff was not informed of the results of the interview with Ms. Allard.

18

## COUNT IV
### FAILURE OR REFUSAL TO TRANSFER, PROMOTE OR HIRE
### AGAINST ALL DEFENDANTS
### 42 U.S.C. § 1981

102. Paragraphs 1 through 101 and 104 through 182 are incorporated herein by reference as though fully set forth herein.

103. Defendant Hartford Hospital and defendant Ciaschini, acting as the hospital's agent and in her individual capacity, and defendant O'Connell, acting as the hospital's agent and in her individual capacity, failed or refused to hire or transfer plaintiff between February 2000 and March 2001, inclusive, because of plaintiff's race, in violation of the Civil Rights Acts of 1866, 42 U.S.C. § 1981.

## COUNT V
### RETALIATION
### AGAINST DEFENDANT HARTFORD HOSPITAL
### 42 U.S.C. § 2000e-3(a)

104. Paragraphs 1 through 103 and 125 through 182 are incorporated herein by reference as though fully set forth herein.

105. Defendant Hartford Hospital and defendant Ciaschini, acting as the hospital's agent, and defendant O'Connell, acting as the hospital's agent, retaliated against plaintiff by ensuring that plaintiff would not be eligible to interview for new or open positions in the hospital prior to the March 31, 2001, elimination of plaintiff's position at the hospital because of plaintiff's race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

106. In letters dated January 23, 2001, and February 9, 2001, to defendant Ciaschini, plaintiff reported that:

A.  defendant Niles had made racial comments to plaintiff that were discriminatory and based on plaintiff's race;

B.  defendant O'Connell was sabotaging plaintiff's efforts to find employment in the hospital;

C.  plaintiff had been rejected for numerous transfer and hire employment opportunities in the hospital;

D.  Alex Moreau had told plaintiff that defendant O'Connell was the impediment to plaintiff's finding anther job in the hospital;

E.  the wife of a cancer center patient told plaintiff that defendant Niles had said plaintiff would not be employed by the hospital after March 2001;

F.  defendant O'Connell, defendant Niles, and "very possibly links" in Human Resources were racially motivated against plaintiff in their attempts to encourage plaintiff to leave the hospital.

**Suspension**

107. On Friday, February 9, 2001, defendant O'Connell suspended (Step 4 of discipline policy) plaintiff without pay and without Final Written Warning (Step 3 of discipline policy).

108. Defendants O'Connell and Ciaschini, in a written warning dated Tuesday, February 13, 2001, alleged that plaintiff's behavior did not meet the Hartford Hospital Code of Conduct and Performance Management Competencies which reads: "We develop and strengthen collaborative relationships with all of our customers, including our patients, their families, our employees, volunteers, medical staff and our business partners."

109. Plaintiff was not in a management position at Hartford Hospital and was not subject to, but should have been the beneficiary of, Management Competencies.

110. Defendants O'Connell and Ciaschini directed that plaintiff would be subject to the discipline policy for thirty-four work (34) days, the same time period remaining until plaintiff's position at the hospital was eliminated.

111. On February 13, 2001, defendants O'Connell and Ciaschini informed plaintiff that failure to fulfill the Management Competency would advance plaintiff to Suspension or Discharge (Step 4 of discipline policy), however, plaintiff had been subjected to Suspension on February 9, 2001, prior to the February 13, 2001, Final Written Warning (Step 3 of discipline policy).

112. Defendants O'Connell and Ciaschini denied plaintiff the opportunity to seek employment opportunities as an internal candidate during plaintiff's final thirty-four (34) days of employment at the hospital.

113. Defendants O'Connell and Ciaschini retaliated against plaintiff for plaintiff's written complaints of discrimination made on January 23, 2001, and February 9, 2001, and plaintiff's verbal complaints.

21

114. Under the hospital's Rules of Conduct, which do apply to all employees, examples of unprofessional or inappropriate behavior violations requiring disciplinary conduct include "fighting on hospital premises at any time, threatening, intimidating, use of profanity or racial or ethnic slurs, coercing or interfering with employees, supervisors, patients, at any time."

115. Defendants O'Connell and Ciaschini alleged that plaintiff:

    A. caused a hospital employee, Jan Lynch, to feel ignored when plaintiff did not acknowledge Ms. Lynch's greeting sometime in January or February 2001;

    B. caused a medical engineer, Robert Lindyer, who was sitting in Ms. Lynch's office to sternly repeat "Good morning" when plaintiff did not acknowledge his first attempt on February 8, 2001;

    C. caused a hospital employee, Susan Wright, to feel offended and snubbed when plaintiff did not say "Good morning" on February 5, 2001;

    D. caused a fabrication designer, John Unikewicz, who was sitting in Ms. Lynch's office to feel uncomfortable when plaintiff said "excuse me" as plaintiff attempted to retrieve a laptop to perform work on February 8, 2001;

    E. did not greet a hospital employee, Sandy Beggs, who was siting in Ms. Lynch's office on February 8, 2001;

    F. did not say hello to defendant O'Connell as plaintiff passed by defendant O'Connell's office to enter Ms. Lynch's office on February 12, 2001;

    G. merely smiled at defendant O'Connell when defendant O'Connell said hello to plaintiff on February 12, 2001.

116. Plaintiff's laptop was stored in Ms. Lynch's office.