## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARAIYA SOLOMON, | : | CIVIL ACTION NO. |
| | : | 3:02-cv-1116 (EBB) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HOSPITAL, et al. | : | |
| | : | |
| Defendants. | : | November 19, 2004 |

### DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT IN
### SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Hartford Hospital, Susan O'Connell, Gladys Ciaschini and Sandra Niles

submit their Local Rule 56(a)1 Statement in support of their Motion for Summary Judgment.

### I. BACKGROUND

1.    Plaintiff, Saraiya Solomon ("Solomon"), a black female, was employed by

Hartford Hospital (the "Hospital") from August 9, 1997 through March 31, 2001.  February

20, 2004 Amended Complaint ("Compl.")/Answer ("Ans.") ¶9.

2.    On or about August 9, 1997, Solomon began her employment at the Hospital

as a part-time information desk receptionist with the title of Administrative Associate I ("AA

I").  Compl./Ans. ¶19.

1

3.    The Hospital's Application for Employment originally completed and signed by Solomon in July 1997 contains the following statement:

> *I understand that this application and/or any resultant employment at Hartford Hospital and/or its affiliates does not imply or indicated any intent of establishing a contractual relationship. I further understand that my employment is at will and can be terminated by me or by the hospital or its affiliates at any time, for any reason. Also, I understand that this application is not an offer of employment.*

Declaration of Patricia Synhorst ("Synhorst Dec.") ¶5, Appendix ("App.") A, Tab A.

4.    On or about March 22, 1999, Solomon transferred from the main lobby of the Hospital to begin work as an AA I at the entrance of the Conklin Building.  Compl./Ans. ¶29.

5.    The Radiation Oncology Department was located in the Gray Cancer Center at the Hospital.  Compl./Ans. ¶25.

6.    Defendant, Susan O'Connell ("O'Connell"), was and still remains a manager in the Radiation Oncology Department.  She interviewed and made the decision to hire Solomon as an AAI in the Conklin Building. Compl./Ans. ¶22; Declaration of Susan O'Connell ("O'Connell Decl.") ¶3, App. A, Tab B.

7.    The construction of a new building at the Hospital, known as the "CORE Building Project," meant that the Gray Cancer Center entrance would be closed and patients

2

would be required to detour through the Conklin Building entrance to reach the Gray Cancer Center. Compl./Ans. ¶26.

8.    One of Solomon's duties as an AA I at the entrance of the Conklin Building was to receive detoured cancer patients and direct them to the Gray Cancer Center. Compl./Ans. ¶27; O'Connell Dec. ¶3, App. A, Tab B.

9.    In addition to Solomon, O'Connell hired two Transport Aides, Kelvin Griffith ("Griffith"), who is black, and Virginia Hernandez-Green ("Green"), who is hispanic, to work at the Conklin Building entrance during the CORE Building Project. Their primary function was to transport patients from the Conklin Building entrance to the Gray Cancer Center. O'Connell Dec. ¶4, App. A, Tab B.

10.    The two Transport Aide positions and Solomon's position were scheduled to end upon on the reopening of the entrance to the Gray Cancer Center. Compl./Ans. ¶54; O'Connell Dec. ¶3, App. A, Tab B.

11.    Prior to hiring Solomon for the AAI position in the Conklin Building, O'Connell informed Solomon that Solomon's position would be eliminated when the CORE building project was completed, and the Cancer Center entrance was reopened. O'Connell Dec. ¶3, App. A, Tab B.

12.     Solomon testified at her deposition that she is aware that she had an "at will" employment relationship with the Hospital. Solomon Deposition Transcript ("Solomon Dep.") at 293, App. B, Tab A.

13.     During all times relevant to the events alleged in the Second Amended Complaint in this action, the Hospital maintained a Performance Management Policy. Declaration of Gladys Ciaschini ("Ciaschini Dec.") ¶20, App. A, Tab C.

14.     On March 19, 2001, Solomon filed an Affidavit of Illegal Discriminatory Employment Practices with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC") alleging that the Hospital discriminated against her on the basis of race. Compl./Ans. ¶6.

15.     At her deposition, Solomon testified that she first became aware of the Performance Management Policy, and its corresponding performance improvement process, when the Hospital submitted its Answer to the CHRO Charge. Solomon Dep. at 286, App. B, Tab A; Deposition Exhibit ("Depo. Ex.") 33, App. B, Tab B.

16.     Solomon did not rely on the terms of the Performance Management Policy when she transferred to the AA I position in the Conklin Building. Solomon Dep. at 286, App. B, Tab A.

4

## II. THE JULY 30, 2001 WRITTEN WARNING
## AND AUGUST 6, 2001 MEMORANDUM

17.    During an August 5, 1999 meeting with Solomon and Griffith, O'Connell issued Written Warnings, dated July 30, 1999 (the "July 30th Written Warning"), to both Solomon and Griffith.  O'Connell Dec. ¶4; Compl./Ans. ¶35.

18.    The July 30th Written Warning stated, in part:

*In March I held a meeting in my office with the Cancer Center staff at the Conklin Building.  At this meeting I informed each of you that staff needed to be present from 7:00 AM- 5:30 PM.  I also informed each of you that you would need to cross-cover each position when an absence was present.  Each of you agreed to this.  This memo is a response to the lack of staff from 7:00 am – 5:30 pm.*

O'Connell Dec. ¶4, App. A, Tab B.

19.    O'Connell issued the July 30th Written Warning to Solomon and Griffith because O'Connell believed that they were not providing the necessary transport assistance at the entrance to the Conklin Building.  O'Connell believed that Solomon was not providing the necessary transport aide coverage in Griffith's absence.  O'Connell also believed that Solomon was not altering her work hours to provide full transport aide coverage between 7:00 a.m. and 5:30 p.m.  Id.

20.    Solomon refused to sign the July 30th Written Warning and informed

O'Connell for the first time that she [Solomon] might have a back condition that prevented

her from providing patient transport assistance.   Id. ¶5.


21.    During O'Connell's August 5th meeting with Solomon and Griffith, Solomon

demanded that Griffith not speak to her.  Id. ¶5.


22.    On or about August 6, 1999, O'Connell provided Solomon with a

Memorandum (the "August 6th Memo.") which stated as follows:

> *After our meeting yesterday [August 5th] I spoke with the Human Resources*
> *department regarding your inability to push a wheelchair.  Upon their advisement I*
> *will not expect you for two weeks to push a wheelchair.  On August 23, I will expect*
> *you to assist in wheelchair transports when needed unless you have a doctor's note*
> *indicating a physical restriction.*
>
> *On August 23 if you have a doctor's note indicating a physical restriction I will make*
> *arrangements with the Occupational Health department to further assess the situation*
> *and care plan.*

Id.


23.    After receiving documentation from Solomon's health care provider about

Solomon's back condition and after Solomon was evaluated by the Hospital's Occupational

Health Department, O'Connell decided to relieve Solomon of her duty to provide patient

transport assistance.  Id.


6

24.     On or about January 12, 2001, O'Connell sent a Memorandum to the

Hospital's Department of Human Resources which stated:

> **REGARDING:**
> *Performance Management Memos dated 7/30/99 + 8/6/99*
>
> *The issues regarding coverage, timecards, vacation and illness have been resolved. Saraiya's back injury had been an ongoing issue with Occupational Health and her physician. The Cancer Center decided not to utilize Sarayai [sic] for transfers and call for available volunteers instead. Sarayai [sic] informed us that her back injury was old but prevented her from lifting and pushing.*

Id.

25.     O'Connell conducted performance evaluations of Solomon on October 21, 1999 and October 24, 2000. In the October 21, 1999 review, O'Connell gave Solomon an overall rating of "Effective" and increased Solomon's hourly wage from $9.88 to $10.41. In the October 24, 2000 review, O'Connell gave Solomon an overall rating of "Exemplary" and increased Solomon's hourly wage from $10.41 to $11.01. Compl./Ans. ¶¶67, 68.

26.     Because O'Connell had released Solomon from her patient transport duties, O'Connell did not consider either the July 30 Written Warning or August 6 Memo in Solomon's October 21, 1999 or October 24, 2000 performance evaluations. O'Connell Dec. ¶5, App. A, Tab B.

27.     Despite giving Solomon an overall rating of "Effective" in Solomon's October 21, 1999 performance evaluation, O'Connell ranked Solomon as "Needs Improvement" in

the Core Values of "Relationships" and "Communication", due in large part to Solomon's

verbal outburst toward Griffith on August 5, 1999.   Id. ¶6.


28.     On or about October 21, 1999, Solomon provided O'Connell with a

Memorandum which stated as follows:

> *Susan, regarding the "Communication" portion of my performance evaluation of October 13, 1999 in which I received a rating of "needs improvement", in reference to how I communicate with my team members I truly believe and know as I intimated to you during my evaluation that what is being misconstrued as my inability to communicate with certain individuals amounts to differences in personality.*
>
> *We are all individuals and as you know we all have personalities and a personal style. The reality is that we often have to work with those whose personal style is different from our own.   I know that this is the case here.*
>
> *I can however assure you that my personal style and the personal style of any other staff member will not and has not interfered with the dispensing of my duties in this position.*

O'Connell Dec. ¶5; App. A, Tab B.


29.     On December 26, 2000, Galdys Ciaschini ("Ciaschini"), a Human Resources

Consultant in the Hospital's Human Resources Department, met with Solomon to discuss the

conclusion of her assignment as an AAI in the Conklin Building.  During their meeting,

Ciaschini advised Solomon that she needed to secure another position within the Hospital

prior to the conclusion of her assignment or her Hospital employment would be terminated at

that time.  Ciaschini Dec. ¶3, App. A, Tab C.

30.    Ciaschini met again with Solomon on January 18, 2000, at which time they were joined on speaker phone by O'Connell. During this meeting, Ciahchini informed Solomon that unless she found another position within the Hospital, her employment would end effective March 31, 2001. Id. ¶4.

31.    O'Connell informed Solomon that she would be willing to act as an employment reference to assist Solomon in her efforts to transfer to another position within the Hospital. Despite O'Connell's offer, Solomon never asked her to serve as a reference. Solomon Dep. at 338-39, App. B, Tab A; O'Connell Dec. ¶6, App. A, Tab B.

### III. THE JANUARY 19, 2001 COMPLAINT BY SANDRA NILES

32.    On January 19, 2001, Sandra Niles ("Niles"), who worked in the Radiation Oncology Department in an administrative capacity, made a written complaint to Ciashini about an encounter she had with Solomon earlier that day. Niles' complaint stated as follows:

> *This morning, 6:30 A.M. in the cafeteria while I was having breakfast by myself. Saraja [sic] Solomon approached me at my table. She said "I am going to be working in this hospital and I am telling you this one time, you do not talk to me in any way. Do not speak to [sic] about anything I am doing personal or business. I do not like you and you do not like me. Did you get that clear?" I said "Yes I certainly do" She turned and repeated something else like "Are you sure you understand?"*
>
> *I do not know what provoked this. Yesterday I passed her [sic] She was working on a project from the Cancer Center and I went up to her desk and remarked how interesting it looked with the lap top. She turned to me and said "Was I out gossiping?", I said I was at lunch. I ignored her remark, not sure what she meant. She then said she will be working in administration shortly. I did not say anything, just have a nice day and left. said anything. [sic]*

9

Ciaschini Dec. ¶6, App. A, Tab C.

33.    Niles told Ciaschini that she felt threatened and harassed by Solomon and that she wanted the Hospital to address January 19, 2000 incident.  Id.

34.    On January 22, 2001, Ciaschini met with Solomon to discuss Niles' January 19 complaint.  Maria Tenero, another Hospital Human Resources Consultant, was also present at this meeting.  Ciaschini summarized Niles' complaint for Solomon and Solomon responded that it was "pretty much true."  However, Solomon denied that she harassed or threatened Niles.  Solomon also stated that it was a fact that she and Niles did not like each other, and that "she had been receiving condescending comments from Sandra for 20 months" and she [Solomon] was no longer going to accept it.  Solomon also stated that on January 18, 2001, Niles had asked her a personal question, and that she [Solomon] did not want to have conversations with Niles about personal matters, but rather, only business matters.  Id. ¶7.

35.    The Hospital did not take any disciplinary action against Solomon as a result of the January 19, 2001 incident with Niles.  Id.

## IV. SOLOMON'S JANUARY 23, 2001 LETTER

36.    On January 24, 2001, Ciaschini received a letter from Solomon dated January 23, 2001 (the "January 23 Letter").  Solomon's January 23 Letter, provided, in part:

10

*As I disclosed to you yesterday I have worked with Sandra Niles for twenty months. Within those twenty months Sandra has repeatedly made condescending remarks to me. For example: Because I do not presently own and automobile and she (Ms. Niles) is aware of this fact, on several occasions she has made disparaging statements about my traveling to work by bus. (A situation that I regard and regarded as none of her business) There was also a situation that I interpreted as racially motivated: Ms. Niles said to me on an occasion that she burned in the summer and that she wished that she could be as dark as I am. Given her previous comments to me I took her remark as a racial slur.*

Id. ¶8.

37.    The January 23 Letter further stated, in part:

(6)    *One of the transferred co-workers intimated to me that Susan O'Connell was the impediment that was preventing me from transferring out of her department.*

(7)    *Lastly, a Cancer Center patient intimated to me that Sandra Niles told her that after March 2000 I would not be employed by this organization.*

*In conclusion this leads me to believe that there is collusion on the part of Susan O'Connell, Sandra Niles, and very possibly links in the human resources department of this organization to encourage me to resign, and unfortunately I believe it is racially motivated.*

Id.

38.    The first time that Solomon informed Ciaschini of her belief that Niles'

remarks were racially motivated was in her January 23 Letter. Id.

39.    In a February 2, 2001 letter to Ciaschini, Solomon wrote:

*On or about the last week of December 2000, Alex Moreau (a former coworker) stated that Virginia Hernandez Green (or Greene) told him that Susan O'Connell's plan was to not give a favorable recommendation concerning my transfer, and that if she really wanted to facilitate a transfer all she (O'Connell) had to do was pick up the phone,*

11

> *because she could making things happen for people in the organization, as she was going to do for him.*
>
> *On or about the first week of January 2001, Ann Carpanzano (her husband is a patient at the Cancer Center) called me at work and stated that Sandra Niles told her that I would not be working in the organization after March 2001, because that was their plan from a year ago because they did not like me, because they though that I was an uppity black bitch.*

Id. ¶10.


40.    After receiving Solomon's February 2nd letter regarding the alleged statements by Virginia Hernandez-Green and Ann Carpanzano, Ciaschini interviewed Hernandez-Green, and Hernandez-Green denied making any comments to Moreau about Solomon's transfer. Ciaschini also interviewed O'Connell and she denied having any plan to not give Solomon a favorable recommendation. Id. ¶11.


41.    By letter dated February 16, 2001, Ciashini informed Solomon of the results of her investigation into these alleged comments. Id.


42.    Both Niles and O'Connell denied ever making any statements to anyone about Solomon being an "uppity black bitch" or an alleged plan to end Solomon's Hospital employment. Id.

## V. THE ALLEGED UNSEALED PAYCHECK ENVELOPE

43.     On or after January 29, 2001, Ciaschini received a letter from Solomon which stated that when Solomon received her Hospital paycheck on January 25, 2001, Solomon discovered that the envelope containing the paycheck had not been sealed.  Solomon's letter stated that when she called the payroll department about this, she was informed that the Hospital out-sources its payroll to another company and that occasionally that company fails to seal a paycheck envelope.  Solomon claimed in the January 25th letter this was "another form of harassment."  Id.  ¶13.

44.     In response to Solomon's complaint about her paycheck envelope not being sealed, Ciaschini interviewed Jan Lynch ("Lynch"), the Hospital employee responsible for distributing the checks for Solomon's department.  Lynch denied opening Solomon's paycheck envelope.  From time to time, the Payroll Department fails to seal a paycheck envelope fully, which is what Ciaschini concluded happened to Solomon's check in this instance.  Ciaschini informed Solomon of her conclusion by letter dated February 16, 2001. Id.

45.     On or after January 31, 2001, Niles informed Ciaschi that Solomon was not speaking with patients in the Conklin reception area.  Niles told Ciaschini that she had received several inquiries for assistance directly from patients at the Conklin Building entrance.  According to Niles, rather than speaking directly with Niles on the telephone when

patients needed assistance, Solomon was putting patients on the phone to speak directly with Niles. Id. ¶12.

46.    On February 1, 2004, O'Connell and Ciaschini met with Solomon to discuss how these patient communications were being handled. Solomon admitted that she had given the phone directly to patients to speak with Niles because she [Solomon] did not care to speak directly to Niles. O'Connell and Ciaschini informed Solomon that as part of her duties she was required to speak directly to Niles and not to give the phone to patients to avoid speaking with Niles directly. Id. ¶12.

47.    On February 5, 2001, Ciaschini received another letter from Solomon dated February 2, 2001. In this letter Solomon claimed that sometime earlier when she had called Niles for assistance, Niles "blew her off" and told her to seek assistance elsewhere. Id. ¶14.

48.    Ciaschini investigated Solomon's claim that Niles "blew her off" when Solomon called for assistance. Niles denied being abrupt with Solomon on this occasion. Since there was no witness to the actual exchange, Ciaschini could not determine who was giving the more accurate version of the event. Ciaschini informed Solomon of the results of her investigation by letter dated February 16, 2001. Id. ¶14.

## VI. SOLOMON'S FEBRUARY 9, 2001 COMPLAINT ABOUT NILES

49.   On February 9, 2001, Solomon provided Ciaschini with a document which

Solomon described as her "recollection of some of the condescending remarks and racial

slurs" that she had been subjected to by Niles over the previous twenty-one months.  The

document, which is marked as Deposition Exhibit 28 ("Depo. Ex."), states as follows:

*My Notes On The Harassing Events of The Past 21 Months*

1.   *Constant comments about my traveling to work by bus.*
   *a.      Aziza (my daughter) and I were running errands on my lunch hour. Sandra Niles commented that she didn't know how I could stand not having a car.*
2.   *Sandra Niles made numerous comments about my residing in Hartford, and how she personally just couldn't stand it, and that Hartford was just a place for her to work.*
3.   *There were numerous questions to me about which bus I took to work.  (as if she really cared).*
4.   *Sandra Niles said that she wished that she could be as dark as I am (I knew that she was being sarcastic, no white person wishes to be black!).*
5.   *Sandra Niles made comment on the tone of my foundation. (makeup)  She stated that she felt that I should be wearing a darker foundation, because since she had been a former model she was an expert on those matters, and the foundation that I was wearing was much too light for me.  Once when I was skimming through a magazine I commented on how good Tina Turner looked (I said, "Now she has a body to die for")  Sandra Niles commented, "But she isn't black right?, she couldn't be"*
6.   *Niles commented on seeing Porgy and Bess stating, "That the black characters looked so ridiculous the way that they were dressed and the way that they were dancing and singing and that she personally didn't see what the big deal about the production was.*
7.   *Niles commented that she only found the lighter skinned Arabic men attractive, and that she couldn't imagine how all of these people that came from Africa could look so different. (She was very friendly with the lighter skinned valet parkers at the hospital most of whom came from Africa, but she especially took a liking to one of the lighter skinned valet parkers in particular)*

15