8.  *Niles wanted to know how as a black woman I kept my hair in the hair style that I wear it in, and that she thought that all black peoples' hair was kinky you know she said, "like brillo."*

9.  *When Niles was helping to plan a Cancer Center event "Celebrate Life" (1999) I asked her about using jazz music at the event. Niles remarked that the majority of the Cancer Center patients were white and that they would probably not like jazz music because she didn't either because jazz tended to be an ethnic type thing. And people with class really didn't like jazz.*

Id. ¶15, App. A, Tab C; Depo. Ex. 28, App. B, Tab C.

50.     Ciaschini met with Niles and asked her whether she made any of the statements that Solomon attributed to her in the February 9, 2001 letter (Depo. Ex. 28). With respect to Solomon's claim that Niles made statements about Solomon taking the bus to work, Niles said that she considered it a convenience to live on a bus line and apologized if Solomon misconstrued her statement. With respect to the remaining statements in Deposition Exhibit 28, Niles either denied or did not recall making any such statements. Ciaschini informed Solomon of the results of her investigation by letter dated February 16, 2001. Id.

51.     Solomon testified at her deposition as follows:

Q:  Now I'm going to direct your attention to Defendant's Exhibit 28. Do you claim that each of the comments set forth in this exhibit constitutes either a racial comment or a racial slur?

A:  What I state is that a compilation of all these comments could infer racism and some of them definitely do.

Solomon Depo. at 241, App. B, Tab A.

52.     Solomon further testified:

Q:  Did you tell her that you considered it to be offensive?

A:  No.

16

Q:    Why not?

A:    Why should I? Why should I let someone know that something that petty could bother me? *It didn't really bother me because all I wanted to do was get paid. So I really didn't care about Sandra Niles' comments that much.* But when I found out that Hartford Hospital was trying to keep me from working there and they were trying to discriminate against me, that's when everything became a serious issue.

Id. at 246 (emphasis added), App. B, Tab A.

53.    Solomon never told Niles that she found any of Niles' alleged comments to be offensive. Id. at 251-52.

54.    Solomon testified as follows:

Q:    Ms. Solomon, were you angry with Sandra Niles?

A:    At what particular point in time?

Q:    At any particular point in time when you were employed in the core project?

A:    I would say this: I didn't appreciate Sandra Niles comments. I wouldn't say that it rose to anger to be honest.

Id. at 322.

55.    Neither Ciaschini or O'Connell ever made any racist or racial comments to Solomon. Id. at 314.

56.    At all times relevant to the Complaint in this action, the Hospital maintained an Employee Grievance procedure through which employees could file complaints if they believed they had not been treated fairly. Among other situations, this policy applies when an employee believes that he or she is being harassed or otherwise mistreated in the

workplace. It does not apply, however, in situations involving alleged sexual harassment. Declaration of Richard McAloon ("McAloon Dec.") ¶10, App. A, Tab I.

57.     Solomon never filed a grievance pursuant to the Grievance Procedure claiming that she was being harassed or allegedly mistreated by Sandra Niles. Id. ¶11.

## VII. SOLOMON'S FEBRUARY 9, 2001 SUSPENSION AND FEBRUARY 13, 2001 WRITTEN WARNING

58.     On February 9, 2001, O'Connell said "hello" to Solomon and Solomon deliberately ignored her. Solomon Depo. at 211-12, App. B, Tab A; O'Connell Dec. ¶9, App. A, Tab B; Ciaschini Dec. ¶18, App. A, Tab C.

59.     O'Connell then called Solomon into her office and reminded her of a similar incident she had earlier in the week in which Solomon refused to acknowledge another Cancer Center employee. Id.

60.     Solomon admitted that she refused to speak with another Cancer Center employee earlier in the week and told O'Connell that she was not required to speak with anyone at the Hospital unless it was directly related to work. Id.

61.     O'Connell then suspended Solomon for the remainder of the day on February 9, 2001. O'Connell Dec. ¶9, App. A, Tab B.

18

62.    Hartford Hospital's Mission, Vision and Values provide, in part:

*Communication – We strive to acquire and understand information and share it clearly and effectively.*

*Relationships – We develop and strengthen collaborative relationships with all our customers, including our patients, their families, our employees, volunteers, medical staff and business partners.*

Ciaschini Dec. ¶19, App. A, Tab C.

63.    Hartford Hospital's Mission, Vision and Values Statement apply to all Hartford Hospital employees.  Solomon Depo. at 200, App. B, Tab A.

64.    In a February 12, 2001 letter to Ciaschini, Solomon states in part, as follows:

*On February 9, 2001 as I was going to retrieve a laptop computer to begin my assigned work Susan O'Connell said "Hi" to me, and I did not respond.  She immediately asked to meet with me in her office.  <u>At this meeting she related to me that a man (a cancer center employee who I have never met previously or been introduced to) had complained to her that I did not speak with him when he had spoken to me a few days earlier (which had been true)</u>  She went on to inform me that I had to resond [sic] to her and other employees when they said hello to me.  I told her that I did not agree and that my understanding was that I am here to do a job, and that job is to greet, direct and assist patients and visitors.  <u>I also told her that I am openly compelled to speak to fellow employees when my job dictates that I do so, and any other communications would be personal and would have to be mutually voluntary</u>.*

Ciaschini Dec. ¶18 (emphasis added), App. A, Tab C.

65.    On February 13, 2001, O'Connell issued Solomon a Written Warning pursuant to the Hospital's Performance Management Policy, based on Solomon's refusal to comply with the "Relationships" competency that is part of the Hospital's Mission, Vision and Values.  O'Connell Dec. ¶10, App. A, Tab B.

66.    O'Connell's conclusion that Solomon failed to comply with the "Relationships" competency was based on several incidents, some of which O'Connell had observed and others that had been communicated to her by Cancer Center staff members:

    (a)    On several occasions during January and February 2001, Solomon refused to acknowledge Jan Lynch ("Lynch") when entering and leaving Lynch's office.

    (b)    On February 8, 2001, Solomon went into Robert Lindyer's ("Lindyer") office where Lindyer was seated with Susan Wright ("Wright").  Lindyer said "hello" to Solomon and Solomon did not respond.

    (c)    On February 5, 2001, Wright said "good morning Saraiya" and Solomon ignored her.

    (d)    On February 8, 2001, John Unikewicz ("Unikewicz"), Lindyer, Sandy Beggs (Beggs") and Lynch were all in Lynch's office when Solomon entered. Solomon did not acknowledge anyone in the office.  She walked up to Unikewicz and repeated "excuse me" several times.  Unikewicz was confused as to what Solomon was asking for because she did not clarify her intent. Lynch, suspecting that Solomon wanted to put a laptop computer on a chair, suggested that Solomon just put it on the table.

    (e)    On February 9, 2001, O'Connell said hello to Solomon and Solomon ignored her.

    (f)    On February 12, 2001, O'Connell was sitting in her office when Solomon passed by twice.  Both times O'Connell said "hello" to Solomon and Solomon did not respond.

Id.

## VIII. SOLOMON'S ALLEGED FAILURE TO
## RECEIVE A PAYCHECK ON MARCH 1, 2001

67.    On March 1 and 2, 2001, O'Connell was not present at work.
Id. ¶11.

68.    When paychecks arrived for distribution to the Cancer Center staff on March
1, 2001, a member of the staff noted that Solomon did not have a check.  Id.

69.    Pam Badolato, another Cancer Center employee, who is white, also did not
receive a paycheck on March 1, 2001.  Id.

70.    It was determined that Solomon had not submitted her timecard for this pay
date.  Id.

71.    Solomon's timecard was submitted to the Payroll Department on March 1,
2001 and her paycheck was issued by no later than March 2, 2001.  Id.

72.    Cancer Center employees normally present their timecards to O'Connell for
approval.  If a time card is missing, a secretary normally makes O'Connell aware of the
missing card.  On the day that timecards were collected for the March 1, 2001 payroll, there

21

was a secretary temporarily filling in for the regular secretary and she did not inform

O'Connell that any time cards were missing.  Id.

73.    When the timecards were submitted, O'Connell did not know Solomon's card

was missing.  Id.

74.    By letter dated March 29, 2001, O'Connell and Ciaschini again informed

Solomon that her position was being eliminated effective March 31, 2001.  Ciaschini Dec.

¶23; App. A, Tab C.

### IX. SOLOMON'S TRANSFER APPLICATIONS

### (1) Administrative Associate I in Hemodialysis (Compl. ¶¶81-82)

75.    In or about June 2000, Monica Kowalski was the Office Manager in the

Hemodialysis Unit.  Declaration of Monica Kowalski ("Kowalski Dec.") ¶2, App. A, Tab

D.

76.    To be qualified for the Administrative Associate I position, candidates needed

to have a medical background, knowledge of medical terminology, and knowledge of task-

based computer programs.  Id. ¶4.

22

77.    The hiring committee was also seeking candidates with nursing unit experience, knowledge of the lab ordering process, hospital billing and the use of OASIS (a computer program used by the Hospital for medical record retrieval).  Id.

78.    Solomon had little to no medical background and limited knowledge of medical terminology.  Id. ¶5.

79.    Lovie Degourville, who is black, was hired for the Administrative Associate I position.  Id.

80.    Ms. Degourville was already a Patient Care Technician within the Hemodialysis Unit and was familiar with the hemodialysis process.  She also had a medical background, knowledge of medical terminology, task specific Hospital computer programs and OASIS.  As a Patient Care Technician, Ms. Degourville also had a good deal of direct patient contact and was familiar with the dialysis patients.  Id.

### (2) Administrative Associate II in the
### Human Resources Department (Compl. ¶83)

81.    In or about August 2000, William Bell ("Bell"), a Hospital Human Resources Consultant, interviewed Solomon for the position of Human Resources Associate. Declaration of William Bell ("Bell Dec.") ¶3, App. A, Tab E.

82.    The Human Resources Associate position required two years' previous experience in human resources-personnel.  Id. ¶4.

83.    Solomon did not possess two years' previous experience in human resources-personnel and, therefore, did not meet the minimum requirements of the position.  Id. ¶5.

84.    Dawn Packman ("Packman"), who is white, was the successful candidate for the position.  Id. ¶6.

85.    Packman possessed at least two years' previous experience in human resources-personnel.  Id.

86.    Prior to eliminating Solomon from consideration for the position, Bell had no communication of any kind with either Niles or O'Connell about Solomon's application.  Id.

### (3) Patient Administrative Associate
### in Women's Ambulatory Health Department (Compl. ¶84)

87.    In or about February 2000, the Hospital's Women's Ambulatory Health Department was seeking to hire a Patient Administrative Associate ("PAA").  Declaration of Susan Maxwell ("Maxwell Dec.") ¶3, App. A, Tab F.

24

88.    Susan Maxwell, the Hospital's Unit Director for Women's Ambulatory Health, was the hiring manager for the PAA position.  Id. ¶¶2-3.

89.    The PAA position required someone who was bi-lingual in English and Spanish.  Id. ¶3.

90.    Solomon is not bi-lingual in English and Spanish.  Id. ¶4; Solomon Depo. at 231, App. B, Tab A.

91.    Maxwell eliminated Solomon's application for the PAA position from consideration because Solomon was not bi-lingual.  Maxwell Dec. ¶4, App. A, Tab F.

92.    Prior to eliminating Solomon's application from consideration for the PAA position, Maxwell had no communication of any kind with O'Connell or Niles about Solomon's application.  Id.

93.    Gladys Ciaschini also played no role in Maxwell's decision to eliminate Solomon from consideration.  Id.

94.    The successful applicant for the position was Margie Gonzalez ("Gonzalez"). Gonzalez is bi-lingual in English and Spanish.  Id. ¶5.

25

### (4) Administrative Associate III
### in the Research Department (Compl. ¶85)

95.    In March 2000, the Hospital's Research Department was seeking to fill the position of Administrative Associate III ("AA III").  Declaration of Laurine Bow ("Bow Dec.") ¶2, App. A, Tab G.

96.    Laurine Bow ("Bow"), the Associate Director for Research at the Hospital, was the hiring manager for the AA III position.  Id. ¶3.

97.    The AA III position required someone who was very experienced in using Microsoft Word, Excel and Access.  It also required someone with extensive experience working with databases.  Id. ¶4.

98.    Bow interviewed both Solomon and Tiffany Rowe ("Rowe") for the AA III position.  Id. ¶3.

99.    Bow chose Rowe for the AA III position over Solomon because Bow believed that Rowe was better qualified.  Rowe was very experienced in using Microsoft Word, Excel and Access.  She also had extensive experience working with databases.  Bow also chose Rowe because Rowe had close to four years of administrative experience working with many of these applications whereas Solomon's last position was as a receptionist.  Bow also chose Rowe because Rowe holds a Bachelor's degree whereas Solomon does not.  Id. ¶4.

100.    Prior to choosing Rowe as the successful applicant, Bow had no communications of any kind with O'Connell, Niles or Ciaschini about Solomon's application. Id. ¶5.

### (5) Administrative Associate II and Patient Administrative Associate in the Care Continuum Department (Comp. ¶¶86-87):

### (a) Case Coordination

101.    In October 2000, Patricia Sobieski ("Sobieksi") was employed by Hartford Hospital (the "Hospital") as a Manager of the Case Coordination area in the Care Continuum Department.  Declaration of Patricia Sobieski ("Sobieski Dec.") ¶2, App. A, Tab H.

102.    As part of a reorganization of the Care Continuum Department, Case Coordination created three new Administrative Associate II ("AA II") positions.  Id. ¶3.

103.    One of the AA II positions was not posted because it had been designated by the Department of Human Resources for Doreen Forrest, who is black, because Ms. Forrest required a light-duty accommodation after returning from a worker's compensation leave. Id.

104.    There were two different AA II positions created (AA II #1 and AA II #2), each with somewhat differing job duties.  Id. ¶4.

27

105.    The AA II #1 position supported those activities surrounding the utilization review and planning process.  It included communication with home care agencies and vendors to procure services for discharge for individual patients.  It also entailed communication with insurance companies to obtain authorizations for treatment.  Id.

106.    The AA II #2 role supported the Hospital physician who was involved in reviewing insurance company denials of the Hospital's claims for service and the Hospital's resulting appeals.  In part, this involved the processing of paperwork involved in the review/denial process and tracking the status of patient accounts.  Id.

107.    Both jobs also entailed telephone contact with various community agencies in an attempt to arrange accommodations and assistance for patients upon discharge when necessary.  Id.

108.    In or about late September or early October 2000, Sobieski interviewed Solomon for these AA II positions.  Beth Grieg ("Grieg"), who was the Director of Care Coordination in the Care Continuum Department, also participated in the interview.  Id. ¶5.

109.    Based on the interview and her review of Ms. Solomon's application, Sobieski did not believe that she was qualified for either AA II position.  Id.

110.    Sobieski and Grieg hired Emmy Lopez ("Lopez"), who is hispanic, for the AA II #2 position.  Id. ¶6.

111.    At that time, Lopez was working in the Women's Health Department at the Hospital.  She had also previously worked at the Hospital for six years as an Emergency Department ("E.D.") Assistant.  Sobieski and Grieg viewed Lopez's experience in Women's Health and the E.D. as desirable because the AA II #2 position interacts with both the E.D. and Women's Health.  Id.

112.    Sobieski and Greig also felt that Ms. Lopez's knowledge of the E.D. staff and workflow would assist her in carrying out her role as an AA II.  Id.

113.    Sobieski and Greig also felt that Lopez's E.D. experience was also attractive because it gave her a great deal of clinical patient and family contact, which she would also have in the AA II position.  Id.

114.    Lopez was also fully familiar with all of the computer programs used by Case Coordination, such as SMS (the Hospital program used to manage patient information), Groupwise (the Hospital email program), Powerpoint, Microsoft Word and Excel.  Id.

115.    Lopez had also previously worked at Mercy Housing and Shelter Corp. and the Archdiocese of Hartford.  Sobieski and Grieg believed that Lopez's past relationship with

29

these community organizations would be beneficial to her in arranging accommodations and assistance for patients upon discharge. Id.

116.   Lopez was also bi-lingual, which Sobieski and Grieg viewed as an additional asset for the AA II position. Id.

117.   Grieg and Sobieski hired Elizabeth Kirol ("Kirol"), who is white, for the AA II # 1 position. Id. ¶7.

118.   Kirol had worked at the Hospital for almost thirteen years, twelve years as a Patient Administrative Associate ("P.A.A.") and approximately one year in the Medical Records Department. Id.

119.   Sobieksi and Grieg viewed Kirol's institutional knowledge of the Hospital as an asset. Id.

120.   Kirol was also very familiar with the computer programs used by Case Coordination, including SMS, Excel and Groupwise. Id.

121.   Sobieski and Grieg also viewed Kirol's experience in the Medical Records Department as extremely valuable because one of the functions of the AA II # 1 position was to obtain patient records from the Medical Records Department after a patient has been