discharged so that the procedures that the patient has undergone can be summarized by a nurse and submitted to the insurance company for payment. The faster the records can be obtained, the quicker the Hospital can submit a request for payment. Grieg and Sobieski believed that Kirol's past experience in Patient Records would assist her in tracking down the necessary records. Id.

122.    Solomon had some computer skills in Microsoft Word and Excel, but did not have experience in SMS or Groupwise. Sobieski and Grieg viewed these computer skills as essential to AA II position. Id. ¶8.

123.    Solomon had previously interacted with patients only as a receptionist, directing them where to go and answering their questions. Id.

124.    Sobieski and Grieg viewed the qualifications of Kirol and Lopez for the AA II position as far surpassing Solomon's qualifications. Id.

125.    Sobieski never had any communications with either O'Connell or Niles of any nature about Solomon's application. Sobieski does not know either of these individuals. Id. ¶9.

126.    Gladys Ciaschini in no way attempted to influence Sobieski's hiring decision with respect to either AA II position. Id.

127.    Sobieski has no reason to believe that Grieg ever had any communication with either O'Connell or Niles about Ms. Solomon's application, or that Ciaschini attempted to influence Grieg's hiring decision in any way.  Id.

### (b) Assessment Center

128.    On or about On or about September 15, 2000, the Hospital's Care Continuum Assessment Center, posted vacancies for two full-time and two part-time Patient Administrative Associates ("PAA").  Synhorst Dec. ¶6, App. A, Tab A.

129.    Solomon interviewed for these vacancies by Beth Grieg, the hiring manager, but was not chosen because Grieg determined that there were "more qualified candidates." Id. ¶7.

130.    The following individuals have held the PAA role in the Assessment Center since the Center's inception in September 2000:

- Valerie Samuels ("Samuels"), who is black, automatically transferred into the Assessment Center in or about October 2000 from the Pre-admission Testing Department when the Pre-admission Testing Department was absorbed by the Care Continuum Department.

- Sonia Gutierrez ("Guttierrez"), who is Hispanic, also automatically transferred into the Assessment Center from the Pre-admission testing

32

department when the Pre-admission Testing Department was absorbed by the Care Continuum Department. Gutierrez left the department in January 2001.

- Dorreen Forrest ("Forrest"), who is black, was hired in or about October 2000. Forrest was hired by Grieg, the previous manager responsible for the Care Continuum Department. Forrest left the Assessment Center in or about February 2001, to work in the Case Coordination area of the Care Continuum Department.

- Takesha Archer ("Archer"), who is black, was hired in or about November 2000. Archer was hired by Grieg.

- Rita Ferrera ("Ferrera"), who is white, was hired in or about December 2000 by Susan Stagg ("Stagg"). Stagg hired Ms. Ferrera to replace Gutierrez, who left the Assessment Center effective January 2001.

- Novette Grant ("Grant"), who is black, was hired in or about January 2001. Stagg hired Grant to replace Forrest.

- Jannina Kornas ("Kornas"), who is white, and Phylis Watson ("Watson"), who is black, were hired in or about February 2001.

- Yashica Blue, who is black, was hired in or about January 2002. Stagg hired Ms. Blue to replace Ms. Ferrera.

- Marisol Pedrasa, who is hispanic, was hired in or about August 2002. Stagg hired Pedrasa to fill a new position.

Declaration of Susan Stagg ("Stagg Dec.") ¶8, App. A, Tab I.

### (6) Administrative Associate II in the Public Relations Department of Connecticut Children's Hospital (Comp. ¶¶88-89):

131.   Hartford Hospital is a non-stock subsidiary of Hartford Health Care Corporation ("HHC"). Connecticut Children's Hospital, formally known as Connecticut Children's Medical Center ("CCMC"), has no corporate affiliation with either Hartford Hospital or HHC. Declaration of Richard McAloon ("McAloon Dec.") ¶4, App. A, Tab J.

132.   At all times relevant to the Complaint in this action, Hartford Hospital and CCMC have each maintained their own separate Administration and Board of Directors. Id. ¶5

133.   Hartford Hospital and CCMC have also maintained separate and distinct facilities and street addresses. Id.

134.   At all times relevant to the Complaint in this action, Hartford Hospital and CCMC have each maintained their own separate and distinct human resource departments. Id. ¶6

135.    Hartford Hospital hiring managers do not make hiring decisions with respect to applicants for employment positions at CCMC and they do not make disciplinary or other employment decisions regarding CCMC employees. Likewise, CMCC employees do not make hiring decisions with respect to applicants for employment positions at Hartford Hospital and they do not make disciplinary or other employment decisions regarding Hartford Hospital employees. Id.

136.    Richard McAloon ("McAloon") is the top human resources executive at Hartford Hospital. Neither McAloon nor anyone working under his supervision has control or supervisory authority over any employee of CCMC. Id. ¶¶3, 6.

137.    Through a policy formerly known as Hartford Hospital Human Resources Policy #603 entitled "Connecticut Health Systems Transferability" ("Policy #603"), employees from Hartford Hospital, CCMC, and Mid-State Medical Center were given the opportunity to apply for transfer from one employer to another without experiencing a break in service. Id. ¶7.

138.    Under Policy #603, job openings for full and part-time positions at each hospital were posted internally at Hartford Hospital, CCMC, and Mid-State Medical Center giving employees from each hospital an opportunity to apply. According to the policy, applicants for such positions were then treated by each organization as internal applicants. Id.

139.    At all times relevant to the Complaint in this action, Hartford Hospital has maintained its own Human Resources Policies and Procedures.  It does not rely on any human resources policies or procedures from CCMC.  Id. ¶8.

140.    During the time period relevant to the Complaint in this action, the only Human Resources policy that Hartford Hospital and CCMC may have shared is Policy #603. Id.

141.    The hiring managers Solomon refers to in Paragraph 88 of her Complaint are not employees of Hartford Hospital.  Id.  ¶9.

142.    The Administrative Associate II position that Solomon applied for at CCMC was not a Hartford Hospital position, Hartford Hospital did not make the hiring decision with respect to Solomon's application for the position.  Id.

143.    Hartford Hospital does not have access to or control over any documents relating to CCMC's decision on Ms. Solomon's application for this position. Id.

## (7) Financial Counselor in the
## Patient Accounts Department (Compl. ¶90):

144.    In November 2000, Lisa Maurice ("Maurice"), who is black, was a Supervisor in the Patient Accounts Department at the Hospital.  Declaration of Lisa Maurice ("Maurice Dec.")¶2, App. A, Tab K.

145.    In or about April through November 2000, the Patient Accounts Department was seeking to hire several individuals for the position of Administrative Associate II ("AA II").  Id. ¶3.

146.    This AA II position required a high school diploma, at least one year of experience in hospital or insurance billing, and excellent interpersonal and communication skills.  The position also required typing skills, basic math skills, and the ability to read, write and speak English.  Id.

147.    On or about April 21, 2000, Solomon applied for the AA II position.  In or about April or May 2000, Maurice, along with Ernest Woollet ("Woollet"), who is also a supervisor in Patient Accounts, interviewed Solomon.  Id. ¶4.

148.    After interviewing Solomon and reviewing her application materials, Maurice concluded that Solomon was not qualified for the position.  Solomon did not have any health

37

insurance processing experience or financial experience, which was a key qualification for the position. Id. ¶5.

149.    Another primary function of the position was data entry. Solomon revealed during her interview that she had performed data entry at the Travelers several years ago and also had an additional position that required data entry skills. However, in Maurice's opinion, Solomon's employment history did not reflect that she had the necessary level of data entry skills. Id.

150.    While Ms. Solomon's receptionist position at the Hospital demonstrated customer service skills for greeting people and giving them directions to locations at the Hospital, Maurice concluded that Solomon's application and interview revealed that she did not have the relevant job-related experience in problem solving that requires the application of analytical skills to determine what went wrong on a patient account from the time the patient received services to the time the patient complaint was filed. Id.

151.    Maurice also believed that Ms. Solomon did not possess some of the other attributes the Patient Accounts Department was seeking in an Administrative Associate II. For example, the Patient Accounts Department was seeking someone who had a demonstrated record of dedication, longevity and loyalty. The résumé submitted by Solomon reflected work experience totaling six years, but her time in each position was very short. Id.

38

152.    During her interview, Solomon also indicated to Maurice that her weakness as an employee was in performing routine job tasks. This response troubled Maurice because, in Maurice's opinion, every job has routine aspects to it. Id.

153.    Based on Maurice's review of Solomon's résumé and her interview, Maurice eliminated Ms. Solomon from consideration for the AA II position. Id.

154.    In or about April/May 2000, Maurice, along with Beverly Davis ("Davis"), who is also a Supervisor in the Patient Accounts Department, interviewed Jeannina Thompson ("Thompson") for the same AA II position applied for by Solomon. Id. ¶6; Declaration of Beverly Davis ("Davis Dec.") ¶7, App. A, Tab L.

155.    Davis and Thompson are both black. Id.

156.    At the time of the interview, Thompson had been employed for approximately six months at the CCMC, where she served as an Administrative Assistant. Maurice Dec. ¶7, App. A, Tab K; Davis Dec. ¶8, App. A, Tab L.

157.    Among other duties, as an Administrative Assistant at CCMC, Thompson was responsible for verifying patients' insurance and obtaining authorizations for treatment from

39

insurance companies. Thompson was also familiar with SMS (the Hospital computer program used to manage patient information).  Id.

158.  Prior to working at CCMC, Thompson was employed at Kaiser Permanente for nine and one-half years in several different positions. Among other activities, in her various roles at Kaiser Permanente she updated and verified insurance information for new members, processed insurance claims for patients, attorneys, and health care providers, and registered patients and collected cash co-payments. Maurice Dec. ¶8, App. A, Tab K; Davis Dec. ¶9, App. A., Tab L.

159.  Based on Thompson's previous experience in hospital and insurance billing, along with her favorable interview and her experience with SMS, Davis and Maurice decided to hire Thompson for the AA II position. Maurice Dec. ¶9, App. A, Tab K; Davis Dec. ¶10, App. A, Tab L.

160.  At no time prior to eliminating Solomon's application from consideration did Maurice have any communication with O'Connell, Niles, or Ciaschini about Solomon's application. Maurice Dec. ¶10, App. A, Tab K.

161.  At no time prior to deciding to hire Thompson did Davis have any communication with O'Connell, Niles, or Ciaschini about Solomon's application. Davis Dec. ¶11, App. A, Tab L.

40

161.    On or about May 10, 2000, Davis also interviewed Debby Senior ("Senior"), who is white, for one of the AA II positions in the Patient Accounts Department. Id. ¶4, App. A, Tab L.

162.    At the time, Senior had been working for the previous three and one-half years as a part-time AA II in the Patient Accounts Department at the Institute of Living ("IOL"), which is an affiliate of the Hospital. Prior to her employment at the IOL, Senior was employed for five years in the Patient Accounts Department at St. Francis Hospital. Id.

163.    The AA II role at the Hospital serves the same function and has generally the same duties as the AA II position that Senior held at the IOL, the only real difference being that the IOL position was part-time rather than full-time. Both jobs entail interviewing patients and their families with regard to their ability to pay for Hospital services and helping to obtain payment from either the patient's family or the insurance company after the patient is discharged. Knowledge of Hospital or insurance billing is a key qualification for both positions. Id. ¶5.

164.    Based on Senior's previous patient accounts experience at both the IOL and St. Francis Hospital, and her extensive experience in Hospital billing, Davis made the decision to hire Senior for one of the open AA II positions at the Hospital, effective May 28, 2000. Id. ¶6.

41

### (8) Financial Counselor in the
### Patient Accounts Department (Compl. ¶91):

165.    In November 2000, Teri Duarte ("Duarte") was employed by Hartford

Hospital as a Team Leader in the Patient Accounts Department. Declaration of Teri Duarte

("Duarte Declaration") ¶2, App. A, Tab M.


166.    In November 2000, the Patient Accounts Department was seeking to hire a

Financial Counselor. Id. ¶2.


167.    The Financial Counselor position required two to three year of experience in

Hospital or insurance billing. The Patient Accounts Department was also seeking candidates

with patient registration experience, payor insurance experience, and some computer

knowledge. Id. ¶4.


168.    Duarte and Elizabeth Lawson ("Lawson"), who was another Team Leader in

the Patient Accounts Department, interviewed Solomon for the Financial Counselor position

in or about November 2000. Id. ¶5.

169.    Solomon had some computer knowledge, however, she had no experience in hospital or insurance billing. She also lacked experience in patient registration and payor insurance. Id. ¶6.

170.    Sharlyn Pacheco ("Pacheco"), who is hispanic, was the successful candidate for the position. She had previous experience in insurance billing, along with experience in patient registration and payor insurance. Id. ¶7.

### (9) Patient Administrative Assistant in the OPD/Adult Primary Department (Compl. ¶92):

171.    On or about January 18, 2001, in an effort to assist Solomon in finding a new position within the Hospital, Ciaschini referred her to two Patient Administrative Associate postings. Ciaschini Dec. ¶5, App. A, Tab C.

172.    Because Ciaschini was not the Human Resources Consultant assigned to these positions, she did not realize at the time she referred Solomon that these positions required bi-lingual skills in English and Spanish. Id.

173.    Solomon is not bi-lingual and, therefore, did not qualify for these positions. Id.

43

**(10) Patient Administrative Associate in the
Care Continuum Department (Compl. ¶93):**

174.    In or about January 2001, Stagg interviewed Solomon for the position of PAA

in the Care Continuum Assessment Center at Hartford Hospital.  There were two such

positions available at the time.  Stagg Dec. ¶3, App. A, Tab I.

175.    The job qualifications for the PAA position were:

High School Diploma.  Prior experience in patient care environments desired
performing various support functions where solid interpersonal skills were essential.
Ability to navigate hospital based computer applications for information (SMS look-
up, lab studies, etc.) desired. Ability to perform phlebotomy and obtain quality EKGs
highly desired.

Id.

176.    Stagg chose Phyllis Watson ("Watson"), who is black, and Janina Kornas

("Kornas"), who is white, for the two open PAA positions.  Id. ¶5.

177.    Stagg chose Kornas over Solomon because Kornas had three to four active

years of work experience in phlebotomy, and also had knowledge of EKGs and vital signs.

While Solomon may have possessed a certificate in phlebotomy, she did not possess any

actual work experience in phlebotomy.  Id. ¶6.

44

178.    While Watson did not possess any active experience in phlebotomy, she had past work experience with EKGs and monitors, whereas Solomon did not.  Watson also had extensive clerical work experience.  Id.

179.    Prior to making her decision, Stagg had no communications of any kind with either O'Connell or Niles about Solomon's application.  Also, Ciaschini, the Human Resources Consultant assigned to the posting, made no attempt to influence Stagg's decision. Id. ¶7.

### (11) Patient Administrative Associate
### in the Cardiology Center (Compl. ¶94):

180.    In or about February 2001, Solomon submitted a transfer application for a Patient Administrative Associate Position in the Cardiology Department.  Ciaschini Dec. ¶22, App. A, Tab C.

181.    Solomon's application was initially screened by the Department of Human Resources and was referred to the hiring manager in the Cardiology Department.  Id.

182.    Following Solomon's receipt of the February 13, 2001 Written Warning, her application was returned to the Department of Human Resources and she was eliminated from consideration for the PAA position in the Cardiology Department because she was not