eligible for transfer due to the fact that she was in the performance improvement process as a result of the February 13th Written Warning. Id.

    183. The Hospital's Performance Management Policy provides as follows:

> Opportunities for pay increases, lump sum awards, promotion, transfer and tuition reimbursement will be delayed while the employee is in the Performance Improvement process. (Steps 2-4). If the formal process is successful, any resulting pay increase will not be retroactive.

Id. ¶20.

    184. During the thirty-four (34) work days that Solomon was in the performance improvement process, in accordance with the Performance Management Policy, she was not eligible to transfer to any other position within the Hospital. Id. ¶21.

### (12) Patient Administrative Associate in the Nursing Unit (Bliss 10) (Compl. ¶¶95-101)

    185. In February 2001, Lea Allard ("Allard") was a Nurse Manager at Hartford Hospital on Bliss Wing - 10 East. Declaration of Lea Allard ("Allard Dec.") ¶2, App. A, Tab N.

    186. In February 2001, Bliss Wing – 10 East was seeking to hire a Patient Administrative Associate ("PAA"). Allard was the hiring manager for this position. Id. ¶3.

187. To qualify for this position, the candidate needed to know how to read heart monitors, understand and transcribe physician's orders and prescriptions, order laboratory tests, order EKGs and other physical tests, have a working knowledge of computers, and have good communication skills. Id. ¶4.

188. Allard interviewed Solomon for the position on or about February 21, 2001. Allard's impression from the interview was that Solomon did not necessarily have the requisite experience for the position. Specifically, Solomon had no experience reading heart monitors, transcribing physician's orders and prescriptions, ordering laboratory tests, EKGs or other physical tests. Id. ¶6.

189. Allard made the decision to hire Linda Connors ("Connors"), a white female, for this PAA position. Id. ¶7.

190. At the time, Connors was already a Patient Care Associate within the Cardiology Department. As a Patient Care Associate, she had cross-trained on many of the responsibilities of the PAA position, such as submitting requests for laboratory tests. She also knew how to read heart monitors and was familiar with or computer system. Id.

191. Based on Connors' previous experience within the Cardiology Department, Allard believed that Connors was more qualified than Solomon for the PAA position. Id.

47

192. Prior to making her decision, Allard did not discuss Ms. Solomon's application with O'Connell or Niles. Id. ¶8.

## X. DISPARATE IMPACT UNDER TITLE VII (COUNT SEVEN)

193. Solomon's claim for disparate impact race discrimination in Count VII of the Complaint is based on the following theory proffered by plaintiff: O'Connell suspended Solomon on February 9, 2001, and issued a written notice to Solomon on February 13, 2001, based on Solomon's failure to greet white employees located in Lynch's office. However, when O'Connell witnessed Solomon tell another black employee, Griffith, that Solomon and Griffith would not speak except professionally, O'Connell did not intervene or issue any discipline.
Plaintiff's Responses to Defendants' First Set of Interrogatories ("Pl. Intterog. Resp.") ¶19; App. B, Tab D.

## XI. DISPARATE IMPACT UNDER TITLE VII (COUNT EIGHT)

194. Solomon's claim for disparate impact race discrimination in Count Eight of the Complaint is based on her claim that the Hospital had a requirement or a preference that required applicants for certain positions to be bi-lingual in English and Spanish and that such policy had a disparate impact on black applicants. Compl. ¶¶135-142.

48

## XII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (a) As to O'Connell

195.  Solomon's claim for intentional infliction of emotional distress against O'Connell is based upon the following alleged "extreme and outrageous" acts:

- The February 13, 2001 Written Warning. Solomon Depo. at 208-09, 219, App. B, Tab A.

- The fact that she was suspended without pay. Id. at 210.

- Solomon's claim the O'Connell was working "behind the scenes to keep her from transferring." Id. at 219.

- Solomon's claim that O'Connell helped her own spouse get a job at the Hospital. Id. at 229.

- Solomon's claim that O'Connell helped her daughter get into a radiation therapy program in the Hospital's School of Allied Health. Id.

### (b) As to Ciaschini

196.  Solomon's claim for intentional infliction of emotional distress against Ciaschini is based upon the following alleged "extreme and outrageous" acts:

- Her allegation that Ciaschini supported O'Connell's suspension of Solomon without pay, which resulted in Solomon being unable to transfer to open positions, being ineligible for tuition reimbursements, and being eligible for lump sum payments. Id. at 231.

49

- Her allegation that Ciaschini referred Solomon to a position that she was not qualified for because Solomon was not bi-lingual. Id. at 231-32.

### (c) As to Niles

197. Solomon's claim for intentional infliction of emotional distress against Niles is based upon the following alleged "extreme and outrageous" acts:

- The alleged statements by Niles contained in Solomon's letter to Ciaschini, dated February 9, 2001, which is marked as Defendant's Exhibit 28. Id. at 236-38; Depo. Ex. 28, App. B, Tab C.

198. Solomon also bases her claim for intentional infliction of emotional distress on the following alleged "extreme and outrageous" acts:

- Her claim that she was receiving unfavorable references from O'Connell which were negatively impacting her attempts to transfer;
- Her belief that she was being prevented from transferring due to race discrimination;
- The elimination of her position effective March 31, 2001;
- Alleged Hospital gossip and attempts to humiliate her due to her failure to obtain an internal transfer after attending so many interviews;
- Receiving a paycheck in an envelope that was not sealed;
- Not receiving a paycheck on March 1, 2001;

- Her inability to transfer due to her suspension;

- Her inability to find comparable work following the termination of her employment;

- Her lack of knowledge about the type of references Hartford Hospital is providing to prospective employers;

- Her inability to meet financial obligations or afford medical insurance.

Pl. Interrog. Resp. ¶8, App. B, Tab D.

## XIII. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

199. Solomon's claim that O'Connell knew or should have known that her alleged unlawful discriminatory conduct involved an unreasonable risk of causing emotional distress is based on the following:

- Because O'Connell put her in a position in which she would not have a job; Solomon Depo. at 276; App. B, Tab A.

- Because O'Connell suspended her without pay and gave her a written warning. Id.

200. Solomon's claim that Ciaschini knew or should have known that her alleged unlawful discriminatory conduct involved an unreasonable risk of causing emotional distress is based on the fact that Ciaschini put Solomon in a position in which Solomon would not have a job. Id. at 277

51

201. Solomon's claim that Niles knew or should have known that her alleged unlawful discriminatory conduct involved an unreasonable risk of causing emotional distress is based on the fact that Niles put Solomon in a position in which Solomon would not have a job. Id. at 278.

### XIV. TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE (COUNT NINETEEN)

202. Solomon's claim for tortious interference with contract and prospective economic advantage is based on the following:

> Defendants knew that Solomon's position at the Hospital was scheduled for elimination on March 31, 2001, and by issuing a suspension on February 9, 2001, and a written warning on February 13, 2001, defendants ensured that Solomon would not be eligible to seek employment as an internal transfer.

Pl. Interrog. Resp. ¶21, App. B, Tab D.

203. Solomon's claim that Ciaschini acted outside the scope of her employment and interfered with Solomon's employment relationship with the Hospital is based on the following:

- Solomon's claim that Ciaschini called O'Connell and told O'Connell that Solomon's transfer application for another position had been rejected. Solomon Depo. at 301, 307, App. B, Tab A.

- The fact that Ciaschini supported the written warning and suspension imposed by O'Connell. Id. at 307.

52

- The fact that Ciaschini referred Solomon for positions for which she was not qualified. Id.

204. Solomon's claim that Niles acted outside the scope of her employment and interfered with Solomon's employment relationship with the Hospital is based on the following:

- Solomon's claim that Niles went to the Cancer Center Director to complain about the incident between she and Solomon on January 19, 2001. Id. at 305, 308, App. B, Tab A.

- The fact that Niles went to Ciaschini to make a statement about Solomon and the January 19, 2001 incident. Id. at 308.

- Solomon's claim that Niles "blew her off" while Solomon was trying to do her [Solomon's] job. Id. at 310.

205. Solomon has no evidence that Niles went to the Cancer Center Director to complaint about the January 19, 2001 incident. Id. at 308.

206. Solomon's claim that O'Connor acted outside the scope of her employment and interfered with Solomon's employment relationship with the Hospital is based on the fact that O'Connell suspended Solomon without pay and issued her a written warning. Id. at 306.

53

DEFENDANTS,
HARTFORD HOSPITAL, GLADYS
CIASCHINI, SUSAN O'CONNELL, AND
SANDRA NILES

By _____
Brenda A. Eckert (ct00021)
beckert@goodwin.com
Gregg Goumas (ct19095)
ggoumas@goodwin.com
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
Tel. (860) 251-5000
Fax: (860) 251-5214

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing Defendants' Rule 56(a)1 Statement in Support of their Motion for Summary Judgment was sent via U.S. mail, postage prepaid, on this 19th day of November, 2004, to:

Rachel M. Baird, Esq.
Law Office of Rachel M. Baird
379 Prospect Street
Torrington CT 06790-5239

_____
Gregg P. Goumas

367543 v.01 S1