## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARAIYA SOLOMON, | : | CIVIL ACTION NO. |
| | : | 3:02-cv-1116 (EBB) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HOSPITAL, et al. | : | |
| | : | |
| Defendants. | : | November 19, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Hartford Hospital (the "Hospital"), Susan O'Connell ("O'Connell"),

Gladys Ciaschini ("Ciaschini") and Sandra Niles ("Niles") submit this Memorandum in

support of their Motion for Summary Judgment on plaintiff, Saraiya Solomon's ("Solomon")

Second Amended Complaint ("Complaint"), dated February 20, 2004.

## PRELIMINARY STATEMENT

In her nineteen count Complaint, Solomon claims that the defendants discriminated

against her in the terms and conditions of her employment and terminated her employment on

the basis of her race (black). She alleges violations of Title VII of the 1964 Civil Rights Act,

as amended, 42 U.S.C. §§ 2000e et seq., the Civil Rights Act of 1866 ("Title VII"), as

amended (Counts One, Three, Five, Seven, Eight, Nine, and Eleven) as to the Hospital only,

42 U.S.C. § 1981 (Counts Two, Four, Six, Ten and Twelve) as to all defendants, and the

Connecticut Fair Employment Practices Act ("CFEPA"), §§ 46a-60 et seq. (Counts Thirteen

and Fourteen) as to the Hospital only. Solomon also alleges state common law causes of

1

action of intentional (Count Fifteen) and negligent (Count Sixteen) infliction of emotional distress, breach of implied contract (Count Seventeen), breach of the implied covenant of good faith and fair dealing (Count Eighteen), and tortious interference with contract (Count Nineteen). Defendants now seek summary judgment on Solomon's Complaint in its entirety.

## FACTS

Solomon, a black female, began her employment at the Hospital on August 9, 1997, as a part-time information desk receptionist with the title of Administrative Associate I ("AA I"). Complaint ("Compl.")/Answer ("Ans.") ¶¶9, 19.

The Hospital employment application originally completed and signed by Solomon in July 1997 contained a statement acknowledging that her employment was "at will" and could be terminated at any time. Defendants' 56(a)1 Statement ("Def. 56(a)1") ¶3. At her deposition, Solomon also acknowledged that she was an employee "at-will". Id. ¶12.

On or about March 22, 1999, Solomon transferred from the main lobby of the Hospital to begin work as an AA I at the entrance of the Conklin Building. Compl./Ans. ¶29. The Radiation Oncology Department was located in the Gray Cancer Center at the Hospital. Id. ¶25. O'Connell, the manager in the Radiation Oncology Department, interviewed and made the decision to hire Solomon as an AAI in the Conklin Building. Id. ¶22; Def. 56(a)1 ¶6.

The construction of a new building at the Hospital, known as the "CORE Building Project," meant that the Gray Cancer Center entrance would be closed and cancer patients would be required to detour through the Conklin Building entrance to reach the Gray Cancer Center. Compl./Ans. ¶26. One of Solomon's duties as an AA I at the entrance of the

2

Conklin Building was to receive detoured cancer patients and direct them to the Gray Cancer Center. Id. ¶27; Def. 56(a)1 ¶8.

In addition to Solomon, O'Connell hired two Transport Aides, Kelvin Griffith ("Griffith") (black) and Virginia Hernandez Green ("Green") (hispanic), to work at the Conklin Building entrance during the CORE Building Project. Id. ¶9. Their primary function was to transport patients from the Conklin Building entrance to the Gray Cancer Center. Id.; Compl./Ans. ¶27;

Prior to hiring Solomon in 1999, O'Connell informed her that the AA I position in the Conklin Building would be eliminated when the CORE building project was completed, and the Cancer Center entrance was reopened. Def. 56(a)1 ¶11; Compl./Ans. ¶54. The two Transport Aide positions were also scheduled to end upon the reopening of the entrance to the Gray Cancer Center. Compl./Ans. ¶54.

During an August 5, 1999 meeting with Solomon and Griffith, O'Connell issued them both Written Warnings, dated July 30, 1999 (the "July 30th Written Warning"). Def. 56(a)1 ¶17. O'Connell issued the July 30th Written Warnings because she believed that Solomon and Griffith were not providing the necessary transport assistance at the entrance to the Conklin Building. Id. ¶19. O'Connell also believed that Solomon was not providing the necessary transport aide coverage in Griffith's absence; she was also not altering her work hours to provide full transport aide coverage between 7:00 a.m. and 5:30 p.m. During their meeting with O'Connell, Solomon yelled at Griffith and demanded that he not speak with her. Declaration of Susan O'Connell ("O'Connell Dec.") ¶6, App. A, Tab B.

3

Solomon refused to sign the July 30th Written Warning, and, for the first time, informed O'Connell that she might have a back condition that prevented her from providing patient transport assistance. Id. ¶20. On or about August 6, 1999, O'Connell gave Solomon a Memorandum (the "August 6th Memo") informing her that, due to her alleged back ailment, Solomon was excused from providing patient transport duty until August 23, 1999. Id. ¶22. However, the August 6th Memo stated that Solomon would be expected to assist in wheelchair transports as of August 23rd unless she had a doctor's note excusing her from doing so. Id.

After receiving documentation from Solomon's health care provider about Solomon's back condition, and after Solomon was evaluated by the Hospital's Occupational Health Department, O'Connell decided to relieve Solomon of her duty to provide patient transport assistance. Id. ¶23. On or about January 12, 2001, O'Connell sent a Memorandum to the Department of Human Resources confirming that the issues discussed in the July 30th Warning and the August 6th Memo had been resolved and that she had excused Solomon from patient transport duties due to her ongoing back problems. Id. ¶24.

On October 21, 1999, O'Connell conducted her first evaluation of Solomon's work performance. Compl./Ans. ¶67. O'Connell gave Solomon an overall rating of "Effective" and increased Solomon's hourly wage from $9.88 to $10.41. Id. However, O'Connell ranked Solomon as "Needs Improvement" in the Core Values of "Relationships" and "Communication", due in large part to Solomon's verbal outburst toward Griffith during their meeting on August 5, 1999. Id. ¶27. In Solomon's next performance evaluation, on October 24, 2000, O'Connell gave her an overall rating of "Exemplary" and increased

4

Solomon's hourly wage from $10.41 to $11.01.  Compl./Ans. ¶¶67-68.  Because O'Connell had released Solomon from her patient transport duties, she did not consider either the July 30 Written Warning or August 6 Memo when completing Solomon's 1999 or 2000 performance evaluations.  Def. 56(a)1 ¶26.

On or about October 21, 1999, Solomon provided O'Connell with a memo which, presumably, was intended to address Solomon's August 5th outburst at Griffith that resulted in her receiving the "needs improvement" rating in the "Communication" category of her performance evaluation.  Id. ¶28.  In her memo, Solomon claims that her method of communicating with her team members should not be misconstrued as an "inability to communicate," as it was attributable to a difference in personality.  Id.

On December 26, 2000, Ciaschini, a Human Resources Consultant in the Hospital's Human Resources Department, met with Solomon to discuss the conclusion of her temporary assignment in the Conklin Building.  Id. ¶29.  During their meeting, Ciaschini told Solomon that she needed to secure another position within the Hospital prior to the conclusion of her temporary assignment or else her Hospital employment would be terminated at that time.  Id.

Ciaschini met again with Solomon on January 18, 2000, and they were joined on speaker phone by O'Connell.  Id. ¶30.  During this meeting, Ciahchini informed Solomon that unless she found another position within the Hospital, her employment would end on March 31, 2001.  Id.  At this meeting, O'Connell also offered to serve as an employment reference to assist Solomon in her efforts to transfer to another position within the Hospital. Id. ¶31.

5

As discussed in greater detail below in Section II B, between June 2000 and February 2001, Solomon applied unsuccessfully for internal transfers within the Hospital. Despite O'Connell's offer to serve as an employment reference, Solomon never asked her to do so. Id.

On January 19, 2001, Niles, an administrative aide in the Radiation Oncology Department, who was the receptionist in the Gray Cancer Center, complained to Ciashini about an encounter she had with Solomon earlier that day. Id. ¶32. Niles' written complaint stated that she was having breakfast in the cafeteria by herself that morning when Solomon approached and said to her: "I am going to be working in this hospital and I am telling you this one time, you do not talk to me in any way. Do not speak to [sic] about anything I am doing personal or business. I do not like you and you do not like me ... Are you sure you understand?" Id.

Niles, unaware of what had provoked this incident with Solomon, felt threatened and harassed and wanted the Hospital to investigate. Id. ¶33. Ciaschini met with Solomon on January 22nd to discuss the January 19th incident. Id. Solomon acknowledged that Niles version of the incident was "pretty much true." Id. ¶34 . However, she denied harassing or threatening Niles. Id. Solomon also stated that it was a fact that she and Niles did not like each other, and that she had been "receiving condescending comments from Sandra for 20 months." Id. She was no longer going to accept such conduct from Niles. Id. Solomon said she did not want to have conversations with Niles about personal matters, but insisted that she would speak to Niles only about business matters. Id. The Hospital did not take any

disciplinary action against Solomon based on the January 19, 2001 incident with Niles. Ciaschini Dec. ¶35.

On January 24, 2001, Ciaschini received a letter from Solomon dated January 23, 2001 (the "January 23 Letter"). Id. ¶36. In the January 23rd Letter, Solomon reiterated her claim that Niles had been making "condescending remarks" to her over the last twenty months. Id. For the first time, Solomon also characterized Niles' alleged comments as being "racially motivated" and referred to another one of Niles' alleged remarks as a "racial slur." Id. Solomon also claimed in her January 23 Letter that one of her "former co-workers intimated to [her] that Susan O'Connell was the impediment that was preventing [her] from transferring out of her department," and that "a Cancer Center patient intimated to [her] that ... Niles told her that after March 2001 [she] would not be employed by this organization." Id. Solomon also claimed that there was "collusion on the part of Susan O'Connell, Sandra Niles, and very possibly links in the human resources department of this organization to encourage [her] to resign, and unfortunately ... it is racially motivated." Id.

In her February 2, 2001 response to a request by Ciaschini for more information about the claims contained in her January 23 Letter, Solomon wrote:

> On or about the last week of December 2000, Alex Moreau (a former coworker) stated that Virginia Hernandez Green (or Greene) told him that Susan O'Connell's plan was to not give a favorable recommendation concerning my transfer, and that if she really wanted to facilitate a transfer all she (O'Connell) had to do was pick up the phone, because she could making things happen for people in the organization, as she was going to do for him.

> On or about the first week of January 2001, Ann Carpanzano (her husband is a patient at the Cancer Center) called me at work and stated that Sandra Niles told her

7

> *that I would not be working in the organization after March 2001, because that was*
> *their plan from a year ago because they did not like me, because they thought that I*
> *was an uppity black bitch.*

Id. ¶39.

After receiving Solomon's February 2nd letter, Ciaschini interviewed Hernandez-Green who denied making any comments to Moreau about Solomon's transfer. Id. ¶40. Ciaschini also interviewed O'Connell, and she too denied making any of the statements Solomon attributed to her in the February 2nd letter. Id. Further, both Niles and O'Connell denied ever making any statements to anyone about Solomon being an "uppity black bitch" or an alleged plan to end Solomon's Hospital employment. Id. ¶42. By letter dated February 16, 2001, Ciashini informed Solomon of the results of her investigation. Id. ¶41.

In a letter dated January 29, 2001, Solomon informed Ciaschini that when she (Solomon) received her Hospital paycheck on January 25, 2001, she discovered that the envelope containing the paycheck had not been sealed. Id. ¶43. Solomon stated that when she called the payroll department about this, she was informed that the Hospital out-sources its payroll to another company and that occasionally that company failed to seal a paycheck envelope. Id. Solomon claimed that this was "another form of harassment." Id.

In response to Solomon's complaint, Ciaschini interviewed Jan Lynch ("Lynch"), the employee responsible for distributing the Cancer Center paychecks. Id. ¶44. Lynch denied opening Solomon's paycheck envelope. Id. Based on her investigation, Ciaschini concluded that the Payroll Department simply failed to seal Solomon's paycheck envelope, which happened from time-to-time with other Hospital employees. Id.

In late January 2001, Niles informed Ciaschini that Solomon was not speaking with patients in the Conklin reception area. Id. ¶45. Niles stated that she had received several telephone inquiries for assistance directly from patients at the Conklin Building entrance. Id. Niles reported that rather than speaking directly with Niles on the telephone when patients needed assistance, Solomon was putting these patients on the phone to speak directly with Niles. Id.

O'Connell and Ciaschini met with Solomon on February 1st to discuss how these patient communications were being handled. Id. ¶46. Solomon admitted that she gave the phone directly to patients to speak with Niles because she [Solomon] did not want to speak to her. Id. O'Connell and Ciaschini told Solomon that she was required to speak directly to Niles to carry out her duties and instructed her not to give the phone to patients to avoid speaking with Niles directly. Id. ¶46. During their meeting, Solomon informed O'Connell and Ciaschini that she would only speak to staff members about work-related issues and would not engage in social pleasantries. Declaration of Susan O'Connell ("O'Connell Dec.") ¶8.

Later, Ciaschini received another letter from Solomon dated February 2, 2001. Id. ¶47. In this letter Solomon claimed that previously, when she had called Niles for assistance, Niles "blew her off" and told her to seek assistance elsewhere. Id. Ciaschini questioned Niles about this claim by Solomon and Niles denied being abrupt with Solomon on this occasion. Id. ¶48 Since there was no witness to the actual exchange, Ciaschini could not determine who was giving the more accurate version of the event. Id.

On February 9, 2001, Solomon provided Ciaschini with a document which Solomon described as her "recollection of some of the condescending remarks and racial slurs" that she had been subjected to by Niles over the previous twenty-one months. Id. ¶49. Generally, the alleged comments by Nilesrelated to Solomon living in Hartford, utilizing public transportation, the tone of her make-up, her hair style, the folk opera *Porgy & Bess*, the skin color of Arabic men, and jazz music. Id. When asked at her deposition whether, in her opinion, the comments constituted racial slurs, Solomon responded "that a compilation of all these comments could infer racism and some of them definitely do." Id. ¶51. However, despite her characterization of Niles' alleged comments as racist, Solomon also testified that "she really didn't care about Sandra Niles comments that much." Id. ¶52. She also admitted that she never told Niles that she found any of the alleged comments offensive, nor did Solomon ever become angry at Niles for making the remarks. Id. ¶¶53-54. Solomon does not claim that she ever heard O'Connell or Ciaschini make any racist comments. Id. ¶55.

Ciaschini questioned Niles about the statements that Solomon attributed to her in the February 9, 2001 letter. Id. ¶50. With respect to Solomon's claim that Niles commented about Solomon taking the bus to work, Niles said that she considered it a convenience to live on a bus line and apologized if Solomon misconstrued her statement. Id. Regarding the remaining statements, Niles either denied or did not recall making any such remarks. Id. Ciaschini informed Solomon of the results of her investigation. Id. Significantly, Solomon does not claim that Niles made any further comments following her complaint to Ciaschini.

On February 9, 2001, O'Connell—Solomon's immediate supervisor—said "hello" to Solomon, and Solomon deliberately ignored her. Id. ¶¶58, 64. O'Connell then called

Solomon into her office and informed her that another Cancer Center had recently

complained to her [O'Connell] that when he said hello to Solomon a few days earlier,

Solomon had refused to speak with him as well. Id. ¶¶59, 64.  Solomon admitted that this

was true and told O'Connell that she was "only compelled to speak to fellow employees

when [her] job dictates that [she] do so and any other communications would be personal and

have to be mutually voluntary." Id. ¶¶60, 64.  At that point, O'Connell suspended Solomon

for the remainder of the day. Id. ¶61.

O'Connell and Solomon met again with Solomon on February 13, 2001 at which time

O'Connell issued her a Written Warning pursuant to the Hospital's Performance Management

Policy. Id. ¶65.  The warning was based on Solomon's refusal to communicate with

O'Connell and other Hospital personnel, which was inconsistent with the "Relationships"

competency that is part of the Hospital's Mission, Vision and Values.[1] Id. ¶¶62, 65-66.  The

warning was based on the February 9th encounter in which Solomon deliberately ignored

O'Connell, an earlier incident in which Solomon refused to acknowledge co-worker Robert

Lindyer, and on several other similar incidents between Solomon and other Cancer Center

employees. Id. ¶66.  The February 13th written warning placed Solomon in the Hospital's

Performance Improvement Process for the thirty-four work days remaining prior to the

conclusion of her temporary position on March 31, 2001. Id. ¶¶66, 182-184.  In

accordance with the Performance Management Policy, during this time, Solomon was

---

[1] The "Relationships" competency, which applies to all Hospital employees, provides that "we develop and strengthen collaborative relationships with all our customers, including our patients, their families, our employees, volunteers, medical staff and business partners." Solomon Deposition Transcript ("Solomon Depo.") at 200, App. B, Tab A; Def. 56(a)1 ¶62.

11

ineligible for pay increases, lump sum awards, promotion, transfer and tuition reimbursement. Id. ¶¶183-84.

On March 1, 2001, when the Hospital paychecks arrived for distribution to the Cancer Center staff, there were no paychecks for Solomon and Pam Badolato ("Badolato"), another member of the Cancer Center staff, who is white. Id. ¶¶68-69. After some quick research, it was determined that Solomon's timecard had not been submitted to the payroll department. Id. ¶70. Solomon's timecard was immediately submitted and she received her paycheck by no later than the following day. Id. ¶71. Cancer Center employees normally present their timecards to O'Connell for approval. Id. ¶72. If a time card is missing, O'Connell's regular secretary normally makes O'Connell aware of the missing card. Id. On the day that timecards were collected for the March 1, 2001 payroll, O'Connell's regular secretary was not present and the substitute secretary did not inform O'Connell that any time cards were missing. Id. ¶72. Thus, when the timecards were submitted, O'Connell did not know Solomon's card was missing. Id. ¶73.

As indicated to Solomon at the time she was selected for the temporary position in the Conklin Building, her temporary position was eliminated effective March 31, 2001 and her employment with the Hospital was terminated, with the re-opening of the entrance to the Gray Cancer Center and the conclusion of the CORE building project. Id. ¶74; Compl./Ans. ¶54. Solomon filed a charge of discrimination with the Connecticut Commission on Human Rights ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on March 19, 2001. Compl./Ans. ¶6.

## LAW AND ARGUMENT

### I.    STANDARD OF REVIEW

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See also Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. Accord, Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992), cert. denied, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryan v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-50. "The mere existence of some alleged

13

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 247-48 (emphasis in original).

## II.    SOLOMON CANNOT PREVAIL ON HER CLAIMS UNDER TITLE VII, §1981 AND/OR CFEPA.

### A.    Solomon's Claims of Disparate Treatment Race Discrimination Under Title VII, § 1981 and CFEPA Should Be Dismissed.

Solomon alleges disparate treatment race discrimination under Title VII (Counts One, Three, Nine, Eleven), §1981 (Two, Four, Ten, Twelve) and Conn. Gen. Stat. § 46a-60(a) et seq. (Count Thirteen).

In deciding whether summary judgment should be granted on Solomon's disparate treatment claims, the Court must first determine whether she has established a prima facie case of discrimination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, (1981); Reeves v. Sanderson Plumbing, 530 U.S. 133, 142, (2000).  A Title VII plaintiff may establish a prima facie case of discrimination by showing that (1) she was within the protected group, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) that action took place under circumstances giving rise to an inference of discrimination. See Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2[d] Cir. 2001) (emphasis added).  The Second Circuit has held that the elements of a prima facie case of employment discrimination under Title VII apply equally to a claim under 42 U.S.C.

14

§1981. See Choudhury v. Polytechnic Institute of New York, 735 F.2d 38, 45 (2$^d$ Cir. 1984); see also Almonte v. The Coca-Cola Bottling Co. of New York, 959 F.Supp. 569, 572 (D. Conn. 1997) (applying elements of prima facie case under Title VII to §1981). Similarly, claims under CFEPA are analyzed in the same manner as those under Title VII. Arnold v. Yale New Haven Hospital, 213 F. Supp. 2d 142, 151 (D. Conn. 2002).

After the plaintiff establishes a prima facie case under Title VII, §1981 or CFEPA, the burden of production shifts to the employer who must articulate a legitimate non-discriminatory reason for the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, (1993); see also Choudhury, 735 F.2d. at 44 (Title VII burden-shifting analysis applied equally to claims under §1981).

If the defendant articulates a non-discriminatory reason, then the burden-shifting framework "disappear[s], and the sole remaining issue [is] discrimination vel non." Reeves, 530 U.S. at 142, 120 S.Ct. at 2106. The Court must then examine the evidence to determine if the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the defendant." Schnabel v. Abramson, 232 F.3d 83, 90 (2nd Cir. 2000); Winstock v. Columbia Univ., 224 F.3d 33, 43 (2nd Cir. 2000) (The question on summary judgment is whether "the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough ... to disbelieve the employer; the factfinder *must also believe the plaintiff's explanation of intentional discrimination.*") (emphasis added).