1.      **The July 30, 1999 Written Warning.**

       a.      **To The Extent That Solomon's Disparate Treatment Claims Under Title VII and CFEPA Are Based On The July 30, 1999 Written Warning, They Are Barred By The Applicable Statutes Of Limitations.**

Solomon claims that she was issued a written warning on July 30, 1999 based on her race. Compl. ¶¶35-47. However, this claim is barred because she did not raise it before the EEOC and CHRO within the applicable statute of limitations.

"District Courts may only hear those claims involving discriminatory acts that were raised before the EEOC and which occurred within the 300 days of the EEOC charge was filed." Coger v. State of Connecticut, 309 F.Supp. 2d 274, 282 (D. Conn. 2004); See 42 U.S.C. § 2000 e-5(e). "To determine the timeliness of an EEOC complaint and an ensuing lawsuit, the court must identify the dates on which the alleged discriminatory acts took place." Id. Solomon was issued the July 30, 1999 Written Warning on no later than August 4, 1999, yet she did not file her CHRO and EEOC charge until March 19, 2001. Def. 56(a)1 ¶14. Because she was issued the July 30, 1999 Written Warning more than 300 days before she filed her EEOC charge, her claim under Title VII based on such warning is time barred under 42 U.S.C. § 2000e-5(e).[2] Similarly, to the extent that her CFEPA claim is

---

[2] To the extent that Solomon may claim that there was a "continuing violation" in connection with the July 30th Warning, the Supreme Court has held that "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," like the written warning, are "easy to identify" and "constitutes a separate actionable unlawful employment practice." Amtrak v. Morgan, 536 U.S. 101, 113 (2002). In Paragraph 46 of the Complaint, Solomon alleges that "she was denied opportunities in her employment because of the July 30, 1999 memorandum...." While it is true that employees who are in Steps 2-4 of the Hospital's Performance Management Policy are not eligible for "pay increases, lump sum awards, promotion, transfer and tuition reimbursement," it is undisputed that Solomon received pay increases with her performance evaluations in both 1999 and 2000. Def. 56(a)1 ¶¶183, 25. The undisputed evidence is that due to Solomon's ongoing back problems, O'Connell released her from her patient transport duties and did not consider the July 30th Warning in

16

based on the July 30, 1999 warning, it too is time-barred under Conn. Gen. Stat. §46a-82(e). See also Cavuoto v. Oxford Health Plans, Inc., 2000 U.S. Dist. LEXIS 9112 at *3 n.2, Case No. 3:99-cv-446 (EBB)(D. Conn. June 22, 2000) (180 day statute of limitations applies to claims under FEPA)[3].

> **b.** **Solomon's Disparate Treatment Claim Based on the July 30, 1999 Written Warning Also Fails on the Merits.**
>
> **(1)** **Solomon Cannot Establish a Prima Facie Case of Race Discrimination.**

The July 30th Written Warning was not an adverse employment action. The Second Circuit has held that a written warning is not an adverse employment action when it fails to lead to any materially adverse change in the terms and conditions of employment. See Weeks v. New York State Div. of Parole, 273 F.3d 76, 85 (2d Cir. 2001), abrogated on other grounds by Amtrak v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002). In Weeks, the Second Circuit held that notice of discipline was not an adverse employment action when the plaintiff had not shown that it led to any tangible consequences. See 273 F.3d at 86. As discussed above, the July 30th Warning did not lead to *any material change* in the terms and conditions of Solomon's employment. Solomon has no evidence to support her allegation that she was denied any transfer opportunities as a result of the July 30th Written Warning and she did, in fact, receive pay increases in 1999 and 2000. Def. 56(a)1 ¶25.

Solomon also cannot satisfy the fourth element of the prima facie case test. She has no evidence that O'Connell's decision to issue her a written warning took place under

---

either her 1999 or 2000 performance reviews. Id. ¶26. Similarly, Solomon has *no admissible evidence* that she was subsequently deprived of *any* employment opportunities based on the July 30th Warning.

17

circumstances giving rise to an inference of race discrimination. <u>Mario v. P&C Food Markets, Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002). It is undisputed that Solomon never heard O'Connell use any racially derogatory language. Def. 56(a)1 ¶55. It is also undisputed that O'Connell made the decision to hire Solomon in March 1999 (<u>id.</u> ¶6), approximately *six months* before she was issued the written warning, which would undermine any claim that O'Connell was motivated by discriminatory animus. <u>See</u> <u>Grady v. Affiliated Cent. Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997)("When the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring."); <u>see also</u> <u>Alphonse v. State of Connecticut Department of Administrative Services</u>, 2004 U.S. Dist. LEXIS 7239 at *6 n.7, No. 3:02-cv-1195(MRK) (D. Conn. April 21, 2004)(applying same actor inference to denial of a request for a pay increase).[4]

> **(2)     Even if Solomon Could Establish a Prima Facie Case, the Hospital Had a Legitimate Non-Discriminatory Reason For Issuing Her The July 30th Written Warning.**

At the time they were interviewed, both Griffith and Solomon were informed by O'Connell that they would be expected to cover for each other to ensure that there was always sufficient transport assistance available for cancer patients. O'Connell Dec. ¶4; App. A, Tab B. Initially, there was no difficulty with this arrangement because the two Transport Aides provided coverage between the hours of 7:00 a.m. and 5:30 p.m. <u>Id.</u>  However,

---

[3] <u>See</u> App. B, Tab E.

18

during illness, vacation, and after one of the Transport Aides was transferred to another position, Solomon and Griffith were failing to adhere to the arrangement by providing full transport coverage. Id. Specifically, Solomon was not providing transport coverage to cancer patients in Griffith's absence. Id. Thus, O'Connell had a legitimate, non-discriminatory reason for issuing Solomon the July 30th Written Warning.[5] Even if a rational jury could conclude that the Hospital's articulated reason for issuing the written warning was false, Solomon still must demonstrate that "the asserted pretextual reason[] was intended to mask [race] discrimination." Schnabel, 232 F.3d at 88. In this case, any reasonable inference of race discrimination would be decisively undercut by the "abundant and uncontroverted evidence that no discrimination occurred," Reeves, 530 U.S. at 148, namely the fact that the same individual who hired Solomon just a few months earlier, also made the decision to issue her the written warning. See Choate v. Transport Logistics Corp., 234 F. Supp. 2d 125, 134 (D. Conn. 2002) (relying on same actor inference in determining that plaintiff could not carry her ultimate burden of proving discrimination).

> 2.  **The February 9, 2001 Suspension and the February 13, 2001 Written Warning.**[6]

---

[4] See App. B, Tab F.

[5] It was not until Solomon received the July 30th Warning that she made O'Connell aware of the fact that she had a back problem which inhibited her ability to provide patient transport assistance. Def. 56(a)1 ¶20. After O'Connell received the necessary documentation from Solomon's health care provider, and after Solomon was examined by the Hospital's Department of Occupational Health, Solomon was relieved from her transfer duties and released from the warning. Id. ¶¶23-24.

[6] Although the allegations surrounding Solomon's February 9, 2001 suspension and February 13, 2001 Written Warning are contained in her Title VII retaliation claim (Count Five), they are incorporated by reference into her claims disparate treatment race discrimination under Title VII, §1981 and CFEPA. Solomon's retaliation claims are discussed separately, infra.

19

To the extent that Solomon alleges that her suspension by O'Connell on February 9, 2001 and subsequent written warning she received on February 13, 2001 were based on her race, such claims should be dismissed. On the morning of Friday, February 9, 2001, O'Connell, Solomon's manager, said "hello" to Solomon and Solomon intentionally ignored her. Def. 56(a)1 ¶¶58, 64. Just a short time earlier, Solomon had refused to speak with another Cancer Center employee when he spoke to her. Id. Solomon then told O'Connell that she was only required to speak with her co-workers when her job required it, and that any other communication "would be personal and would have to be mutually voluntary." Id. ¶¶60, 64. Due to Solomon's refusal to communicate in an appropriate manner with her immediate supervisor and her co-workers, O'Connell suspended Solomon for the remainder of the day on February 9th in order to confer with Human Resources regarding the appropriate disciplinary action to address Solomon's communication problem.[7] Id. ¶61. It is important to note that just eight days earlier, on February 1st, O'Connell and Ciaschini had counseled Solomon about her continued refusal to engage in collegial and appropriate conversation with Hospital staff. Id. ¶46. During their February 1st meeting, Solomon insisted that she would only speak to staff regarding work-related matters and would not engage in social pleasantries with them if she did not like them. O'Connell Dec. ¶8, App. A, Tab B.

---

[7] While not dispositive of the issues raised in defendants' Motion for Summary Judgment, O'Connell intended for Solomon's February 9th partial day suspension to be an administrative suspension with pay. O'Connell Dec. ¶9. However, unbeknownst to O'Connell, Solomon allocated vacation time to cover the portion of the day that she was suspended on February 9th. Id.

20

On February 13, 2001, O'Connell and Ciaschini met again with Solomon to discuss Solomon's refusal to communicate with her co-workers. Id. ¶65. At that time, O'Connell issued Solomon a written warning due to her failure to comply with the "Communication" and "Relationships" competencies, which are part of the "Hospital's Mission, Vision and Values." Id. In addition to the incident in which Solomon refused to acknowledge O'Connor on February 9th and another similar incident between Solomon and another co-worker shortly before that, the February 13, 2001 Written Warning also addressed several other incidents in which Solomon refused to communicate appropriately with her co-workers. Id. ¶¶65-66.

   a.   **Solomon Cannot Establish a Prima Facie Case of Race Discrimination Based on Either Her February 9, 2001 Suspension or the February 13, 2001 Written Warning.**

There is no evidence to suggest that Solomon was suspended on February 9th or issued the February 13th Written Warning under circumstances that give rise to an inference of race discrimination. To create such an inference, Solomon may attempt to rely on her allegation that one of her co-workers, Alex Moreau ("Moreau"), told her that O'Connell "was the impediment to [Solomon's] transfer." Compl. ¶77(a). Solomon claims that Moreau informed her that O'Connell had told Virginia Hernandez-Green, another one of Solomon's co-workers, that "O'Connell would not give Solomon a favorable recommendation." Id. ¶77(b). However, Solomon has no absolutely evidence to support this double hearsay allegation. In fact, Ciaschini questioned Hernandez-Green about this claim, and Hernandez-Green denied ever making such a statement to Moreau. Def. 56(a)1 ¶40. Solomon also claims that "Niles told the wife of a cancer center patient that [Solomon] would not be

21

would not be working at the Hospital after March 31, 2001, because it was 'their' plan from

a year ago not to recommend [Solomon] for new or open positions within the hospital

because 'they' did not like [her] and thought she was an "uppity black bitch." Compl. ¶

77(c).  Again, however, Solomon cannot produce any admissible evidence to support this

allegation.  Niles denied ever making such a statement to anyone.  Def. 56(a)1 ¶42.

Further, because it was O'Connell who was responsible for approving Solomon's hire as

well as suspending her on February 9th and issuing her a written warning on February 13th,

the "same actor" inference undermines any inference that race discrimination played a role

in these employment actions.

> **b.** **The Hospital Had a Legitimate Non-Discriminatory Reason for Suspending Solomon on February 9th and Issuing Her the February 13, 2001 Written Warning.**

It is undisputed that on February 9, 2001, when Solomon's manager, O'Connell, said

"hello" to her, Solomon deliberately ignored her.  Id. ¶¶58, 64.  That morning, Solomon

also informed O'Connell of her policy of only speaking with her fellow employees "when

[her] job dictates that [she] do so...".  Id. ¶¶60, 64.  Just days earlier on February 1st,

during her meeting with Ciaschini and O'Connell, Solomon similarly proclaimed that she

would only speak to staff regarding "work-related matters" and refused to engage in "social

pleasantries."  Id; O'Connell Dec. ¶8, App. A, Tab B.  She also had previously instructed

her co-workers, Niles and Griffith, to speak with her only about work-related matters.  Id.

¶¶65-66.  Further, several of her co-workers had reported to O'Connell that they attempted

to speak with Solomon but had been ignored and rebuffed by her.  Id.  One of the Hospital's

Core competencies, which apply to all employees, is that employees should strive to establish

22

her managers and co-workers and to respond to their attempts to speak with her in a cordial

manner was simply inconsistent with that value.  Furthermore, even in the absence of such a

Core competency, as a matter of public policy, an employer must have the right to discipline

an employee who refuses to engage in collegial and cordial relationships with co-workers in

the workplace.  The Hospital had legitimate, non-discriminatory reasons for suspending

Solomon for a portion of the day on February 9th and issuing her the February 13, 2001

Written Warning.[8]

> **B.** **Solomon's Failure to Hire Claims Under Title VII, §1981 and CFEPA Are Without Merit.[9]**

Solomon alleges that between February 2000 and March 2001, the Hospital

discriminated against her based on her race in violation of Title VII (Count Three, ¶¶50-

100), §1981 (Count Four) and CFEPA (Count Thirteen) when it refused to hire or transfer

her to various positions within the Hospital.  The underlying allegation behind all of

Solomon's failure to hire claims, is that the individual defendants - O'Connell, Ciaschini and

Niles -- somehow impeded her attempts to transfer.  See Compl. ¶¶52, 77-80.  However,

Solomon has absolutely no admissible evidence that any of the individual defendants

interfered with her transfer attempts in any way.[10]

---

[8]As part of Solomon's retaliation claim, she alleges that on one occasion she received her paycheck in an unsealed envelope, and on another occasion she received her paycheck a day late.  See Compl. ¶¶118-122. While these allegations are incorporated by reference into her discrimination claim, the Hospital will address these claims below in Section D.

[9] The same Title VII burden shifting analysis discussed above with respect to plaintiff's claims based on the alleged written warnings and suspension also applies to plaintiff's failure to hire claims.  See e.g. Green v. Harris Publications, 331 F. Supp. 2d 180, 186 (S.D.N.Y. 2004).

[10] When questioned at her deposition about what evidence she had that O'Connell gave any of the hiring managers with whom Solomon interviewed a negative recommendation about her, Solomon testified: "I guess the evidence is I have is that I didn't get promoted.  And other people who came from different departments

23

Not only will Solomon be unable to show that the individual defendants influenced her transfer attempts in any way, but she also cannot prevail on her failure to hire claims because: (1) her claims are barred by the applicable statute of limitations; (2) she was not qualified for the positions in question; or (3) if she was qualified, the Hospital had legitimate non-discriminatory reasons for not selecting her.

### 1.    Administrative Associate I in the Hemodialysis Department (Compl. ¶¶81-82).

Solomon alleges that on or about June 26, 2000, she applied for the position of Administrative Associate I ("AA I") in the Hemodialysis Department, that she was qualified for the position, and that the position remained vacant after her application was rejected. Id. First, Solomon was not qualified for the position. As discussed in the Declaration of Monica Kowalski, the Office Manager of the Hemodialysis Department, the AA I position required someone with a medical background, knowledge of medical terminology, and knowledge of task-based hospital computer programs. Def. 56(a)1 ¶76. It was also desirable for the AA I candidates to have nursing unit experience, knowledge of the lab ordering process, hospital billing, and the use of OASIS (a computer program used for medical record retrieval). Id. Solomon, however, had little to no medical background and limited knowledge of medical terminology, both of which were required for the position. Id. Even if Solomon could demonstrate that she was qualified for the position, there is no evidence that her application was rejected under circumstances giving rise to an inference of discrimination. See Cruz v.

---

doing totally different jobs, totally different things with totally different skills were able to get promoted. And that's my evidence." Solomon Dep. at 216, App. B, Tab A. Further, when asked whether she had any evidence that O'Connell had any contact with any of the hiring managers who rejected her for internal transfers

Coach Stores, 202 F.3d 560, 565 (2d Cir. 2000). Also, it is undisputed that the candidate

ultimately hired for the position, Lovie Degourville ("Degourville"), was black. Def. 56(a)1

¶79. As one district court recognized, "where a person of the same background is hired

rather than a complainant, it does not make sense for a fact-finder to infer discrimination

without some explanation for this result from which discrimination can be inferred...."

Caldwell v. City of White Plains, 1993 U.S. Dist. LEXIS 4927 at *1, 92-Civ.-1011 (VLB)

(S.D.N.Y. March 17, 1993).[11]

Even if Solomon could show that she was qualified for the position, Degourville was

the more qualified candidate. A candidate's superior qualifications can be a legitimate non-

discriminatory reason. See Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).

As described in Kowalski's declaration, Degourville was already a Patient Care Technician

in the Hemodialysis Department and was familiar with the hemodialysis process. Def.

56(a)1 ¶80.  She also had a medical background, knowledge of medical terminology, task

specific Hospital computer programs and OASIS. Id. Further, based on her prior work

experience, Degourville also had substantial patient contact and familiarity with the regular

hemodialysis patients, which would be helpful in her role as an AA I. Id. "To overcome a

non-discriminatory explanation for failing to [promote], a plaintiff must show that she is *not*

*only* qualified for the position, but that she is the best-qualified candidate for the position

under the criteria suggested by the employer." See Naftchi v. New York Univ., 14 F. Supp.

2d 473, 480 (S.D.N.Y. 1998) (emphasis added). Solomon cannot meet this burden. Her

---

at the Hospital, she answered: "As I sit here today, my evidence to is [sic] the fact that I'm no longer employed
there. That's my evidence." Id. at 217.

discrimination claims under Title VII, §1981 and CFEPA based on this application should be dismissed.

### 2.    Administrative Associate II in the Human Resources Department (Compl. ¶¶83-83(c)).

Solomon alleges that in August 2000, she applied for the position of Administrative Associate II in the Human Resources Department, that she was qualified for the position, and that her application was rejected while a white female was hired. Id. As an initial matter, Solomon was not qualified for this position.[12] Among other qualifications, this position required two years of experience in human resources-personnel. Def. 56(a)1 ¶82. William Bell ("Bell"), a Human Resources Consultant, eliminated Solomon's application from consideration because she did not possess two year's previous human resources-personnel experience.[13] Id. ¶83. Thus, Solomon fails to state a prima facie case of discrimination based on her application for the human resources position.

Even if Solomon could establish a prima facie case, the Hospital had a legitimate, non-discriminatory reason for not selecting her for the position. Solomon clearly was not the most qualified candidate. Dawn Packman ("Packman"), who is white, was the successful applicant for the position. Id. ¶84. Packman possessed the requisite two years of experience in the human-resources personnel field having previously worked as a human resources assistant with Liturgical Publications. Id. Solomon lacked any human resources work

---

[11] See App. B, Tab G.

[12] Solomon alleges that the title of the position she applied for was Administrative Associate II. Compl. ¶83. However, there was no such position in the Department of Human Resources at that time. Declaration of William Bell ("Bell Cec.") ¶3, App. A, Tab E. The actual title of the position Solomon applied for was "Human Resources Associate." Id.

experience.  Id. ¶83.  Because Packman was clearly the more qualified candidate, Solomon's

claims under Title VII, §1981 and CFEPA based her application for the human resources

position should be dismissed.

> **3.     Patient Administrative Associate in Women's Ambulatory Health Department (Compl. ¶84).**

Solomon alleges that on or about February 17, 2000, she applied for and was rejected

for the position of Patient Administrative Associate ("PAA") in the Women's Ambulatory

Health Department.  Id.

> **a.     Solomon's claims under Title VII and CFEPA based on her February 17, 2000 application for the PAA position are barred by the applicable statutes of limitations.**

As discussed above, a 300-day statute of limitations applies to claims brought under

Title VII, see Coger, 309 F. Supp. 2d at 282, while a 180-day statute of limitations applies to

claims under CFEPA.  See Conn. Gen. Stat. 46a-82(e).  Solomon filed her charge of

discrimination with the CHRO on March 19, 2001.  Def. 56(a)1 ¶14.  Thus, the Court can

only hear claims under Title VII which involved discriminatory acts occurring on or after

May 23, 2000, which is 300-days before the CHRO charge was filed.  Similarly, the Court

can only consider claims under CFEPA, based on discriminatory acts occurring on or after

September 20, 2000, which is 180 days before the CHRO charge was filed.  Solomon alleges

that on February 17, 2000, she applied for the PAA position and was rejected.  Accordingly,

her claims under Title VII and CFEPA are time barred.

---

[13] As reflected by Solomon's résumé, she had absolutely no previous work experience in human resources.  Def. 56(a)1 ¶83.

**b.**    **Solomon's disparate treatment claim based on her February 17, 2000 application for the PAA position also fails on the merits.**

Solomon cannot state a prima facie case of discrimination based on her application for the PAA position in Women's Ambulatory Health. This position required applicants who were bi-lingual in English and Spanish. Def. 56(a)1 ¶89. As a preliminary matter, Solomon's Complaint does not allege that she was qualified for the position. This may be because Solomon was not bi-lingual, and, therefore, not qualified for the position. Id. ¶90. Susan Maxwell, the hiring manager for the position, eliminated Solomon's application on this basis. Id. ¶91. Further, aside from the fact that she was not qualified, Solomon has no evidence to suggest that her application was rejected under circumstances giving rise to an inference of discrimination.

Maxwell hired Emmy Gonzalez ("Gonzalez"), who is hyispanic, because she believed that she was the most qualified applicant for the position. Id. ¶94. Unlike Solomon, Gonzalez was bi-lingual in English and Spanish and spoke both languages fluently. Id. Thus, the Hospital had a legitimate non-discriminatory reason for hiring Gonzalez rather than Solomon and her claim of discrimination under Title VII, §1981 and CFEPA should be dismissed.

**4.**    **Administrative Associate III in the Research Department (Compl. ¶85).**

Solomon alleges that on or about March 10, 2000, she applied and was not selected for the position of Administrative Associate III ("AA III") in the Research Department. Id.

28

a.    **Solomon's claims under Title VII and CFEPA based on her March 10, 2000 application for the AA III position are barred by the applicable statutes of limitations.**

Insofar as Solomon claims discrimination under Title VII and CFEPA are based on her March 10, 2000 application and rejection from the AA III position, her claims under title VII and CFEPA are time-barred. See Sections 1a and 3a, supra.

b.    **Solomon's disparate treatment claim based on her March 10, 2000 application for the AA III position also fails on the merits.**

Solomon's claim that she was denied the AA III position based on her race fails because she was not the most qualified candidate for the position. Associate Director of Research, Laurine Bow ("Bow"), chose Tiffany Rowe ("Rowe") as the successful applicant for this position. Def. 56(a)1 ¶98. Bow chose Rowe for the position because she believed that Rowe was better qualified. Id. ¶99. In particular, Rowe was very experienced in using Mircosoft Word, Excel and Access. Id. She also had extensive experience working with databases. Id. Furthermore, Rowe had almost four years of administrative experience working with many of these computer applications, all of which were central to the function of the AA III in the Research Department. Id. On the other hand, Solomon's most recent experience was as a receptionist. Id. Rowe also held a bachelor's degree, whereas Solomon did not. Id. Furthermore, even if Solomon could demonstrate that Bow's asserted reason for choosing Rowe was pretext, she still cannot demonstrate that "the asserted pretextual reason was intended to mask [race] discrimination." Schnabel, 232 F.3d at 88. Solomon's discrimination claims under Title VII, §1981 and CFEPA based on her application for the AA III position should be dismissed.

29

**5.    Administrative Associate II and Patient Administrative Associate in the Care Continuum Department (Comp. ¶¶86-87).**

Solomon alleges that on October 4, 2000, she applied and was rejected for at least four (4) open positions of AA II and PAA in the Care Continuum Department.

**a.    The AA II positions in Care Continuum (Case Coordination).**

On September 15, 2000, as part of a departmental reorganization, the Case Coordination area of the Care Continuum Department posted two new vacant AA II positions (AA II #1 and AA II #2).  Declaration of Patricia Sobieski ("Sobieski Dec.") ¶3, App. A, Tab H.

**(1)    Administrative Associate II #1**

The AA II #1 position supported those activities surrounding the utilization and review planning process.  Def. 56(a)1 ¶105.  It included communication with home care agencies and vendors to procure services for discharge for individual patients.  Id.  The AA II #1 role also entailed communication with insurance companies to obtain authorizations for treatment.  Id.  The position also involved the use of Microsoft Word and Excel, SMS and Groupwise, and, therefore, required someone who was proficient in those applications.  Id.

**(a)    The Hospital had legitimate non-discriminatory reasons for not selecting Solomon for the AA II #1 position.**

Assuming that Solomon can establish that she was qualified for AA II # 1 position, which the Hospital does not concede, the Hospital had a legitimate, non-discriminatory reason for not hiring her.  As discussed in the Declaration of hiring manager, Patricia Sobieski ("Sobieski"), submitted herewith, Elizabeth Kirol ("Kirol"), who is white, was

30