many of the responsibilities of the PAA position, such as submitting requests for laboratory tests. Id. She also knew how to read heart monitors and was familiar with the computer system used by the department. Id. The Hospital had a legitimate, non-discriminatory reason for not selecting Solomon for the PAA position. Solomon's disparate treatment claim based on this application should be dismissed.

### C.    Solomon Cannot Prevail Against Any of the Defendants on Her Hostile Work Environment Claim Under Title VII, §1981 and/or CFEPA.

Solomon alleges that between March 1999 and March 2001, she was "subjected to a work environment pervaded by attitudes of racial discrimination," see Compl. ¶¶ 32(a)-(j)), in violation of Title VII (Count One), §1981 (Count Two), and CFEPA (Count Thirteen).[22] Specifically, she claims that Niles, who is white: (a) frequently commented on Solomon's dark skin color; (b) frequently referred to Solomon's residence in Hartford, commenting that for Niles Hartford was just a place to work and she could not personally live in Hartford; (c) frequently alluded to the fact that Solomon rode the public buses and did not have a car; (d) suggested that Solomon should use a darker make-up foundation; (e) told Solomon that she (Niles) wanted to be as dark as her while Solomon claims she had reason to believe that Niles did not, in fact, wish to be black; (f) while viewing a photograph of Tina Turner in a magazine, said that Turner could not be black; (g) told Solomon that the black characters in the musical *Porgy and Bess* looked ridiculous in the way they were dressed and dancing; (h) commented that she preferred the appearance of the lighter skinned Arabic men who worked as valet parking attendants at the entrance of the Conklin Building; (i) commented on

46

Solomon's hair texture, asking how Solomon achieved her hairstyle because black people's hair is "kinky, you know, like Brillo;" (j) rejected Solomon's suggestion to use Jazz music at a cancer center event, while commenting to Solomon that people with class did not like Jazz music, that most of the cancer center patients were white, and that Niles did not like Jazz music. Id.[23]

Title VII prohibits an employer's conduct that "has the purpose or effect of ... creating an intimidating, hostile or offensive work environment." Tomka v. Seiler Corp., 66 F.3d 1295, 1304, 1305 (2[d] Cir. 1995) (citing Meritor Savings Bank v. Vinson, 477 U.S. 57, (1986)). A hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule and insult' ... that is 'sufficiently severe or severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367 (1993) (quoting Meritor, 477 U.S. at 65, 67). Whether a working environment is sufficiently hostile or abusive depends on the "totality of circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. A hostile work environment claim has both an objective and subjective component:

> Conduct that is not severe or pervasive enough to create an *objectively hostile or abusive work environment* - an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not *subjectively perceive the environment to be abusive*, the

---

[22] As a preliminary matter, there is no individual liability under Title VII, see Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000)(per curiam) or CFEPA. See Perodeau v. City of Hartford, 259 Conn. 729 (2002).
[23] Niles' alleged racist comments are also found in Defendants' Deposition Exhibit 28. See App. B, Tab C. To the extent that any of these alleged comments may have occurred prior to May 23, 2000, Solomon's claims under Title VII and CFEPA are barred by the applicable statute of limitations. See Sections 1a and 3a, supra.

> conduct has not actually altered the conditions of the victim's employment, and there is no Title VII claim.

Harris, 510 U.S. at 21-22 (emphasis added). Whether an environment is "objectively hostile" requires the Court to determine "whether a reasonable person who is the target of the discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999). The reasonable person test, however, does not incorporate the "perspective of the particular ethnic or gender group" to which the plaintiff belongs. Id. at 436.

For acts of racial discrimination such as racist comments, slurs and jokes to be actionable, there must be "more than a few isolated incidents of racial enmity ... meaning that instead of sporadic racial slurs there must be a steady barrage of opprobrious racial comments." Schawapp, 118 F.3d at 110-11 (internal citations and quotations omitted); see also Tomka, 66 F.3d at 1305 n.5 ("the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Carrero v. New York City Hous. Auth., 890 F.2d 569, 577-78 (2d Cir. 1989) (the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2283 (1998) ("'simple teasing', ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'").[24]

---

[24] In analyzing plaintiff's hostile work environment claim brought under §1981, the same standard of proof applies as under Title VII. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000).

### 1.    Niles' Alleged Comments Were Not Objectively Hostile.

For purposes of this motion, even if the Court could conclude that Niles made the alleged comments, they were not objectively hostile. None of the comments were overtly racist in nature.[25] Even if such statements were insensitive, they certainly did not rise to the level of a "steady barrage of opprobrious racial comments." Schawapp, 118 F.3d at 110-11. Further, none of the comments were in any way threatening, and, in most cases, were not even directed at Solomon herself. See e.g., Kodengada v. International Business Machines Corp., 88 F. Supp. 2d 236, 243 (2000) (noting that a derogatory comment about another person "generally does not have the same sting as an ethnic slur directed at [the plaintiff]"). Furthermore, the alleged comments were sporadic and spread over a two-year period. See Id. (six comments lacking in severity over seven months too infrequent to give rise to hostile environment claim).

### 2.    Solomon Did Not Find Niles' Alleged Comments Offensive.

To maintain a claim for a hostile work environment, Solomon must demonstrate that she found Niles' comments to be offensive. Harris, 510 U.S. 21-22. The undisputed evidence, however, reveals that she was not offended. Solomon testified that she never told

---

With respect to Solomon's hostile work environment claim under CFEPA, the same standard applies. See Rogus v. Bayer Corp., 2004 U.S. Dist. LEXIS 17026, at *6, No. 3:02-cv-1778 (MRK) (D. Conn. Aug. 25, 2004). See App. B, Tab J.

[25] When asked at her deposition whether each of the comments contained in Defendants' Deposition Exhibit 28 constituted a "racial slur," Solomon testified that "a compilation of all these comments could infer racism and some of them definitely were." Solomon Dep. at 241, App. B, Tab A. She also testified that many of the comments were "racist" by virtue of the fact that Niles made them. Id. at 241-43. When asked whether they would be "racist" if made by someone else, she testified: "It all depends on who that someone else was and what our relationship had been and what our history was." Id. at 243.

Niles that she found her comments offensive.  Solomon Dep. at 246, 252.  Further, when asked why, she answered:

> Why should I? Why should I let someone know that something that petty could bother me. *It didn't really bother me because all I wanted to do was get paid. So I didn't really care about Sandra Niles' comments that much.*  But when I found that Hartford Hospital was trying to keep me from working there and they were trying to discriminate against me, that's when everything became an issue.

Id. at 246 (emphasis added).  Further, while she may not have appreciated Niles' comments, they never made her angry.  Id. at 322.  Clearly, Solomon was not offended by Niles' alleged comments and, therefore, her hostile environment claim should be dismissed as to Niles and the Hospital.

### 3.    There Is No Evidence That Either O'Connell or Ciaschini Subjected Solomon to a Hostile Work Environment.

To the extent that Solomon attempts to state a hostile work environment claim based on any conduct by O'Connell or Niles, she has no evidence that either them subjected her to any racially offensive comments.  In fact, she acknowledges that neither O'Connell nor Ciaschini ever made any racist or racial comments toward her.  Id. at 314.  Solomon's hostile workenvironment claim against O'Connell and Ciaschini should also be dismissed.

### 4.    Even if the Court Finds That There Was a Hostile Work Environment, the Hospital Cannot Be Held Liable For Such Conduct.

Even if Solomon can establish that Niles' conduct led to a racially hostile work environment, which she cannot, the Hospital is not liable for Niles' conduct because it exercised care to prevent such conduct and Solomon unreasonably failed to take advantage of the corrective measures that were available to her.  The Supreme Court has ruled that

50

employers are not automatically liable for [racial] harassment perpetrated by their employees. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). Where an employee is the victim of [racial] harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employers' vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. See Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998). Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court first looks to whether the supervisor's behavior "culminated in a tangible employment action" against the employee, Burlington Indus, Inc., 524 U.S. at 765; if it did, "the employer will, *ipso facto*, be vicariously liable." Mack v. Otis Elevator Co., 326 F.3d 116, 124 (2d Cir.), cert. denied, 124 S.Ct. 562 (2003). In the absence of such a tangible action, an employer will still be liable for hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior," and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid the harm otherwise." Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004)(citing Burlington Indus., Inc., at 765).

While Solomon alleges that Niles acted as her supervisor, see Compl. ¶16, a claim which the Hospital vehemently denies, the Hospital is still entitled to take advantage of the affirmative defense because Niles' alleged harassing conduct did not "culminate in a tangible employment action." Solomon's employment at the Hospital ended on March 31, 2001 when

51

she was unable to secure another position, *not* as a result of any of Niles' alleged harassment.
At all times relevant to Solomon's claims, the Hospital maintained an employee grievance
procedure which was intended to address the type of harassment claimed by Solomon. Def.
56(a)1 ¶56. Despite the availability of this procedure, during the more than twenty-months
she claims Niles had been harassing her, Solomon never formally utilized the grievance
process. Id. ¶157. When she did file a complaint with the Department of Human Resources,
albeit outside of the official grievance process, Ciaschini immediately investigated it.
Presumably the alleged harassment ceased because Solomon made no further complaints.
Thus, due to its prompt, immediate and effective response, the Hospital cannot be held
liable. See Hylton v. Norrell Health Care of New York, 53 F. Supp. 2d 613, 618-19
(S.D.N.Y. 1999)(granting summary judgment in plaintiff's hostile work environment claim
where the employer's response was prompt, reasonable and effective).

### D.   Solomon's Retaliation Claims Under Title VII, §1981, and CFEPA Are Also Wthout Merit.

Solomon alleges that after informing the Hospital in letters dated January 23, 2001
and February 9, 2001 that she was being subjected to various forms of discrimination,
Compl. ¶¶106(A)-(F), O'Connell and Ciaschini retaliated against her in the following ways
(id. ¶113): (1) she was suspended without pay on February 9, 2001 (id. ¶107); (2) she was
issued a written warning on February 13, 2001, depriving her of the ability to transfer to
another position during the last thirty-four (34) days of her Hospital employment prior to her
position being eliminated (id. ¶¶ 108-112); (3) on January 25, 2001, she received her
paycheck in an unsealed envelope (id. ¶¶ 118-19); and (4) she experienced a one-day delay in

receiving her paycheck for the March 1, 2001 payroll. Id. ¶¶121-22.[26] She alleges

retaliation as to the Hospital only under Title VII (Count Ten) and CFEPA (Count Fourteen),

and as to all defendants under §1981 (Count Eleven). For the reasons discussed below, these

claims should be dismissed.

Retaliation cases are subject to the same burden-shifting framework for analyzing

Title VII discriminatory treatment cases established by the Supreme Court in McDonnell

Douglas v. Green, 411 U.S. 792 (1973). To establish a prima facie case of retaliation under

Title VII, a plaintiff must show that: "(1) she was engaged in an activity protected under

Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3)

the employer took an adverse employment action against the plaintiff; and (4) a causal

connection existed between the plaintiff's protected activity and the adverse action taken by

the employer." Mack v. Otis Elevator Co., 326 F. 3d 116, 129 (2d Cir. 2003) (internal

quotations omitted). Once the plaintiff established a prima facie case "the burden of

production shifts to the employer who must defeat a rebuttable presumption of discrimination

by articulating a legitimate, non-discriminatory reason for the employment decision." Byrnie

v. Town of Cromwell Bd. of Education, 243 F.3d 93, 102 (2d Cir. 2001). Like the

plaintiff's burden on her prima facie case, the employer's burden of production is also not

very demanding. Bickerstaff v. Vassar College, 196 F. 3d 435, 446 (2d Cir. 1999).

If the employer meets this burden, the plaintiff must demonstrate that the defendant's

explanations are a pretext for impermissible retaliation. See Gallagher v. Delaney, 139 F.3d

---

[26] Solomon also alleges that on February 12, 2001, she informed Ciaschini of her intent to file a claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). See Compl. ¶123.

338, 349 (2d Cir. 1998). "In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason for discharging her is false pretext and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision." Barlow v. State of Connecticut Department of Public Health, 319 F. Supp. 2d 250 (D. Conn. 2004).[27]

### 1. Alleged Adverse Employment Actions Occurring Prior to January 23, 2001.

The first time that Solomon engaged in alleged "protected activity" was when she submitted the January 23, 2001 letter to Ciaschini raising the possibility that she was being subjected to race discrimination. Thus, even though she incorporates into her retaliation claim many of defendants' actions occurring prior to January 23rd, such as the July 30, 1999 Warning and the denial of many of her transfer applications, such employment actions could not have been retaliatory because they predate her protected conduct. Any employment actions prior to January 23, 2001 should not be considered as part of Solomon's retaliation claim.

### 2. The February 9, 2001 Suspension and the February 13, 2001 Written Warning.

With respect to Solomon's February 9, 2001 suspension and February 13, 2001 Written Warning, as discussed above with respect to Solomon's discrimination claims, O'Connell had legitimate, non-discriminatory reasons for suspending Solomon and issuing her the written warning. Defendants rely on their argument as set forth in Section 2b, supra.

---

[27]Courts also apply the same legal standard to retaliation claims brought under §1981, see Gallagher, 139 F.3d at 349, as well as CFEPA. See Rogus, 2004 U.S. Dist. LEXIS 17026 at *7.

### 3.     The January 25, 2001 Unsealed Paycheck Envelope.

Solomon alleges that two days following her January 23, 2001 written complaint of race discrimination, she received an unsealed pay envelope. Compl. ¶118-19. Her receipt of an unsealed paycheck envelope was not an adverse employment action. The Second Circuit defines "adverse employment action" as occurring when a plaintiff endures a "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)(internal citations omitted). A material adverse change is a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F. 2d 132, 136 (7th Cir. 1993). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (quoting Crady, 993 F.2d at 136).

Furthermore, Solomon cannot establish a causal connection between her January 23rd complaint and her receipt of an unsealed paycheck envelope. In response to Solomon's complaint about the unsealed paycheck envelope, Ciaschini interviewed Lynch, the Hospital employee responsible for distributing the paychecks. Def. 56(a)1 ¶44. Lynch denied opening the Solomon's paycheck envelope. Id. As a result, Ciaschini concluded that the Payroll Department simply failed to seal the paycheck envelope. Id. Solomon has no evidence to support her claim that anyone opened or failed to seal the envelope due to a retaliatory motive.

55

### 4.    The March 1, 2001 Paycheck.

Solomon alleges that on March 1, 2001, after having received eighty-eight straight paychecks, she did not receive a paycheck because O'Connell did not submit Solomon's timecard. See Compl. ¶¶120-121. Solomon admits, however, that the Payroll Department issued her check the following day. Id. ¶122. The one-day delay experienced by Solomon in receiving her paycheck does not amount to an adverse employment action. See Lawrence v. Fashion Institute of Technology, 2002 U.S. Dist. LEXIS 23916, at *6, No. 01-cv-7395(AKH) (S.D.N.Y. December 12, 2002)(noting that administrative trouble experienced in collecting a paycheck, while an inconvenience, is not an adverse employment action)[28]; Sprott v. Franco, 1997 U.S. Dist LEXIS 1935, at *40 n.5 (S.D.N.Y. Feb. 24, 1997)(same).[29]

Solomon also cannot show any causal connection or retaliatory animus stemming from the one-day delay she experienced in receiving her check. As explained by O'Connell, normally employees give their timecard directly to her for approval. Def. 56(a)1 ¶72. On this occasion, however, Solomon failed to submit her timecard for approval. Id. ¶70. If a timecard is missing, the regular department secretary normally alerts O'Connell to this fact. Id. ¶72. However, on the day that O'Connell approved the timecards the regular secretary was absent and the temporary secretary did not inform O'Connell that Solomon's timecard had not been submitted. Id. As soon as it was discovered that Solomon was not issued a

---

[28] See App. B, Tab K.
[29] See App. B, Tab L.

56

paycheck for the March 1 payroll, her timecard was approved and the Payroll Department issued her a check the very next day.  Id. ¶71.

### 5.    The January and February 2001 Transfer Applications.

To the extent that Solomon bases her retaliation claim on any of the transfer applications she made following her January 23, 2001 letter to Ciaschini, as discussed above, the Hospital had non-discriminatory reasons for not selecting Solomon for such positions. See Sections B9 – B12.  Furthermore, Solomon has absolutely no evidence that O'Connell, Ciaschini or Niles interfered with her transfer applications in any way.  Def. 56(a)1 ¶¶86, 92-93, 100, 125-126, 160-161, 179, 192.

### E.    Defendants Are Entitled To Judgment As a Matter of Law on Solomon's Claims for Disparate Impact Race Discrimination under Title VII.

Solomon alleges that the Hospital engaged in employment practices that had a disparate impact on black employees (Counts Seven and Eight).  To state a prima face case of disparate impact discrimination under Title VII, the plaintiff bears the burden of demonstrating that a specific policy or practice of the defendant had a disproportionately negative impact on the plaintiff's protected class.  42 U.S.C. § 2000e-2(k)(1)A); Jackson v. University of New Haven, 228 F. Supp. 2d 156, 163 (D. Conn. 2002).  "To make this showing, a plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two."  Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001); Jackson, 228 F. Supp. 2d at 164. Statistics are often an important element of a disparate treatment claim.  See Robinson, 267 F. 3d at 160 ("Statistical proof almost always occupies center stage in a prima facie showing

57

of a disparate impact claim"); <u>Smith v. Xerox Corp.</u>, 196 F.3d 358, 365 (2d. Cir.

1999)(holding that after plaintiffs identify a specific employment practice "plaintiffs then

must present statistical evidence of a kind and degree sufficient to show the practice in

question has caused the exclusion" of protected groups)(citations omitted).

### 1. The Alleged Requirement That Black Employees Engage in Non-Job Related Conversation With White Employees.

In Count Seven, Solomon alleges that the Hospital "used an employment practice that

required black employees to engage in non-job related conversation with white employees

using discipline to enforce this requirement, but did not require black employees to engage in

non-job related conversation with other black employees...." Compl. ¶127. This claim fails

for several reasons.

First, Solomon cannot demonstrate that the Hospital maintained such an employment

policy. It is undisputed that on February 9, 2001, Solomon was suspended after deliberately

refusing to speak with her supervisor and another co-worker. <u>See</u> Section, A2, <u>supra</u>.

Later, on February 13, 2001, Solomon was issued a Written Warning due to her failure to

comply with the "Communication" and "Relationships" competencies which are part of the

Hospital's "Mission, Vision and Values," based on her refusal to acknowledge her

supervisor's greeting and appropriately engage in casual workplace conversation with other

co-workers. <u>Id.</u> The Hospital requires all employees to comply with its "Mission, Vision

and Values," regardless of race.

Furthermore, even if Solomon could establish that the Hospital maintained an

employment practice that required black employees to engage in non-job related

58

conversations with white employees, she cannot demonstrate that this practice had a disparate impact on black employees.  She has *absolutely no evidence, statistical or otherwise,* to make such a showing.  Count Seven should be dismissed.

### 2.    The English-Spanish Bi-lingual Requirement.

In Count Eight, Solomon alleges that the Hospital "used an employment practice that required Spanish and English lingual skills as qualification for certain administrative positions," and that "this requirement or preference ... is an employment practice that causes a disparate impact on individuals of plaintiff's race."  Compl. ¶¶136, 141.  In other words, Solomon claims that an employment qualification which requires candidates to speak both Spanish and English has a disparate impact on black applicants.  Solomon has no evidence to support this claim.

Despite extensive research, the Hospital could not find a single case from any federal court in the country considering the question of whether a bi-lingual requirement could give rise to a disparate impact claim based on *race*.  Perhaps this is because language skills are not an immutable characteristic of race, but rather of national origin.  On that note, Courts have held that a preference for a person with a bi-lingual ability does not constitute national origin discrimination under Title VII.  See Richardson v. CenterCare, Inc., 2004 U.S. Dist. LEXIS 19606 at *2, No. 02-CV-9212 (LAP) (S.D.N.Y. Sept. 30, 2004).[30]

It is undisputed that Solomon's transfer applications for several positions were rejected because she was not bi-lingual in English and Spanish, which was a minimum qualification for those positions.  See Sections B3 and B9, supra.  Even if the Hospital's

59