UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARAIYA SOLOMON, | : | |
| | : | |
| Plaintiff, | : | CASE NO.:  3:02-cv-1116(EBB) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HOSPITAL, | : | |
| GLADYS M. CIASCHINI, | : | |
| SUSAN A. O'CONNELL, and | : | |
| SANDRA NILES, | : | |
| | : | |
| Defendants. | : | APRIL 5, 2005 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Saraiya Solomon submits this memorandum in opposition and response to the Motion for Summary Judgment against all counts of the Second Amended Complaint[1] filed by Defendants Hartford Hospital, Gladys M. Ciaschini, Susan A. O'Connell, and Sandra Niles.

---

[1] The Second Amended Complaint alleges:

- In Counts One, Three, Nine, and Eleven: Disparate Treatment Race Discrimination (42 U.S.C. § 2000e-2(a)) against Hartford Hospital;

- In Counts Seven and Eight:  Disparate Impact Race Discrimination (42 U.S.C. § 2000e-2(a), 2(k)) against Hartford Hospital;

- In Counts Five and Fourteen:  Unlawful Retaliation (42 U.S.C. § 2000e-3 and Conn. Gen. Stat. § 46a-60(a)(4)) against Hartford Hospital;

- In Counts Two, Four, Six, Ten, and Twelve: Equal Rights Violations (42 U.S.C. §§ 1981, 1981b) against all Defendants; and

- In Count Thirteen:  Race Discrimination (Conn. Gen. Stat. § 46a-60(a)(1)) against Hartford Hospital.

In accordance with the stringent standards set forth in Connecticut courts for extreme and outrageous conduct required by an intentional infliction of emotional distress claim and the limited applicability of the negligent infliction of emotional distress to the actual manner of discharge, and, for the practical reason that any award for damages under these claims would be duplicative of damages received under the anti-discrimination counts, Plaintiff does not oppose Defendants' motion for summary judgment against these claims at Counts Fifteen and Sixteen.  Finally, as regards the last remaining Counts Seventeen, Eighteen, and Nineteen, not already addressed in the instant footnote and containing state common law claims, Plaintiff does not oppose Defendants' motion for summary judgment.

## **OUTLINE OF MEMORANDUM**

I.   **SUMMARY REMARKS**

II.  **FACTS**
   A. <u>Hartford Hospital's Discriminatory Management of Plaintiff's Transfer Applications</u>
      i. *Defendant Susan A. O'Connell's Changed Perspective Toward Plaintiff*
      ii. *Defendant Gladys M. Ciaschini Replaces Judy Brady as the Human Resources Consultant for Radiation Oncology*
      iii. *Plaintiff's Transfer Efforts*
         1. Administrative Associate I in Hemodialysis Unit (Position Reference #A021681037F)
         2. Financial Counselor in Patient Accounts Department (Position Reference #A010803074A)
         3. Human Resources Associate in Human Resources Department (Position Reference #A010501039A)
         4. Patient Administrative Associate and Administrative II positions in Care Continuum (Position Reference #A020403002D (Position Reference #A020420002D)
         5. Administrative Associate III in Research Department (Position Reference #A129503008E)
         6. Hospital Position Requiring Spanish and English (Bilingual) Skills (Position Reference #A025662036) (Position Reference #A030080029) (Position Reference #A030089003E) (Position Reference #A025780010)
         7. Patient Administrative Associate in Care Continuum-Assessment Center (Position Reference #A0204003006D) (Position Reference #A0204003005D)
         *8.* Transfer Applications Denied Due to Written Warning Issued by Defendant Susan A. O'Connell (Position Reference #A025961062B) (Bliss Unit-10 East Position)
      iv. *The Conklin Building Entrance Transport Aides' Internal Transfer Efforts*
         1. Conklin Building Entrance Transport Aide Virginia Hernandez-Green
         2. Conklin Building Entrance Transport Aide Juan Urena
         3. Conklin Building Entrance Transport Aide Alex Moreau
         4. Conklin Building Entrance Transport Aide Kelvin Griffith
   B. <u>Hartford Hospital's Retaliatory Disciplinary Action Against Plaintiff</u>
      i. *Suspect Procedural Implementation of Performance Improvement Process*
      ii. *Suspect Substantive Implementation of Performance Improvement Process*
   C. <u>Hartford Hospital's Retaliatory Termination Actions Against Plaintiff</u>
      i. *Thirty-Four Days*
      ii. *Policies and Conditions Applied to Plaintiff's Position Elimination*
      iii. *Ineligibility for Rehire*

III. **LEGAL ARGUMENT**
   A. <u>Standard for Summary Judgment</u>
   B. <u>Disparate Treatment Race Discrimination</u>
   C. <u>Disparate Impact Race Discrimination</u>
   D. <u>Unlawful Retaliation</u>
   E. <u>Equal Rights Violations</u>

IV.  **CONCLUSION**

**I.      SUMMARY REMARKS**

A familiarity with Hartford Hospital's Human Resources Policies and Procedures lends understanding to the subtlety of the majority of the discriminatory acts that deprived Plaintiff of an equal opportunity under the law to work at Hartford Hospital ("Hospital").  Overt acts support Plaintiff's discrimination and equal rights complaint as well.  In this memorandum, Plaintiff addresses five courses of conduct which provide adequate measure of inference for a reasonable trier of fact to conclude that Hartford Hospital deprived Plaintiff of opportunities, based on her race, for transfer to other positions in the Hospital prior to, and following, the March 31, 2001, elimination of Plaintiff's position.  (Declaration of Saraiya Solomon ("Pl.'s Dec.") ¶2, Local Rule 56(a)2 Statement ("L.R. 56(a)2 Statement"), Tab A)

- First, the Hospital ignored and acted in contravention of its Staff Reduction Policy which assigns "priority consideration" to employees affected by position reductions "for open positions at any level in any department of the hospital for which they meet the qualifications and for which they have the ability to adequately perform the required functions within a ninety day period."  (Hospital Staff Reduction Policy, L.R. 56(a)2 Statement, Ex. 23)

- Second, the Hospital abused its Performance Management and Performance Improvement Policy by first suspending Plaintiff without pay on February 9, 2001, and then issuing a written warning to Plaintiff on February 13, 2001, in retaliation for Plaintiff's January 23, 2001, complaints of discrimination and February 12, 2001, notice of intent to file an administrative, anti-discrimination complaint.  (Hospital Performance Management and Performance Improvement Process Policy; January 23, 2001, Letter; February 12, 2001, Letter; Defs.' Mem. in Supp. of Summ. J., Declaration of Gladys Ciaschini ("Def. Ciaschini Dec."),

3

App. A, Tab C at Tabs 4, 13, 16, and 20) (Written Warning, Defs.' Mem. in Supp. of Summ. J., Declaration of Susan O'Connell ("Def. O'Connell Dec."), App. A, Tab B at Tab 5)

- Third, the Hospital, by averring that Plaintiff was not qualified for positions after she was referred and participated in employment interviews, dismisses, without explanation, the provision of its Recruiting and Selection Policy that imposes as a condition precedent upon any employment interview a determination by a Hospital Human Resources Consultant that the applicant is qualified for the position. (Hospital Recruiting and Selection Policy, L.R. 56(a)2 Statement, Ex. 24)

- Fourth, the Hospital violated its Separation of Employment Policy and Rehires Policy by marking Plaintiff as ineligible for rehire following the elimination of her position on March 31, 2001. (Pl.'s Payroll Activity Window, L.R. 56(a)2 Statement, Ex. 1) (Hospital Rehires Policy, L.R. 56(a)2 Statement, Ex. 25) (Hospital Separation of Employment Policy, L.R. 56(a)2 Statement, Ex. 26)

- Fifth, the Hospital discriminated against Plaintiff, who is black, by requiring that candidates for selected positions at the Hospital have bilingual skills in Spanish and English without data or policy to support its determinations that those with bilingual skills in Spanish and English would be more qualified to perform the positions' requirements. (Admissions by Defendants Nos. 147, 151, L.R. 56(a)2 Statement, Ex. 45) (Admissions by Defendants Nos. 145, 149, 153, L.R. 56(a)2 Statement, Ex. 29) (Pl.'s Dec. ¶¶48, 68, 70, 71, L.R. 56(a)2 Statement, Tab A)

The Hospital's deviation from its policies is evident in: (1) Plaintiff's submission of numerous unsuccessful applications for transfer to other positions in the Hospital within the three-hundred day period prior to her March 19, 2001, administrative discrimination complaint

4

(Pl.'s Dec. ¶101, L.R. 56(a)2 Statement, Tab A); (2) a thirty-four (34) work day disciplinary period imposed against Plaintiff on February 13, 2001, rendering Plaintiff ineligible to apply for transfer to other positions in the Hospital for the remaining thirty-four (34) work days of her employment through March 31, 2001 (Def. O'Connell Interrog. Resp. No. 8, L.R. 56(a)2 Statement, Ex. 49) (Pl.'s Dec. ¶108, L.R. 56(a)2 Statement, Tab A); and (3) the Hospital's determination that it would record Plaintiff as ineligible for rehire even though such ineligibility did not apply to employees terminated as a result of staff reduction or position elimination (Pl.'s Payroll Activity Window, L.R. 56(a)2 Statement, Ex.1) (Hospital Rehires Policy, L.R. 56(a)2 Statement, Ex. 25) (Hospital Separation of Employment Policy, L.R. 56(a)2 Statement, Ex. 26)

## II. FACTS

### A. Hartford Hospital's Discriminatory Management of Plaintiff's Transfer Applications

#### i. *Defendant Susan A. O'Connell's Changed Perspective Toward Plaintiff*

Plaintiff obtained her Administrative Associate I (AAI) position in Radiation Oncology through an internal transfer from Volunteer Services on March 22, 1999, and began applying for internal transfer from Radiation Oncology in February of 2000 in contemplation of the March 31, 2001, elimination of her position. (Pl.'s Dec. ¶¶2, 44, 48, 50-51, 59, 61-62, 65, 68, 70, 72, 76, 79, L.R. 56(a)2 Statement, Tab A)  The internal transfer procedure is guided by the Hospital's Recruiting and Selection Policy.  The policy provides guidelines for all hiring managers and human resources personnel.  According to the policy, when an opening occurs in a department, a manager evaluates the need and submits a requisition form to the Human Resources (HR) Department for approval.  The HR Consultant assigned to the department having the vacancy screens applicants and refers those who are qualified to the requesting department's

manager for an employment interview.  (Hospital Recruiting and Selection Policy, L.R. 56(a)2 Statement, Ex. 24)

When Plaintiff applied for internal transfer to the Radiation Oncology Department in February of 1999, the hiring manager for the department was Defendant Susan A. O'Connell ("O'Connell") and the HR Consultant was Judy Brady ("Ms. Brady").  (Pl.'s Transfer Application, L.R. 56(a)2 Statement, Ex. 3)  Ms. Brady referred Plaintiff's application to O'Connell for an interview.  Following the interview, O'Connell offered Plaintiff the position and noted on her application "exceptional skills and interview."  (Pl.'s Transfer Application, L.R. 56(a)2 Statement, Ex. 3)

The Radiation Oncology Department was located in the Gray Cancer Center Building ("Cancer Center") at the Hospital.  The construction of a new building at the Hospital required Cancer Center patients to detour through the Conklin Building.  Plaintiff's position at the entrance to the Conklin Building was created to receive the detoured cancer center patients and direct them to the cancer center.  The other two positions assigned to the Conklin Building entrance were Transportation ("Transport") Aide positions filled, at various points during Plaintiff's tenure, by employees Kelvin Griffith ("Mr. Griffith"), Virginia Hernandez-Green ("Ms. Hernandez-Green"), Alex Moreau ("Mr. Moreau"), and Juan Urena ("Urena").  (Pl.'s Dec. ¶¶33, 82, 83, 85, L.R. 56(a)2 Statement, Tab A)  While Mr. Urena and Plaintiff worked together at the entrance of the Conklin Building, O'Connell requested that a count be made of the amount of foot traffic entering the Conklin Building.  The count amounted to approximately 1500 people per day between the hours of 7 A.M. and 5:30 P.M.  (Pl.'s Dec. ¶88, L.R. 56(a)2 Statement, Tab A)  While Plaintiff was employed at the Hospital, no one ever made her aware of any customer complaint made against her.  (Pl.'s Dec. ¶89, L.R. 56(a)2 Statement, Tab A)  A

6

summary of Plaintiff's position duties required her to: (a) provide basic secretarial and clerical support to the work area by performing tasks that were routine and directed; (b) follow instructions and procedures to perform tasks as assigned; and (c) report to assigned supervisor. (AAI Role Description, L.R. 56(a)2 Statement, Ex. 4)  The Transport Aides transported the Cancer Center patients in wheelchairs or as otherwise required.

Four months after O'Connell offered Plaintiff the AAI position in Radiation Oncology, a discrepancy occurred between O'Connell's and Plaintiff's understandings of the requirements of the position.  O'Connell asserted to Plaintiff that the Transport Aides and Plaintiff were to provide "cross-coverage" for their positions.  Specifically, Transport Aides would perform Plaintiff's reception duties and Plaintiff would perform the Transport Aide duties, as necessary. (Pl.'s Dec. ¶32, L.R. 56(a)2 Statement, Tab A)  Plaintiff told O'Connell that this "cross-coverage" requirement had not been communicated to her during her interview with O'Connell and Defendant Sandra Niles ("Niles") or in the course of her application for transfer to the AAI position.  (Pl.'s Dec. ¶10, L.R. 56(a)2 Statement, Tab A)  Plaintiff expressed concern about the additional Transport Aide duties due to her preexisting back condition and informed O'Connell that she would not be able to "cross-cover" for the Transport Aides.  (Pl.'s Dec. ¶¶23, 28, L.R. 56(a)2 Statement, Tab A)  O'Connell demanded that Plaintiff provide a physician's note indicating a physical restriction by August 23, 1999, which Plaintiff did provide.  (Medical Notes, L.R. 56(a)2 Statement, Ex. 6 and Ex. 7) (Pl.'s Dec. ¶¶23, 24, L.R. 56(a)2 Statement, Tab A)

Nonetheless, O'Connell issued a "Performance Management" document to Plaintiff dated July 30, 1999.  (Performance Management Document, Def. O'Connell Dec., App. A, Tab B at Tab 1)  The Performance Management document addressed expectations and goals for personnel

7

matters and the "cross-coverage" issue between the Transport Aide positions and Plaintiff's AAI position. In addition, the document demonstrated that Niles held a supervisory role for the Conklin Building entrance staff consisting of Plaintiff and the transport aides. For example, the document indicated that the staff assigned to the Conklin Building entrance was required to obtain the permission of Niles or O'Connell for all vacation requests and early or late arrivals. (Def. O'Connell Dec., App. A, Tab B at Tab 1)

Plaintiff was not aware that the document issued by O'Connell dated July 30, 1999, regarding Performance Management constituted a disciplinary action under Step 2 of the Hospital's Performance Improvement Process (PIP), formerly known as the Disciplinary Policy, until December 26, 2000, when she met with Defendant Gladys Ciaschini ("Ciaschini"), the HR Consultant who had replaced Ms. Brady as the human resources representative assigned to the Radiation Oncology Department. (Pl.'s Dec. ¶26, L.R. 56(a)2 Statement, Tab A) (January 23, 2001, E-mails between Ciaschini and O'Connell, L.R. 56(a)2 Statement, Ex. 8) The PIP consists of (1) Verbal Counseling; (2) Formal Improvement Documentation; (3) Final Written Warning; and (4) Suspension or Discharge. (Def. Ciaschini Dec., App. A, Tab C at Tab 16) The PIP states that an employee will experience delay in opportunities for pay increases, lump sum awards, promotion, transfer, and tuition reimbursement for the time period spent in PIP Steps 2-4. At Step 3, the employee is warned that if "immediate improvement is not demonstrated within an appropriately limited, specific and final time frame, the employee will be suspended and/or terminated, depending upon the nature of the problem." Step 4 imposes suspension without pay or termination.

After Plaintiff's December 26, 2000, meeting with Ciaschini, O'Connell issued a document dated January 12, 2001, regarding "Performance Management Memos dated 7/30/99 +

8/6/99," indicating to Ciaschini:

> The issues regarding coverage, timecards, vacation and illness have been resolved. Saraiyais [sic²] back injury had been an ongoing issue with Occupational Health and her physician. The Cancer Center decided not to utilize Sarayai [sic³] for transfers and call for available volunteers instead. Sarayai [sic⁴] informed us that her back injury was old but prevented her from lifting and pushing.

(Pl.'s Dec. ¶¶28, 29, L.R. 56(a)2 Statement, Tab A) (January 12, 2001, O'Connell Memorandum, L.R. 56(a)2 Statement, Ex. 9)  While the July 30, 1999, PIP Step 2 disciplinary period purportedly remained in effect from July 30, 1999, through January 12, 2001, contrary to the PIP provision indicating that "[a]n employee will experience delay in opportunities for pay increases, lump sum awards, promotion, transfer, and tuition reimbursement for the time period spent in PIP Steps 2-4," Plaintiff submitted transfer applications and received pay increases.  (Pl.'s Dec. ¶26, L.R. 56(a)2 Statement, Tab A) (Defs.' Local Rule 56(a)1 Statement, No. 25)  Clearly, that particular provision of the PIP, prohibiting an employee's internal transfer and pay increases during a disciplinary period is discretionary, which will gain import when it is shown that the Hospital strictly enforced the prohibition on Plaintiff's opportunity to transfer following Plaintiff's complaints of discrimination in January and February of 2001.  (Pl.'s Dec. ¶108, L.R. 56(a)2 Statement, Tab A)

In any case, although O'Connell interviewed and hired Plaintiff in March of 1999, within four months, O'Connell had issued a formal improvement document to Plaintiff and declined to intervene in a work centered issue arising between Plaintiff and Mr. Griffith, a black male Transport Aide assigned to the Conklin Building entrance.  Plaintiff noted numerous difficulties

---

² At the time O'Connell drafted this document for Ciaschini, O'Connell had supervised Plaintiff Saraiya Solomon for twenty-two (22) months, including conducting yearly performance evaluations and reviewing biweekly time cards submitted by Plaintiff.
³ *See* note 2, *supra*.
⁴ *See* note 2, *supra*.

in patient care arising from the fact that Mr. Griffith would disappear for hours from the Conklin Building entrance.  On August 5, 1999, Plaintiff requested a meeting with O'Connell to discuss Mr. Griffith's unprofessional behaviors and Plaintiff's frustration with not having the resources to provide for patient care while Mr. Griffith was absent without explanation.  Cancer Center patients would not receive transport as a result of Mr. Griffith's behaviors.  (Pl.'s Dec. ¶¶33, L.R. 56(a)2 Statement, Tab A)  Eventually, on October 19, 2000, O'Connell would terminate Mr. Griffith's employment due to excessive absenteeism but on August 5, 1999, O'Connell viewed Plaintiff's complaints about Mr. Griffith with detachment, or even amusement.  (Pl.'s Dec. ¶34, L.R. 56(a)2 Statement, Tab A) (Hospital Employee Record Change Notice (ERCN) re: Mr. Griffith, Ex. 10)  O'Connell knew that Plaintiff, a black female, and Mr. Griffith, a black male, did not speak after the August 5, 1999, meeting but it was of no consequence to O'Connell.  O'Connell's treatment of the issues that had arisen between Plaintiff and Mr. Griffith would stand in contrast to the heightened scrutiny and disciplinary action that would be taken against Plaintiff in February of 2001 when white employees reported that Plaintiff had not greeted them.  (Def. O'Connell Dec., App. A, Tab B at Tab 5) O'Connell's response to white employees' complaints that Plaintiff did not greet them as they expected to be greeted in January and February of 2001 and her response to Plaintiff's assertion in July of 1999 that Plaintiff had a back condition which prevented her from assuming the duties of the transport aide positions were the same:  O'Connell disciplined Plaintiff.  (Def. O'Connell Dec., App. A, Tab B at Tab 1 and Tab 5) (Pl.'s Dec. ¶¶26, 102, L.R. 56(a)2 Statement, Tab A)

At section II(A)(1) of the Defendants' Memorandum in Support of Summary Judgment ("Memorandum"), Defendants allege that Plaintiff cannot claim that the July 30, 1999, Performance Improvement document is an adverse discriminatory action because it did not occur

10

within the 180 day or 300 day period preceding Plaintiff's March 19, 2001, administrative complaint. First, the disciplinary period imposed by the July 30, 1999, memorandum did not end until January 12, 2001, well within the statute of limitations period set by Plaintiff's March 19, 2001, administrative complaint. (Pl.'s Dec. ¶101, L.R. 56(a)2 Statement, Tab A) (L.R. 56(a)2 Statement, Ex. 9) Second, the import of the July 30, 1999, document is that it ignited a change in O'Connell's perspective toward Plaintiff such that it is no longer relevant that O'Connell hired Plaintiff in March of 1999 and marked on her application "exceptional skills and interview." (L.R. 56(a)2 Statement, Ex. 3) The change that occurred in O'Connell's treatment of Plaintiff after Plaintiff asserted her positions to O'Connell in July of 1999 portended what would occur when other white employees felt that Plaintiff was not as deferential to them as they would expect. By June of 2000 another change occurred, Ciaschini replaced Ms. Brady, the HR Consultant who had been involved in the recruitment and selection of Plaintiff for the AAI position. (Def. Ciaschini Dec. ¶2, App. A, Tab C)

> ii. *Defendant Gladys M. Ciaschini Replaces Judy Brady as the HR Consultant for Radiation Oncology*

The Hospital hired Ciaschini in July of 2000 as the HR Consultant assigned to, among other departments, Radiation Oncology. (Def. Ciaschini Dec. ¶2, App. A, Tab C) When Plaintiff submitted her application to the Radiation Oncology Department in February of 1999, she was referred by Ms. Brady and hired by O'Connell. (L.R. 56(a)2 Statement, Ex. 3) By July of 1999, O'Connell's perspective toward Plaintiff had changed after Plaintiff asserted her position that her AAI Role Description and duties did not include the physical duties of transporting patients. (AAI Role Description, L.R. 56(a)2 Statement, Ex. 4) Niles, who had participated with O'Connell in interviewing Plaintiff, was then placed in a supervisory position to Plaintiff and the Transport Aides requiring that Plaintiff and the Transport Aides obtain Niles'

permission for vacation requests and early or late arrivals.  (Def. O'Connell Dec., App. A, Tab B at Tab 1) (Pl.'s Dec. ¶8, 116, L.R. 56(a)2 Statement, Tab A )  O'Connell considered Niles as her "only back-up" and depended on her to "check on things" at Plaintiff's work area, especially when O'Connell was occupied at health care facilities other than Hartford Hospital.  (Pl.'s Dec. ¶¶9, 117, L.R. 56(a)2 Statement, Tab A)  In turn, while Niles supervised Plaintiff the work environment focused on race:

- Niles, in the first week of Plaintiff's work at the Conklin Building entrance, made consistent remarks about Plaintiff's use of the bus for transport to work, and questioned how Plaintiff could manage without a car;

- Niles, during the twenty-one (21) months that Plaintiff worked at the Conklin Building and prior to Plaintiff's complaint, made numerous statements about Plaintiff's residence in Hartford, Niles' aversion to ever living in Hartford, and Niles' intent just to work, not live, in Hartford;

- Niles asked Plaintiff for details about the bus Plaintiff used for transport to work;

- In the Summer of 1999, as Plaintiff was walking back to her work area, she passed Niles in a tunnel connecting the Cancer Center to the Conklin Building and Niles commented that she wished she could be as dark as Plaintiff;

- Niles told Plaintiff that Plaintiff should wear a darker make-up foundation since the make-up foundation that Plaintiff was using was too light;

- Niles told Plaintiff that Tina Turner could not be black as Plaintiff admired Tina Turner's physical appearance;

- Niles told Plaintiff that the black characters in the musical "Porgy and Bess" looked ridiculous in the way they dressed and danced;

- Niles told Plaintiff that she believed black people all had kinky hair, similar to "brillo,";

- In coordinating a Cancer Center event for survivors, Niles told Plaintiff that the majority of the cancer center patients were white and they would probably not enjoy jazz music, as jazz was ethnic, and people of a certain class did not enjoy jazz; and

- Niles commented to Plaintiff that the lighter skinned cancer center valet drivers of Arabic ethnicity were more attractive and she could not understand how people from Africa could appear so different.

12

(Pl.'s Dec. ¶14, L.R. 56(a)2 Statement, Tab A)  In February and April of 2000, as Plaintiff reached the midpoint between her hire for the AAI position in Radiation Oncology and its scheduled elimination, she began to submit applications for internal transfer to other positions in the Hospital.  On June 27, 2000, Plaintiff and Mr. Griffith met with Ms. Brady, O'Connell, and John Fagan ("Mr. Fagan") regarding the scheduled elimination of Plaintiff's and Mr. Griffith's positions and their opportunities for internal transfer.  Mr. Fagan had called the meeting to inform Plaintiff and Mr. Griffith that the Hospital wished to keep them as employees following the elimination of their positions.  During the meeting, Plaintiff told Ms. Brady that Plaintiff had applied for an AAI position in the Hospital's Hemodialysis Unit.  (Pl.'s Dec. ¶57, L.R. 56(a)2 Statement, Tab A)  Ms. Brady told Plaintiff that her application would be given priority because of the scheduled elimination of Plaintiff's position at the Conklin Building entrance.  (Pl.'s Dec. ¶57, L.R. 56(a)2 Statement, Tab A)  However, Ms. Brady was replaced by Ciaschini in July of 2000 and Ciaschini would later advise at least one hiring manager that Plaintiff was not entitled to any priority consideration.  (Def. Ciaschini Dec. ¶2, App. A, Tab C) (Pl.'s Dec. ¶¶73-74, L.R. 56(a)2 Statement, Tab A)  Plaintiff filled the months of June of 2000 through January of 2001 with work and preparing internal transfer applications for no less than eleven open Hospital positions.[5]

---

[5] Plaintiff applied for transfer to fifteen positions between February of 2000 and February of 2001.  However, as regards (a) the Patient Administrative Associate position in Women's Ambulatory Health Services addressed at section II(B)(3) of Defendants' Memorandum, the successful candidate was chosen in March of 2000 and remained employed in that position through July 24, 2002, and Plaintiff concedes that this adverse action occurred prior to the 180 day and 300 day statute of limitations period determined by Plaintiff's filing of her administrative complaint on March 19, 2001, with the Connecticut Commission on Human Rights and Opportunities (CHRO); (b) the position at the Connecticut Children's Medical Center addressed at section II(B)(6) of Defendants' Memorandum, Plaintiff concedes that this adverse action occurred prior to the 180 day and 300 day statute of limitations period determined by Plaintiff's filing of her administrative complaint on March 19, 2001, with the CHRO; and (c) the Administrative Associate II position in Patient Accounts addressed at section II(B)(7) of Defendants' Memorandum, Plaintiff concedes that this adverse action occurred

In the final week of December of 2000, Plaintiff had an initial meeting with Ciaschini and two more meetings were memorialized in a letter from Ciaschini to Plaintiff dated January 22, 2000.[6]  (January 22, 2000[sic][7], Letter from Ciaschini to Plaintiff, L.R. 56(a)2 Statement, Ex. 14) Ciaschini provided a copy of the January 22, 2000[8], letter to O'Connell.[9]  Nonetheless, at no point did Ciaschini or O'Connell inform Plaintiff that she was entitled to priority consideration when applying for open positions.  (Pl.'s Dec. ¶128, L.R. 56(a)2 Statement, Tab A)  Ciaschini referred Plaintiff in her January 22, 2000[10], letter to a voice mail that Ciaschini had left for Plaintiff on January 19, 2001, informing Plaintiff of "four additional PAA jobs, in the OPD and Bliss 9 ICU, you [Plaintiff] qualified for" (L.R. 56(a)2 Statement, Ex. 14) but did not reference Plaintiff's eligibility for priority consideration under the Staff Reduction Policy.  (L.R. 56(a)2 Statement, Ex. 23) (Pl.'s Dec. ¶128, L.R. 56(a)2 Statement, Tab A)  Furthermore, as regards a Patient Administrative Associate position that Plaintiff applied for in the Care Continuum in September of 2000 and January of 2001, Ciaschini was the Human Resources Consultant assigned to the open positions and would have had a direct opportunity to inform the hiring managers of the scheduled elimination of Plaintiff's position under the Staff Reduction Policy but she did not.  (Posting and Transfer Application for Position #A02042002D, L.R. 56(a)2

---

prior to the 180 day and 300 day statute of limitations period determined by Plaintiff's filing of her administrative complaint on March 19, 2001, with the CHRO.  The remaining positions are addressed at section II(A)(iii), *infra*.

[6] Plaintiff received the letter in January of 2001.  (Pl.'s Dec. ¶69, L.R. 56(a)2 Statement, Tab A)

[7] Plaintiff received the letter in January of 2001.  (Pl.'s Dec. ¶69, L.R. 56(a)2 Statement, Tab A)

[8] Plaintiff received the letter in January of 2001.  (Pl.'s Dec. ¶69, L.R. 56(a)2 Statement, Tab A)

[9] The Hospital's policy states that an employee's manager may only be contacted regarding an internal transfer application when the employee provides express consent for such contact.  The purported reason for this policy is employee confidentiality.  Defendants rely on this policy to demonstrate that O'Connell could not have interfered with Plaintiff's internal transfer applications because Plaintiff did not provide express authorization for her to be contacted.  However, Ciaschini's release of the January 22, 2001, letter to O'Connell casts this policy of confidentiality and limited communication in doubt, especially since the letter references Patient Administrative Associate positions in the Care Continuum Department assigned to Ciaschini as the HR Consultant conducting the screenings for referral of qualified candidates to the manager for interviews.  (Hospital Career Opportunities Policy, L.R. 56(a)2 Statement, Ex. 31 at p.1, ¶2) (L.R. 56(a)2 Statement, Ex. 14) (Pl.'s Dec. ¶72-73, L.R. 56(a)2 Statement, Tab A)

[10] Plaintiff received the letter in January of 2001.  (Pl.'s Dec. ¶69, L.R. 56(a)2 Statement, Tab A)

Statement, Ex. 27) (Posting and Transfer Application for Position #A0204003006D, L.R. 56(a)2 Statement, Ex. 28)

The Hospital continues to maintain however, as applied to Plaintiff's case, contrary to its Staff Reduction Policy, that "qualified internal candidates whose positions are ending are afforded the same preference as other qualified internal candidates in the selection process for new or vacant positions consistent with the Hospital's Career Opportunities policy." (Admissions by Defendants No. 29, L.R. 56(a)2 Statement, Ex. 29)  The Career Opportunities Policy does not address the status of employees subject to termination based on staff reduction and the elimination of their positions.  It does not reference employees subject to staff reductions or provide for their priority consideration over other internal candidates.  (Hospital Career Opportunities Policy, L.R. 56(a)2 Statement, Ex. 31)  In addition, the Career Opportunities Policy provides internal employees only a one-month probationary period upon their transfer to a new or vacant position whereas the Staff Reduction Policy sets forth a standard requiring that internal transfers adequately perform the functions of their positions within a ninety day period. (L.R. 56(a)2 Statement, Ex. 23)  As it admits, the Hospital did not afford priority consideration to any of Plaintiff's applications for internal transfer. (Admissions by Defendants No. 29, L.R. 56(a)2 Statement, Ex. 29)

      *iii. Plaintiff's Transfer Efforts*

<u>Disparate Treatment Race Discrimination</u>

The facts alleged and supported in subparts (1) through (5) of section II(A)(iii), *infra*, detailing, one by one, Plaintiff's efforts to transfer to the open positions of AAI in Hemodialysis, Financial Counselor in Patient Accounts, Human Resources Associate in Human Resources, PAA and AAII in Care Continuum, and AAIII in Research, *inter alia*, provide adequate

inference of disparate treatment race discrimination, under the law, for Plaintiff's complaint to survive Defendants' Motion for Summary Judgment on Counts One, Three, Nine, Eleven, and Thirteen.

In each of these five hiring decisions, the Hospital denied Plaintiff priority consideration for the positions and denied Plaintiff a period of ninety days to adequately perform her newly assigned duties in contravention of and deviation from the Hospital's Staff Reduction Policy. The successful candidates in all five positions were Hispanic and white.

In two of these five hiring decisions, concerning the AAI in Hemodialysis and Financial Counselor in Patient Accounts positions, the Hospital dissembles the facts to convey purported non-discriminatory bases for its actions.

In three of these five hiring decisions, concerning the AAI in Hemodialysis, Financial Counselor in Patient Accounts, and Human Resources Associate in Human Resources for which Plaintiff interviewed, the Hospital contends that Plaintiff was not qualified in contravention of and deviation from its own Recruitment and Selection Policy that imposes as a condition precedent upon any employment interview a determination by a Hospital Human Resources Consultant that the applicant is qualified for the position. (L.R. 56(a)2 Statement, Ex. 24)

In four of these five hiring decisions, concerning the AAI in Hemodialysis, Financial Counselor in Patient Accounts, Human Resources Associate in Human Resources, and PAA and AAII in Care Continuum positions, the Hospital hired external candidates despite Plaintiff's entitlement to priority consideration and despite a preference for Plaintiff as an internal candidate. (L.R. 56(a)2 Statement, Exs. 23, 31)  As regards the PAA and AAII Care Continuum positions, the Hospital does not deny that Plaintiff was qualified.  The Hospital's actions in referring Plaintiff to the hiring managers for interviews is an admission under the Hospital's

16

policy that Plaintiff was qualified for the AAI in Hemodialysis,[11] Financial Counselor in Patient Accounts, and Human Resources Associate in Human Resources positions. If Plaintiff had been considered in accordance with Hospital policy and her qualifications, she would have been the offered each of these positions.

Finally, in one of these five hiring decisions, concerning the AAIII in Research position, the Hospital offers the non-discriminatory basis for its hire of a white woman as "better qualified" than Plaintiff. If the Hospital had complied with its Recruitment and Selection Policy and provided priority consideration to Plaintiff's application and a period of ninety days for Plaintiff to adequately perform her newly assigned duties or properly considered Plaintiff's qualifications, then Plaintiff would have been offered the AAIII position.

1. Administrative Associate I in Hospital's Hemodialysis Unit
   (Position Reference #A021681037F)

The Hospital posted notice of a position opening for an Administrative Associate I in the Hemodialysis Unit on June 2, 2000, under Position Reference #A021681037F. (Position Reference #A021681037F and Pl.'s Transfer Application, Defs.' Mem. in Supp. of Summ. J., Declaration of Monica Kowalski (hereinafter, "Kowalski Dec."), App. A, Tab D at Tab 1 and 2)

The HR Consultant and hiring manager conducting the selection and recruitment were Joyce Harrison and Monica Kowalski ("Ms. Kowalski"), respectively. The Hospital's Recruiting and Selection Policy required the HR Consultant to screen both internal and external applicants and refer qualified candidates to the manager. (L.R. 56(a)2 Statement, Ex. 23) The manager conducted employment interviews with candidates screened by the HR Consultant.

---

[11] See fn 1, *supra.*

17

The hiring manager interviewed Plaintiff, an internal candidate, for Position Reference #A021681037A and asserts that Plaintiff was not qualified for the position. (Kowalski Dec. ¶5, App. A, Tab D) Under the Hospital's policy, Plaintiff would not have been referred for an interview with the hiring manager if she was not qualified for the position. (L.R. 56(a)2 Statement, Ex. 23) According to Ms. Kowalski, a panel "ultimately hired Lovie DeGourville, who is black, for the AAI position." (Kowalski Dec. ¶5, App. A, Tab D) Ms. Kowalski's representation in her Declaration that Ms. DeGourville was hired for the AAI position is not supported by Ms. DeGourville's personnel record. In addition, Ms. Kowalski omits other pertinent information from her Declaration. First, she omits that an external candidate, Terri Durler, was the original hire for the position. Ms. Durler submitted her application on July 28, 2000. (Durler Application, L.R. 56(a)2 Statement, Ex. 32) The date on Ms. Durler's application demonstrates that the position remained open in July of 2000 and, since Plaintiff had not been notified that she was not been chosen for the position, Plaintiff remained eligible. (Pl.'s Dec. ¶51, L.R. 56(a)2 Statement, Tab A) Ultimately, however, even though she was offered and accepted the position, Ms. Durler never worked in the position. (Production Resp. by Defs. No. 121, L.R. 56(a)2 Statement, Ex. 33) Second, Ms. Kowalski omits that Jennifer Vasquez ("Ms. Vasquez") transferred to the position of AAI in Hemodialysis on December 17, 2000, after she was offered the position by Ms. Kowalski. (ERCN re: Ms. Vasquez, L.R. 56(a)2 Statement, Ex. 34)[12] Ms. Vasquez transferred to a Hospital Pharmacy Associate position on January 28, 2001. (ECRN re: Vasquez, L.R. 56(a)2 Statement, Ex. 69) Ms. Kowalski claims that Ms. DeGourville then was hired for the AAI position because she was familiar with the hemodialysis process

---

[12] Thereafter, Vasquez transferred to the position of Pharmacy Associate effective January 28, 2001. (ECRN re: Ms. Vasquez, L.R. 56(a)2 Statement, Ex. 69) On November 5, 2001, she transferred to an Administrative Associate I position. On February 1, 2003, she transferred to a Patient Administrative Associate position. (ERCN re: Ms. Vasquez, L.R. 56(a)2 Statement, Ex. 35)

through her experience as a Patient Care Technician in the unit already. (Kowalski Dec. ¶5, App. A, Tab D)

The Hospital does not have Ms. Vasquez' successful transfer application for Position Reference #A021681037.[13] However, it is undisputed that Ms. Kowalski hired Ms. Vasquez to begin work as an Administrative Associate I on December 17, 2000. (L.R. 56(a)2 Statement, Ex. 34) Ms. DeGourville's personnel records indicate that she never held the position of AAI. (Evaluation re: Ms. Degourville for FY 2001, L.R. 56(a)2 Statement, Ex. 37) (Evaluation re: Ms. DeGourville for FY 2001, L.R. 56(a)2 Statement, Ex. 38) (ECRN re: Ms. DeGourville, L.R. 56(a)2 Statement, Ex. 39)[14] Ms. DeGourville held the position of Patient Care Technician in Hemodialysis from at least June 4, 1999, through April 29, 2001. (L.R. 56(a)2 Statement, Ex. 39) She transferred to the position of Administrative Associate II in Interventional Electrophysiology on April 29, 2001. (L.R. 56(a)2 Statement, Ex. 38) Prior to her transfer on April 29, 2001, she held the position of Patient Care Technician in Hemodialysis. (L.R. 56(a)2 Statement, Ex. 37 and Ex. 39)

Ms. Kowalski declined to give Plaintiff consideration as each of Ms. Kowalski's choices for the position failed to begin (Ms. Durler), transferred (Ms. Vasquez), or really never held the position at all (Ms. DeGourville). On May 16, 2001, the Hospital represented to the CHRO that

---

[13] In response to Plaintiff's Requests for Production at No. 125: "Produce applications for each person hired as an Administrative Associate I in the Hemodialysis since December 16, 2000," Defendants responded: "See Applications from the following applicants for the full-time Administrative Associate I position in the Hemodialysis Department since December 16, 2000: Lovie DeGourville, April Walden, Maria Traina and Kelly Generis." In addition, the Hospital produced Ms. Vasquez' original application for hire at the Hospital dated December 16, 1997, in response to Request No. 125, but not her transfer application. (Production Resp. by Defs. No. 125, L.R. 56(a)2 Statement, Ex. 33)

[14] The ERCN at Exhibit 39 refers to a "Lovie J. Kelsey." (L.R. 56(a)2 Statement, Ex. 39) Lovie DeGourville filed a change of name notice with the Hospital dated August 31, 2001, changing her name from "DeGourville" to "Kelsey." (Change of Name Form, L.R. 56(a)2 Statement, Ex. 68)

the position was not currently filled." (Defs.' CHRO Verified Answer to the Complaint, L.R. 56(a)2 Statement, Ex. 40)

Ms. Kowalski's representation that a black female was "ultimately" hired for the AAI position is contradicted by the Hospital's records. Her motivation for representing that a black female was hired when one was not is a material issue of fact that may more than infer discriminatory motive to a reasonable trier of fact. Ms. Kowalski dissembled in her representation that a black female was hired for the position and this was used by the Defendants in their motion for summary judgment to argue that "'where a person of the same background is hired rather than a complainant, it does not make sense for a fact-finder to infer discrimination without some explanation for this result from which discrimination can be inferred …" (Defs.' Memorandum at 25) (quoting Caldwell v. City of White Plains, 1993 U.S. Dist. LEXIS 4927 at *1, 92-Civ.-1011(VLB)(S.D.N.Y. March 17, 1993))

In addition, a comparison of Ms. Kowalski's statement in her Declaration that Plaintiff was not qualified for the AAI position (Kowalski Dec. ¶5, App. A, Tab D) to her statement at an administrative proceeding that Plaintiff was qualified but not as qualified as the chosen applicant may result in a reasonable fact finder's inference of discriminatory motive. (Pl.'s Dec. ¶52, L.R. 56(a)2 Statement, Tab A) When Ms. Kowalski testified at the CHRO fact-finding hearing that Plaintiff was qualified for the position, Ciaschini's hand and arm gestures toward Ms. Kowalski as Ms. Kowalski testified at the administrative hearing support a need for the Hospital's motivations to be addressed by a fact finder as well. [15] (Pl.'s Dec. ¶52, L.R. 56(a)2 Statement, Tab A)

---

[15] At the CHRO Hearing, Ms. Kowalski stated that Plaintiff "was qualified for the position, but she felt that the chosen applicant was more qualified." At the moment that Ms. Kowalski stated that Plaintiff was qualified for the position,