Finally, Defendants argue that the Hospital's denial of Plaintiff's application for the AAI position should not be considered under the Connecticut Fair Employment Practices Act (CFEPA) because the denial of her transfer occurred more than 180 days prior to her complaint of discrimination. However, because the position remained unfilled until December 17, 2000, and was vacant again on January 28, 2001, when Plaintiff was still employed at the Hospital and eligible for transfer, Plaintiff contends that the adverse actions occurring on these dates when Plaintiff was denied the position twice more occurred within the 180 days preceding the filing of the complaint.[16] Furthermore, according to the Hospital's response to the CHRO complaint the position remained unfilled as of May 16, 2001, most likely because Ms. DeGourville, despite Ms. Kowalski assertions that she "ultimately" held the position, never in fact did hold the position. (L.R. 56(a)2 Statement, Ex. 40)

2. Financial Counselor in Patient Accounts Department
(Position Reference #A010803074A)

The Hospital posted notice of a position opening for a Financial Counselor in Patient Accounts on October 6, 2000, under Position Reference #A010803074A. (Defs.' Mem. in Supp. of Summ. J., Declaration of Teri Duarte ("Duarte Dec."), App. A, Tab M at Tab 1) The HR Consultant and Manager were Bill Bell and Teri Duarte ("Ms. Duarte"), respectively. Ms. Duarte and another team leader in the department interviewed Plaintiff in November of 2000. According to Ms. Duarte, "Sharlyn Pacheco, who is Hispanic, was the successful applicant for

---

Plaintiff observed Ciaschini, who was present while Ms. Kowalski was testifying, silently raise herself up in her chair and silently bring her hands down. (Pl.'s Dec. ¶52, L.R. 56(a)2 Statement, Tab A)

[16] Apparently, the Hospital used the applications it had received following the June 2, 2000, posting to "transfer" Lovie DeGourville to the position. Ms. DeGourville's application was dated June 26, 2000, and Plaintiff's application was dated June 17, 2000, placing them in the same pool of candidates and extending the application process through at least January 28, 2001, when Ms. Vasquez departed. (ECRN re: Ms. Vasquez, L.R. 56(a)2 Statement, Ex. 69) Plaintiff was never notified that she did not obtain the position and so remained eligible and prepared to assume it. (Pl.'s Dec. ¶51, L.R. 56(a)2 Statement, Tab A)

the position." Ms. Pacheco, a Hispanic female, was an external candidate for the position as evidenced by her submission of a resume and not a transfer application. (Duarte Dec. ¶7, App. A, Tab M at Tab 2)

Ms. Duarte and Mr. Bell concluded that "Solomon was not qualified for the position." (Duarte Dec. ¶6, App. A, Tab M) Under the Hospital's policy, Plaintiff would not have been referred for an interview with the hiring manager if she was not qualified for the position. (L.R. 56(a)2 Statement, Ex. 24)

3. Human Resources Associate in Human Resources Department
(Position Reference #A010501039A)

The Hospital posted notice of a position opening for a Human Resources Associate in the Human Resources Department on August 14, 2000, under Position Reference #A010501039A. (Defs.' Mem. in Supp. of Summ. J., Declaration of Bill Bell ("Bell Dec."), App. A, Tab E at Tab 1) Mr. Bell was the HR Consultant and hiring manager conducting the selection and recruitment process. The Hospital's Recruiting and Selection Policy required the HR Consultant to screen both internal and external applicants and refer qualified candidates to the manager. The manager conducts employment interviews with candidates screened by the HR Consultant. (L.R. 56(a)2 Statement, Ex. 24) As regards Position Reference #A010501039A, Mr. Bell served as the HR Consultant as well as the hiring manager. Plaintiff's interview with Mr. Bell, in his capacity as hiring manager, could only have occurred under Hospital policy if Mr. Bell, in his capacity as HR Consultant, had determined that Plaintiff was qualified for the position.

Mr. Bell interviewed Solomon, an internal candidate, for Position Reference #A010501039A. He told Plaintiff during the interview that "they" had recently hired a few people in the department who were low on experience and could not take on another. (Pl.'s Dec. ¶59, L.R. 56(a)2 Statement, Tab A) Mr. Bell reiterated this at the administrative hearing. (Pl.'s

Dec. ¶59, L.R. 56(a)2 Statement, Tab A)  According to Mr. Bell, Dawn Packman, an external candidate, was qualified for the position and Plaintiff was not.  Ms. Packman, a white female, was terminated effective August 21, 2002, due to poor performance. (ECRN re: Ms. Packman, Ex. 41)  (Bell Dec. ¶6, App. A, Tab E)  In certain cases, Mr. Bell deemed it within his discretion to hire individuals low on experience but in Plaintiff's case he did not exercise that discretion even though Plaintiff's position was subject to elimination and she was entitled to priority consideration.

> 4.  Patient Administrative Associate and Administrative Associate II
>     Positions in Care Continuum
>     (Position Reference ## A020403002D, A020420002D)

The Hospital posted notice of two openings for Administrative Associate II positions in Care Continuum-Case Coordination on September 15, 2000, under Position Reference #A020420002D.   The HR Consultant assigned to the opening was Ciaschini and the hiring managers were Patricia Sobieski ("Ms. Sobieski"), the Manager of Case Coordination in Care Continuum, and Beth Grieg "(Ms. Grieg").  Solomon submitted a transfer application dated September 21, 2000, (Sobieski Dec., App. A, Tab H at Tab 2) and interviewed for the position. Ms. Sobieski determined that Solomon was not qualified for the position, although this is not recorded on Solomon's transfer application. (Sobieski Dec., App. A, Tab H at Tab 2)  An external candidate, Emy Lopez ("Ms. Lopez"), a Hispanic female, and  Elizabeth Kirol, a white female and internal transfer, were hired.  (Sobieski Dec. ¶6, App. A, Tab H)

Ms. Lopez, at the time of her application dated September 18, 2000, was a temporary employee with less than six months of employment at the Hospital.  (Sobieski Dec., App. A, Tab H at Tab 3)  Although she submitted a transfer application, Ms. Lopez was not eligible for consideration as an internal transfer.  (Policy, L.R. 56(a)2 Statement, Ex. 31)  Hospital human

resources marked on Ms. Lopez' application for internal transfer, "Hire Date – 8/31/00, temporary position, needs to apply by application (see attached)." (Sobieski Dec., App. A, Tab H at Tab 3) (Policy, L.R. 56(a)2 Statement, Ex. 31)  In the portion of her application which required a signature for her supervisor to sign, required when an applicant with less than six months of employment is seeking transfer, Ms. Lopez, instead of providing the signature wrote, "[a]t the present time my position is only temp – only to 9/31/[sic]."  (Sobieski Dec., App. A, Tab H at Tab 3)[17]  It was noted at Ms. Lopez' interview that her position in Women's Health was due to end on October 30.  (Administrative Associate Interview Process re: Ms. Lopez, L.R. 56(a)2 Statement, Ex. 61)  At Plaintiff's interview there was no such note that her position was ending even though Ciaschini was the assigned Human Resources Consultant for the recruitment and selection process and knew that Plaintiff's position was ending. (Administrative Associate Interview Process re: Plaintiff, L.R. 56(a)2 Statement, Ex. 62)

In her Affidavit, Ms. Sobieski avers that she never had any communications with O'Connell or Niles about Plaintiff's application.  (Sobieski Dec. ¶9, App. A, Tab H)  She then states:  "Gladys Ciaschini in no way attempted to influence my hiring decision with respect to either position."  (Sobieski Dec. ¶9, App. A, Tab H)  However, Ms. Sobieski treads too far in her attempt to assist the Hospital's defense.  It may be inferred from Ms. Sobieski's assertion that she and Ciaschini either did not follow Hospital policy in hiring for the AA II positions or Ms. Sobieski wishes so much to defend against any claim that Ciaschini had engaged in discriminatory conduct that Ms. Sobieski asserts that Ciaschini "in no way attempted to influence my hiring decision with respect to either position," a clear abdication by Ciaschini of her job

---

[17] Ms. Sobieski notes that Ms. Lopez had worked for six years as an Emergency Room Assistant which is reflected in Ms. Lopez' resume.  (Resume re: Ms. Lopez, Ex. 56) (Sobieski Dec., App. A., Tab H at ¶6)  However, the notes from Ms. Lopez' interview reflect that Ms. Lopez worked for nine years as an Emergency Room Assistant.  (Ex. 61)

duties and Hospital policy. (Policy, L.R. 56(a)2 Statement, Ex. 24) (Role Description, L.R. 56(a)2 Statement, Ex. 53) Regardless, even if Ciaschini did refuse to forward a recommendation to Ms. Sobieski as the Recruiting and Selection Policy would indicate is Ciaschini's role in the process, Ciaschini's silence on the fact that Plaintiff's position was subject to staff reduction provides adequate inference of Ciaschini's discriminatory, and retaliatory intent.

The Hospital posted notice of two openings for Patient Administrative Associate positions in Care Continuum-Assessment Center on September 15, 2000, under reference #A020403002D. (Declaration of Patricia Synhorst ("Synhorst. Dec."), Defs.' Mem. in Supp. of Summ. J., App. A, Tab A at Tab 2) The HR Consultant assigned to the recruitment and selection process for the opening was Ciaschini and the hiring managers were Ms. Sobieski, the Manager of Case Coordination in Care Continuum, and Ms. Grieg. Plaintiff submitted a transfer application dated September 21, 2000. (Synhorst Dec., App. A, Tab A at Tab 3) Ms. Grieg recorded that Plaintiff was not the most qualified for the position. (Synhorst Dec., App. A, Tab A at Tab 3)

### 5. Administrative Associate III in Research Department (Position Reference #A129503008E)

In March of 2000, Plaintiff submitted her application for the position of Administrative Associate III (AAIII) in the Research Department. The hiring manager was Laurine Bow ("Ms. Bow"), an Associate Director for Research at Hartford Hospital. Ms. Bow, the sole decision maker with respect to the position, chose another applicant, Tiffany Rowe ("Ms. Rowe"), a white female, for the position. (Declaration of Laurine Bow ("Bow Dec.") ¶3, Defs.' Mem. in Supp. of Summ. J., App. A, Tab G) Ms. Bow believed that "Ms. Rowe was better qualified for the AA III position than was Ms. Solomon." (Bow Dec. ¶4, App. A, Tab G)

Ms. Rowe transferred to the position of AAIII in the Research Department on March 27, 2000, after she was offered the position by Ms. Bow.  (Connecticut Health System Transfer Form, Ex. 42)  On December 21, 2000, Ms. Bow transferred to the position of Business Systems Analyst in the Research Department.  (ERCN re: Ms. Rowe, Ex. 43)

At that time when Ms. Rowe left her AAIII position, Plaintiff was still employed at the Hospital and eligible for internal transfer.  As the Hospital's treatment of the AAI position in Hemodialysis demonstrates, the Hospital could have used the internal applications already submitted for the position in March of 2000 to choose another candidate upon Ms. Rowe's departure.  *See* note 16, *supra*.  The Hospital denied Plaintiff the AAIII position in December of 2000, after Ms. Rowe's departure, even though Plaintiff was entitled to priority consideration and had been found qualified for the position.

- <u>Disparate Impact Race Discrimination</u>

The facts alleged and supported in subpart (6) of section II(A)(iii), *infra*, regarding Plaintiff's efforts to transfer to open positions requiring bilingual skills in English and Spanish, *inter alia*, provide adequate inference of disparate impact race discrimination, under the law, for Plaintiff's complaint to survive Defendants' Motion for Summary Judgment on Counts Seven, Eight, and Thirteen.

First, the Hospital had preference for bilingual Spanish and English candidates in selecting internal and external candidates for new or vacant positions.  (Admissions by Defendants Nos. 145, 149, L.R. 56(a)2 Statement, Ex. 29)  Some vacant or new positions set forth such bilingual Spanish and English skills as a qualification for the position.

Second, the Hospital did not have a formalized written policy, other than its equal employment opportunity policies, for determining whether a new or vacant position required that

a candidate for a position have bilingual skills. (Admissions by Defendants Nos. 143, 147, L.R. 56(a)2 Statement, Ex. 45)

Third, the Hospital's Equal Employment Opportunity (EEO) Policy provisions do not address bilingual skills but set forth: "When hiring or promoting within those job categories in which a specific group is underutilized, we will take affirmative action to seek out qualified applicants." (Hospital Equal Employment Opportunity/Affirmative Action Policy, L.R. 56(a)2 Statement, Ex. 46)

The Hospital's reference to its EEO Policy as its only guide for determining whether a new or vacant position requires that a candidate have bilingual Spanish and English skills implies that bilingual Spanish and English skills are related to an "underutilized" group. By this reasoning then, the policy guiding the Hospital in determining whether a position requires bilingual skills asks whether the specific group of Hispanics is underutilized in determining whether a particular position requires bilingual skills. However, a more reasonable justification for requiring bilingual skills as a qualification for some positions is that there is some need among the population served for employees who speak Spanish as well as English. Nonetheless, the Hospital has no data to support this need and such a presumption, without any data or support, is subject to abuse and discretionary application. The seemingly neutral preference, without guidelines for its use supported by demographic data, has a disparate impact on those non-Hispanics, such as Plaintiff, a black female, who do not speak Spanish to the degree and extent that the Hispanic group does.

Plaintiff was denied three positions because she was not able to speak Spanish. The Hospital had no policy or means of determining which positions, if any, required bilingual Spanish and English skills. (L.R. 56(a)2 Statement, Ex. 45)

27

6.   Hospital Positions Requiring Spanish and English (Bilingual) Skills
(Position Reference ##A025663036, A030080029, A030089003E)

The Hospital posted notices of position openings for a Patient Administrative Associate in OPD/Adult Primary on September 22, 2000, under Position Reference #A030089003E and Administrative Associate positions under Position Reference ##A025663036 and A030080029. (Def. Ciaschini Dec., App. A, Tab C at Tab 1)  The HR Consultant assigned to the recruitment and selection of a candidate for Position Reference #A030089003E was Maria Herrera.  (Posting Position Reference #A03089003E, Ex. 47)  By letter dated January 22, 2000,[18] Ciaschini referred Plaintiff to Position Reference ##A025663036 and A030080029.  (L.R. 56(a)2 Statement, Ex. 14)  In a subsequent letter dated February 16, 2001, Ciaschini informed Plaintiff that the positions required bilingual skills.  Ciaschini wrote to Plaintiff regarding those skills:  "It is my understanding that you do not have those skills."  (Def. Ciaschini Dec., App. A, Tab C at Tab 7 at p.4)   At the time Plaintiff received the February 16, 2001, letter from Ciaschini, Plaintiff was less thirty-four (34) work days from the elimination of her position.  Ciaschini was the Human Resources Consultant who signed the transfer application indicating that Plaintiff would not be referred because the position required bilingual skills.  (Def. Ciaschini Dec., App. A, Tab C at Tab 1)  Ciaschini's signature on Plaintiff's transfer application for Position Reference ##A025663036 and A030080029 demonstrates two points:  First, if Ciaschini was a Human Resources Consultant involved in the recruitment and selection for the position, as her signature on the application implies (Policy, L.R. 56(a)2 Statement, Ex. 24), then it is difficult to understand why she referred Plaintiff to the position[19];  and second, the fact that Plaintiff was not

---

[18] Plaintiff received the letter in January of 2001.  (Pl.'s Dec. ¶69, L.R. 56(a)2 Statement, Tab A)
[19] Ciaschini met with Plaintiff on December 26, 2000, and took notes regarding Plaintiff's qualifications.  (Pl.'s Dec. ¶66, L.R. 56(a)2 Statement, Tab A) (Ciaschini's Handwritten Notes, L.R. 56(a)2 Statement, Ex. 13)

referred for an interview with a hiring manager regarding these positions which required bilingual skills, skills which Plaintiff, as Ms. Ciaschini so succinctly stated, "did not have," demonstrates that, for each and every one of the positions where Plaintiff was referred for an interview, she was qualified despite the hiring managers declarations to the contrary.

The Hospital did have a preference for bilingual candidates in selecting internal candidates for new or vacant positions while Plaintiff was employed. (Admissions by Defendants Nos. 145, 149, L.R. 56(a)2 Statement, Ex. 29) Ciaschini is Hispanic and was aware that Plaintiff was not bilingual in Spanish and English. (Ciaschini Resume, L.R. 56(a)2 Statement, Ex. 48) (L.R. 56(a)2 Statement, Ex. 13) In fact, Ciaschini was knowledgeable about Plaintiff's skills having met with Plaintiff and maintained drafted written notes about her skills. (L.R. 56(a)2 Statement, Ex. 13) While it is true that the Hospital did not have a compilation of data or information supporting its requirement that candidates possess bilingual skills to qualify for certain positions at the Hospital (Admissions by Defendants Nos. 143, 147, L.R. 56(a)2 Statement, Ex. 45) and there was no formalized written policy except the Hospital's EEO Policy for determining whether a candidate required bilingual skills to be qualified for the position. (Admissions by Defendants No. 151, L.R. 56(a)2 Statement, Ex. 45), Ciaschini did have access to the actual postings in human resources.

Even so, if for some reason Ciaschini was unable to ascertain from human resource documents the qualifications required for Position Reference ##A025663036 and A030080029, there is no explanation for the terse and spiteful manner in which she informs Plaintiff that "[i]t is my [Ciaschini's] understanding that you [Plaintiff] do not have those skills," except that Ciaschini was retaliating against Plaintiff after receiving notice from Plaintiff on February 12, 2001, that Plaintiff intended to file a complaint with the CHRO alleging discrimination. (Def.

Ciaschini Dec., App. A, Tab C at Tab 13)  Ciaschini took retaliatory pleasure in informing

Plaintiff that Plaintiff was not part of the select few who had bilingual skills and therefore would

not be eligible to even interview for those positions.  Ciaschini is bilingual.  (L.R. 56(a)2

Statement, Ex. 48)

 As regards the PAA position posted under Position Reference #A030089003E, an

external candidate, Brenda Laureano-Geer ("Ms. Laureano-Geer") was offered and accepted the

position.  (Ms. Laureano-Geer's Application, L.R. 56(a)2 Statement, Ex. 50)  Ms. Laureano-Geer

was hired by Cathy Yairnsky on November 6, 2000, as a Patient Administrative Associate in the

OPD/Adult Primary.  (Ms. Laureano-Geer's Application, L.R. 56(a)2 Statement, Ex. 50)   The

position required bilingual skills in English and Spanish.  (Posting Position Reference

#A030089003E, L.R. 56(a)2 Statement, Ex. 51)  In a subsequent evaluation of Ms. Laureano-

Geer's performance, her manager noted on October 22, 2001, that Ms. Laureano-Geer was

expected to "improve English skills," and needs to improve on verbal and written

communication, respectively.  (Ms. Laureano-Geer Evaluation, L.R. 56(a)2 Statement, Ex. 52)

-  Unlawful Retaliation

 The facts alleged and supported in subparts (7) and (8) of section II(A)(iii), *infra*,

regarding Plaintiff's efforts to transfer to open positions following her initial complaint of

discrimination on January 23, 2001, *inter alia*, provide adequate inference of unlawful retaliation

for Plaintiff's complaint to survive Defendants' Motion for Summary Judgment on Counts Five

and Fourteen.

 Plaintiff engaged in protected activity when she submitted a written complaint of

discrimination to Ciaschini dated January 23, 2001.  (Def. Ciaschini Dec., App. A, Tab C at Tab

4)  Plaintiff interviewed for a PAA position in the Care Continuum-Assessment Center with the

hiring manager for the department, Susan Stagg, on January 22, 2001. Ciaschini was the Human Resources Consultant assigned to recruit and select a candidate for the position with Ms. Stagg. Plaintiff suffered an adverse employment action when she was told by Ms. Stagg in the fifth day subsequent to January 23, 2001, that Plaintiff was not offered the position. Ms. Stagg denies that Ciaschini made any effort to influence Ms. Stagg's hiring decision but the Hospital polices clearly provide that Ciaschini, in her position as the HR Consultant was required to make a recommendation. (Policy, L.R. 56(a)2 Statement, Ex. 24) Ciaschini's silence regarding Plaintiff's entitlement to priority consideration and a ninety (90) day period to adequately perform her job duties constituted a retaliatory action in response to Plaintiff's protected activity of January 23, 2001. There is no reasonable explanation for Ciaschini's omission except retaliatory intent.

A written warning issued on February 13, 2001, prohibited Plaintiff from applying for internal transfer to any open positions for the remainder of her employment. As Plaintiff demonstrates in section II(B), *infra*, O'Connell's and Ciaschini's reasons for issuing the written warning to Plaintiff on February 13, 2001, are not only pretext for impermissible retaliation but provided the Hospital a means, as well, to prevent Plaintiff from applying for transfer during the last thirty-four days (34) of her employment and two week period of severance pay. This thirty-four (34) day disciplinary period, unsupported by any other rationale except that it was the period remaining until Plaintiff's job would be eliminated, prevented Plaintiff from obtaining the PAA positions in the Cardiology Center 10 and Bliss Wing-10 East. (Def. O'Connell Interrog. Resp. No. 8, L.R. 56(a)2 Statement, Ex. 49)

7.  Patient Administrative Associate in Care Continuum-Assessment Center
(Position Reference # A0204003006D)

The Hospital posted notice of position openings for Patient Administrative Associates in the Care Continuum-Assessment Center on January 5, 2001, under Position Reference #A0204003006D.  (Defs.' Mem. in Supp. of Summ. J., Declaration of Susan Stagg ("Stagg Dec.") ¶3, App. A, Tab I)  The HR Consultant and hiring manager were Ciaschini and Susan Stagg ("Ms. Stagg"), respectively.  Phyllis Watson ("Ms. Watson") submitted a transfer application dated December 15, 2000.  (Stagg Dec., App. A, Tab I at Tab 4)  Janinia Kornas ("Ms. Kornas") submitted a transfer application dated January 4, 2001.  (Stagg Dec., App. A, Tab I at Tab. 3) Plaintiff submitted a transfer application dated January 5, 2001. (Stagg Dec., App. A, Tab I at Tab1)  Ms. Stagg chose Ms. Watson, a black female, and Ms. Kornas, a white female, for the positions.  (Stagg Dec. ¶5, App. A, Tab I)  Plaintiff was not offered the position following her interview with Ms. Stagg.  Ms. Stagg recorded the reason as "more experienced candidate … skill …phlebotomy, EKG … clerical knowledge."  (Stagg Dec., App. A, Tab I at Tab 1)

According to Ms. Stagg, the position required, "[a]mong other qualifications … someone with previous experience in the patient care environments performing various support functions where solid interpersonal skills were essential."  She also sought "someone who had past experience in phlebotomy and who had the ability to obtain quality EKGs."  (Stagg Dec. ¶4, App. A, Tab I)  Plaintiff, Ms. Kornas, and Ms. Watson each brought a partial degree of these qualifications, however where Ms. Kornas and Ms. Watson lacked skills, Ms. Stagg was

32

forgiving.  As regards Plaintiff, Ms. Stagg reached for reasons not to offer her the position. (Stagg Dec. ¶6, App. A, Tab I)[20]

Plaintiff interviewed for the position of PAA in Care Continuum-Assessment Center on January 22, 2001, and was told by the hiring manager Susan Stagg that EKG procedure was "an easy skill to learn" and Care Continuum would be willing to train a candidate that had the other qualifications.  (Pl.'s Dec. ¶71, L.R. 56(a)2 Statement, Tab A)   Plaintiff called Ms. Stagg within a week and was told that she did not get the position.  (Pl.'s Dec. ¶71, L.R. 56(a)2 Statement, Tab A)  The Hospital's failure to apply the Staff Reduction Policy provisions of priority consideration and provide Plaintiff a period of ninety days to adequately perform her newly assigned duties was overt in Ms. Stagg's hiring decision because the Human Resources Consultant assigned to work with Ms. Staff in filling the position was Ciaschini.  Ciaschini was aware that Plaintiff's position was subject to elimination on March 31, 2001.  (L.R. 56(a)2 Statement, Ex. 14)  One of Ciaschini's job duties as a Human Resources Consultant was to be familiar with the compilation of Hospital Human Resources Procedures and Policies.  (Role Description re: Ciaschini, Ex. 53) (L.R. 56(a)2 Statement, Ex. 48)   In Ms. Stagg's hiring decision, the Staff Reduction Policy is entirely ignored even though Ciaschini would have had the opportunity, in this hiring decision, to ensure that the policy was implemented.

In her Affidavit, Ms. Stagg avers that she did not speak with Niles or O'Connell prior to the hiring decision then states "Galdys [sic] Ciaschini, The Human Resources Consultant assigned to the job posting, made no attempt to influence my hiring decision."  (Stagg Dec. ¶7, App. A, Tab I)  However, Ms. Stagg treads too far in her attempt to assist the Hospital's defense.

---

[20] "While Ms. Solomon may have possessed a certificate in phlebotomy at the time, she did not have any previous work experience in phlebotomy.  With respect to Ms. Watson, although she did not have active experience in phlebotomy, she had extensive clerical skills and had previously worked with EKGs and monitors."  (Stagg Dec. ¶6, App. A, Tab I)

The Hospital's own Recruiting and Selection Policy states, as a guideline for managers: "Make the final selection in consultation with the Human Resources Consultant"; and as a guideline for Human Resources Consultants: "Make a final selection recommendation to the manager and advise on appropriate hiring rate of pay." (L.R. 56(a)2 Statement, Ex. 24)  Therefore, it may be inferred from Ms. Stagg's assertion that she and Ciaschini either did not follow Hospital policy in hiring for the PAA open position or Ms. Stagg wishes so much to defend against any claim that Ciaschini had engaged in discriminatory conduct that Ms. Stagg asserts that Ciaschini "made no attempt to influence my hiring decision," a clear abdication by Ciaschini of her job duties and Hospital policy. (L.R. 56(a)2 Statement, Ex. 24) (L.R. 56(a)2 Statement, Ex. 53)  Regardless, even if Ciaschini had not complied with Hospital policy and refused to forward a recommendation to Ms. Stagg as the policy indicates is Ciaschini's job, Ciaschini's silence on the fact that Plaintiff's position was subject to staff reduction provides adequate inference of Ciaschini's discriminatory, and retaliatory, intent.

>8.   Transfer Applications Denied Due to the Written Warning Issued by O'Connell
>      (Position Reference #A025961062B) (Bliss-10 East)

The Hospital posted notice of a position opening for a Patient Administrative Associate in Cardiology Center 10 on January 11, 2001, under Position Reference #A025961062B. (Synhorst Dec., App. A, Tab A at Tab 4)  The HR Consultant assigned to the recruitment and selection of a candidate for the position was Ellen Vitale.  Solomon was not offered the position "because of the letter in her file that were [sic] put after 2/2/01." (Synhorst Dec., App. A, Tab A at Tab 5)

The successful candidate for the PAA position in Cardiology Center 10 was Pamela Garcia ("Ms. Garcia").  Ms. Garcia submitted her application on April 19, 2001, and commenced

employment with the Hospital on May 14, 2001.  (Synhorst Dec., App. A, Tab A at Tab 7)  The

Hospital discharged Ms. Garcia on March 16, 2003, for attendance and recorded its

unwillingness to rehire her due to her absenteeism.  (ERCN re: Ms. Garcia, Ex. 54)

Lea Allard, the Nurse Manager on Bliss Wing-10 East, interviewed Plaintiff for a

position on Bliss-10 East on or about February 21, 2001.  (Defs.' Mem. in Supp. of Summ. J.,

Declaration of Lea Allard ("Allard Dec.") ¶¶3, 5, App. A, Tab N)  According to Ms. Allard, the

position essentially served as a secretary within the unit.  (Allard Dec. ¶4, App. A, Tab N)

During the interview, Plaintiff told Ms. Allard that she had received a written warning.  (Pl.'s

Dec. ¶78, L.R. 56(a)2 Statement, Tab A)  Ms. Allard never contacted Plaintiff regarding the

position.  (Pl.'s Dec. ¶78, L.R. 56(a)2 Statement, App. A)  Linda Connors, a white female, was

hired for the position.  (Allard Dec. ¶7, App. A, Tab N)  Ms. Allard's impression from the

interview was that "Solomon did not necessarily have the requisite experience for the position."

(Allard Dec. ¶6, App. A, Tab N)

*iv.  The Conklin Building Entrance Transport Aides' Internal Transfer Efforts*

During her tenure as an AAI assigned to the Conklin Building entrance, Plaintiff worked

with four Transport Aides, Virginia Hernandez-Green, Juan Urena, Alex Moreau, and Kelvin

Griffith.  Each of these employees faced the elimination of their position at the same time

Plaintiff's position was due for elimination, March 31, 2001.  Except for Kelvin Griffith, a black

male, who was terminated for absenteeism in October of 2000, the other employees, a Hispanic

female and two Hispanic males, each transferred internally to positions with an increase in pay.

At least two of the transfers required on the job training.  According to the Hospital, when

"permissible and appropriate it provides various forms of training and/or classroom instruction

related to the various duties entailed by various positions within the Hospital." (Admissions by

Defendants No. 11, L.R. 56(a)2 Statement, Ex. 55)

1.    Conklin Building Entrance Transport Aide Virginia Hernandez-Green

Ms. Hernandez-Green was hired by the Hospital as a Patient Service Associate. (ERCN

re: Ms. Hernandez-Green, L.R. 56(a)2 Statement, Ex. 18)  She transferred to the position of

Transport Aide assigned to the Conklin Building entrance on March 28, 1999. (L.R. 56(a)2

Statement, Ex. 18)  Ms. Hernandez-Green's previous position at the Hospital included stocking

supplies on a nursing unit.  She received job-specific training related to her duties as a Transport

Aide. (Admissions by Defendants No. 16, L.R. 56(a)2 Statement, Ex. 45)  She transferred to the

position of Administrative Associate I on November 21, 1999, and received a pay increase.

(ERCN re: Ms. Hernandez-Green, L.R. 56(a)2 Statement, Ex. 17) (Pl.'s Dec. ¶¶82-83, L.R.

56(a)2 Statement, Tab A)

2.    Conklin Building Entrance Transport Aide Juan Urena

Mr. Urena was hired on August 17, 1999, by the Hospital and transferred from his

position as a Food and Nutrition Services Associate to the Transport Aide position on December

19, 1999. (ERCN re: Mr. Urena, L.R. 56(a)2 Statement, Ex. 19)  On May 8, 2000, he transferred

to the position of Patient Care Associate. (ERCN re: Mr. Urena, L.R. 56(a)2 Statement, Ex. 20)

Mr. Urena then transferred to the position of Psychiatric Technician. (Payroll Activity Window

Re: Mr. Urena, L.R. 56(a)2 Statement, Ex. 57)  For each of these positions he received a pay

increase. (Payroll Activity Windows re: Mr. Urena, L.R. 56(a)2 Statement, Exs. 58-60)  Prior to

his transfer from the Transport Aide position, Mr. Urena had never been employed by the

Hospital in a Patient Care Associate or Patient Care Assistant position. (Admissions by

Defendants No. 133, L.R. 56(a)2 Statement, Ex. 45)  Following his transfer, he received training

36

in his new position as a Patient Care Associate.  (Pl.'s Dec. ¶¶84-87, L.R. 56(a)2 Statement, Tab A) (Admissions by Defendants No. 240, L.R. 56(a)2 Statement, Ex. 55)

### 3.    Conklin Building Entrance Transport Aide Alex Moreau

Mr. Moreau transferred from his Transport Aide position at the Conklin Building entrance on January 8, 2001.  (ERCN re: Mr. Moreau, L.R. 56(a)2 Statement, Ex. 16)   (Pl.'s Dec. ¶ 81, L.R. 56(a)2 Statement, Tab A)  On May 20, 2001, Mr. Moreau transferred to the position of Administrative Associate I.  (ERCN re: Mr. Moreau, L.R. 56(a)2 Statement, Ex. 63)

### 4.    Conklin Building Entrance Transport Aide Kelvin Griffith

Mr. Griffith's employment was terminated on October 19, 2000.  (ERCN re: Mr. Griffith, L.R. 56(a)2 Statement, Ex. 10)  He was marked ineligible for rehire for "abuse of no show with no notice," a violation of the Hospital's Rules of Conduct regarding absenteeism.  (L.R. 56(a)2 Statement, Ex. 10)

### B.    The Hospital's Retaliatory Disciplinary Action Against Plaintiff

In letters dated January 23, 2001, and February 9, 2001, Solomon complained to Ciaschini that:

- Niles had made racial comments to Plaintiff that were discriminatory and based on Plaintiff's race;

- O'Connell was sabotaging Plaintiff's efforts to find employment in the Hospital;

- Plaintiff had been rejected for numerous transfer and hire employment opportunities in the Hospital;

- Alex Moreau, a Transport Aide assigned to the Conklin Building, had told Plaintiff that O'Connell was the impediment to Plaintiff's finding another position in the Hospital;

- the wife of a cancer center patient told Plaintiff that Niles had said Plaintiff would not be employed by the Hospital after March 2001; and

- O'Connell, Niles, and very possibly links in Human Resources were racially

motivated against Plaintiff in their attempts to encourage Plaintiff to leave the hospital.

(Def. Ciaschini Dec., App. A, Tab C at Tabs 4 and 10)  Plaintiff then provided written notice to

Ciaschini on February 12, 2001, of her intent to file a discrimination complaint with the

Connecticut Commission on Human Rights and Opportunities (CHRO).  (Def. Ciaschini Dec.,

App. A, Tab C at Tab 13)

### i.   Suspect Procedural Implementation of PIP

O'Connell's Implementation of the PIP demonstrated a discriminatory animus toward

Plaintiff.  This discriminatory bias and retaliatory motive are indicated by O'Connell's

procedural deviation from the Hospital's PIP and her decision to implement the policy when

substantive grounds were lacking.   The Employee Performance Improvement Process (PIP),

formerly known as the Hospital's Disciplinary Policy, consists of Steps 1 through 4.  PIP Step 3,

the "Final Written Warning," provides:

> If the goals for improvement are not met within the time frame
> specified at the previous conference, the manager will meet with
> the employee and advise that if immediate improvement is not
> demonstrated within an appropriately limited, specific and final
> time frame, the employee will be suspended and/or terminated,
> depending upon the nature of the problem.

PIP Step 4, "Suspension or Termination," provides, in relevant part:

> Some problems may be best handled by suspension without pay for
> an appropriate number of days, and others may warrant discharge.

(Def. Ciaschini Dec., App. A, Tab C at Tab 16)

On Friday, February 9, 2001, O'Connell told Plaintiff that she was suspended.  (Pl.'s

Dec. ¶98, L.R. 56(a)2 Statement, Tab A)  Plaintiff used six hours of vacation time for the period

she was suspended on February 9, 2001, so that she would be paid for the entire day.  (Pl.'s Time

Cards, L.R. 56(a)2 Statement, Ex. 21)  The Hospital policies do not provide for any suspension

38

with pay (Hospital Vacation Time Accrual Policy, Holiday Time Accrual Policy, Sick Time Accrual Policy, Leave of Absence Policy, Ex. 64)  Plaintiff's use of her vacation time demonstrated that she understood that she had been suspended without pay.  (Policies, L.R. 56(a)2 Statement, Ex. 64)

O'Connell, as the Radiation Oncology Manager, approved staff time cards.  The Time Cards and Timekeeping Policy provides, in relevant part: "Employees authorized to approve time card entries and overtime must be supervisory/management personnel."  (Hospital Time Cards and Timekeeping Policy, L.R. 56(a)2 Statement, Ex. 65)  The Vacation Time Accrual Policy demands that a manager approve an employee's vacation time.  (Policies, L.R. 56(a)2 Statement, Ex. 64)  As the July 30, 1999, memorandum from O'Connell to Plaintiff indicated, staff assigned to the Conklin Building entrance was required to obtain the permission of Niles or O'Connell for all vacation requests and early or late arrivals.  (Def. O'Connell Dec., App. A, Tab B at Tab 1)  In fact, the Hospital contends that one reason for its failure to issue Plaintiff a timely check on March 1, 2001, was that O'Connell did not receive Plaintiff's time card for approval. (Memorandum from Jan Lynch to Plaintiff dated March 1, 2001, Ex. 22)  Plaintiff contends that her time card for the pay period reflected in the March 1, 2001, pay check was submitted in the same manner as it had for the previous twenty-one (21) months under O'Connell's supervision. (Pl.'s Dec. ¶¶118-124, L.R. 56(a)2 Statement, Tab A)  Similarly, following Plaintiff's January 23, 2001, complaint of discrimination, Plaintiff received her paycheck in an open envelope. Prior to that date, January 25, 2001, Plaintiff had received eighty-eight (88) consecutive pay checks and had never received one in an open envelope.  (Pl.'s Dec. ¶94, L.R. 56(a)2 Statement, Tab A)

At various times, O'Connell has represented that (a) she suspended Plaintiff with pay on February, 9, 2001; (b) she was "shocked" to hear that Plaintiff was suspended without pay because she checked the payroll record; (c) Plaintiff's suspension was an administrative suspension as opposed to a disciplinary suspension; (d) an administrative suspension was with pay and a disciplinary suspension was without pay; and (e) she was certain she suspended Plaintiff with pay because she checked the patrol records. (Pl.'s Dec. ¶¶111-112, L.R. 56(a)2 Statement, Tab A).

O'Connell's representation that she "was under the impression that Ms. Solomon had used this time [vacation] at the beginning of the work week, when, in fact, she used vacation time to cover the time during which she was suspended on Friday, February 9" (Def. O'Connell Dec. ¶9, App. A, Tab B) implies that O'Connell did not check the time card and that Plaintiff's vacation time was deducted without Plaintiff having received O'Connell's or Niles' permission. However, Plaintiff received a timely check for the week ending February 10, 2001, and by the Hospital's reasoning, O'Connell would have approved Plaintiff's timecard for this to occur. (L.R. 56(a)2 Statement, Ex. 22) O'Connell's explanation that her "intention was to suspend Ms. Solomon with pay for the remainder of the day on Friday" is not credible. (Def. O'Connell Dec. ¶9, App. A, Tab B) (Pl.'s Dec. ¶¶111(a), (b), (d), 112, L.R. 56(a)2 Statement, Tab A)

"Administrative suspension" is a term of art fabricated by O'Connell to explain why she did not follow PIP procedures. An examination of the applicable policies addressing all manner of time taken off from work at the Hospital does not mention any type of "administrative leave." (Policies, L.R. 56(a)2 Statement, Ex. 64) O'Connell suspended Plaintiff under PIP Step 4 without first implementing PIP Step 3. One reasonable inference drawn from O'Connell's deviation from Hospital PIP procedure, which becomes even stronger when the alleged factual

40

basis for the discipline is examined, is that O'Connell's urge for retaliation against Plaintiff was so strong that her need to ensure that Plaintiff would never work at the Hospital after March 31, 2001, overwhelmed her more than twenty years of familiarity with Hospital policy. (Hospital Performance Appraisal Form, L.R. 56(a)2 Statement, Ex. 66)

   *ii. Suspect Substantive Implementation of PIP*

  O'Connell and Ciaschini, in a written warning dated Tuesday, February 13, 2001, alleged that Plaintiff's behavior did not meet the Hartford Hospital Code of Conduct and Performance Management Competencies which reads: "We develop and strengthen collaborative relationships with all of our customers, including our patients, their families, our employees, volunteers, medical staff and our business partners." (Def. Ciaschini Dec., App. A, Tab C at Tab 14)

  •  First, a plain language interpretation of the provision renders its applicability to Plaintiff ambiguous at best. Plaintiff was an employee at the Hospital. For the provision to apply, Plaintiff would have to be subsumed within the scope of "we," the first word in the provision. Whomever "we" refers to in the provision clearly has employees as deduced from the provision's phrase "our employees." Plaintiff did not have employees. She was an employee. Therefore Plaintiff must be excluded from the class of individuals, designated as "we," who employ others.

  •  Second, the subjective nature of the complaints underlying the written warning would cause a reasonable fact-finder to question Ciaschini's and O'Connell's motivations in disciplining Plaintiff. Ciaschini and O'Connell alleged that Plaintiff:

    a. caused a hospital employee, Jan Lynch ("Ms. Lynch"), to feel ignored when Plaintiff did not acknowledge Ms. Lynch's greeting sometime in January or February 2001;