b.  caused a medical engineer, Robert Lindyer, who was sitting in Ms. Lynch's

office to sternly repeat "Good morning" when plaintiff did not acknowledge his

first attempt on February 8, 2001;

c.  caused a hospital employee, Susan Wright, to feel offended and snubbed when

plaintiff did not say "Good morning" on February 5, 2001;

d.  caused a fabrication designer, John Unikewicz, who was sitting in Ms. Lynch's

office to feel uncomfortable when plaintiff said "excuse me" as plaintiff

attempted to retrieve a laptop to perform work on February 8, 2001;

e.  did not greet a hospital employee, Sandy Beggs, who was sitting in Ms. Lynch's

office on February 8, 2001;

f.  did not say hello to O'Connell as Plaintiff passed by O'Connell's office to enter

Ms. Lynch's office on February 12, 2001; and

g.  merely smiled at O'Connell when O'Connell said hello to Plaintiff on February

12, 2001.

(Def. O'Connell Dec., App. A, Tab B at Tab 5)

With the exception of O'Connell, Plaintiff did not work with any of the persons named in

the written warning, who were all white including Jan Lynch, Robert Lindyer, Susan Wright,

John Unkewicz, and Sandy Beggs.  (Pl.'s Dec. ¶¶103, 105, L.R. 56(a)2 Statement, Tab A) These

individuals named in the written warning had offices in the Cancer Center and not the Conklin

Building where Plaintiff worked.  (Admissions by Defendants Nos. 97-110, L.R. 56(a)2

Statement, Ex. 67)  (Pl.'s Dec. ¶105, L.R. 56(a)2 Statement, Tab A)  Plaintiff's contact with Ms.

Lynch, Mr. Lindyer, Mr. Unkewicz, and Ms. Beggs (hereinafter, the "Jan Lynch office group")

in Ms. Lynch's office on February 8, 2001, was mandated by the fact that a laptop computer used

by Plaintiff to perform her duties was stored in Ms. Lynch's office. (Pl.'s Dec. ¶105, L.R. 56(a)2 Statement, Tab A) Plaintiff did not have an office. Her work area was in an open lobby at the entrance to the Conklin Building. (Pl.'s Dec. ¶5, L.R. 56(a)2 Statement, Tab A) The Hospital has more than 6000 employees. (Admissions by Defendants No. 192, L.R. 56(a)2 Statement, Ex. 45) It is not unreasonable to assert that it is a very subjective matter whether any one or more of the Hospital's 6000 employees feels "uncomfortable," "ignored," "offended," "snubbed," and "ungreeted" at any given time.

What is known is that O'Connell never asked what the Jan Lynch office group was doing in Ms. Lynch's office. However, O'Connell "does not believe that it is unusual for them all to be in the same place at the same time" because they "all work in the same department." (Def. O'Connell Interrog. Resp. No. 10, L.R. 56(a)2 Statement, Ex. 49) What the record does show is that Plaintiff, a black woman, was occupied in a work related function attempting to obtain a laptop computer. (Pl.'s Dec. ¶105, L.R. 56(a)2 Statement, Tab A) The computer happened to be stored in a single office assigned to Ms. Lynch where four white individuals comprising the Jan Lynch office group were engaged in what may or may not have been work related. (Pl.'s Dec. ¶105, L.R. 56(a)2 Statement, Tab A) It is known that the Jan Lynch office group did have the time to interrupt whatever they were doing to focus their attention on the manner in which Plaintiff, a black woman, greeted them. (Def. O'Connell Dec., App. A, Tab B at Tab 5) The Jan Lynch office group had time to complain to O'Connell that Plaintiff's greetings when she entered Ms. Lynch's office did not meet their expectations. O'Connell, in response, was more concerned about the white workers' feelings regarding the nature of a black woman's greeting then by the possibility that the Jan Lynch office group was engaged in what may have been basically a "goof off" session with excess time to harass Plaintiff.

If the Jan Lynch office group had been working as Plaintiff was working, the group

members would not have had time to even notice Plaintiff's efforts to obtain the laptop. It is

pure speculation of course to reason how many hours the Jan Lynch office group then used of

Hartford Hospital time to discuss their snubbed, offended, and hurt feelings but a reasonable trier

of fact could draw an inference that the Jan Lynch office group was more concerned with

harassing a working black woman than accomplishing their own work. O'Connell's complete

ignorance of the white workers' activities and whether those white workers were actually doing

what they were supposed to be doing to earn their pay as compared to the effort and time

O'Connell and Ciaschini expended in drafting the written warning and ensuring that Plaintiff

would not be able to transfer to open positions during her remaining thirty-four (34) days at the

Hospital has no reasonable, non-discriminatory, neutral, or non-retaliatory explanation. The

work atmosphere under O'Connell's supervision caused Robert Lindyer, a white man, to believe

that he had the authority over Plaintiff, a black woman, such that he spoke "sternly" to her when

she did not greet him as he thought he was entitled. There can be little doubt that if Kelvin

Griffith, a black male transport aide, had been sitting in Jan Lynch's office doing nothing and

complained to O'Connell that Plaintiff made him feel "uncomfortable," "ignored," "offended,"

"snubbed," and "ungreeted" when she did not say "hello" to him as she stopped to retrieve a

laptop to do her work, O'Connell first would have asked what Mr. Griffith was doing sitting

around the office during work time, and second, she would not have issued Plaintiff a written

warning. (Pl.'s Dec. ¶¶34-36, L.R. 56(a)2 Statement, Tab A) (L.R. 56(a)2 Statement, Ex. 10)

O'Connell's view of the entire situation that evolved in Ms. Lynch's office on February 8, 2001,

was so skewed by her own motives of retaliation that she did not even understand the irony of

using the fact that Mr. Lindyer had spoken "sternly" to Plaintiff to justify issuing a written

warning to Plaintiff for failing to work collaboratively.

As regards the event in January or February of 2001 when Ms. Lynch apparently felt

ignored and the events of February 12, 2001, when O'Connell needed more than a smile from

Plaintiff and believed that an occasion when O'Connell and Plaintiff passed in the hall merited a

vocal greeting as well, the total subjectivity of whether one views these as real or imagined

transgressions necessitates a fact finder's determination of O'Connell's and Ciaschini's

motivations for taking the drastic and career ending response that they did when they issued the

suspension and written warning to Plaintiff. (Def. O'Connell Dec., App. A, Tab B at Tab 5)

C.      The Hospital's Retaliatory Adverse Actions Against Plaintiff

            i.   *Thirty-Four Days*

The most overt, and, at least arguably, direct evidence of discrimination resulting in an

adverse action found in the entire course of events leading to the instant cause of action is

O'Connell's straightforward response to the question of why she chose to impose a thirty-four

(34) day disciplinary period following her issuance of Plaintiff's February 13, 2001, written

warning. One expects that the Hospital would have a policy expressing a range of disciplinary

periods imposed for certain offenses so that managers, human resource personnel, and employees

in general would have an expectation of the consequences of violations and whether in

particular cases an employee has been treated in a manner consistent with the treatment of other

employees. Absent such a formalized range of possible disciplinary periods, one might expect

that a manger such as O'Connell with years of experience would have developed a working

sense and justification of appropriate ranges of disciplinary periods for certain offenses. This

does not appear to be the case. The Hospital's PIP does not specify any guideline for making

45

such a determination so the Hospital, as an entity, must be held responsible for the opportunity it

affords employees such as O'Connell and Ciaschini to abuse their unfettered discretion.

When asked to identify each reason or basis for determining that the length of Plaintiff's

written warning issued on February 13, 2001, would be thirty-four (34) days, O'Connell

responded, with no further justification, explanation or reasoning: "Thirty-four days was the

number of work-days remaining at the time of plaintiff's written warning until plaintiff's

position in the CORE project was eliminated." (Def. O'Connell Interrog. Resp. No. 8, L.R.

56(a)2 Statement, Ex. 49) (Pl.'s Dec. ¶¶108, 111(f), L.R. 56(a)2 Statement, Tab A)  This

admission, absent any additional justification, elaboration, or reasoning, and taking into account

that Plaintiff would not be eligible for the preference afforded to employees when seeking

internal transfer and the priority consideration given to employees subject to staff reduction so

long as she was subject to the disciplinary period[21], allows no explanation other than retaliation

for the written warning.  O'Connell did not consider whether Plaintiff's written warning

warranted a thirty-four (34) day disciplinary period or more or less.  Apparently whatever

number of work days remained for Plaintiff at the time of her written warning would have been

the number of days that O'Connell deemed appropriate for the disciplinary period.

### ii.  Position Elimination

By joint letter dated March 29, 2001, Ciaschini and O'Connell provided Plaintiff notice

of various policy provisions that would apply to her as an employee terminated for staff

reduction reasons.  They told Plaintiff:

---

[21] The Hospital Staff Reduction Policy in effect during Plaintiff's tenure as an AAI in the Radiation Oncology Department maintained:  "Any employees affected by position reductions, and not at Step 2 or higher of the Performance Improvement Process, will first be given priority consideration for open positions at any level in any department of the hospital for which they meet the qualifications and for which they have the ability to adequately perform the required functions within a ninety day period."  (L.R. 56(a)2 Statement, Ex. 23)

- You will be eligible for severance pay for a period of two weeks based on your years of service.

- Because you are on a written warning, you will not be eligible under Hartford Hospital policy to apply for posted positions at Hartford Hospital and its affiliates during your severance period.[22]

- You are eligible to receive assistance in resume preparation and job search techniques.

(Def. Ciaschini Dec., App. A, Tab C at Tab 20)  Plaintiff was eligible for severance pay because

she was a full time employee who was terminated in accordance with the Staff Reduction Policy.

(Hospital Severance Policy, L.R. 56(a)2 Statement, Ex. 51)[23]  The Staff Reduction Policy

provided for assistance in resume preparation and job search techniques, as well.  (L.R. 56(a)2

Statement, Ex. 23)   Finally, the Staff Reduction Policy placed restrictions on employees affected

by staff reductions who were at Step 2, 3, or 4 of the Performance Improvement Process.  (L.R.

56(a)2 Statement, Ex. 23)[24]   For Ciaschini and O'Connell to recognize that these provisions

applied to Plaintiff's termination, they must have known that the reason for Plaintiff's

termination was a reduction in staff.  The Hospital's record of Plaintiff as ineligible for rehire has

no neutral, justification.  (Hospital Payroll Record re: Plaintiff, L.R. 56(a)2 Statement, Ex. 1)

(Hospital Rehires Policy, L.R. 56(a)2 Statement, Ex. 25)

---

[22] In June of 2001, the Hospital revised its Staff Reduction Policy to reflect that "[w]hile receiving severance pay, laid-off employees who were not at Step 2 (Formal Improvement Documentation /Written Warning) or higher of the performance Improvement Process will receive priority consideration for any open positions for which they apply and meet the qualifications[.]"  (Hospital Staff Reduction Policy, Rev. 6/01, L.R. 56(a)2 Statement, Ex. 67)  At the time of Solomon's termination there was no such restriction in place.  (L.R. 56(a)2 Statement, Ex. 23)  Nonetheless, Ciaschini applied the revised June of 2001 policy to Solomon's severance period in April of 2001.

[23] The purpose of the Hospital Severance Pay Policy is "[t]o compensate full time employees who are terminated in accordance with the staff reduction and/or reorganization policy."  (L.R. 56(a)2 Statement, Ex. 51)

[24] The Hospital's Staff Reduction Policy provides that "[e]mployees in positions identified for reduction who are at Step 2 (Written Warning) or higher of the Performance Improvement Process will be laid off and will not be eligible to be considered for other positions within the hospital."  (L.R. 56(a)2 Statement, Ex. 23)

In addition, employees rehired "within 30 consecutive working days after separation will have their service bridged" meaning that they will retain the original date of hire and will continue to accrue benefits at the same rate as before separation." (Hospital Payroll Record re: Plaintiff, Ex. 25) Even given Ciaschini's and O'Connell's inaccurate notice to Solomon that she would not be eligible to apply for positions during her severance period through April 14, 2001[25], there were still fifteen (15) days left following the end of the severance period in which Plaintiff could have bridged her service had she been eligible for rehire. Although Ciaschini determined that although she would inform Solomon, inaccurately, that she was not able to apply for positions while she was on severance, Ciaschini would not tell Solomon that for 30 consecutive working days if she could find a position she would be able to bridge her benefits. (L.R. 56(a)2 Statement, Ex. 25) (Def. Ciaschini Dec., App. A, Tab C at Tab 20)

### iii. Not Eligible for Rehire

Plaintiff's position was eliminated on March 31, 2001, and she received severance pay through April 14, 2001. (Pl.'s Dec. ¶3, L.R. 56(a)2 Statement, Tab A) The Hospital recorded the reason for Solomon's March 31, 2001, termination as a "staff reduction." (Hospital Payroll Record re: Plaintiff, L.R. 56(a)2 Statement, Ex. 1)

Contrary to Plaintiff's termination status as a "staff reduction," the Hospital recorded that it would not consider Solomon for rehire. (Hospital Payroll Record re: Plaintiff, L.R. 56(a)2 Statement, Ex. 1) (L.R. 56(a)2 Statement, Ex. 25) The Hospital Rehires Policy provides that former employees applying for rehire "will be evaluated on the same basis as other applicants." (L.R. 56(a)2 Statement, Ex. 25) The policy further explains that "consideration will be given to past job performance, the circumstances surrounding their termination from Hartford Hospital

---

[25] See note 17, *supra*.

and their references from their former employer." (L.R. 56(a)2 Statement, Ex. 25)  However,

"former employees who have been terminated for violating the Rules of Conduct will not be

rehired." (L.R. 56(a)2 Statement, Ex. 25)

Plaintiff was eligible for rehire because the reason for her termination was staff reduction.

(L.R. 56(a)2 Statement, Ex. 1) According to Hospital policy, Plaintiff was "laid-off."  The

Separation of Employment Policy distinguishes between a layoff and a termination.  (L.R. 56(a)2

Statement, Ex. 26)  The policy defines a termination as a "separation in which the employee is

removed from the payroll for violations of Rules of Conduct, unsatisfactory job performance, or

any other reason indicating termination."   The Hospital Rehires Policy states that former

employees will not be eligible for rehire if the termination is a result of a violation of the Rules

of Conduct.  (L.R. 56(a)2 Statement, Ex. 25)

Plaintiff was not terminated for violating the Rules of Conduct.  The Hospital's records

demonstrate that her termination was by reason of staff reduction.  The Hospital's determination

that Plaintiff would not be eligible for rehire provides substantial grounds for inference of

impermissible discriminatory motive and retaliation for filing an anti-discrimination complaint,

or both.

## III.    LEGAL ARGUMENT

### A.  Standard for Summary Judgment

"Showing that the employer's proffered legitimate explanation for termination is not

worthy of belief is 'one form of circumstantial evidence that is probative of intentional

discrimination, and it may be quite persuasive.  In appropriate circumstances, the trier of fact can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up

a discriminatory purpose.'"  Windham v. Time Warner, Inc., 275 F.3d 179 (2d. Cir. 2001)

(quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000)).  Hartford Hospital's

recorded reason for Plaintiff's termination was "staff reduction," however the Hospital's

determination that Plaintiff would not be eligible for rehire and its discriminatory and retaliatory

actions toward Plaintiff during her employment denied Plaintiff an equal opportunity under the

law to transfer to another position in the Hospital.  Therefore, relying on <u>Windham</u>, a trier of

fact, in the instant case, may reasonably infer that any one or more of the Hospital's false

explanations for its disciplinary actions toward Plaintiff and rejections of Plaintiff's internal

transfer applications were efforts to evade detection of a discriminatory purpose.

"A trial court must be especially cautious in deciding whether to grant [summary

judgment] in a discrimination case, because the employer's intent is often at issue and careful

scrutiny may reveal circumstantial evidence supporting an inference of discrimination."  <u>Belfi v.

Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999); <u>see</u> <u>also</u>  <u>Newtown v. Shell Oil Co., et al.</u>, 52

F.Supp.2d 366, 372 (D.Conn. 1999) ("Considering the factors delineated by the Supreme Court

in <u>Harris</u>[<u>v. Forklift Sys., Inc.</u>, 510 U.S. 17 (1993)], and looking at all of the circumstances, we

are doubtful that the conduct complained of rises to the level of a hostile work environment

amounting to unwelcome sexual conduct which is sufficiently severe or pervasive to alter the

conditions of plaintiff's employment.  However, as the Second Circuit has repeatedly cautioned

in employment cases, reasonable jurors might disagree.") (citation omitted)  "Only when

reasonable minds could not differ as to the import of the evidence is summary judgment proper."

<u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1981).

    B.  <u>Disparate Treatment Race Discrimination and Unlawful Retaliation</u>

"A plaintiff may establish a claim of disparate treatment under Title VII … by showing

that he has suffered an adverse job action under circumstances giving rise to an inference of

discrimination on the basis of race …" Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004)

Plaintiff's initial burden is to establish a *prima facie* case of discrimination by showing that she

(1) is a member of a protected class; (2) is qualified for the position; and (3) experienced an

adverse employment action under circumstances giving rise to an inference of discrimination.

Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing McDonnell Douglas Corp.

v. Green, 411 U.S. 792, 802 (1973).  "Once a defendant offers a legitimate, non-discriminatory

reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of

proving that the defendant intentionally discriminated against her in the employment decision."

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).  "Evidence that an

employer's reason is false, combined with the evidence presented to establish a *prima facie* case,

in some cases can be sufficient to sustain a plaintiff's burden, and a plaintiff need not have any

further evidence of discrimination."  Back v. Hastings-on-Hudson Union Free School District,

365 F.3d 107, 120 (2d Cir. 2004).  A plaintiff must establish a *prima facie* case, respond to a

defendant's non-discriminatory reasons for its actions, and produce sufficient evidence showing

that the reasons proffered by the defendant are pretextual to create an issue of material fact.

Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999).

    *i. Plaintiff's Prima Facie Case*

    Plaintiff is a black female and thus a member of a protected group.  (Am. Compl., ¶9)

She was qualified for the Administrative Associate I position in the Hemodialysis Unit, Financial

Counselor position in the Patient Accounts Department, Human Resources Associate position in

the Human Resources Department, Patient Administrative Associate and Administrative

Associate II positions in the Care Continuum, and Administrative Associate III position in the

Research Department.  The Hospital established Plaintiff as qualified for each of these positions

51

when the Human Resources Consultant assigned to the recruitment and selection process referred

Plaintiff as a qualified candidate to the hiring manager in the department for an interview based

on Plaintiff's transfer applications, training, and credentials.  Plaintiff experienced an adverse

employment action for each of the transfer applications that she submitted when she was not

offered the positions.  The circumstances of Plaintiff's adverse employment actions provide

inference of discrimination for the reasons stated in the foregoing memorandum at section

II(A)(iii)(1), (2), (3), (4), and (5), above.

### ii.  Hartford Hospital's Legitimate, Non-Discriminatory Reason

The Hospital claims that Plaintiff was either not qualified for the positions or not as

qualified as other candidates.

### iii.  Pretext and Intent to Discriminate

The Hospital never considered Plaintiff's transfer applications by the proper standard in

accordance with its Staff Reduction Policy and ignored the applicable provisions of the Career

Opportunities Policy that gave Plaintiff preference as an internal transfer hire.  Although the

Hospital had programs in place to provide training, no one considered that as an option for

Plaintiff even though she would have had ninety (90) days to perform a new position adequately.

Ciaschini told one hiring manager, Susan Stagg, specifically not to afford Plaintiff priority

consideration.  Ciaschini intentionally withheld information from both hiring managers and

Plaintiff regarding Plaintiff's eligibility for priority consideration.  Second, as Ciaschini replaced

Ms. Brady and as Niles gathered more supervisory authority over Plaintiff, Plaintiff experienced

harassment and adverse employment actions at the hands of the three individual Defendants.

Ciaschini published a letter dated January 22, 2000[sic2001] to O'Connell regarding Plaintiff's

transfer efforts even though such information was deemed confidential.  O'Connell used Niles as

a "back-up" and gave her authority over Plaintiff to permit vacation and late arrival requests.

Niles proceeded to focus on Plaintiff's race and color by using racial slurs and inundating

Plaintiff with personal questions about her race, color, and lifestyle.  Third, the Hospital provided

false information to support its motion.  Each and every successful applicant for the positions

referenced in section II(A)(iii)(1), (2), (3), (4), and (5), above, was white or Hispanic.  The hiring

manager for the AAI position in the Hemodialysis Unit, Ms. Kowalski, provided false

information in support of the Hospital's motion for summary judgment when she swore that a

black female, Lovie DeGourville, had held the position when she had not.  Ms. Kowalski's

knowledge of the falseness of her statement is indicated by a qualifier, "ultimately," to direct

attention from the fact that the position remained open for five (5) months following Plaintiff's

interview and then when a second candidate was chosen to commence work in December of

2000, she lasted little more than one month in the position such that Plaintiff could have been

transferred to the position prior to the elimination of her position on March 31, 2001.  See Hack

v. Presidents and Fellows of Yale College, 237 F.3d 81, 101 (2d Cir. 2000) ("The consequence

of a plaintiff engaging this opportunity and demonstrating falsity is that it may (and, in most

circumstances, will) advance her greater enterprise of showing discriminatory intent.").

   C.  Disparate Impact Race Discrimination

   "'Disparate impact claims involve three stages of proof.'  Robinson v. Metro-North

Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001)  First, a claimant must make a prima facie

showing of disparate impact.  Id.  This requires a plaintiff to establish by a preponderance of the

evidence that the employer 'uses a particular employment practice that causes a disparate impact

on the basis of race, color, religion, sex, or national origin.'  Id. (quoting 42 U.S.C. § 2000e-

2(k)(1)(A)(i)). 'To make this showing, a plaintiff must (1) identify a policy or practice, (2)

53

demonstrate that a disparity exists, and (3) establish a causal relationship between the two.' Id.

(citation omitted). If the plaintiff makes a prima facie showing of disparate impact, the burden

shifts to the employer 'to demonstrate that the challenged practice or policy is "job related for the

position in question and consistent with business necessity."' Id. at 161 (citation omitted). If the

employer fails to demonstrate a business justification for the policy or practice, then the plaintiff

prevails.  However, if the employer succeeds in establishing a business justification, then the

burden shifts back to the plaintiff 'to establish the availability of an alternate policy or practice

that would also satisfy the asserted business necessity, but would do so without producing the

disparate effect.' Id. (citations omitted)." Equal Employment Opportunity Commission v.

Beauty Enterprises, Case No. 3:01CV378(AHN) (D. Conn. 2005)

The Hospital discriminated against Plaintiff, who is black, by requiring that candidates

for selected positions at the Hospital have bilingual skills in Spanish and English without data or

policy to support its determinations that those with bilingual skills in Spanish and English would

be more qualified to perform the positions' requirements.  (Admissions by Defendants Nos. 147,

151, L.R. 56(a)2 Statement, Ex. 45) (Admissions by Defendants Nos. 145, 149, 153, L.R. 56(a)2

Statement, Ex. 29) (Pl.'s Dec. ¶¶48, 68, 70, 71, L.R. 56(a)2 Statement, Tab A)

D.  Equal Rights Violations

"Section 1981 states in relevant part that '[a]ll persons within the jurisdiction of the

United States shall have the same right in every State and Territory to make and enforce

contracts.'  42 U.S.C. § 1981(a).  Section 1981 essentially 'outlaws discrimination with regard to

the enjoyment of all benefits, privileges, terms, and conditions of a contractual relationship,'

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 68 (2d Cir. 2000), though § 1981 only

prohibits discrimination based on race, ancestry, ethnic characteristics or alienage and does not

54

prohibit discrimination based on gender, religion, or national origin. See Anderson v. Conboy,

156 F.3d 167, 169-70 (2d Cir. 1998). ...  As stated by the Second Circuit, '[a]n act of retaliation

for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is

cognizable under § 1981 unless that activity was also protected by § 1981.' Hawkins v. 1115

Legal Service Care, 163 F.3d 684, 693 (2d Cir. 1998). As the Second Circuit explained in

Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38 (2d Cir. 1984), [a] retaliation claim is

cognizable under § 1981 to make that section an available and effective remedy for racially

motivated employment discrimination. . . . [A]n employee who is punished for seeking

administrative or judicial relief, regardless of the merits of his initial claim, has failed to secure

that right to equal treatment which constitutes the fundamental promise of § 1981. When a

complainant experiences retaliation for the assertion of a claim to even-handed treatment, he

remains under a handicap not faced by his colleagues. Such inequality . . . is   proscribed by §

1981.  Id. at 43. See also Lizardo v. Denny's, Inc., 270 F.3d 94, 105 (2d Cir. 2001) ("Retaliation

claims are cognizable under § 1981."). Therefore, '[m]ost of the core substantive standards that

apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims

of discrimination in employment in violation of § 1981.' Patterson v. County of Oneida, N.Y.,

375 F.3d 206, 225 (2d Cir. 2004); see also Whidbee, 223 F.3d at 69." Lewis v. State of

Connecticut, Case No. 3:02-cv2304(MRK) (D. Conn. 2005).  The individual Defendants as well

as Hartford Hospital denied Plaintiff her civil rights when Plaintiff was not discriminated against

in her transfer attempts and then retaliated against when she engaged in protected activity to

complain.

## IV.     CONCLUSION

Based on the foregoing material issues of fact from which a reasonable trier of fact may

infer discrimination, unlawful retaliation, and deprivation of rights based on Plaintiff's race,

Plaintiff opposes Defendants' motion for summary judgment as to Counts One through Fourteen,

inclusive.


                                        PLAINTIFF
                                        SARAIYA SOLOMON


                    BY:     _____
                                        Rachel M. Baird
                                        (Fed. Bar No. 12131)
                                        Law Office of Rachel M. Baird
                                        Stonegate Professional Building
                                        379 Prospect Street
                                        Torrington CT 06790-5239
                                        Tel:  (860) 626-9991
                                        Fax:  (860) 626-9992

## **CERTIFICATION**

I HEREBY CERTIFY THAT the foregoing <u>Plaintiff's Memorandum of Law in</u>

<u>Opposition to Defendant's Motion for Summary Judgment</u> was mailed, first-class, postage paid,

on April 5, 2005, to counsel for the Defendants at the following address:

Brenda Eckert
Gregg P. Goumas
Shipman & Goodwin LLP
One Constitution Plz
Hartford CT 06103-1919

*Counsel for Hartford Hospital, et al*


                            _____
                            Rachel M. Baird