UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARAIYA SOLOMON, | : | |
| | : | |
| Plaintiff, | : | CASE NO.: 3:02-cv-1116(EBB) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HOSPITAL, | : | |
| GLADYS M. CIASCHINI, | : | |
| SUSAN A. O'CONNELL, and | : | |
| SANDRA NILES, | : | |
| | : | |
| Defendants. | : | APRIL 5, 2005 |

**PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT**

Plaintiff Saraiya Solomon hereby submits, pursuant to Local Rule 56(a), a Local Rule 56(a)2 Statement,[1] to accompany Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment filed by Defendants Hartford Hospital, Gladys M. Ciaschini, Susan A. O'Connell, and Sandra Niles.

---

[1] The Second Amended Complaint alleges:

- In Counts One, Three, Nine, and Eleven: Disparate Treatment Race Discrimination (42 U.S.C. § 2000e-2(a)) against Hartford Hospital;

- In Counts Seven and Eight: Disparate Impact Race Discrimination (42 U.S.C. § 2000e-2(a), 2(k)) against Hartford Hospital;

- In Counts Five and Fourteen: Unlawful Retaliation (42 U.S.C. § 2000e-3 and Conn. Gen. Stat. § 46a-60(a)(4)) against Hartford Hospital;

- In Counts Two, Four, Six, Ten, and Twelve: Equal Rights Violations (42 U.S.C. §§ 1981, 1981b) against all Defendants; and

- In Count Thirteen: Race Discrimination (Conn. Gen. Stat. § 46a-60(a)(1)) against Hartford Hospital.

In accordance with the stringent standards set forth in Connecticut courts for extreme and outrageous conduct required by an intentional infliction of emotional distress claim and the limited applicability of the negligent infliction of emotional distress to the actual manner of discharge, and, for the practical reason that any award for damages under these claims would be duplicative of damages received under the anti-discrimination counts, Plaintiff does not oppose Defendants' motion for summary judgment against these claims at Counts Fifteen and Sixteen. Finally, as regards the last remaining Counts Seventeen, Eighteen, and Nineteen, not already addressed in the instant footnote and containing state common law claims, Plaintiff does not oppose Defendants' motion for summary judgment.

1

## CONTENTS OF STATEMENT

I.     RESPONSES[2] TO DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

II.     DISPUTED ISSUES OF MATERIAL FACT

III.     AFFIDAVITS, RESPONSES TO DISCOVERY REQUESTS, AND EVIDENTIARY DOCUMENTS

    A. Tab A____Declaration of Saraiya Solomon

    B. Tab B____Declaration of Aziza I. Solomon

    C. Tab C____Declaration of Rachel M. Baird

### EXHIBITS 1 – 69 TO LOCAL RULE 56(a)2 STATEMENT

| | |
|---|---|
| Ex. 1 | Pl.'s Payroll Activity Window |
| Ex. 2 | Pl.'s ERCN |
| Ex. 3 | Pl.'s Transfer Application |
| Ex. 4 | AAI Role Description |
| Ex. 5 | Def. Ciaschini Notes |
| Ex. 6 | Medical Notes |
| Ex. 7 | OHS Referral Form |
| Ex. 8 | E-mails, January 23, 2001 |
| Ex. 9 | January 12, 2000, Memorandum |
| Ex. 10 | ERCN re: Kelvin Griffith |
| Ex. 11 | Pl.'s Education and Credentials |
| Ex. 12 | Pl.'s Training |
| Ex. 13 | Def. Ciaschini Handwritten Notes |
| Ex. 14 | January 22, 2000, Letter |
| Ex. 15 | Pl.'s Transfer Application |
| Ex. 16 | ERCN re: Alex Moreau |
| Ex. 17 | ERCN re: Virginia Hernandez-Green |
| Ex. 18 | ERCN re: Virginia Hernandez-Green |
| Ex. 19 | ERCN re: Juan Urena |
| Ex. 20 | ERCN re: Juan Urena |
| Ex. 21 | Pl.'s Time Cards |
| Ex. 22 | Jan Lynch, March 1, 2001, Memorandum |
| Ex. 23 | Staff Reduction Policy |
| Ex. 24 | Recruiting and Selection Policy |
| Ex. 25 | Rehires Policy |
| Ex. 26 | Separation of Employment Policy |

---

[2] Defendants' Local Rule 56(a)1 Statements are bracketed by quotation marks and Plaintiff's responses appear in bold type.

| Ex. 27 | Posting and Transfer Application Position Reference #A020420002D |
| --- | --- |
| Ex. 28 | Posting and Transfer Application Position Reference #A020403006D |
| Ex. 29 | Admissions of Defendants |
| Ex. 30 | CHRO Hearing Audio Tapes 1-5 |
| Ex. 31 | Career Opportunities Policy |
| Ex. 32 | Durler Transfer Application |
| Ex. 33 | Defs.' Production Responses |
| Ex. 34 | ERCN re: Jennifer Vasquez |
| Ex. 35 | ERCN re: Jennifer Vasquez |
| Ex. 37 | Evaluation re: Lovie DeGourville |
| Ex. 38 | Evaluation re: Lovie DeGourville |
| Ex. 39 | ERCN re: Lovie Kelsey |
| Ex. 40 | CHRO Verified Answer |
| Ex. 41 | ERCN re: Dawn Packman |
| Ex. 42 | Rowe Transfer Application |
| Ex. 43 | ERCN re: Tiffany Rowe |
| Ex. 44 | ERCN re: Novette Grant |
| Ex. 45 | Admissions by Defendants |
| Ex. 46 | EEO/Affirmative Action Policy |
| Ex. 47 | Posting Position Reference #A030089003E |
| Ex. 48 | Def. Ciaschini Resume |
| Ex. 49 | Def. O'Connell Interrog. Resp. |
| Ex. 50 | Geer Employment Application |
| Ex. 51 | Severance Policy |
| Ex. 52 | Evaluation re: Brenda Laureano-Geer |
| Ex. 53 | Def. Ciaschini Role Description |
| Ex. 54 | ERCN re: Pamela Garcia |
| Ex. 55 | Admissions by Defendants |
| Ex. 56 | Resume re: Emy J. Lopez |
| Ex. 57 | Payroll Activity Window re: Juan Urena |
| Ex. 58 | Payroll Activity Window re: Juan Urena |
| Ex. 59 | Payroll Activity Window re: Juan Urena |
| Ex. 60 | Payroll Activity Window re: Juan Urena |
| Ex. 61 | Interview Notes re: Emy J. Lopez |
| Ex. 62 | Pl.'s Interview Notes |
| Ex. 63 | ERCN re: Alex Moreau |
| Ex. 64 | Hospital Policies |
| Ex. 65 | Time Card and Timekeeping Policy |
| Ex. 66 | Def. O'Connell Evaluation |
| Ex. 67 | Staff Reduction Policy, Rev. 6/01 |
| Ex. 68 | Change of Name re: Lovie DeGourville |
| Ex. 69 | ERCN re: Jennifer Vasquez |

**I.    RESPONSES TO DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT**

1.    "Plaintiff, Saraiya Solomon ("Solomon"), a black female, was employed by Hartford Hospital (the "Hospital") from August 9, 1997 through March 31, 2001.  February 20, 2004 Amended Complaint ("Compl.")/Answer ("Ans.") ¶9."

      **Admit.**

2.    "On or about August 9, 1997, Solomon began her employment at the Hospital as a part-time information desk receptionist with the title of Administrative Associate I ("AA I").  Compl./Ans. ¶19."

      **Admit.**

3.    "The Hospital's Application for Employment originally completed and signed by Solomon in July 1997 contains the following statement:

> *I understand that this application and/or any resultant employment at Hartford Hospital and/or its affiliates does not imply or indicated any intent of establishing a contractual relationship.  I further understand that my employment is at will and can be terminated by me or by the hospital or its affiliates at any time, for any reason.  Also, I understand that this application is not an offer of employment.*

Declaration of Patricia Synhorst ("Synhorst Dec.") ¶5, Appendix ("App.") A, Tab A."

      **Admit.**

4.    "On or about March 22, 1999, Solomon transferred from the main lobby of the Hospital to begin work as an AAI at the entrance of the Conklin Building.  Compl./Ans. ¶29."

      **Admit.**

5.    "The Radiation Oncology Department was located in the Gray Cancer Center at the Hospital.  Compl./Ans. ¶25."

      **Admit.**

6. "Defendant, Susan O'Connell ("O'Connell"), was and still remains a manager in the Radiation Oncology Department. She interviewed and made the decision to hire Solomon as an AAI in the Conklin Building. Compl./Ans. ¶22; Declaration of Susan O'Connell ("O'Connell Decl.") ¶3, App. A, Tab B."

   **Admit.**

7. "The construction of a new building at the Hospital, known as the "CORE Building Project," meant that the Gray Cancer Center entrance would be closed and patients would be required to detour through the Conklin Building entrance to reach the Gray Cancer Center. Compl./Ans. ¶26."

   **Admit.**

8. "One of Solomon's duties as an AAI at the entrance of the Conklin Building was to receive detoured cancer patients and direct them to the Gray Cancer Center. Compl./Ans. ¶27; O'Connell Dec. ¶3, App. A, Tab B."

   **Admit.**

9. "In addition to Solomon, O'Connell hired two Transport Aides, Kelvin Griffith ("Griffith"), who is black, and Virginia Hernandez-Green ("Green"), who is hispanic, to work at the Conklin Building entrance during the CORE Building Project. Their primary function was to transport patients from the Conklin Building entrance to the Gray Cancer Center. O'Connell Dec. ¶4, App. A, Tab B."

   **Admit.**

10. "The two Transport Aide positions and Solomon's position were scheduled to end upon on the reopening of the entrance to the Gray Cancer Center. Compl./Ans. ¶54; O'Connell Dec. ¶3, App. A, Tab B."

**Admit.**

11.     "Prior to hiring Solomon for the AAI position in the Conklin Building, O'Connell informed Solomon that Solomon's position would be eliminated when the CORE building project was completed, and the Cancer Center entrance was reopened.  O'Connell Dec. ¶3, App. A, Tab B."

**Admit.**

12.     "Solomon testified at her deposition that she is aware that she had an "at will" employment relationship with the Hospital.  Solomon Deposition Transcript ("Solomon Dep.") at 293, App. B, Tab A."

**Admit with clarification.  Plaintiff testified:  "Well I now know that at will is the type of employment that I had.  But at that time, I mean I'm not an attorney.  I don't know the law.  So I really didn't know what type of relationship we had.  What kind of legal or what type of contract we had."  (Solomon Dep. at 293)**

13.     "During all times relevant to the events alleged in the Second Amended Complaint in this action, the Hospital maintained a Performance Management Policy.  Declaration of Gladys Ciaschini ("Ciaschini Dec.") ¶20, App. A, Tab C."

**Admit.**

14.     "On March 19, 2001, Solomon filed an Affidavit of Illegal Discriminatory Employment Practices with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC") alleging that the Hospital discriminated against her on the basis of race. Compl./Ans. ¶6."

**Admit.**

15. "At her deposition, Solomon testified that she first became aware of the Performance Management Policy, and its corresponding performance improvement process, when the Hospital submitted its Answer to the CHRO Charge. Solomon Dep. at 286, App. B, Tab A; Deposition Exhibit ("Depo. Ex.") 33, App. B, Tab B."

**Admit with clarification.  First, Defendants filed a Verified Answer to Plaintiff's CHRO charge.  (Solomon Dep. at 286)  Second, Plaintiff became aware on February 13, 2001, and December 26, 2000, of the Hospital's disciplinary policy when she received a written warning from O'Connell (Def. O'Connell Dec., App. A, Tab B at Tab 5) and was told by Ciaschini at a December 26, 2000, meeting that a "written warning"[3] had been placed in her file in 1999.  (Pl.'s Dec. ¶26, Tab A) (January 23, 2001, E-mails between O'Connell and Ciaschini, Ex. 8)  O'Connell and Ciaschini did not attach the Hospital's Performance Improvement Policy to the February 13, 2001, written warning or to the 1999 memorandum and Plaintiff did not view the written formal Performance Improvement Policy until the Hospital provided it to the CHRO.  (Solomon Dep. at 286) (Def. O'Connell Dec., App. A, Tab B at Tab 1 and Tab 5)**

16. "Solomon did not rely on the terms of the Performance Management Policy when she transferred to the AA I position in the Conklin Building. Solomon Dep. at 286, App. B, Tab A."

**Admit.**

---

[3] The Hospital's Performance Improvement Process (PIP) did not contain a "written warning" component.  The four steps to the PIP were entitled in ascending order, "Verbal Counseling," "Formal Improvement Documentation," "Final Written Warning," and Suspension or Termination."  (Def, Ciaschini Dec., App. A, Tab C at Tab 16) Therefore, although Ciaschini refers to the 1999 document as a "written warning," (L.R. 56(a)2 Statement, Ex. 8) clearly it was not because within the 1999 document, it states " [f]ailure to meet the above goals will immediately advance you to Step #3 HH Performance Management System – Final Written Warning."  (Def. O'Connell Dec., App. A, Tab B at Tab 1)

7

17.     "During an August 5, 1999 meeting with Solomon and Griffith, O'Connell issued Written Warnings, dated July 30, 1999 (the "July 30th Written Warning"), to both Solomon and Griffith.  O'Connell Dec. ¶4; Compl./Ans. ¶35."

**Deny.  Through the process of discovery, Plaintiff has ascertained that the document dated July 30, 1999, which Plaintiff understood to be a "memo" when she received it, was in fact a "formal improvement documentation" issued pursuant to Step 2 of the Performance Improvement Process (PIP).  (Def. Ciaschini Dec., App. A, Tab C at Tab 16)**

18.     "The July 30th Written Warning stated, in part:

*In March I held a meeting in my office with the Cancer Center staff at the Conklin Building.  At this meeting I informed each of you that staff needed to be present from 7:00 AM- 5:30 PM.  I also informed each of you that you would need to cross-cover each position when an absence was present.  Each of you agreed to this.  This memo is a response to the lack of staff from 7:00 am – 5:30 pm.*

O'Connell Dec. ¶4, App. A, Tab B."

**Admit with clarification.  The July 30, 1999 "formal improvement documentation" was not a "written warning."  See response to No. 17, *supra*.  Plaintiff admits that the July 30, 1999, "formal improvement documentation" stated, in part:**

*In March I held a meeting in my office with the Cancer Center staff at the Conklin Building.  At this meeting I informed each of you that staff needed to be present from 7:00 AM- 5:30 PM.  I also informed each of you that you would need to cross-cover each position when an absence was present.  Each of you agreed to this.  This memo is a response to the lack of staff from 7:00 am – 5:30 pm.*

19.     "O'Connell issued the July 30th Written Warning to Solomon and Griffith because O'Connell believed that they were not providing the necessary transport assistance at the entrance to the Conklin Building.  O'Connell believed that Solomon was not providing the necessary transport aide coverage in Griffith's absence.  O'Connell also believed that Solomon

8

was not altering her work hours to provide full transport aide coverage between 7:00 a.m. and 5:30 p.m. Id."

**Admit with clarification. The July 30, 1999 "formal improvement documentation" was not a "written warning." See response to No. 17, *supra*. Plaintiff admits that O'Connell avers that she issued the July 30, 1999 "formal improvement documentation" for the reasons stated at No. 19, above, and that Plaintiff has no evidence to refute O'Connell's statement of her beliefs except the trier of fact's assessment of her credibility taking into account the fact that O'Connell failed to correctly identify the nature of the July 30, 1999, document.**

20.     "Solomon refused to sign the July 30th Written Warning and informed O'Connell for the first time that she [Solomon] might have a back condition that prevented her from providing patient transport assistance. Id. ¶5."

**Deny. First, the July 30, 1999 "formal improvement documentation" was not a "written warning." See response to No. 17, *supra*. Second, Plaintiff did have a preexisting back condition and informed O'Connell. (Pl.'s Dec. ¶23, Tab A) (Medical Note and OHS Form, Ex. 6 and Ex. 7) Third, O'Connell's Declaration does not state that Plaintiff told her she "might" have a back condition, the Declaration states that Plaintiff told O'Connell that she "claimed" to have a back condition. The term "might" implies that Plaintiff herself was unsure if she had a back condition which was not the case. (Pl.'s Dec. ¶23, Tab A)**

21.     "During O'Connell's August 5th meeting with Solomon and Griffith, Solomon demanded that Griffith not speak to her. Id. ¶5."

9

**Deny with clarification. Plaintiff told Mr. Griffith in O'Connell's presence that Plaintiff would not be speaking with Mr. Griffith unless their jobs mandated. (Pl.'s Dec. ¶34, Tab A)**

22. "On or about August 6, 1999, O'Connell provided Solomon with a Memorandum (the "August 6th Memo.") which stated as follows:

> *After our meeting yesterday [August 5th] I spoke with the Human Resources department regarding your inability to push a wheelchair. Upon their advisement I will not expect you for two weeks to push a wheelchair. On August 23, I will expect you to assist in wheelchair transports when needed unless you have a doctor's note indicating a physical restriction.*
>
> *On August 23 if you have a doctor's note indicating a physical restriction I will make arrangements with the Occupational Health department to further assess the situation and care plan. .*

Id."

**Admit**

23. "After receiving documentation from Solomon's health care provider about Solomon's back condition and after Solomon was evaluated by the Hospital's Occupational Health Department, O'Connell decided to relieve Solomon of her duty to provide patient transport assistance. Id."

**Admit in part. Plaintiff admits that O'Connell did not expect Plaintiff to perform the Transport Aide duty of physically transporting patients after Plaintiff provided documentation from her health care provider and Hartford Hospital's Occupational Health Department. (January 12, 2001, Memorandum from O'Connell, Ex. 9) (Medical Note and OHS Form, Ex. 6 and Ex. 7)**

**Deny in part. Plaintiff denies that the Transport Aide duty was one that she needed to be "relieved" of as an Administrative Associate I. (Pl.'s Dec. ¶31-32, Tab A)**

10

24. "On or about January 12, 2001, O'Connell sent a Memorandum to the Hospital's Department of Human Resources which stated:

> *REGARDING:*
> *Performance Management Memos dated 7/30/99 + 8/6/99*
>
> *The issues regarding coverage, timecards, vacation and illness have been resolved. Saraiya's back injury had been an ongoing issue with Occupational Health and her physician. The Cancer Center decided not to utilize Sarayai [sic] for transfers and call for available volunteers instead. Sarayai [sic] informed us that her back injury was old but prevented her from lifting and pushing.*

Id."

**Admit.**

25. "O'Connell conducted performance evaluations of Solomon on October 21, 1999 and October 24, 2000. In the October 21, 1999 review, O'Connell gave Solomon an overall rating of 'Effective' and increased Solomon's hourly wage from $9.88 to $10.41. In the October 24, 2000 review, O'Connell gave Solomon an overall rating of 'Exemplary' and increased Solomon's hourly wage from $10.41 to $11.01. Compl./Ans. ¶¶67, 68."

**Admit.**

26. "Because O'Connell had released Solomon from her patient transport duties, O'Connell did not consider either the July 30 Written Warning or August 6 Memo in Solomon's October 21, 1999 or October 24, 2000 performance evaluations. O'Connell Dec. ¶5, App. A, Tab B."

**Admit with clarification. First, the July 30, 1999 "formal improvement documentation" was not a "written warning." See response to No. 17,** *supra***. Second, Plaintiff denies that the Transport Aide duty was one that she needed to be "released" from as an Administrative Associate I. (Pl.'s Dec. ¶¶31-32, Tab A) Third, Plaintiff has no**

11

**evidence to refute O'Connell's statement of her considerations except the trier of fact's assessment of her credibility taking into account the fact that O'Connell failed to correctly identify the nature of the July 30, 1999, document.**

27.     "Despite giving Solomon an overall rating of "Effective" in Solomon's October 21, 1999 performance evaluation, O'Connell ranked Solomon as "Needs Improvement" in the Core Values of "Relationships" and "Communication", due in large part to Solomon's verbal outburst toward Griffith on August 5, 1999.   Id. ¶6."

**Admit in part.  O'Connell recorded an overall rating of "Effective" in Plaintiff's October 21, 1999 performance evaluation and recorded "Needs Improvement" in the Core Values of "Relationships" and "Communication."**

**Deny in part.  O'Connell's Declaration does not use the term "verbal outburst" and Plaintiff denies that a verbal outburst occurred.  (Def. O'Connell Dec. ¶6, App. A, Tab B)**

28.     "On or about October 21, 1999, Solomon provided O'Connell with a Memorandum which stated as follows:

> *Susan, regarding the "Communication" portion of my performance evaluation of October 13, 1999 in which I received a rating of "needs improvement", in reference to how I communicate with my team members I truly believe and know as I intimated to you during my evaluation that what is being misconstrued as my inability to communicate with certain individuals amounts to differences in personality.*
>
> *We are all individuals and as you know we all have personalities and a personal style. The reality is that we often have to work with those whose personal style is different from our own.  I know that this is the case here.*
>
> *I can however assure you that my personal style and the personal style of any other staff member will not and has not interfered with the dispensing of my duties in this position.*

O'Connell Dec. ¶5; App. A, Tab B."

**Admit.**

29.     "On December 26, 2000, Galdys Ciaschini ("Ciaschini"), a Human Resources Consultant in the Hospital's Human Resources Department, met with Solomon to discuss the conclusion of her assignment as an AAI in the Conklin Building.  During their meeting, Ciaschini advised Solomon that she needed to secure another position within the Hospital prior to the conclusion of her assignment or her Hospital employment would be terminated at that time.  Ciaschini Dec. ¶3, App. A, Tab C."

**Admit.**

30.     "Ciaschini met again with Solomon on January 18, 2000, at which time they were joined on speaker phone by O'Connell.  During this meeting, Ciaschini informed Solomon that unless she found another position within the Hospital, her employment would end effective March 31, 2001.  Id. ¶4."

**Admit with clarification.   Plaintiff admits that such a meeting occurred but does not recall the date of the meeting and has no evidence to refute Ciaschini's Declaration that the meeting occurred on January 18, 2001, except a trier of fact's assessment of Ciaschini's credibility.  (Def. Ciaschini Notes, Ex. 5) (Pl.'s Dec. ¶¶13, 15, 16, Tab A)**

31.     "O'Connell informed Solomon that she would be willing to act as an employment reference to assist Solomon in her efforts to transfer to another position within the Hospital.  Despite O'Connell's offer, Solomon never asked her to serve as a reference.  Solomon Dep. at 338-39, App. B, Tab A; O'Connell Dec. ¶6, App. A, Tab B."

**Admit.**

32. "On January 19, 2001, Sandra Niles ("Niles"), who worked in the Radiation Oncology Department in an administrative capacity, made a written complaint to Ciashini about an encounter she had with Solomon earlier that day. Niles' complaint stated as follows:

> *This morning, 6:30 A.M. in the cafeteria while I was having breakfast by myself. Saraja [sic] Solomon approached me at my table. She said "I am going to be working in this hospital and I am telling you this one time, you do not talk to me in any way. Do not speak to [sic] about anything I am doing personal or business. I do not like you and you do not like me. Did you get that clear?" I said "Yes I certainly do" She turned and repeated something else like "Are you sure you understand?"*
>
> *I do not know what provoked this. Yesterday I passed her [sic] She was working on a project from the Cancer Center and I went up to her desk and remarked how interesting it looked with the lap top. She turned to me and said "Was I out gossiping?", I said I was at lunch. I ignored her remark, not sure what she meant. She then said she will be working in administration shortly. I did not say anything, just have a nice day and left. said anything. [sic]*

Ciaschini Dec. ¶6, App. A, Tab C."

**Admit with clarification. Plaintiff denies that she and Niles spoke in the cafeteria on January 19, 2001, and avers that the conversation took place on January 18, 2001. (Pl.'s Dec. ¶16, Tab A)  Admit the remainder.**

33. "Niles told Ciaschini that she felt threatened and harassed by Solomon and that she wanted the Hospital to address January 19, 2000 incident. Id."

**Objection; absent a Declaration or Affidavit submitted by Niles this statement is inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

34. "On January 22, 2001, Ciaschini met with Solomon to discuss Niles' January 19 complaint. Maria Tenero, another Hospital Human Resources Consultant, was also present at this meeting. Ciaschini summarized Niles' complaint for Solomon and Solomon responded that it was "pretty much true." However, Solomon denied that she harassed or threatened Niles. Solomon also stated that it was a fact that she and Niles did not like each other, and that "she had

14

been receiving condescending comments from Sandra for 20 months" and she [Solomon] was no longer going to accept it.  Solomon also stated that on January 18, 2001, Niles had asked her a personal question, and that she [Solomon] did not want to have conversations with Niles about personal matters, but rather, only business matters.  Id. ¶7."

**Admit in part.  Plaintiff admits that Niles asked the personal question but not on January 18, 2001.  (Pl.'s Dec. ¶16, Tab A)**

35.   "The Hospital did not take any disciplinary action against Solomon as a result of the January 19, 2001 incident with Niles.  Id."

**Admit with clarification.  The "incident" referred to occurred on January 18, 2001.  (Pl.'s Dec. ¶16, Tab A)  The Hospital did not impose any formal discipline pursuant to its Performance Improvement Process.  The term "disciplinary action" used by Ciaschini in her Declaration is undefined by Hospital policy.  (Def. Ciaschini Dec., App. A, Tab C at Tab 16)**

36.   "On January 24, 2001, Ciaschini received a letter from Solomon dated January 23, 2001 (the "January 23 Letter").  Solomon's January 23 Letter, provided, in part:

> *As I disclosed to you yesterday I have worked with Sandra Niles for twenty months. Within those twenty months Sandra has repeatedly made condescending remarks to me. For example: Because I do not presently own and automobile and she (Ms. Niles) is aware of this fact, on several occasions she has made disparaging statements about my traveling to work by bus. (A situation that I regard and regarded as none of her business) There was also a situation that I interpreted as racially motivated: Ms.*
> *Niles said to me on an occasion that she burned in the summer and that she wished that she could be as dark as I am.  Given her previous comments to me I took her remark as a racial slur.*

Id. ¶8."

**Admit.**

37.   "The January 23 Letter further stated, in part:

15

> *(6)    One of the transferred co-workers intimated to me that Susan O'Connell was the impediment that was preventing me from transferring out of her department.*
> *(7)    Lastly, a Cancer Center patient intimated to me that Sandra Niles told her that after March 2000 I would not be employed by this organization.*
>
> *In conclusion this leads me to believe that there is collusion on the part of Susan O'Connell, Sandra Niles, and very possibly links in the human resources department of this organization to encourage me to resign, and unfortunately I believe it is racially motivated.*

Id."

      **Admit.**

38.    "The first time that Solomon informed Ciaschini of her belief that Niles' remarks were racially motivated was in her January 23 Letter. Id."

      **Admit.**

39.    "In a February 2, 2001 letter to Ciaschini, Solomon wrote:

> *On or about the last week of December 2000, Alex Moreau (a former coworker) stated that Virginia Hernandez Green (or Greene) told him that Susan O'Connell's plan was to not give a favorable recommendation concerning my transfer, and that if she really wanted to facilitate a transfer all she (O'Connell) had to do was pick up the phone, because she could making things happen for people in the organization, as she was going to do for him.*
>
> *On or about the first week of January 2001, Ann Carpanzano (her husband is a patient at the Cancer Center) called me at work and stated that Sandra Niles told her that I would not be working in the organization after March 2001, because that was their plan from a year ago because they did not like me, because they though that I was an uppity black bitch.*

Id. ¶10"

      **Admit.**

40.    "After receiving Solomon's February 2nd letter regarding the alleged statements by Virginia Hernandez-Green and Ann Carpanzano, Ciaschini interviewed Hernandez-Green, and Hernandez-Green denied making any comments to Moreau about Solomon's transfer.

16

Ciaschini also interviewed O'Connell and she denied having any plan to not give Solomon a favorable recommendation.  Id. ¶11."

   **Objection, in part; absent a Declaration or Affidavit submitted by Ms. Hernandez-Green, her statement is inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

   **Objection, in part; Ciaschini's statement of O'Connell's statement is inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

   **Admit in part.  Regarding O'Connell, Plaintiff acknowledges that O'Connell's Declaration states that she told Ciaschini that O'Connell "never said to anyone, including Virginia Hernandez-Green, that [she] was not going to give Ms. Solomon a favorable recommendation to assist her in transferring to another position at the end of the CORE project."  (O'Connell Dec. ¶6, App. A, Tab C)  Plaintiff does not have evidence to refute O'Connell's representation in her Declaration except a trier of fact's assessment of her credibility.**

41. "By letter dated February 16, 2001, Ciashini informed Solomon of the results of her investigation into these alleged comments.  Id."

   **Admit.**

42. "Both Niles and O'Connell denied ever making any statements to anyone about Solomon being an "uppity black bitch" or an alleged plan to end Solomon's Hospital employment.  Id."

   **Objection; absent a Declaration or Affidavit submitted by Niles this statement is inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

   **Deny regarding O'Connell.  O'Connell does not deny in her Declaration that she ever called Plaintiff an "uppity black bitch" and absent such a statement by O'Connell**

**in a Declaration or Affidavit, Plaintiff, who does not have independent or direct knowledge of O'Connell's statements, cannot admit that the evidence supports such an admission and, in fact, since O'Connell had opportunity to deny making such a statement in her Declaration and did not, Plaintiff denies.**

      43.    "On or after January 29, 2001, Ciaschini received a letter from Solomon which stated that when Solomon received her Hospital paycheck on January 25, 2001, Solomon discovered that the envelope containing the paycheck had not been sealed. Solomon's letter stated that when she called the payroll department about this, she was informed that the Hospital out-sources its payroll to another company and that occasionally that company fails to seal a paycheck envelope. Solomon claimed in the January 25th letter this was "another form of harassment." Id. ¶13."

          **Admit.**

      44.    "In response to Solomon's complaint about her paycheck envelope not being sealed, Ciaschini interviewed Jan Lynch ("Lynch"), the Hospital employee responsible for distributing the checks for Solomon's department. Lynch denied opening Solomon's paycheck envelope. From time to time, the Payroll Department fails to seal a paycheck envelope fully, which is what Ciaschini concluded happened to Solomon's check in this instance. Ciaschini informed Solomon of her conclusion by letter dated February 16, 2001. Id."

          **Admit.**

      45.    'On or after January 31, 2001, Niles informed Ciaschi that Solomon was not speaking with patients in the Conklin reception area. Niles told Ciaschini that she had received several inquiries for assistance directly from patients at the Conklin Building entrance.

According to Niles, rather than speaking directly with Niles on the telephone when patients needed assistance, Solomon was putting patients on the phone to speak directly with Niles. Id. ¶12."

**Objection; absent a Declaration or Affidavit submitted by Niles this statement is inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

46.   "Solomon admitted that she had given the phone directly to patients to speak with Niles because she [Solomon] did not care to speak directly to Niles. O'Connell and Ciaschini informed Solomon that as part of her duties she was required to speak directly to Niles and not to give the phone to patients to avoid speaking with Niles directly. Id. ¶12."

**Admit in part. On February 1, 2001, O'Connell and Ciaschini met with Plaintiff to discuss how patient communications were being handled. O'Connell and Ciaschini informed Plaintiff that as part of her duties she was required to speak directly to Niles and not to give the phone to patients to avoid speaking with Niles directly.**

**Deny in part. Plaintiff did not inform Ciaschini and O'Connell that she did not care to speak directly to Niles. (Pl.'s Dec. ¶98, Tab A)**

47.   "On February 5, 2001, Ciaschini received another letter from Solomon dated February 2, 2001. In this letter Solomon claimed that sometime earlier when she had called Niles for assistance, Niles "blew her off" and told her to seek assistance elsewhere. Id. ¶14."

**Admit.**

48.   "Ciaschini investigated Solomon's claim that Niles "blew her off" when Solomon called for assistance. Niles denied being abrupt with Solomon on this occasion. Since there was no witness to the actual exchange, Ciaschini could not determine who was giving the more

19

accurate version of the event. Ciaschini informed Solomon of the results of her investigation by letter dated February 16, 2001. Id. ¶14."

**Objection; absent a Declaration or Affidavit submitted by Niles this statement is inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

**Admit the remainder insofar as it is supported by Ciaschini's Declaration and Plaintiff has no evidence, except a trier of fact's assessment of credibility, to refute Ciaschini's statements.**

49. "On February 9, 2001, Solomon provided Ciaschini with a document which Solomon described as her "recollection of some of the condescending remarks and racial slurs" that she had been subjected to by Niles over the previous twenty-one months. The document, which is marked as Deposition Exhibit 28 ("Depo. Ex."), states as follows:

*My Notes On The Harassing Events of The Past 21 Months*

1. *Constant comments about my traveling to work by bus.*
   a. *Aziza (my daughter) and I were running errands on my lunch hour. Sandra Niles commented that she didn't know how I could stand not having a car.*
2. *Sandra Niles made numerous comments about my residing in Hartford, and how she personally just couldn't stand it, and that Hartford was just a place for her to work.*
3. *There were numerous questions to me about which bus I took to work. (as if she really cared).*
4. *Sandra Niles said that she wished that she could be as dark as I am (I knew that she was being sarcastic, no white person wishes to be black!).*
5. *Sandra Niles made comment on the tone of my foundation. (makeup) She stated that she felt that I should be wearing a darker foundation, because since she had been a former model she was an expert on those matters, and the foundation that I was wearing was much too light for me. Once when I was skimming through a magazine I commented on how good Tina Turner looked (I said, "Now she has a body to die for") Sandra Niles commented, "But she isn't black right?, she couldn't be"*
6. *Niles commented on seeing Porgy and Bess stating, "That the black characters looked so ridiculous the way that they were dressed and the way that they were dancing and singing and that she personally didn't see what the big deal about the production was.*

20