7.    *Niles commented that she only found the lighter skinned Arabic men attractive, and that she couldn't imagine how all of these people that came from Africa could look so different. (She was very friendly with the lighter skinned valet parkers at the hospital most of whom came from Africa, but she especially took a liking to one of the lighter skinned valet parkers in particular)*

8.    *Niles wanted to know how as a black woman I kept my hair in the hair style that I wear it in, and that she thought that all black peoples' hair was kinky you know she said, "like brillo."*

9.    *When Niles was helping to plan a Cancer Center event "Celebrate Life" (1999) I asked her about using jazz music at the event. Niles remarked that the majority of the Cancer Center patients were white and that they would probably not like jazz music because she didn't either because jazz tended to be an ethnic type thing. And people with class really didn't like jazz.*

Id. ¶15, App. A, Tab C; Depo. Ex. 28, App. B, Tab C."

**Admit.**

50.    "Ciaschini met with Niles and asked her whether she made any of the statements that Solomon attributed to her in the February 9, 2001 letter (Depo. Ex. 28). With respect to Solomon's claim that Niles made statements about Solomon taking the bus to work, Niles said that she considered it a convenience to live on a bus line and apologized if Solomon misconstrued her statement. With respect to the remaining statements in Deposition Exhibit 28, Niles either denied or did not recall making any such statements. Ciaschini informed Solomon of the results of her investigation by letter dated February 16, 2001. Id."

**Admit with clarification. Plaintiff has direct knowledge of Niles' statements from Niles' testimony at the CHRO fact-finding hearing as set forth in Plaintiff's Declaration. (Pl.'s Dec. ¶¶14, 21-22, Tab A).**

**Objection; except for those statements witnessed by Plaintiff at the CHRO Hearing on November 28, 2001, absent a Declaration or Affidavit submitted by Niles this statement is inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

**Admit the remainder.**

51.    "Solomon testified at her deposition as follows:

Q:    Now I'm going to direct your attention to Defendant's Exhibit 28.  Do you claim that each of the comments set forth in this exhibit constitutes either a racial comment or a racial slur?

A:    What I state is that a compilation of all these comments could infer racism and some of them definitely do.

Solomon Depo. at 241, App. B, Tab A."

**Admit.**

52.    "Solomon further testified:

Q:    Did you tell her that you considered it to be offensive?
A:    No.
Q:    Why not?
A:    Why should I?  Why should I let someone know that something that petty could bother me?  *It didn't really bother me because all I wanted to do was get paid.  So I really didn't care about Sandra Niles' comments that much.*  But when I found out that Hartford Hospital was trying to keep me from working there and they were trying to discriminate against me, that's when everything became a serious issue.

Id. at 246 (emphasis added), App. B, Tab A."

**Admit.**

53.    "Solomon never told Niles that she found any of Niles' alleged comments to be

offensive.  Id. at 251-52."

**Admit.**

54.    "Solomon testified as follows:

Q:    Ms. Solomon, were you angry with Sandra Niles?
A:    At what particular point in time?
Q:    At any particular point in time when you were employed in the core project?
A:    I would say this: I didn't appreciate Sandra Niles comments.  I wouldn't say that it rose to anger to be honest.

Id. at 322."

**Admit.**

55.    "Neither Ciaschini or O'Connell ever made any racist or racial comments to Solomon.  Id. at 314."

**Admit.**

56.    "At all times relevant to the Complaint in this action, the Hospital maintained an Employee Grievance procedure through which employees could file complaints if they believed they had not been treated fairly.  Among other situations, this policy applies when an employee believes that he or she is being harassed or otherwise mistreated in the workplace.  It does not apply, however, in situations involving alleged sexual harassment.  Declaration of Richard McAloon ("McAloon Dec.") ¶10, App. A, Tab I."

**Admit.**

57.    "Solomon never filed a grievance pursuant to the Grievance Procedure claiming that she was being harassed or allegedly mistreated by Sandra Niles.  Id. ¶11."

**Deny.  Although Plaintiff was not aware of the Hospital's Employee Grievance Policy, she did file a complaint with Ciaschini, her Human Resource Consultant, in accordance with Step 2 of the policy, however Ciaschini did not forward a copy of the results of the investigation to O'Connell, as dictated by the policy and did not forward a copy of the results of the investigation to Plaintiff's Vice-President or Collaborative Management Team as dictated by the policy.  Furthermore, O'Connell never sent Plaintiff a response to the recommendations within one week (5 working days) of Ciaschini's findings.  (Defs.' Mem. in Supp. of Summ. J., (Declaration of Richard McAloon, App. A, Tab J at Tab 2) (Pl.'s Dec. ¶17, Tab A) (Ciaschini Dec., App. A, Tab C) (O'Connell Dec., App. A, Tab B)**

58.    "On February 9, 2001, O'Connell said "hello" to Solomon and Solomon deliberately ignored her.  Solomon Depo. at 211-12, App. B, Tab A; O'Connell Dec. ¶9, App. A, Tab B; Ciaschini Dec. ¶18, App. A, Tab C."

**Admit with clarification.   Plaintiff did not verbally say "hello" in response to O'Connell's "hello."  See Solomon Dep. at 211-212:**

**"Q.:    You acknowledge that you did not say hello to Susan O'Connell; is that right?**

**A.:    I acknowledge that.  I never denied that."  (Pl.'s Dec. ¶98, Tab A)**

59.    "O'Connell then called Solomon into her office and reminded her of a similar incident she had earlier in the week in which Solomon refused to acknowledge another Cancer Center employee.  Id."

**Admit with clarification.  Plaintiff did not verbally say "hello" in response to another Cancer Center employee's "hello" earlier in the week.  (Pl.'s Dec. ¶98, Tab A)**

60.    "Solomon admitted that she refused to speak with another Cancer Center employee earlier in the week and told O'Connell that she was not required to speak with anyone at the Hospital unless it was directly related to work.  Id ."

**Admit with clarification.  Admit that Plaintiff told O'Connell at some point that she did not feel that she had to engage in personal conversations with employees unless it was mutual.**

61.    "O'Connell then suspended Solomon for the remainder of the day on February 9, 2001.  O'Connell Dec. ¶9, App. A, Tab B."

**Admit.**

62.    "Hartford Hospital's Mission, Vision and Values provide, in part:

*Communication – We strive to acquire and understand information and share it clearly and effectively.*

*Relationships – We develop and strengthen collaborative relationships with all our customers, including our patients, their families, our employees, volunteers, medical staff and business partners.*

Ciaschini Dec. ¶19, App. A, Tab C."

**Admit.**

63.     "Hartford Hospital's Mission, Vision and Values Statement apply to all Hartford Hospital employees.  Solomon Depo. at 200, App. B, Tab A."

**Deny.**

**"Q.:     Now do you contend in this action that Hartford Hospital's mission, vision and values do not apply to you?**

**A.:     I will answer that by saying that my *assumption* is that their mission, vision and values apply to all employees."  (Solomon Dep. at 200) (emphasis in italics added)**

64.     "In a February 12, 2001 letter to Ciaschini, Solomon states in part, as follows:

*On February 9, 2001 as I was going to retrieve a laptop computer to begin my assigned work Susan O'Connell said "Hi" to me, and I did not respond.  She immediately asked to meet with me in her office.  <u>At this meeting she related to me that a man (a cancer center employee who I have never met previously or been introduced to) had complained to her that I did not speak with him when he had spoken to me a few days earlier (which had been true)</u>  She went on to inform me that I had to resond [sic] to her and other employees when they said hello to me.  I told her that I did not agree and that my understanding was that I am here to do a job, and that job is to greet, direct and assist patients and visitors.  <u>I also told her that I am openly compelled to speak to fellow employees when my job dictates that I do so, and any other communications would be personal and would have to be mutually voluntary.</u>*

Ciaschini Dec. ¶18 (emphasis added), App. A, Tab C."

**Admit.**

65.    "On February 13, 2001, O'Connell issued Solomon a Written Warning pursuant to the Hospital's Performance Management Policy, based on Solomon's refusal to comply with the "Relationships" competency that is part of the Hospital's Mission, Vision and Values. O'Connell Dec. ¶10, App. A, Tab B."

**Admit with clarification.  Plaintiff admits that the document entitled, "Performance Improvement Process, Written Warning," issued on February 13, 2001, by O'Connell and Ciaschini states:  "Your refusal to communicate with Hospital personnel prevents you from meeting the Relationship Competency that all HH employees must meet and prompted your suspension on Friday."  (Def. O'Connell Dec., App. A, Tab B. at Tab 5)**

66.    "O'Connell's conclusion that Solomon failed to comply with the "Relationships" competency was based on several incidents, some of which O'Connell had observed and others that had been communicated to her by Cancer Center staff members:

(a)    On several occasions during January and February 2001, Solomon refused to acknowledge Jan Lynch ("Lynch") when entering and leaving Lynch's office.

(b)    On February 8, 2001, Solomon went into Robert Lindyer's ("Lindyer") office where Lindyer was seated with Susan Wright ("Wright").  Lindyer said "hello" to Solomon and Solomon did not respond.

(c)    On February 5, 2001, Wright said "good morning Saraiya" and Solomon ignored her.

(d)    On February 8, 2001, John Unikewicz ("Unikewicz"), Lindyer, Sandy Beggs ("Beggs") and Lynch were all in Lynch's office when Solomon entered. Solomon did not acknowledge anyone in the office.  She walked up to Unikewicz and repeated "excuse me" several times.  Unikewicz was confused as to what Solomon was asking for because she did not clarify her intent. Lynch, suspecting that Solomon wanted to put a laptop computer on a chair, suggested that Solomon just put it on the table.

(e)    On February 9, 2001, O'Connell said hello to Solomon and Solomon ignored her.

(f)    On February 12, 2001, O'Connell was sitting in her office when Solomon passed by twice.  Both times O'Connell said "hello" to Solomon and Solomon did not respond.

Id."

**Admit with clarification. Plaintiff admits that the document entitled, "Performance Improvement Process, Written Warning," issued on February 13, 2001, by O'Connell and Ciaschini includes five (5) bulleted references to occurrences on "January and February 2001," February 8, 2001 – am," "February 5, 2001," February 8, 2001 – pm," and "February 12, 2001 – 3:30 pm.," that appear to be summarized in (a) through (f), above, and that immediately preceding the bulleted references in the February 13, 2001, document, O'Connell and Ciaschini wrote: "Your refusal to communicate with Hospital personnel prevents you from meeting the Relationship Competency that all HH employees must meet and prompted your suspension on Friday."  (Def. O'Connell Dec., App. A, Tab B. at Tab 5)**

67.    "On March 1 and 2, 2001, O'Connell was not present at work. Id. ¶11."

**Admit with clarification.  Plaintiff admits that O'Connell's Declaration supports this "undisputed fact" in that Plaintiff has no evidence, except a trier of fact's assessment of the witness's credibility, to refute whether O'Connell was present at work on March 1 and 2, 2001.**

68.    "When paychecks arrived for distribution to the Cancer Center staff on March 1, 2001, a member of the staff noted that Solomon did not have a check.  Id."

**Objection; absent a Declaration or Affidavit submitted by the staff member this statement is inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

69.    "Pam Badolato, another Cancer Center employee, who is white, also did not receive a paycheck on March 1, 2001. Id."

**Admit insofar as O'Connell's statement is based on personal knowledge and observation however if O'Connell was not present at work on March 1 and 2, 2001, this is unlikely. See No. 67, *supra*.**

**Otherwise, Objection; absent a Declaration or Affidavit submitted by Pam Badalato this statement is inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

70.    "It was determined that Solomon had not submitted her timecard for this pay date. Id."

**Deny. (Pl.'s Dec.¶¶118, 120, 122, 123, Tab A)**

71.    "Solomon's timecard was submitted to the Payroll Department on March 1, 2001 and her paycheck was issued by no later than March 2, 2001. Id."

**Admit with clarification. Plaintiff admits that she received her paycheck on March 2, 2001, and acknowledges that O'Connell's Declaration states, "Once the error was discovered, the timecard was provided to payroll and Ms. Solomon received her check by no later than March 2, 2001." (O'Connell Dec., App. A, Tab B at ¶11)**

72.    "Cancer Center employees normally present their timecards to O'Connell for approval. If a time card is missing, a secretary normally makes O'Connell aware of the missing card. On the day that timecards were collected for the March 1, 2001 payroll, there was a secretary temporarily filling in for the regular secretary and she did not inform O'Connell that any time cards were missing. Id."

**Deny. First, the Hospital Time Cards and Timekeeping Policy states that "[u]pon completion and authorization, these time cards shall be arranged in employee number sequence and placed in an envelope with the department name and cost center indicated on the envelope … ." Next, the policy requires supervisory/management personnel to submit time cards to payroll each week "regardless if they have been used or not." (Time Cards and Timekeeping Policy, Ex. 65) Second, the July 30, 1999, formal improvement documentation informs Plaintiff that she is to keep her time card at the time clock in the cancer center lounge. (Def. O'Connell Dec., App. A, Tab B at Tab 1) Third, Plaintiff never submitted her time card to O'Connell in the twenty-one (21) months that she was employed at the Cancer Center. (Pl.'s Dec. ¶122,Tab A) Finally, if the Time Cards and Timekeeping Policy required that O'Connell submit time cards even for those employees who were not present on a day for the time card to be submitted or who had not used their time card, according to O'Connell those employees would not have been paid because they did not submit their time cards to her, a clear contravention of Hospital policy. Plaintiff denies that the "temporary" secretary was not familiar with the time card procedure." (Pl.'s Dec. ¶124, Tab A)**

73.    "When the timecards were submitted, O'Connell did not know Solomon's card was missing. Id."

**Plaintiff acknowledges that O'Connell states in her Declaration: "Normally, timecards are either given directly to me by the employee, or a department secretary will inform me those timecards are still missing. On that day, there was a secretary temporarily filling in for the regular secretary and she did not inform me that there were any timecards missing." (Def. O'Connell Dec. ¶11, App A, Tab B) Plaintiff has no**

evidence available to contest what O'Connell knew except for the Hospital Time Cards and Timekeeping Policy (Policy, Ex. 65), the July 30, 1999, document (Def. O'Connell Dec., App. A, Tab B at Tab 1), and Plaintiff's direct knowledge of her own history of submitting time cards. (Pl.'s Dec. ¶¶122-124, Tab A)

74.    "By letter dated March 29, 2001, O'Connell and Ciaschini again informed Solomon that her position was being eliminated effective March 31, 2001.  Ciaschini Dec. ¶23; App. A, Tab C."

       **Admit.**

75.    "In or about June 2000, Monica Kowalski was the Office Manager in the Hemodialysis Unit.  Declaration of Monica Kowalski ("Kowalski Dec.") ¶2, App. A, Tab D."

       **Admit.**

76.    "To be qualified for the Administrative Associate I position, candidates needed to have a medical background, knowledge of medical terminology, and knowledge of task-based computer programs.  Id. ¶4."

       **Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy (Staff Reduction Policy, Ex. 23).**

       **Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (Policy, Ex. 23) or The Hospital's Career Opportunities Policy (Career Opportunities Policy, Ex. 31), or not.**

77.    "The hiring committee was also seeking candidates with nursing unit experience, knowledge of the lab ordering process, hospital billing and the use of OASIS (a computer program used by the Hospital for medical record retrieval).  Id."

**Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (Policy, Ex. 23) or the Hospital's Career Opportunities Policy (Policy, Ex. 31), or not.**

78.    "Solomon had little to no medical background and limited knowledge of medical terminology. Id. ¶5."

**Deny.  (Pl.'s Dec. ¶¶45-47, 51, Tab A) (Plaintiff's Credentials and Training, Ex. 11 and Ex. 12)**

79.    "Lovie Degourville, who is black, was hired for the Administrative Associate I position. Id."

**Deny.  (Ms. DeGourville's FY2001 Evaluations, Employee Record/Change Notice (ERCN), Change of Name Form, Ex. 37, Ex. 38, Ex. 39 and Ex. 68)**

80.    "Ms. Degourville was already a Patient Care Technician within the Hemodialysis Unit and was familiar with the hemodialysis process.  She also had a medical background, knowledge of medical terminology, task specific Hospital computer programs and OASIS.  As a Patient Care Technician, Ms. Degourville also had a good deal of direct patient contact and was familiar with the dialysis patients. Id."

**Plaintiff acknowledges that these statements are contained in Ms. Kowalski's Declaration.  Other than Exhibits 37-39, referenced supra at No. 80, Plaintiff has no independent basis, except a trier of fact's assessment of the witness's credibility, to admit or refute the statements.  However, Ms. Kowalski's credibility is diminished by her false statement that Ms. DeGourville, a black female, was hired for the AAI position.**

81.    "In or about August 2000, William Bell ("Bell"), a Hospital Human Resources Consultant, interviewed Solomon for the position of Human Resources Associate.  Declaration of William Bell ("Bell Dec.") ¶3, App. A, Tab E."

**Admit.**

82.    "The Human Resources Associate position required two years' previous experience in human resources-personnel.  Id. ¶4."

**Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy (Policy, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23) or the Hospital's Career Opportunities Policy (L.R. 56(a)2 Statement, Ex. 31), or not.**

83.    "Solomon did not possess two years' previous experience in human resources-personnel and, therefore, did not meet the minimum requirements of the position.  Id. ¶5."

**Deny.  First, Plaintiff was referred for an interview (Pl.'s Dec. ¶59, Tab A) which only occurred under the Hospital's Recruiting and Selection Policy (Staff Recruiting and Selection Policy, Ex. 24) if a candidate was found qualified for the position.  Second, Plaintiff was subject to the Staff Reduction Policy.  (Policy, Ex. 23)**

84.    "Dawn Packman ("Packman"), who is white, was the successful candidate for the position.  Id. ¶6."

**Admit**.

85.    "Packman possessed at least two years' previous experience in human resources-personnel.  Id."

**Admit.**

86.    "Prior to eliminating Solomon from consideration for the position, Bell had no communication of any kind with either Niles or O'Connell about Solomon's application.  Id."

**Plaintiff admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Mr. Bell's statement by Declaration:  "At no time prior to making my decision that Ms. Solomon was not qualified for the position did I have any communication of any kind with either Susan O'Connell or Sandra Niles about Ms. Solomon's application."  (Bell Dec. ¶6, App. A, Tab E)**

87.    "In or about February 2000, the Hospital's Women's Ambulatory Health Department was seeking to hire a Patient Administrative Associate ("PAA").  Declaration of Susan Maxwell ("Maxwell Dec.") ¶3, App. A, Tab F."

**Admit.**

88.    "Susan Maxwell, the Hospital's Unit Director for Women's Ambulatory Health, was the hiring manager for the PAA position.  Id. ¶¶2-3."

**Admit.**

89.    "The PAA position required someone who was bi-lingual in English and Spanish. Id. ¶3."

**Deny with clarification.  While the Hospital positing for the position lists as a "position requirement" for the PAA position, "[b]ilingual (English/Spanish) required," (Maxwell Dec., App. A, Tab F at Tab 1), Plaintiff denies "bilingual (English/Spanish)" was required to fulfill the duties of the position."  (Defs.' Admissions Nos. 143-152, Ex. 29 and Ex. 45)**

90.    "Solomon is not bi-lingual in English and Spanish. Id. ¶4; Solomon Depo. at 231, App. B, Tab A."

**Admit.**

91.     "Maxwell eliminated Solomon's application for the PAA position from consideration because Solomon was not bi-lingual.  Maxwell Dec. ¶4, App. A, Tab F."

**Admit**

92.     "Prior to eliminating Solomon's application from consideration for the PAA position, Maxwell had no communication of any kind with O'Connell or Niles about Solomon's application. Id."

**Plaintiff admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Maxwell's statement by Declaration:  "At no time prior to making my decision to eliminate Ms. Solomon's application from consideration did I have any communication of any kind with Susan O'Connell or Sandra Niles about Ms. Solomon's application."  (Maxwell Dec. ¶4, App. A, Tab F)**

93.     "Gladys Ciaschini also played no role in Maxwell's decision to eliminate Solomon from consideration.  Id."

**Plaintiff admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Maxwell's statement by Declaration that Gladys Ciaschini "played no role in" her decision to eliminate Plaintiff from consideration. (Maxwell Dec. ¶4, App A. Tab F)**

94.     "The successful applicant for the position was Margie Gonzalez ("Gonzalez"). Gonzalez is bi-lingual in English and Spanish.  Id. ¶5."

**Admit.**

95.    "In March 2000, the Hospital's Research Department was seeking to fill the position of Administrative Associate III ("AA III").  Declaration of Laurine Bow ("Bow Dec.") ¶2, App. A, Tab G."

**Admit.**

96.    "Laurine Bow ("Bow"), the Associate Director for Research at the Hospital, was the hiring manager for the AA III position.  Id. ¶3."

**Plaintiff admits that Ms. Bow declares that she was the "sole decision maker with respect to this position" but does not state in her Declaration that she was the "hiring manager."  (Bow Dec. ¶¶1-5, App. A, Tab G)**

97.    "The AA III position required someone who was very experienced in using Microsoft Word, Excel and Access.  It also required someone with extensive experience working with databases.  Id. ¶4."

**Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (Policy, Ex. 23) or the Hospital's Career Opportunities Policy (Policy, Ex. 31), or not.**

98.    "Bow interviewed both Solomon and Tiffany Rowe ("Rowe") for the AA III position.  Id. ¶3."

**Admit.**

99.    "Bow chose Rowe for the AA III position over Solomon because Bow believed that Rowe was better qualified.  Rowe was very experienced in using Microsoft Word, Excel and Access.  She also had extensive experience working with databases.  Bow also chose Rowe

because Rowe had close to four years of administrative experience working with many of these applications whereas Solomon's last position was as a receptionist. Bow also chose Rowe because Rowe holds a Bachelor's degree whereas Solomon does not. Id. ¶4."

**Plaintiff acknowledges that the Declaration of Ms. Bow supports the Hospital's undisputed fact claim that:**

> **Bow chose Rowe for the AA III position over Solomon because Bow believed that Rowe was better qualified. Rowe was very experienced in using Microsoft Word, Excel and Access. She also had extensive experience working with databases. Bow also chose Rowe because Rowe had close to four years of administrative experience working with many of these applications whereas Solomon's last position was as a receptionist. Bow also chose Rowe because Rowe holds a Bachelor's degree whereas Solomon does not.**

**Plaintiff denies the Hospital's "undisputed fact" that the reasons stated in Ms. Bow's Declaration are the reasons for Ms. Bow's choice of Ms. Rowe over Plaintiff because the claimed reasons ignore and contravene the applicability of the Staff Reduction Policy to Plaintiff's application for no credible reason. (Policy, Ex. 23)**

100. "Prior to choosing Rowe as the successful applicant, Bow had no communications of any kind with O'Connell, Niles or Ciaschini about Solomon's application. Id. ¶5."

**Plaintiff admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Bow's statement by Declaration: "Prior to choosing Ms. Rowe as the successful applicant, I had no communication of any kind with Susan O'Connell, Sandra Niles or Gladys Ciaschini about Ms. Solomon's application." (Bow Dec. ¶5, App. A, Tab G)**

101.     "In October 2000, Patricia Sobieski ("Sobieksi") was employed by Hartford Hospital (the "Hospital") as a Manager of the Case Coordination area in the Care Continuum Department.  Declaration of Patricia Sobieski ("Sobieski Dec.") ¶2, App. A, Tab H."

       **Admit.**

102.     "As part of a reorganization of the Care Continuum Department, Case Coordination created three new Administrative Associate II ("AA II") positions.  Id. ¶3."

       **Admit.**

103.     "One of the AA II positions was not posted because it had been designated by the Department of Human Resources for Doreen Forrest, who is black, because Ms. Forrest required a light-duty accommodation after returning from a worker's compensation leave.  Id."

       **Admit.**

104.     "There were two different AA II positions created (AA II #1 and AA II #2), each with somewhat differing job duties.  Id. ¶4."

       **Admit.**

105.     "The AA II #1 position supported those activities surrounding the utilization review and planning process.  It included communication with home care agencies and vendors to procure services for discharge for individual patients.  It also entailed communication with insurance companies to obtain authorizations for treatment.  Id."

       **Admit.**

106.     "The AA II #2 role supported the Hospital physician who was involved in reviewing insurance company denials of the Hospital's claims for service and the Hospital's resulting appeals.  In part, this involved the processing of paperwork involved in the review/denial process and tracking the status of patient accounts.  Id."

**Admit.**

107.    "Both jobs also entailed telephone contact with various community agencies in an attempt to arrange accommodations and assistance for patients upon discharge when necessary. Id."

**Admit.**

108.    "In or about late September or early October 2000, Sobieski interviewed Solomon for these AA II positions.  Beth Grieg ("Grieg"), who was the Director of Care Coordination in the Care Continuum Department, also participated in the interview.  Id. ¶5."

**Admit with clarification.  On or about September 21, 2000, Plaintiff applied and was referred for an interview for a Patient Administrative Associate position and an Administrative Associate II position in the Care Continuum.  She was interviewed individually by Ms. Sobieski for the AAII positions, and then by Ms. Grieg for the PAA position.  (Pl.'s Dec. ¶62, Tab A)**

109.    "Based on the interview and her review of Ms. Solomon's application, Sobieski did not believe that she was qualified for either AA II position.  Id."

**Deny.  First, Plaintiff was referred for an interview (Pl.'s Dec. ¶61, Tab A) which only occurred under the Hospital's Recruiting and Selection Policy (Policy, Ex. 24) if a candidate was found qualified for the position.**

**Objection, Defendants do not specify whether Ms. Sobieski considered Plaintiff not qualified under the Staff Reduction Policy (Policy, Ex. 24) or the Career Opportunities Policy, or not.**

110.    "Sobieski and Grieg hired Emmy Lopez ("Lopez"), who is hispanic, for the AA II #2 position.  Id. ¶6."

**Admit that Emy J. Lopez was hired for the AA II #2 position and that Ms. Lopez is Hispanic. (Sobieski Dec., App. A, Tab H at Tab 3)**

111. "At that time, Lopez was working in the Women's Health Department at the Hospital. She had also previously worked at the Hospital for six years as an Emergency Department ("E.D.") Assistant. Sobieski and Grieg viewed Lopez's experience in Women's Health and the E.D. as desirable because the AA II #2 position interacts with both the E.D. and Women's Health. Id."

**Admit in part. Plaintiff admits that Lopez was working in the Women's Health Department at the Hospital for less than six months when she applied for the position and that it was noted during her interview that her position was due to end on October 30. (Sobieski Dec., App. A, Tab H at Tab 3) (Interview Notes re: Ms. Lopez, Ex. 61) No such notation about Plaintiff's job elimination was noted during Plaintiff's interview and Ciaschini was the Human Resources Representative assigned to the recruitment and selection for the position. (Interview Notes re: Solomon, Ex. 62) (Sobieski Dec., App. A, Tab H at Tab 1)**

**Deny in part. The notes from Ms. Lopez' interview indicate that she worked as an Assistant in the Emergency Room for nine years and Ms. Lopez' resume indicates six years so Plaintiff has no means of determining the accuracy of these statements. (Ms. Lopez' Resume, Ex. 56) (Interview Notes re: Ms. Lopez, Ex. 61)**

**Plaintiff admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "We viewed her [Lopez'] experience in Women's Health and the E.D. as desirable because the AA II#2**

position interacts with both the E.D. staff and workflow would assist her in carrying out her role as an AA II."  (Sobieski Dec., App. A, Tab H at ¶6)

>Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)

112.    "Sobieski and Greig also felt that Ms. Lopez's knowledge of the E.D. staff and workflow would assist her in carrying out her role as an AA II.  Id."

>Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Also Ms. Lopez's knowledge of the E.D. staff and workflow would assist her in carrying out her role as an AA II,"  (Sobieski Dec., App. A, Tab H at ¶6), except that Ms. Lopez had not been employed in the E.D. since 1996.  (Resume re: Emy J. Lopez, Ex. 56)

>Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)

113.    "Sobieski and Greig also felt that Lopez's E.D. experience was also attractive because it gave her a great deal of clinical patient and family contact, which she would also have in the AA II position.  Id."

>Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Her E.D. experience was also attractive because it gave her a great deal of clinical patient and family contact, which she would have in the AA II position," (Sobieski Dec., App. A,

**Tab H at ¶6), except that Ms. Lopez had not been employed in the E.D. since 1996.**

**(Resume re: Emy J. Lopez, Ex. 56)**

> **Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

114.    "Lopez was also fully familiar with all of the computer programs used by Case Coordination, such as SMS (the Hospital program used to manage patient information), Groupwise (the Hospital email program), Powerpoint, Microsoft Word and Excel.  Id."

> **Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Ms. Lopez was also fully familiar with all of the computer programs used by our department, such as SMS (the Hospital program used to manage patient information), Groupwise (our email program), Powerpoint, Microsoft Word and Excel."  (Sobieiski Dec. ¶6, App. A, Tab H)**

> **Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

115.    "Lopez had also previously worked at Mercy Housing and Shelter Corp. and the Archdiocese of Hartford.  Sobieski and Grieg believed that Lopez's past relationship with these community organizations would be beneficial to her in arranging accommodations and assistance for patients upon discharge.  Id."

> **Plaintiff admits that the resume submitted by Emy Lopez to the Hospital reflected previous employment at Mercy Housing and Shelter Corp. for less than one year**