and with the Archdiocese of Hartford for thirteen months in 1997 and 1998. (Resume re: Emy J. Lopez, Ex. 56)

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Ms, Lopez had also previously worked at Mercy Housing and Shelter Corp. and the Archdiocese of Hartford. ¶6This past relationship with these community organizations would be beneficial to her in arranging accommodations and assistance for patients upon discharge." (Sobieski Dec., App. A, Tab H)**

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

116.    "Lopez was also bi-lingual, which Sobieski and Grieg viewed as an additional asset for the AA II position. Id."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Ms. Lopez was also bilingual, which we viewed as an additional asset." (Sobieski Dec. ¶6, App. A, Tab H)**

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

117.    "Grieg and Sobieski hired Elizabeth Kirol ("Kirol"), who is white, for the AA II # 1 position. Id. ¶7."

**Admit.**

118.    "Kirol had worked at the Hospital for almost thirteen years, twelve years as a Patient Administrative Associate ("P.A.A.") and approximately one year in the Medical Records Department.  Id."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Ms. Kirol had worked at the Hospital  for almost thirteen years, twelve years as a Patient Administrative Associate ("P.A.A.") and approximately one year in the Medical record Department."  (Sobieski Dec. ¶7, App. A, Tab H)**

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

119.    "Sobieksi and Grieg viewed Kirol's institutional knowledge of the Hospital as an asset. Id."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "She brought with her a great deal of institutional knowledge, which we believed to be an asset."  (Sobieski Dec. ¶7, App. A, Tab H)**

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

120.    "Kirol was also very familiar with the computer programs used by Case Coordination, including SMS, Excel and Groupwise.  Id."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "Like Ms. Lopez, Ms. Kirol was also very familiar with the computer programs used by our department, including SMS, Excel and Groupwise." (Sobieski Dec. ¶7, App. A, Tab H)**

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

121.    "Sobieski and Grieg also viewed Kirol's experience in the Medical Records Department as extremely valuable because one of the functions of the AA II # 1 position was to obtain patient records from the Medical Records Department after a patient has been discharged so that the procedures that the patient has undergone can be summarized by a nurse and submitted to the insurance company for payment. The faster the records can be obtained, the quicker the Hospital can submit a request for payment. Grieg and Sobieski believed that Kirol's past experience in Patient Records would assist her in tracking down the necessary records. Id."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "We also viewed her experience in the Medical Records Department as extremely valuable. One of the functions of the AA II # 1 position was to obtain patient records from the Medical Records Department after a patient has been discharged so that the procedures that the patient has undergone can be summarized by a nurse and submitted to the insurance company for payment. The faster the records can be obtained, the quicker the Hospital can submit a request for payment. Ms. Grieg and I believed that Ms. Kirol's past**

experience in Patient Records would assist her in tracking down the necessary records."
(Sobieski Dec. ¶7, App. A, Tab H)

Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms.
Grieg's statements, observations, impressions are inadmissible as hearsay. (D. Conn. L.
Civ. R. 56(a)3)

122.    "Solomon had some computer skills in Microsoft Word and Excel, but did not
have experience in SMS or Groupwise. Sobieski and Grieg viewed these computer skills as
essential to AA II position. Id. ¶8."

Admit in part. Plaintiff was proficient in Microsoft Word and familiar with
Excel and PowerPoint. (Pl.'s Dec. ¶61, Tab A) Plaintiff admits that she did not have
experience in Groupwise or SMS but denies that within the ninety days allotted under the
Staff Reduction Policy (Policy, Ex. 23) she would not have been able to have adequate
experience. (Admissions by Defendants Nos. 11- 12, 15-16, Ex. 45)

Plaintiff acknowledges that she has no evidence, except a trier of fact's
assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration:
"We viewed these computer skills as essential to this position." (Sobieski Dec. ¶8, App. A,
Tab H)

Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms.
Grieg's statements, observations, impressions are inadmissible as hearsay. (D. Conn. L.
Civ. R. 56(a)3)

123.    "Solomon had previously interacted with patients only as a receptionist, directing
them where to go and answering their questions. Id."

Deny. (Pl.'s Dec. ¶¶45, 72, Tab A)

124.    "Sobieski and Grieg viewed the qualifications of Kirol and Lopez for the AA II position as far surpassing Solomon's qualifications.  Id."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "We viewed the qualifications of Ms. Kirol and Ms. Lopez as far surpassing Ms. Solomon's qualifications."  (Sobieski Dec. ¶9, App. A, Tab H)**

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay.  (D. Conn. L. Civ. R. 56(a)3)**

125.    "Sobieski never had any communications with either O'Connell or Niles of any nature about Solomon's application.  Sobieski does not know either of these individuals.  Id. ¶9."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Sobieski's statement by Declaration: "I never had any communications with either Susan O'Connell or Sandra Niles of any nature about Ms. Solomons' application.  In fact, I do not know either of these individuals. We viewed these computer skills as essential to this position."  (Sobieski Dec. ¶9, App. A, Tab H)**

126.    "Gladys Ciaschini in no way attempted to influence Sobieski's hiring decision with respect to either AA II position. Id."

**Deny.  First, the Hospital's own Recruiting and Selection Policy states, as a guideline for managers:  "Make the final selection in consultation with the Human Resources Consultant"; and as a guideline for Human Resources Consultants: "Make a**

46

**final selection recommendation to the manager and advise on appropriate hiring rate of pay." (Policy, Ex. 24) Second, Ciaschini's failure to provide information to Ms. Sobieski that Plaintiff was entitled to priority consideration under the Staff Reduction Policy (Policy, Ex. 23) did influence Ms. Sobieski's decision especially since Ms. Sobieski never claims that Plaintiff was not qualified for the position, and especially since Ms. Sobieski appears to have found the fact that Ms. Lopez' position was ending noteworthy. (Interview Notes re: Emy J. Lopez, Ex. 61)**

127.    "Sobieski has no reason to believe that Grieg ever had any communication with either O'Connell or Niles about Ms. Solomon's application, or that Ciaschini attempted to influence Grieg's hiring decision in any way. Id."

**Objection; absent a Declaration or Affidavit submitted by Ms. Grieg, Ms. Grieg's statements, observations, impressions are inadmissible as hearsay. (D. Conn. L. Civ. R. 56(a)3)**

128.    "On or about September 15, 2000, the Hospital's Care Continuum Assessment Center, posted vacancies for two full-time and two part-time Patient Administrative Associates ("PAA"). Synhorst Dec. ¶6, App. A, Tab A."

**Admit.**

129.    "Solomon interviewed for these vacancies by Beth Grieg, the hiring manager, but was not chosen because Grieg determined that there were "more qualified candidates." Id. ¶7."

**Admit in part. Plaintiff admits that she was not offered the position. Objection, absent Declaration or Affidavit by Ms. Grieg to Ms. Grieg's determination except to the extent that it is stated on Plaintiff's transfer application in part illegibly. (Synhorst Dec., Tab A at Tab 1)**

130.    "The following individuals have held the PAA role in the Assessment Center since the Center's inception in September 2000:

- Valerie Samuels ("Samuels"), who is black, automatically transferred into the Assessment Center in or about October 2000 from the Pre-admission Testing Department when the Pre-admission Testing Department was absorbed by the Care Continuum Department.

- Sonia Gutierrez ("Guttierez"), who is Hispanic, also automatically transferred into the Assessment Center from the Pre-admission testing department when the Pre-admission Testing Department was absorbed by the Care Continuum Department.  Gutierrez left the department in January 2001.

- Dorreen Forrest ("Forrest"), who is black, was hired in or about October 2000. Forrest was hired by Grieg, the previous manager responsible for the Care Continuum Department.  Forrest left the Assessment Center in or about February 2001, to work in the Case Coordination area of the Care Continuum Department.

- Takesha Archer ("Archer"), who is black, was hired in or about November 2000. Archer was hired by Grieg.

- Rita Ferrera ("Ferrera"), who is white, was hired in or about December 2000 by Susan Stagg ("Stagg").  Stagg hired Ms. Ferrera to replace Gutierrez, who left the Assessment Center effective January 2001.

- Novette Grant ("Grant"), who is black, was hired in or about January 2001.  Stagg hired Grant to replace Forrest.

- Jannina Kornas ("Kornas"), who is white, and Phylis Watson ("Watson"), who is black, were hired in or about February 2001.

48

- Yashica Blue, who is black, was hired in or about January 2002. Stagg hired Ms. Blue to replace Ms. Ferrera.

- Marisol Pedrasa, who is hispanic, was hired in or about August 2002. Stagg hired Pedrasa to fill a new position.

Declaration of Susan Stagg ("Stagg Dec.") ¶8, App. A, Tab I."

**Plaintiff denies that Dorreen Forrest, who is black, was hired in or about October 2000 as a PAA. See No. 103, *supra* ("One of the AA II positions was not posted because it had been designated by the Department of Human Resources for Doreen Forrest, who is black, because Ms. Forrest required a light-duty accommodation after returning from a worker's compensation leave. Id.")**

**Plaintiff denies that Ms. Stagg hired Novette Grant. Ms. Grant was hired in or about January 2001 for a PAA position by Beth Grieg. (ERCN re: Ms. Grant, Ex. 44)**

**Plaintiff admits the remainder insofar as she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms' Sobieski's Declarations. (Sobieski Dec. ¶8, App. A, Tab I)**

131. "Hartford Hospital is a non-stock subsidiary of Hartford Health Care Corporation ("HHC"). Connecticut Children's Hospital, formally known as Connecticut Children's Medical Center ("CCMC"), has no corporate affiliation with either Hartford Hospital or HHC. Declaration of Richard McAloon ("McAloon Dec.") ¶4, App. A, Tab J."

**See Pl. Mem. of Law in Opp'n to Summ. J. at note 5 (Plaintiff concedes to Defendants' position at section II(B)(6) of Defendants' Memorandum of Law in Support of Summary Judgment that the Application submitted by Plaintiff for transfer to a CCMC**

**position occurred prior to the 180 day and 300 day statute of limitation periods determined by Plaintiff's filing of her administrative complaint on March 19, 2001, and therefore is outside the jurisdiction of the Court.)**

132.    "At all times relevant to the Complaint in this action, Hartford Hospital and CCMC have each maintained their own separate Administration and Board of Directors.  Id. ¶5"

> See **No. 132,** *supra***.**

133.    "Hartford Hospital and CCMC have also maintained separate and distinct facilities and street addresses.  Id."

> See **No. 132,** *supra***.**

134.    "At all times relevant to the Complaint in this action, Hartford Hospital and CCMC have each maintained their own separate and distinct human resource departments.  Id. ¶6"

> See **No. 132,** *supra***.**

135.    "Hartford Hospital hiring managers do not make hiring decisions with respect to applicants for employment positions at CCMC and they do not make disciplinary or other employment decisions regarding CCMC employees.  Likewise, CMCC employees do not make hiring decisions with respect to applicants for employment positions at Hartford Hospital and they do not make disciplinary or other employment decisions regarding Hartford Hospital employees.  Id."

> See **No. 132,** *supra***.**

136.    "Richard McAloon ("McAloon") is the top human resources executive at Hartford Hospital.  Neither McAloon nor anyone working under his supervision has control or supervisory authority over any employee of CCMC.  Id. ¶¶3, 6."

**See No. 132,** *supra***.**

137.     "Through a policy formerly known as Hartford Hospital Human Resources Policy #603 entitled "Connecticut Health Systems Transferability" ("Policy #603"), employees from Hartford Hospital, CCMC, and Mid-State Medical Center were given the opportunity to apply for transfer from one employer to another without experiencing a break in service.  Id. ¶7."

**See No. 132,** *supra***.**

138.     "Under Policy #603, job openings for full and part-time positions at each hospital were posted internally at Hartford Hospital, CCMC, and Mid-State Medical Center giving employees from each hospital an opportunity to apply.  According to the policy, applicants for such positions were then treated by each organization as internal applicants.  Id."

**See No. 132,** *supra***.**

139.     "At all times relevant to the Complaint in this action, Hartford Hospital has maintained its own Human Resources Policies and Procedures.  It does not rely on any human resources policies or procedures from CCMC.  Id. ¶8."

**See No. 132,** *supra***.**

140.     "During the time period relevant to the Complaint in this action, the only Human Resources policy that Hartford Hospital and CCMC may have shared is Policy #603.  Id."

**See No. 132,** *supra***.**

141.     "The hiring managers Solomon refers to in Paragraph 88 of her Complaint are not employees of Hartford Hospital.  Id.  ¶9."

**See No. 132,** *supra***.**

142.    "The Administrative Associate II position that Solomon applied for at CCMC was not a Hartford Hospital position, Hartford Hospital did not make the hiring decision with respect to Solomon's application for the position.  Id."

**See No. 132,** *supra***.**

143.    "Hartford Hospital does not have access to or control over any documents relating to CCMC's decision on Ms. Solomon's application for this position.  Id."

**See No. 132,** *supra***.**

144.    "In November 2000, Lisa Maurice ("Maurice"), who is black, was a Supervisor in the Patient Accounts Department at the Hospital.  Declaration of Lisa Maurice ("Maurice Dec.")¶2, App. A, Tab K."

**Admit.**

145.    "In or about April through November 2000, the Patient Accounts Department was seeking to hire several individuals for the position of Administrative Associate II ("AA II").  Id. ¶3."

**Admit.**

146.    "This AA II position required a high school diploma, at least one year of experience in hospital or insurance billing, and excellent interpersonal and communication skills. The position also required typing skills, basic math skills, and the ability to read, write and speak English.  Id."

**Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23) or the Hospital's Career Opportunities Policy (L.R. 56(a)2 Statement, Ex. 31), or not.**

147.    "On or about April 21, 2000, Solomon applied for the AA II position.  In or about April or May 2000, Maurice, along with Ernest Woollet ("Woollet"), who is also a supervisor in Patient Accounts, interviewed Solomon.  Id. ¶4."

**See Pl. Mem. of Law in Opp'n to Summ. J. at note 5 (Plaintiff concedes to Defendants' position at section II(B)(6) of Defendants' Memorandum in Support of Summary Judgment that the Application submitted by Plaintiff for transfer to the Financial Counselor position in Patient Accounts occurred prior to the 180 day and 300 day statute of limitation periods determined by Plaintiff's filing of her administrative complaint on March 19, 2001, and therefore is outside the jurisdiction of the Court.)**

148.    "After interviewing Solomon and reviewing her application materials, Maurice concluded that Solomon was not qualified for the position.  Solomon did not have any health insurance processing experience or financial experience, which was a key qualification for the position.  Id. ¶5."

**See No. 147, *supra*.**

149.    "Another primary function of the position was data entry.  Solomon revealed during her interview that she had performed data entry at the Travelers several years ago and also had an additional position that required data entry skills.  However, in Maurice's opinion, Solomon's employment history did not reflect that she had the necessary level of data entry skills.  Id."

**See No. 147, *supra*.**

150.    "While Ms. Solomon's receptionist position at the Hospital demonstrated customer service skills for greeting people and giving them directions to locations at the Hospital, Maurice concluded that Solomon's application and interview revealed that she did not have the relevant job-related experience in problem solving that requires the application of analytical skills to determine what went wrong on a patient account from the time the patient received services to the time the patient complaint was filed.  Id."

> See No. 147, *supra*.

151.    "Maurice also believed that Ms. Solomon did not possess some of the other attributes the Patient Accounts Department was seeking in an Administrative Associate II.  For example, the Patient Accounts Department was seeking someone who had a demonstrated record of dedication, longevity and loyalty.   The résumé submitted by Solomon reflected work experience totaling six years, but her time in each position was very short.  Id."

> See No. 147, *supra*.

152.    "During her interview, Solomon also indicated to Maurice that her weakness as an employee was in performing routine job tasks.  This response troubled Maurice because, in Maurice's opinion, every job has routine aspects to it.  Id."

> See No. 147, *supra*.

153.    "Based on Maurice's review of Solomon's résumé and her interview, Maurice eliminated Ms. Solomon from consideration for the AA II position.  Id."

> See No. 147, *supra*.

154.    "In or about April/May 2000, Maurice, along with Beverly Davis ("Davis"), who is also a Supervisor in the Patient Accounts Department, interviewed Jeannina Thompson

("Thompson") for the same AA II position applied for by Solomon.  Id. ¶6;  Declaration of

Beverly Davis ("Davis Dec.") ¶7, App. A, Tab L."

>    **See No. 147, *supra*.**

155.    "Davis and Thompson are both black.  Id."

>     **See No. 147, *supra*.**

156.    "At the time of the interview, Thompson had been employed for approximately

six months at the CCMC, where she served as an Administrative Assistant.  Maurice Dec. ¶7,

App. A, Tab K; Davis Dec. ¶8, App. A, Tab L."

>    **See No. 147, *supra*.**

157.    "Among other duties, as an Administrative Assistant at CCMC, Thompson was

responsible for verifying patients' insurance and obtaining authorizations for treatment from

insurance companies.  Thompson was also familiar with SMS (the Hospital computer program

used to manage patient information).  Id."

>    **See No. 147, *supra*.**

158.    "Prior to working at CCMC, Thompson was employed at Kaiser Permanente for

nine and one-half years in several different positions.  Among other activities, in her various

roles at Kaiser Permanente she updated and verified insurance information for new members,

processed insurance claims for patients, attorneys, and health care providers, and registered

patients and collected cash co-payments.  Maurice Dec. ¶8, App. A, Tab K; Davis Dec. ¶9, App.

A., Tab L."

>    **See No. 147, *supra*.**

159.    "Based on Thompson's previous experience in hospital and insurance billing,

along with her favorable interview and her experience with SMS, Davis and Maurice decided to

hire Thompson for the AA II position.  Maurice Dec. ¶9, App. A, Tab K; Davis Dec. ¶10, App. A, Tab L."

> **See** No. 147, *supra*.

160.    "At no time prior to eliminating Solomon's application from consideration did Maurice have any communication with O'Connell, Niles, or Ciaschini about Solomon's application.  Maurice Dec. ¶10, App. A, Tab K."

> **See** No. 147, *supra*.

161.    "At no time prior to deciding to hire Thompson did Davis have any communication with O'Connell, Niles, or Ciaschini about Solomon's application.  Davis Dec. ¶11, App. A, Tab L."

> **See** No. 147, *supra*.

161.    "On or about May 10, 2000, Davis also interviewed Debby Senior ("Senior"), who is white, for one of the AA II positions in the Patient Accounts Department.  Id.  ¶4, App. A, Tab L."

> **See** No. 147, *supra*.

162.    "At the time, Senior had been working for the previous three and one-half years as a part-time AA II in the Patient Accounts Department at the Institute of Living ("IOL"), which is an affiliate of the Hospital.  Prior to her employment at the IOL, Senior was employed for five years in the Patient Accounts Department at St. Francis Hospital.  Id."

> **See** No. 147, *supra*.

163.    "The AA II role at the Hospital serves the same function and has generally the same duties as the AA II position that Senior held at the IOL, the only real difference being that the IOL position was part-time rather than full-time.  Both jobs entail interviewing patients and

their families with regard to their ability to pay for Hospital services and helping to obtain

payment from either the patient's family or the insurance company after the patient is

discharged.  Knowledge of Hospital or insurance billing is a key qualification for both positions.

Id. ¶5."

          **See No. 147, *supra*.**

164.    "Based on Senior's previous patient accounts experience at both the IOL and St.

Francis Hospital, and her extensive experience in Hospital billing, Davis made the decision to

hire Senior for one of the open AA II positions at the Hospital, effective May 28, 2000.  Id. ¶6."

          **See No. 147, *supra*.**

165.    "In November 2000, Teri Duarte ("Duarte") was employed by Hartford Hospital

as a Team Leader in the Patient Accounts Department.  Declaration of Teri Duarte ("Duarte

Declaration") ¶2, App. A, Tab M."

        **Admit.**

166.    "In November 2000, the Patient Accounts Department was seeking to hire a

Financial Counselor.  Id. ¶2."

        **Admit.**

167.    "The Financial Counselor position required two to three year of experience in

Hospital or insurance billing.  The Patient Accounts Department was also seeking candidates

with patient registration experience, payor insurance experience, and some computer knowledge.

Id. ¶4."

        **Admit, only as regards those candidates not subject to the Hospital's Staff**

**Reduction Policy (L.R. 56(a)2 Statement, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23) or The Hospital's Career Opportunities Policy (L.R. 56(a)2 Statement, Ex. 31), or not.**

168.  "Duarte and Elizabeth Lawson ("Lawson"), who was another Team Leader in the Patient Accounts Department, interviewed Solomon for the Financial Counselor position in or about November 2000.  Id. ¶5."

**Admit.**

169.  "Solomon had some computer knowledge, however, she had no experience in hospital or insurance billing.  She also lacked experience in patient registration and payor insurance.  Id. ¶6."

**Deny in part.  Plaintiff is proficient in Microsoft Word and familiar with Excel and PowerPoint.  (Pl.'s Dec. ¶62, App. Tab A)  Admit the remainder.**

170.  "Sharlyn Pacheco ("Pacheco"), who is hispanic, was the successful candidate for the position.  She had previous experience in insurance billing, along with experience in patient registration and payor insurance. Id. ¶7."

**Admit.**

171.  "On or about January 18, 2001, in an effort to assist Solomon in finding a new position within the Hospital, Ciaschini referred her to two Patient Administrative Associate postings.  Ciaschini Dec. ¶5, App. A, Tab C."

**Admit in part.  Plaintiff admits that Ciaschini referred her to two Patient Administrative Associate positions.**

**Deny.  Plaintiff references Ciaschini's letter dated February 16, 2001, wherein Ciaschini tersely informs Plaintiff, who at that time had less than thirty-four (34)**

work days until the elimination of her position, that Plaintiff was not eligible for those positions because Plaintiff was not bilingual and stated to Plaintiff: "It is my understanding that you do not have those skills." Even though Ciaschini had referred Plaintiff for the positions and Ciaschini was a Human Resources Consultant, there was no apology just a terse note informing Plaintiff of what Plaintiff already knew, that Plaintiff, unlike Ciaschini, did not speak Spanish. (Def. Ciaschini Dec., App. A, Tab C at Tab 7) (Ciaschini Resume, Ex. 48) (Ciaschini Role Description, Ex. 53) (Ciaschini Notes re: Plaintiff's Qualifications, Ex. 13)

172.    "Because Ciaschini was not the Human Resources Consultant assigned to these positions, she did not realize at the time she referred Solomon that these positions required bilingual skills in English and Spanish. Id."

Deny.   First, Ciaschini was the Human Resources Consultant who signed Plaintiff's transfer application for these positions under the section, "Human Resources Use Only." (Def. Ciaschini Dec., App. A, Tab C at Tab 1) The Hospital's Recruiting and Selection Policy states that the assigned Human Resources Consultant determines whether a candidate is qualified to be referred for an interview. As regards these positions, Ciaschini signed her name in the section of the transfer application indicating that Plaintiff was not qualified because she was not bilingual resulting in Plaintiff not being referred for an interview. (L.R. 56(a)2 Statement, Ex. 24) Second, Ciaschini's Role Description provides that she is to work effectively as a team member both within and across Human Resources teams. (L.R. 56(a)2 Statement, Ex. 53) Third, Ciaschini is bilingual (L.R. 56(a)2 Statement, Ex. 48) Fourth, Ciaschini was familiar with Plaintiff's qualifications. (L.R. 56(a)2 Statement, Ex. 13) Fifth, the tone that Ciaschini used in her February 16, 2001,

**letter to Plaintiff wherein she stated as to bilingual skills:  "It is my understanding that you do not have those skills."  (Def. Ciaschini Dec., App. A, Tab C at Tab 7)**

173.     "Solomon is not bi-lingual and, therefore, did not qualify for these positions.  Id."

**Deny with clarification.  First, while Ciaschini avers that the position required bilingual skills (Def. Ciaschini Dec. ¶5, App. A., Tab C) the Hospital does not provide the position posting as supporting evidence and in fact does not know who actually obtained either position and whether those individuals were bilingual.  (Defs.' Production Responses No. 141, L.R. 56(a)2 Statement, Ex. 33)  Second, while Ciaschini avers that a requirement for the position is bilingual skills, Plaintiff, Plaintiff denies "bilingual (English/Spanish)"was required to fulfill the duties of the position."  (L.R. 56(a)2 Statement, Nos. 143-152, Ex. 29 and Ex. 45)**

174.     "In or about January 2001, Stagg interviewed Solomon for the position of PAA in the Care Continuum Assessment Center at Hartford Hospital.  There were two such positions available at the time.  Stagg Dec. ¶3, App. A, Tab I."

**Admit.**

175.   "The job qualifications for the PAA position were:

High School Diploma.  Prior experience in patient care environments desired performing various support functions where solid interpersonal skills were essential.  Ability to navigate hospital based computer applications for information (SMS look-up, lab studies, etc.) desired. Ability to perform phlebotomy and obtain quality EKGs highly desired.

Id."

**Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23) or the Hospital's Career Opportunities Policy (L.R. 56(a)2 Statement, Ex. 31), or not.**

176.   "Stagg chose Phyllis Watson ("Watson"), who is black, and Janina Kornas ("Kornas"), who is white, for the two open PAA positions.  Id. ¶5."

**Admit.**

177.   "Stagg chose Kornas over Solomon because Kornas had three to four active years of work experience in phlebotomy, and also had knowledge of EKGs and vital signs.  While Solomon may have possessed a certificate in phlebotomy, she did not possess any actual work experience in phlebotomy.  Id. ¶6."

**Plaintiff acknowledges that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute the reasons stated in Ms. Stagg's Declaration for choosing Kornas.**

**Deny.  Plaintiff had actual work experience in phlebotomy.  (Pl.'s Dec. ¶72, Tab A)**

178.   "While Watson did not possess any active experience in phlebotomy, she had past work experience with EKGs and monitors, whereas Solomon did not.  Watson also had extensive clerical work experience.  Id."

**Admit.**

179.   "Prior to making her decision, Stagg had no communications of any kind with either O'Connell or Niles about Solomon's application.  Also, Ciaschini, the Human Resources Consultant assigned to the posting, made no attempt to influence Stagg's decision.  Id. ¶7."

**Deny in part. First, Ms. Stagg contacted Ciaschini to ask what priority Plaintiff's application should receive given the scheduled elimination of Plaintiff's position. (Pl.'s Dec. ¶¶73-74, Tab A) Ciaschini merely told Ms. Stagg to choose the most qualified candidate in clear contravention of the Hospital Staff Reduction Policy. (Pl.'s Dec. ¶¶73-74, Tab A) (L.R. 56(a)2 Statement, Ex. 23) This influenced Ms. Stagg's decision because clearly Ms. Stagg does not state that Plaintiff was not qualified and Ms. Stagg asked the question because she believed that Plaintiff could perform the position if her application was entitled to priority consideration. Second, the Hospital's own Recruiting and Selection Policy states, as a guideline for managers: "Make the final selection in consultation with the Human Resources Consultant"; and as a guideline for Human Resources Consultants: "Make a final selection recommendation to the manager and advise on appropriate hiring rate of pay." (L.R. 56(a)2 Statement, Ex. 24)**

**Plaintiff acknowledges that she does not have evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Stagg's statement that she did not have any communications with Niles or O'Connell about Plaintiff's application.**

180. "In or about February 2001, Solomon submitted a transfer application for a Patient Administrative Associate Position in the Cardiology Department. Ciaschini Dec. ¶22, App. A, Tab C."

**Admit.**

181. "Solomon's application was initially screened by the Department of Human Resources and was referred to the hiring manager in the Cardiology Department. Id."

**Admit.**