182. "Following Solomon's receipt of the February 13, 2001 Written Warning, her application was returned to the Department of Human Resources and she was eliminated from consideration for the PAA position in the Cardiology Department because she was not eligible for transfer due to the fact that she was in the performance improvement process as a result of the February 13th Written Warning. Id."

**Admit.**

183. "The Hospital's Performance Management Policy provides as follows:

> Opportunities for pay increases, lump sum awards, promotion, transfer and tuition reimbursement will be delayed while the employee is in the Performance Improvement process. (Steps 2-4). If the formal process is successful, any resulting pay increase will not be retroactive.

Id. ¶20."

**Admit.**

184. "During the thirty-four (34) work days that Solomon was in the performance improvement process, in accordance with the Performance Management Policy, she was not eligible to transfer to any other position within the Hospital. Id. ¶21."

**Admit.**

185. "In February 2001, Lea Allard ("Allard") was a Nurse Manager at Hartford Hospital on Bliss Wing - 10 East. Declaration of Lea Allard ("Allard Dec.") ¶2, App. A, Tab N."

**Admit.**

186. "In February 2001, Bliss Wing – 10 East was seeking to hire a Patient Administrative Associate ("PAA"). Allard was the hiring manager for this position. Id. ¶3."

**Admit.**

187.    "To qualify for this position, the candidate needed to know how to read heart monitors, understand and transcribe physician's orders and prescriptions, order laboratory tests, order EKGs and other physical tests, have a working knowledge of computers, and have good communication skills.  Id. ¶4."

**Admit, only as regards those candidates not subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23).**

**Objection, Defendants do not specify whether the candidates referenced are subject to the Hospital's Staff Reduction Policy (L.R. 56(a)2 Statement, Ex. 23) or The Hospital's Career Opportunities Policy (L.R. 56(a)2 Statement, Ex. 31), or not.**

188.    "Allard interviewed Solomon for the position on or about February 21, 2001. Allard's impression from the interview was that Solomon did not necessarily have the requisite experience for the position.  Specifically, Solomon had no experience reading heart monitors, transcribing physician's orders and prescriptions, ordering laboratory tests, EKGs or other physical tests.  Id. ¶6."

**Admit with clarification.  Ms. Allard interviewed Plaintiff.  Plaintiff acknowledges Ms. Allard's statement in her Declaration and admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute the reasons stated in Ms. Allard's Declaration for her impression.   Admit the remainder.**

189.    "Allard made the decision to hire Linda Connors ("Connors"), a white female, for this PAA position.  Id. ¶7."

**Admit.**

190.    "At the time, Connors was already a Patient Care Associate within the Cardiology Department.  As a Patient Care Associate, she had cross-trained on many of the responsibilities

of the PAA position, such as submitting requests for laboratory tests. She also knew how to read heart monitors and was familiar with or computer system. Id."

**Plaintiff acknowledges Ms. Allard's statement in her Declaration and admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute the reasons stated in Ms. Allard's Declaration for her impression.**

191. "Based on Connors' previous experience within the Cardiology Department, Allard believed that Connors was more qualified than Solomon for the PAA position. Id."

**Plaintiff acknowledges Ms. Allard's statement in her Declaration and admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Allard's statement of her belief.**

192. "Prior to making her decision, Allard did not discuss Ms. Solomon's application with O'Connell or Niles. Id. ¶8."

**Plaintiff acknowledges Ms. Allard's statement in her Declaration and admits that she has no evidence, except a trier of fact's assessment of the witness's credibility, to refute Ms. Allard's statement.**

193. "Solomon's claim for disparate impact race discrimination in Count VII of the Complaint is based on the following theory proffered by plaintiff: O'Connell suspended Solomon on February 9, 2001, and issued a written notice to Solomon on February 13, 2001, based on Solomon's failure to greet white employees located in Lynch's office. However, when O'Connell witnessed Solomon tell another black employee, Griffith, that Solomon and Griffith would not speak except professionally, O'Connell did not intervene or issue any discipline. Plaintiff's Responses to Defendants' First Set of Interrogatories ("Pl. Intterog. Resp.") ¶19; App. B, Tab D."

**Admit with clarification and addition.  Plaintiff's claim for disparate impact also is supported by O'Connell's choice to suspend and issue a final written warning to Plaintiff for failing to greet a white man, whom O'Connell admits she had not idea what he was doing in Ms. Lynch's office except that he was there a lot with another white woman, Ms. Lynch, but taking absolutely no action when a white man, Mr. Lindyer, speaks "sternly" to a black woman whom everyone agrees was engaged in work.  (Pl.'s Dec. ¶104, Tab A) (Def. O'Connell Dec., App. A, Tab B at Tab 5) (Pl.'s Second. Am. Compl., ¶¶128-135) (Def. O'Connell's Interrog. Resp. No. 8, Ex. 49) (Pl.'s Dec. ¶104, Tab A)**

194.    "Solomon's claim for disparate impact race discrimination in Count Eight of the Complaint is based on her claim that the Hospital had a requirement or a preference that required applicants for certain positions to be bi-lingual in English and Spanish and that such policy had a disparate impact on black applicants.  Compl. ¶¶135-142."

**Admit with clarification and addition.  The Hospital had a preference for hiring applicants with bilingual Spanish and English skills but no data to support the need for such a preference and no policy guiding such a preference except an Equal Employment Opportunity/Affirmative Action Policy stating: "When hiring or promoting within those job categories in which a specific group is underutilized, we will take affirmative action to seek out qualified applicants."  (Hospital Equal Employment Opportunity/Affirmative Action Policy, L.R. 56(a)2 Statement, Ex. 46) (Defs.' Admissions No. 143, L.R. 56(a)2 Statement, Ex. 45)  The seemingly neutral preference, without guidelines fr its use supported by demographic data, has a disparate impact on those non-Hispanics, such as Plaintiff, a black female, who do not speak Spanish to the degree and extent that the Hispanic group does.**

195.    "Solomon's claim for intentional infliction of emotional distress against O'Connell is based upon the following alleged "extreme and outrageous" acts:

- The February 13, 2001 Written Warning.  Solomon Depo. at 208-09, 219, App. B, Tab A.

- The fact that she was suspended without pay.  Id. at 210.

- Solomon's claim the O'Connell was working "behind the scenes to keep her from transferring."  Id. at 219.

- Solomon's claim that O'Connell helped her own spouse get a job at the Hospital. Id. at 229."

- "Solomon's claim that O'Connell helped her daughter get into a radiation therapy program in the Hospital's School of Allied Health.  Id."

    **Plaintiff does not oppose Defendants' Motion for Summary Judgment on Counts Fifteen through Nineteen.  See note 2, *supra*.**

196.    "Solomon's claim for intentional infliction of emotional distress against Ciaschini is based upon the following alleged "extreme and outrageous" acts:

- Her allegation that Ciaschini supported O'Connell's suspension of Solomon without pay, which resulted in Solomon being unable to transfer to open positions, being ineligible for tuition reimbursements, and being eligible for lump sum payments.  Id. at 231.

- Her allegation that Ciaschini referred Solomon to a position that she was not qualified for because Solomon was not bi-lingual.  Id. at 231-32."

    **See No. 195, *supra*.**

197. "Solomon's claim for intentional infliction of emotional distress against Niles is based upon the following alleged "extreme and outrageous" acts:

- The alleged statements by Niles contained in Solomon's letter to Ciaschini, dated February 9, 2001, which is marked as Defendant's Exhibit 28. Id. at 236-38; Depo. Ex. 28, App. B, Tab C."

**See No. 195, *supra*.**

198. "Solomon also bases her claim for intentional infliction of emotional distress on the following alleged "extreme and outrageous" acts:

- Her claim that she was receiving unfavorable references from O'Connell which were negatively impacting her attempts to transfer;
- Her belief that she was being prevented from transferring due to race discrimination;
- The elimination of her position effective March 31, 2001;
- Alleged Hospital gossip and attempts to humiliate her due to her failure to obtain an internal transfer after attending so many interviews;
- Receiving a paycheck in an envelope that was not sealed;
- Not receiving a paycheck on March 1, 2001;
- Her inability to transfer due to her suspension;
- Her inability to find comparable work following the termination of her employment;
- Her lack of knowledge about the type of references Hartford Hospital is providing to prospective employers;
- Her inability to meet financial obligations or afford medical insurance.

Pl. Interrog. Resp. ¶8, App. B, Tab D."

**<u>See</u> No. 195, *supra*.**

199. "Solomon's claim that O'Connell knew or should have known that her alleged unlawful discriminatory conduct involved an unreasonable risk of causing emotional distress is based on the following:

- Because O'Connell put her in a position in which she would not have a job; Solomon Depo. at 276; App. B, Tab A.
- Because O'Connell suspended her without pay and gave her a written warning. <u>Id.</u>"

**<u>See</u> No. 195, *supra*.**

200. "Solomon's claim that Ciaschini knew or should have known that her alleged unlawful discriminatory conduct involved an unreasonable risk of causing emotional distress is based on the fact that Ciaschini put Solomon in a position in which Solomon would not have a job. <u>Id.</u> at 277"

**<u>See</u> No. 195, *supra*.**

201. "Solomon's claim that Niles knew or should have known that her alleged unlawful discriminatory conduct involved an unreasonable risk of causing emotional distress is based on the fact that Niles put Solomon in a position in which Solomon would not have a job. <u>Id.</u> at 278."

**<u>See</u> No. 195, *supra*.**

202. "Solomon's claim for tortious interference with contract and prospective economic advantage is based on the following:

> Defendants knew that Solomon's position at the Hospital was scheduled for elimination on March 31, 2001, and by issuing a suspension on February 9, 2001, and a written

warning on February 13, 2001, defendants ensured that Solomon would not be eligible to seek employment as an internal transfer.

Pl. Interrog. Resp. ¶21, App. B, Tab D."

**See No. 195, *supra*.**

203. "Solomon's claim that Ciaschini acted outside the scope of her employment and interfered with Solomon's employment relationship with the Hospital is based on the following:

- Solomon's claim that Ciaschini called O'Connell and told O'Connell that Solomon's transfer application for another position had been rejected. Solomon Depo. at 301, 307, App. B, Tab A.
- The fact that Ciaschini supported the written warning and suspension imposed by O'Connell. Id. at 307.
- The fact that Ciaschini referred Solomon for positions for which she was not qualified. Id."

**See No. 195, *supra*.**

204. "Solomon's claim that Niles acted outside the scope of her employment and interfered with Solomon's employment relationship with the Hospital is based on the following:

- Solomon's claim that Niles went to the Cancer Center Director to complain about the incident between she and Solomon on January 19, 2001. Id. at 305, 308, App. B, Tab A.
- The fact that Niles went to Ciaschini to make a statement about Solomon and the January 19, 2001 incident. Id. at 308.
- Solomon's claim that Niles "blew her off" while Solomon was trying to do her [Solomon's] job. Id. at 310."

**See No. 195, *supra*.**

205. "Solomon has no evidence that Niles went to the Cancer Center Director to complaint about the January 19, 2001 incident. Id. at 308."

**See No. 195, *supra*.**

206. "Solomon's claim that O'Connor acted outside the scope of her employment and interfered with Solomon's employment relationship with the Hospital is based on the fact that O'Connell suspended Solomon without pay and issued her a written warning. Id. at 306."

**See No. 195, *supra*.**

## II. PLAINTIFF'S DISPUTED ISSUES OF MATERIAL FACT

1. In considering Plaintiff's applications for internal transfer to other positions, Hartford Hospital ("Hospital") ignored and acted in contravention of its Staff Reduction Policy which assigns "priority consideration" to employees affected by position reductions "for open positions at any level in any department of the hospital for which they meet the qualifications and for which they have the ability to adequately perform the required functions within a ninety day period." (Hospital Staff Reduction Policy, Ex. 23) (Declarations of Patricia Synhorst, Susan A. O'Connell, Gladys Ciaschini, Monica Kowalski, Laurine Bow, William Bell, Lea Allard, Teri Duarte, Susan Stagg, Patricia Sobieski, Defs.' Mem. in Supp. of Summ. J., App. A, Tabs A – N) (Pl.'s Dec., 73-74, 128-129, Tab A)

2. The Hospital violated its Performance Management and Performance Improvement Policy by first suspending Plaintiff without pay on February 9, 2001, and then issuing a written warning to Plaintiff on February 13, 2001, in retaliation for Plaintiff's January 23, 2001, complaints of discrimination and February 12, 2001, notice of intent to file an administrative, anti-discrimination complaint. (Hospital Performance Management and

Improvement Process Policy; January 23, 2001, Letter; February 12, 2001, Letter; Defs.' Mem in

Supp. of Summ. J., Declaration of Gladys Ciaschini ("Def. Ciaschini Dec."), App. A, Tab C at

Tabs 4, 13, 16, and 20) (Written Warning, Defs.' Mem. in Supp. of Summ. J., Declaration of

Susan O'Connell ("Def. O'Connell Dec."), App. A, Tab B at Tab 5)

      3.     The Hospital, in averring that that Plaintiff was not qualified for positions after

she was referred and participated in employment interviews, dismisses, without explanation, the

provision of its Recruiting and Selection Policy that imposes as a condition precedent upon any

employment interview a determination by a Hospital Human Resources Consultant that the

applicant is qualified for the position. (Hospital Recruiting and Selection Policy, Ex. 24)

(Declarations of Patricia Synhorst, Susan A. O'Connell, Gladys Ciaschini, Monica Kowalski,

William Bell, Lea Allard, Teri Duarte, Laurine Bow, Susan Stagg, Patricia Sobieski, Defs.'

Mem. in Supp. of Summ. J., App. A, Tabs A – N)

      4.     The Hospital violated its Separation of Employment Policy and Rehires Policy by

marking Plaintiff as ineligible for rehire following the elimination of her position on March 31,

2001. (Pl.'s Payroll Activity Window, Ex. 1) (Hospital Rehires Policy, Ex. 25) (Hospital

Separation of Employment Policy, Ex. 26) (Def. Ciaschini Dec., App. A, Tab C at Tab 20)

      5.     The Hospital discriminated against Plaintiff, who is black, by requiring that

candidates for selected positions at the Hospital have bilingual skills in Spanish and English

without data or policy to support its determinations that those with bilingual skills in Spanish and

English would be more qualified to perform the positions' requirements. (Admissions by

Defendants Nos. 147, 151, L.R. 56(a)2 Statement, Ex. 45) (Admissions by Defendants Nos. 145,

149, 153, L.R. 56(a)2 Statement, Ex. 29) (Pl.'s Dec. ¶¶48, 68, 70, 71, Tab A)

6.      The Hospital determined that Plaintiff was qualified for the position of Administrative Associate I (AAI) in the Hemodialysis Unit when Plaintiff was referred for an interview with the Hiring Manager Monica Kowalski ("Ms. Kowalski").  (Policy, Ex.24) (Declaration of Monica Kowalski ¶3, Defs.' Mot. for Summ. J., App. A, Tab D) (Pl.'s Dec. ¶¶51, 52)[4]

7.      The Hospital determined that Plaintiff was qualified for the position of Financial Counselor in the Patient Accounts Department when Plaintiff was referred for an interview with the Hiring Manager Teri Duarte ("Ms. Duarte").  (Policy, Ex.24) (Declaration of Teri Duarte ("Duarte Dec.") ¶5, Defs.' Mot. for Summ. J., App. A, Tab M) (Pl.'s Dec. ¶62, Tab A)[5]

8.      The Hospital determined that Plaintiff was qualified for the position of Human Resources Associate in the Human Resources Department when Plaintiff was referred for an interview with the Hiring Manager William Bell ("Mr. Bell").  (Policy, Ex.24) (Declaration of William Bell ("Bell Dec.") ¶3, Defs.' Mot. for Summ. J., App. A, Tab E) (Pl.'s Dec. ¶59, Tab A)[6]

9.      The Hospital determined that Plaintiff was qualified for the Patient Administrative Associate and Administrative Associate II positions in the Care Continuum Department when Plaintiff was referred for interviews with hiring managers Patricia Sobieski ("Ms. Sobieski") and Beth Grieg ("Ms. Grieg").  (Policy, Ex.24) (Declaration of Patricia Sobieski ("Sobieski Dec.")

---

[4] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Administrative Associate I in Hemodialysis Unit (Position Reference #A021681037F)," § II(A)(iii)(1).
[5] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Financial Counselor in Patient Accounts Department (Position Reference #A010501039A)," § II(A)(iii)(2).
[6] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Human Resources Associate in Human Resources Department (Position Reference #A010501039A)," § II(A)(iii)(3).

¶5, Defs.' Mot. for Summ. J., App. A, Tab M) (Declaration of Patricia Synhorst ("Synhorst Dec.") ¶6, Defs.' Mot. for Summ. J., App. A, Tab A) (Pl.'s Dec. ¶61, Tab A)[7]

10.    The Hospital determined that Plaintiff was qualified for the position of Administrative Associate III in the Research Department when Plaintiff was referred for an interview with the Hiring Manager Laurine Bow ("Ms. Bow").  Ms. Bow never indicated that Plaintiff was not qualified for the position. (Policy, Ex.24) (Declaration of Laurine Bow ("Bow Dec.") ¶¶3, 4, Defs.' Mot. for Summ. J., App. A, Tab G) (Pl.'s Dec. ¶50, Tab A)[8]

11.    The Hospital's determination that Plaintiff would not be referred for interviews with the hiring managers for the positions requiring Spanish and English bilingual skills posted under position reference numbers A025662036, A030080029, and A030089003 because Plaintiff did not speak Spanish and English demonstrates that Plaintiff was qualified for the positions in the Hemodialysis Unit, Patient Accounts, Human Resources, Care Continuum, and the Research Department, otherwise Plaintiff would not have been referred for and received interviews. (Policy, Ex.24) (Declaration of Gladys Ciaschini ("Def. Ciaschini Dec.") ¶5, Defs.' Mem. in Supp. of Summ. J., App. A, Tab C at Tab 1, Tab 7 at 4)  (Pl.'s Dec. ¶¶,68, 70, Tab A)[9]

12.    The Hospital determined that Plaintiff was qualified for the position of Patient Care Associate in the Care Continuum-Assessment Center when Plaintiff was referred for an interview with the Hiring Manager Susan Stagg ("Ms. Stagg").  Ms. Stagg never indicated that

---

[7] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Patient Administrative Associate and Administrative Associate II positions in Care Continuum (Position Reference #A020403002D) (Position Reference #A020420002D)," § II(A)(iii)(4).

[8] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Administrative Associate III in Research Department (Position Reference #A129503008E)," § II(A)(iii)(5).

[9] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Hospital Positions Requiring Spanish and English (Bilingual) Skills (Position Reference ## A025663036, A030080029, A030089003E)," § II(A)(iii)(6).

plaintiff was not qualified for the position. (Policy, Ex.24) (Declaration of Susan Stagg ("Stagg Dec.") ¶¶3, 5, Defs.' Mem. in Supp. of Summ. J., App. A, Tab I) (Pl.'s Dec. ¶72, Tab A)[10]

13. The Hospital determined that Plaintiff was qualified for the position of Patient Administrative Associate in the Cardiology Department when Plaintiff was referred for an interview with the Hiring Manager. (Policy, Ex.24) (Synhorst Dec. ¶11, App. A, Tab A at Tab 5) [11]

14. Plaintiff she was qualified for the Patient Administrative Associate position in the Cardiology Department. (January 22, 2000[sic][12], Letter, Ex. 14)

15. The Hospital determined that Plaintiff was qualified for the position of Patient Administrative Associate in the Bliss Wing-10 East when Plaintiff was referred for an interview with the Hiring Manager Lea Allard ("Ms. Allard"). Ms. Allard never indicated that Plaintiff was not qualified for the position. (Policy, Ex.24) (Declaration of Lea Allard ("Allard Dec.") ¶¶5, 6, Defs.' Mem. in Supp. of Summ. J., App. A, Tab N) (Pl.'s Dec. ¶78, Tab A)[13]

16. In considering Plaintiff's applications for internal transfer to other positions, Hartford Hospital ("Hospital") ignored and acted in contravention of its Staff Reduction Policy which gave Plaintiff, concerning her transfer applications submitted after March 22, 1999, "priority consideration for open positions at any level in any department of the hospital" for which Plaintiff met the qualifications and for which Plaintiff had the ability to "adequately perform the required functions within a ninety day period." (Policy, Ex. 23) (Defs.' Local Rule

---

[10] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Patient Administrative Associate in Care Continuum-Assessment Center (Position Reference #A0204003006D) (Position Reference #A0204003005D)," § II(A)(iii)(7).

[11] See Pl.'s Mem. of Law in Opp'n to Summ. J., "Transfer Applications Denied Due to the Written Warning Issued by O'Connell (Position Reference #A025961062B) (Bliss-10 East)," § II(A)(iii)(8).

[12] Plaintiff received the letter in January of 2001. (Pl.'s Dec. ¶69, Tab A)

[13] See note 11m *supra*.

56(a)1 Statement, Nos. 10, 11) (Pl.'s Employee Record/Change Notice (ERCN), Ex. 2 and Ex. 3)

(Pl.'s Dec. ¶¶57, 73, 98, 128, 129, Tab A)

      17.    The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Kowalski did not offer Plaintiff the AAI position in the Hemodialysis Unit following Plaintiff's interview.  (Policy, Ex. 23) (Kowalski Dec.¶¶1-6, App. A, Tab D) (Pl.'s Dec. ¶¶51, 52, 54, 57, 128, 129, Tab A)[14]

      18.    The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Kowalski did not offer Plaintiff the AAI position in the Hemodialysis Unit following the failure of Ms. Kowalski's initial selection for the position, Terri Durler, to begin work.  (Policy, Ex. 23) (Durler Application, Ex. 32)  (Production Responses by Defendants No. 121, Ex. 33) (Pl.'s Dec. ¶¶51, 52, 54, 57, 128, 129, Tab A)[15]

      19.    The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Kowalski did not offer Plaintiff the AAI position in the Hemodialysis Unit following the departure of Ms. Kowalski's second selection for the position, Jennifer Vasquez. (Policy, Ex. 23) (ERCN re: Ms. Vasquez, Exs. 34, 35, and 69) (Pl.'s Dec. ¶¶51, 52, 54, 57, 128, 129, Tab A)[16]

      20.    The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Duarte did not offer Plaintiff the Financial Counselor

---

[14] See note 4, *supra*.
[15] See note 4, *supra*.

position in the Patient Accounts Department following Plaintiff's interview. (Policy, Ex. 24) (Duarte Dec. ¶¶1-8, App. A, Tab M) (Pl.'s Dec. ¶¶62-63, 128, 129, Tab A)[17]

21.     The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Mr. Bell did not offer Plaintiff the Human Resources Associate position in the Human Resources Department following Plaintiff's interview. (Policy, Ex.24) (Bell Dec. ¶¶1-6, App. A, Tab E) (Pl.'s Dec. ¶¶59-60, 128, 129, Tab A)[18]

22.     The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Sobieski and Ms. Grieg did not offer Plaintiff a Patient Administrative Associate or Administrative Associate II position in the Care Continuum Department following Plaintiff's interview. (Policy, Ex.24) (Sobieski Dec. ¶¶1-9, App. A, Tab H) (Synhorst Dec., App. A, Tab A at Tab 3) (Pl.'s Dec. ¶¶61, 128, 129, Tab A)[19]

23.     As the Human Resources Consultant assigned to the open Patient Administrative Associate positions in the Care Continuum Department in September of 2000 and January of 2001, Ciaschini would have had a direct opportunity to inform the hiring managers of the scheduled elimination of Plaintiff's position under the Staff Reduction Policy and she was required to but did not. (Policy, Ex. 24) (Posting and Transfer Application for Position #A02042002D, Ex. 27) (Posting and Transfer Application for Position #A0204003006D, Ex. 28) (Def. Ciaschini Role Description, Ex. 53)[20]

---

[16] See note 4, *supra*.
[17] See note 5, *supra*.
[18] See note 6, *supra*.
[19] See note 7, *supra*.
[20] See note 10, *supra*.

24.     The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Bow did not offer Plaintiff the Administrative Associate II position in the Research Department following Plaintiff's interview.  (Policy, Ex.24) (Bow Dec. ¶¶¶¶1-5, App. A, Tab G)  (Sobieski Dec. ¶¶1-9, App. A, Tab H) (Synhorst Dec., App. A, Tab A at Tab 3) (Pl.'s Dec. ¶¶50, 128, 129, Tab A)[21]

25.     The Hospital denied Plaintiff priority consideration and a period of ninety days to adequately perform her new position duties as given applicants subject to position elimination under its Staff Reduction Policy when Ms. Stagg did not offer Plaintiff the Patient Care Associate position in the Care Continuum-Assessment Center following Plaintiff's interview. (Policy, Ex.24) (Stagg Dec. ¶¶1-8, App. A, Tab I) (Pl.'s Dec. ¶¶72, 128, 129, Tab A)[22]

26.     The Hospital did not provide Plaintiff the on-the-job training and instruction that it provided to other employees and for which Plaintiff was entitled under the Staff Reduction Policy that provided for a ninety (90) period for Plaintiff to adequately perform her new job duties following transfer.  (Policy, Ex. 23) (ERCN re: Ms. Hernandez-Green, Ex. 18) (Admissions by Defendants Nos. 16, 133, Ex. 45)  (ERCN re: Ms. Hernandez-Green, Ex. 17) (Pl.'s Dec. ¶¶81-83, 84-87, Tab A)  (ERCN re: Mr. Urena, Ex. 19) (ERCN re Mr. Urena, Ex. 20) (Payroll Activity Windows Re: Mr. Urena, Exs. 57-60) (Admissions by Defendants No. 240, Ex. 55) (ERCN re: Mr. Moreau, Ex. 16) (ERCN re: Mr. Moreau, Ex. 63)

27.     Defendant Susan A. O'Connell ("O'Connell")'s February 9, 2001, suspension of Plaintiff without pay prior to the February 13, 2001, written warning issued to Plaintiff by O'Connell and Defendant Gladys Ciaschini ("Ciaschini") violated the Hospital's Performance

---

[21] See note 8, *supra*.
[22] See note 10, *supra*.

Management and Performance Improvement Policy (PIP) which sets forth a four-step progressive discipline policy that provides for either a period of suspension or termination under Step 4 for “problems” “best handled by suspension without pay for an appropriate number of days” or “discharge” and a final written warning under Step 3 that will be followed by suspension and/or termination, “if immediate improvement is not demonstrated,” “depending upon the nature of the problem.” (Performance Management and Performance Improvement Process Policy, Def. Ciaschini Dec., App. A, Tab C at Tab 16) (Written Warning, Def. O’Connell Dec., App. A, Tab B at Tab 5) (Pl.’s Dec. ¶¶98-99, 111, Tab A)

28. O’Connell and Ciaschini issued a written warning to Plaintiff on February 13, 2001, in retaliation against Plaintiff for Plaintiff’s January 23, 2001, complaint of discrimination and Plaintiff’s February 12, 2001, letter to Ciaschini indicating that Plaintiff intended to file a discrimination claim with the Connecticut Commission on Human Rights and Opportunities (CHRO). (Def. O’Connell Dec., Written Warning, App. A, Tab B at Tab 6) (Def. Ciaschini Dec., January 23, 2001, Letter, App. A, Tab C at Tab 4; February 12, 2001, Letter, App. A, Tab C at Tab 13; February 16, 2001, Letter, App. A, Tab C at Tab 7) (Pl.’s Dec.¶102, Tab A)

29. O’Connell suspended Plaintiff without pay on February 9, 2001, so that Plaintiff used six hours of vacation time to receive her full pay for the time she was suspended by O’Connell. (Pl.’s Dec. ¶¶98-99, 111-112, Tab A) (Hospital Time Cards and Timekeeping Policy, Ex. 65) (Pl.’s Time Cards, Ex. 21)

30. The Hospital policies do not allow for any suspension with pay. (Hospital Vacation Time Accrual Policy, Holiday Time Accrual Policy, Sick Time Accrual Policy, Leave of Absence Policy, Ex. 64)

31. O'Connell's retaliatory motive against Plaintiff was apparent on February 9, 2001, when she suspended Plaintiff without pay and then fabricated an "administrative suspension" time off provision, which does not exist under Hospital policy, to cover her violation of the PIP. (Performance Management and Improvement Process Policy, Def. Ciaschini Dec., App. A, Tab C at Tab 16) (Def. O'Connell Dec. ¶9, App. A, Tab B) (Policies, Ex. 64) (Pl.'s Dec. ¶¶98-99, 111-112, Tab A)

32. O'Connell's representation that she was not aware of the vacation time that Plaintiff took on February 9, 2001, to avoid losing pay during her unpaid suspension is inconsistent with the directive in the July 30, 1999, memorandum from O'Connell that any vacation time had to be approved by her or Niles. (Def. O'Connell Dec., App. A, Tab B at Tab 1) (Pl.'s Dec. ¶¶98-99, 111-112, Tab A)

33. O'Connell's more than 20 year career at the Hospital and award of base pay increases at the top of the scale disproves her lack of knowledge about Hospital policy. (Def. O'Connell Performance Appraisal Processing Form, Ex. 66)

34. O'Connell's representation that she was not aware of the vacation time that Plaintiff took on February 9, 2001, to avoid losing pay during her unpaid suspension is inconsistent with the Hospital's Time Cards and Timekeeping Policy which requires supervisors to approve time cards and the Hospital's Vacation Policy which requires prior approval from a supervisor before vacation time is used. (Policy, Ex. 65) (Policies, Ex. 64)

35. O'Connell's and Ciaschini's February 13, 2001, written warning to Plaintiff was retaliatory because Plaintiff did not violate the Hospital's Code of Conduct and Performance Management Competencies which reads: "We develop and strengthen collaborative relationships

with all of our customers, including our patients, their families, our employees, volunteers, medical staff and our business partners." (Def. Ciaschini Dec., App. A, Tab C at Tab 14)

36. A plain language interpretation of the provision to the Hospital Code of Conduct and Performance Management Competencies cited by O'Connell and Ciaschini in the written warning renders its applicability to Plaintiff ambiguous at best. Plaintiff was an employee at the Hospital. For the provision to apply, Plaintiff would have to be subsumed within the scope of "we," the first word in the provision. Whomever "we" refers to in the provision clearly has employees as deduced from the provision's phrase "our employees." Plaintiff did not have employees. She was an employee. Therefore Plaintiff must be excluded from the class of individuals, designated as "we," who employ others. (Def. Ciaschini Dec., App. A, Tab C at Tab 14)

37. The purpose of O'Connell's written warning issued to Plaintiff for causing a white hospital employee, Jan Lynch ("Ms. Lynch"), to feel ignored when Plaintiff did not acknowledge Ms. Lynch's greeting sometime in January or February 2001; for causing a white medical engineer, Robert Lindyer, who was sitting in Ms. Lynch's office to sternly repeat "Good morning" when Plaintiff did not acknowledge his first attempt on February 8, 2001; for causing a white hospital employee, Susan Wright, to feel offended and snubbed when plaintiff did not say "Good morning" on February 5, 2001; for causing a white fabrication designer, John Unikewicz, who was sitting in Ms. Lynch's office to feel uncomfortable when Plaintiff said "excuse me" as Plaintiff attempted to retrieve a laptop to perform work on February 8, 2001; for not greeting a white hospital employee, Sandy Beggs, who was sitting in Ms. Lynch's office on February 8, 2001; for not saying hello to O'Connell as Plaintiff passed by O'Connell's office to enter Ms. Lynch's office on February 12, 2001; and for merely smiling at O'Connell when O'Connell said

hello to Plaintiff on February 12, 2001, was to prevent Plaintiff from transferring to any other position in the Hospital prior to the elimination of Plaintiff's position on March 31, 2001. (Def. O'Connell Dec., App. A, Tab B at Tab 5) (Pl.'s Dec. ¶108, Tab A)

38.    O'Connell did not ask Mr. Lindyer, Ms. Lynch, Mr. Unkewicz, or Ms. Beggs about their reasons for congregating in Ms. Lynch's office on February 8, 2001, but she should have as part of her inquiry into Plaintiff's "violation " of the Hospital's Code of Conduct and Performance Management Competencies to determine who was not being "collaborative" with whom. (Def. O'Connell Interrog. Res. No. 10, Ex. 69)

39.    While Plaintiff was given a written warning for not stopping her work to address all the white people congregated in Ms. Lynch's office, Mr. Lindyer, who spoke sternly to Plaintiff, seemingly in violation of the Hospital's interpretation of its Code of Conduct and Performance Management Competencies, was portrayed as a victim by O'Connell and Ciaschini. (Def. O'Connell Dec., App. A, Tab B at Tab 5) (Pl.'s Dec. ¶104, Tab A)

40.    O'Connell allowed Plaintiff and Kelvin Griffith, a black male, to work closely and they did so without incidence until Mr. Griffith was terminated even though O'Connell had witnessed Plaintiff inform Mr. Griffith at a meeting on August 5, 1999, that she would speak to him as the performance of their work necessitated. (Pl.'s Dec. ¶32-36, Tab A) (ERCN re: Griffith, Ex. 10)

41.    The work atmosphere under O'Connell's supervision caused Robert Lindyer, a white hospital employee who may or may not have even been working when he encountered Plaintiff on February 8, 2001, to believe that he had the authority over Plaintiff, a black woman engaged in work, such that he spoke "sternly" to her when she did not greet him as he thought he

was entitled. (Def. O'Connell Dec., App. A, Tab B at Tab 5) (Def. Ciaschini Dec., App. A, Tab C at Tab 14) (Pl.'s Dec. ¶104, Tab A)

42.     The motive for O'Connell's issuance of the written warning was to impose a thirty-four (34) day disciplinary period that would preclude Plaintiff from transferring to any other position in the Hospital prior to the elimination of her position on March 31, 2001. (Def. O'Connell Interrog. Resp. No. 8, Ex. 49) (Hospital Career Opportunities Policy, Ex. 31)

43.     O'Connell's failure to take into account any other factor than the time Plaintiff had remaining in her position at the Hospital when O'Connell imposed the thirty-four (34) day disciplinary period shows that O'Connell's only purpose in imposing the discipline was to prevent Plaintiff from applying transfer during Plaintiff's last thirty-four (34) work days at the Hospital. (Def. O'Connell Interrog. Resp. No. 8, Ex. 49)

44.     The only important factor for O'Connell in determining an appropriate discipline for Plaintiff following the February 13, 2001, written warning was how many work days Plaintiff had remaining before the elimination of her position so that O'Connell could impose a disciplinary period of that same length. (Def. O'Connell Interrog. Resp. No. 8, Ex. 49)

45.     Plaintiff's inability to apply for transfer during the thirty-four (34) day disciplinary period that coincided with the last thirty-four (34) days of her employment was in retaliation for her complaints of discrimination because previously, when O'Connell and Ciaschini claimed that Plaintiff was subject to the disciplinary policy, Plaintiff was allowed to apply for transfer and received pay increases as well. (Pl.'s Dec. ¶¶26, 108 Tab A) (Defs.' Local Rule 56(a)1 Statement, No. 25) (Hospital Career Opportunities Policy, Ex. 31) (January 23, 2001, E-mails between Ciaschini and O'Connell, Ex.8)