46.    Plaintiff would have been hired for the Patient Administrative Associate position in the Cardiology Department because she was qualified and eligible for priority consideration if O'Connell and Ciaschini had not issued the written warning.  (Policy, Ex. 24) (Synhorst Dec. ¶11, App. A, Tab A at Tab 5) [23]

47.    Plaintiff would have been hired for the position of Patient Administrative Associate in the Bliss Wing-10 East because she was qualified and eligible for priority consideration if O'Connell and Ciaschini had not issued the written warning.  (Policy, Ex.24) (Declaration of Lea Allard, ¶¶5, 6, Defs.' Mem. in Supp. of Summ. J., App. A, Tab N) (Pl.'s Dec. ¶78, Tab A)[24]

48.    Plaintiff's termination from the Hospital was a voluntary termination due to the elimination of her position and, under the Hospital Rehires Policy and Separation of Employment Policy, Plaintiff was eligible for rehire to the Hospital.  (Pl.'s Payroll Activity Window, Ex. 1) (Hospital Rehires Policy, Ex. 25) (Hospital Separation of Employment Policy, Ex. 26) Hospital Severance Policy, Ex. 51)

49.    The Hospital's purpose in marking Plaintiff ineligible for rehire at the time her position was eliminated on March 31, 2001, under the Staff Reduction Policy was to retaliate against Plaintiff for filing a complaint with the CHRO on March 19, 2001.  (Pl.'s Payroll Activity Window, Ex. 1) (Pl.'s Dec. ¶101, Tab A)

50.    Ciaschini forwarded a letter to Plaintiff on March 29, 2001, informing Plaintiff that Plaintiff's written warning made her ineligible under Hartford Hospital policy to apply for posted positions at Hartford Hospital and its affiliates during her severance period but failed to inform Plaintiff that Plaintiff was eligible to retain her original date of hire and continue to

---

[23] See note 11, *supra*.
[24] See note 11, *supra*.

accrue benefits at the same rate as prior to separation of she was rehired within thirty (30) days which Plaintiff was eligible for and about which Ciaschini should have provided information. (Def. Ciaschini Dec., March 29, 2001, Letter, App. A, Tab C at Tab 20)  (Hospital Separation of Employment Policy, Ex. 26)  (Def, Ciaschini Role Description, Ex. 53)

51.    The information that Ciaschini provided Plaintiff in the March 29, 2001, letter indicating that Plaintiff would not be able to apply for transfer positions during her severance period between March 31, 2001, and April 14, 2001, was false and not supported by any policy in effect on March 29, 2001.  (Staff Reduction Policy, Ex. 23) (Pl.'s Payroll Activity Window, Ex. 1) (Letter, Def. Ciaschini Dec., App. A, Tab 20); *Cf.*: (Hospital Staff Reduction Policy, Rev. 6/01, Ex. 67)

52.    Ciaschini's and O'Connell's failure to inform Plaintiff of Plaintiff's opportunity for rehire and the Hospital's action in marking Plaintiff ineligible for rehire under the Rehires Policy and Separation of Employment Policy was in retaliation against Plaintiff for her complaints of discrimination and CHRO complaint.  (Def. Ciaschini Dec., March 29, 2001, Letter, App. A, Tab C at Tab 20)  (Hospital Separation of Employment Policy, Ex. 26) (Rehires Policy, Ex. 25) (Pl.'s Payroll Activity Window, Ex. 1)

53.    The Hospital's lack of any formalized written policy, other than its equal employment opportunity policies (Hospital Equal Employment Opportunity/Affirmative Action Policy, Ex. 46) for determining whether a new or vacant position required that a candidate for a position have bilingual skills (Admissions by Defendants Nos. 143, 147, Ex. 45), without any data to support a need for bilingual skills has a disparate impact on those non-Hispanics, such as Plaintiff, a black female, who do not speak Spanish to the degree and extent that the Hispanic group does.

54. Ciaschini's actions in referring Plaintiff in January of 2001 to two positions which required bilingual skills in Spanish and English when Ciaschini spoke Spanish herself, knew that Plaintiff did not speak Spanish, and when Ciaschini was the actual HR Consultant who signed Plaintiff's transfer application as ineligible because Plaintiff did not speak Spanish, were intentional and discriminatory. (Letter, Ex. 14) (Def. Ciaschini Dec., App. A, Tab C at Tab 1) (Posting Position Ref. #A03089003E, Ex. 47) (Ciaschini Resume, Ex. 48) (Def. Ciaschini's Handwritten Notes re: Plaintiff's Qualifications, Ex. 13) (Pl.'s Qualifications, Exs. 11 and 12) (Pl.'s Dec. ¶¶45-47, 66-67)

55. Ciaschini referred Plaintiff to positions which required bilingual skills and then told Plaintiff regarding the bilingual positions, without any recognition of her mistake, in a letter dated February 16, 2001, that was written in response to Plaintiff's complaints of discrimination: "It is my understanding that you do not have those [bilingual] skills." (Def. Ciaschini Dec., App. A, Tab C at Tab 7 at p.4) (Def. Ciaschini Dec., App. A, Tab C at Tab 7)

56. The combination of Ciaschini's referral of Plaintiff to apply for those positions requiring bilingual skills despite numerous indications that Ciaschini would have known that the positions required bilingual skills and the manner in which Ciaschini chose to inform Plaintiff that the postings required such skills, by letter intended to respond to Plaintiff's discrimination complaints, demonstrates Ciaschini's discriminatory and retaliatory animus against Plaintiff. (Def. Ciaschini Dec., App. A, Tab C at Tab 7 at p.4) (Def. Ciaschini Dec., App. A, Tab C at Tab 7) (Ciaschini Resume, Ex. 48) (Def. Ciaschini's Handwritten Notes re: Plaintiff's Qualifications, Ex. 13) (Pl.'s Qualifications, Exs. 11 and 12) (Pl.'s Dec. ¶¶45-47, 66-67)

57. Plaintiff was not eligible to interview for the PAA position posted under Position Reference #A030089003E (Posting Reference #A030089003E, Ex. 51) because Plaintiff was not

bilingual but the successful candidate, Brenda Laureano-Geer ("Ms. Laureano-Geer") (Ms. Laureano-Geer's Application, Ex. 50), who was told by her supervisor that she was expected to "improve English skills" did not have the requisite English skills for the bilingual position. (Ms. Laureano-Geer Evaluation, Ex. 52) (Ms. Laureano-Geer Application, Ex. 50)

58. The Hospital's reliance on its Equal Employment Opportunities/Affirmative Action Policy (Policy, Ex.46) as its sole guidance in determining which positions in the Hospital should require bilingual skills subjects the hiring process to arbitrary and discriminatory decision-making because the policy does not provide any guidance for determining the need, if any, for bilingual skills in any particular position. (Admissions by Defendants Nos. 143, 147, L.R. 56(a)2 Statement, Ex. 45)

59. The adverse employment action that occurred when Plaintiff was rejected for the Administrative Associate I position in the Hemodialysis Unit posted on June 2, 2000 (Position Reference #A021681037F and Pl.'s Transfer Application, Kowalski Dec., App. A, Tab D at Tab 1 and 2), was motivated by discrimination based on the following:

    a. The hiring manager, Ms. Kowalski, stated that Plaintiff was qualified. (Pl.'s Dec. ¶¶45, 52, Tab A) (Pl.'s Education and Training Credentials, Ex. 11 and Ex. 12)

    b. Plaintiff was interviewed for the position which requires a determination by the Human Resources Consultant that Plaintiff was qualified. (Policy, Ex. 24) (Pl.'s Dec. ¶51, Tab A)

    c. Plaintiff was entitled to priority consideration and ninety days to perform adequately in the new position because Plaintiff's position was scheduled for elimination. (Policy, 23) (Defs.' Local Rule 56(a)1 Statement, No.11)

    d. Ms. Kowalski lied in her Declaration when she stated that Lovie DeGourville, a black female, had been hired for the position. (Kowalski Dec. ¶5, App. A, Tab D) (Durler Application, Ex. 32) (Production Responses by Defendants, Nos. 121, 125 Ex. 33) (ERCN re: Ms. Vasquez, Ex. 34) (ERCN re: Ms. Vasquez, Ex. 35) (ECRN re: Vasquez, Ex. 69) (Evaluation re: Ms. Degourville for FY 2001, Ex. 37) (Evaluation re: Ms. DeGourville for FY 2001, Ex. 38) (ECRN re: Ms. DeGourville, Ex. 39) (Change of Name Form re: Lovie DeGourville, Ex. 68) (CHRO Verified Answer, Ex. 40 at ¶f)

    e. Ms. Kowalski, contrary to her Declaration, indicated at the CHRO Hearing that Plaintiff was qualified for the position. (Kowalski Dec. ¶5, App. A, Tab D) (Pl.'s Dec. ¶52, Tab A)

60. Plaintiff would have been offered the Financial Counselor position in Patient Accounts posted under Position Reference #A010803074A on October 6, 2000 (Duarte Dec., App. A, Tab M at Tab 1) in the absence of discriminatory motive, for the following reasons:

    a. Plaintiff was interviewed for the position which requires a determination by the Human Resources Consultant that Plaintiff was qualified. (Policy, Ex. 24) (Pl.'s Dec. ¶¶45, 62, Tab A) (Pl.'s Qualifications, Ex. 11 and Ex. 12)

    b. The successful applicant, Sharlyn Pacheco, a Hispanic female, was an external candidate. (Duarte Dec. ¶7, App. A, Tab M at Tab 2)

    c. Plaintiff was entitled to preference as an internal candidate in accordance with the Hospital's Career Opportunities Policy. (Career Opportunities Policy, Ex. 31)

    d. Plaintiff was entitled to priority consideration and ninety days to perform adequately in the new position because Plaintiff's position was scheduled for elimination. (Policy, 23) (Defs.' Local Rule 56(a)1 Statement, No.11)

61. Plaintiff would have been offered the Human Resources Associate position in Human Resources posted under Position Reference #A010501039A on August 14, 2000 (Bell Dec., App. A, Tab E at Tab 1) in the absence of discriminatory motive, for the following reasons:

    a. Plaintiff was interviewed for the position which requires a determination by the Human Resources Consultant that Plaintiff was qualified. (Policy, Ex. 24) (Pl.'s Dec. ¶¶45, 59, Tab A) (Pl.'s Qualifications, Ex. 11 and Ex. 12)

    b. Dawn Packman, a white female and external candidate, was the successful applicant but not more qualified than Plaintiff and was later involuntarily terminated for poor performance. (ECRN re: Ms. Packman, Ex. 41) (Bell Dec. ¶6, App. A, Tab E)

    c. Plaintiff was entitled to preference as an internal candidate in accordance with the Hospital's Career Opportunities Policy. (Career Opportunities Policy, Ex. 31)

    d. Plaintiff was entitled to priority consideration and ninety days to perform adequately in the new position because Plaintiff's position was scheduled for elimination. (Policy, Ex. 23) (Defs.' Local Rule 56(a)1 Statement, No.11)

    e. Mr. Bell indicated to Plaintiff at her interview for the position that "they" had recently hired a few people in that department who were low on experience and the department could not take on another. (Pl.'s Dec. ¶59, Tab A)

    f. Mr. Bell has been a Human Resources Consultant at the Hospital since 1980 and part of his job description would include familiarity with the Hospital Recruiting

89

and Selection Policy, Hospital Staff Reduction Policy, and the Hospital Career Opportunities Policy.  (Bell Dec. ¶2, App. A, Tab E) (Role Description for HR Consultant, Ex. 53)

g. Mr. Bell failed to inform Plaintiff that she was eligible for priority consideration.  (Pl.'s Dec. ¶128, Tab A)

62. Plaintiff would have been offered the position of Patient Administrative Associate or Administrative Associate II in the Care Continuum Department posted under Position Reference ##A020403002D and A020420002D (Sobieski Dec., App. A, Tab H at Tab 2) in the absence of discriminatory motive for the following reasons:

a. Plaintiff was interviewed for the AAII position which requires a determination by the Human Resources Consultant that Plaintiff was qualified.  (Sobieski Dec. ¶5, App. A, Tab M) (Sobieski Dec. ¶5, App. A, Tab H) (Pl.'s Dec. ¶61, Tab A)

b. Plaintiff was interviewed for the Patient Administrative Associate position which requires a determination by the Human Resources Consultant that Plaintiff was qualified.  (Synhorst Dec. ¶7, App. A, Tab A at Tab 3) (Pl.'s Dec. ¶61, Tab A)

c. The Hospital considered the fact that Emy Lopez ("Ms. Lopez"), the successful candidate for the AAII position and a Hispanic female, was in a temporary position at the Hospital which was due to end in October of 2000 but did not consider the fact that Plaintiff's position was due to end in March of 2001 even though Plaintiff was eligible as an internal transfer and for priority consideration, which Ms. Lopez was not.  (Sobieski Dec., App. A, Tab H at Tab 3) (Administrative Associate Interview Process re: Ms. Lopez, Ex. 61) (Ms. Lopez'

90

Resume, Ex. 56) (Administrative Associate Interview Process re: Plaintiff, Ex. 62)   (Policy, Ex. 31)

d. Ciaschini, who was the HR Consultant assigned to the recruitment and selection process for the positions, along with the Hiring Manager Ms. Sobieski, did not tell Ms. Sobieski that Plaintiff's position was due for elimination and recommend that Plaintiff be given priority consideration as Plaintiff was due under the Staff Reduction Policy and as Ciaschini was required to do under the Recruiting and Selection Policy.  (Sobieski Dec. ¶9, App. A, Tab H) (Policy, Ex. 23) (Def. Ciaschini Role Description, Ex. 53)

e. Ms. Sobieski indicates in her Declaration that she has never met Defendants O'Connell and Niles, however she testified in the same room with O'Connell and Niles on November 28, 2001, at the CHRO Hearing.  (Pl.'s Dec. ¶133, Tab A)

63. Plaintiff would have been offered the position of Administrative Associate III in the Research Department posted under Position Reference #A129503008E on December 21, 2000, in the absence of discriminatory motive for the following reasons:

a. Plaintiff was interviewed for the position which requires a determination by the Human Resources Consultant that Plaintiff was qualified.  (Bow Dec. ¶50, App. A, Tab G)

b. The Hiring Manager's initial selection, Tiffany Rowe, transferred to another position in December of 2000 leaving the position vacant. (Connecticut Health System Transfer Form, Ex. 42) (ER/CN re: Rowe, Ex. 43)

c. In December of 2000, Plaintiff remained employed at the Hospital and eligible for transfer to the same extent that Ms. Kowalski claimed that Lovie DeGourville was

91

eligible to assume Ms. Vasquez' AAI position in Hemodialysis following Ms. Vasquez' departure in January of 2001 based on Ms. DeGourville's June of 2000 application form when the position was initially posted prior to Ms. Vasquez being hired.  (Kowalski Dec. ¶5, App. A, Tab D) (Durler Application, Ex. 32) (Production Responses by Defendants, No. 121, Ex. 33) (ERCN re: Ms. Vasquez, Ex. 34) (ERCN re: Ms. Vasquez, Ex. 35) (Evaluation re: Ms. Degourville for FY 2001, Ex. 37) (Evaluation re: Ms. DeGourville for FY 2001, Ex. 38) (ECRN re: Ms. DeGourville, Ex. 39) (Change of Name Form re: Lovie DeGourville, Ex. 68) (CHRO Verified Answer, Ex. 40 at ¶f)

64. Plaintiff would have been offered the position of Patient Administrative Associate in Care Continuum-Assessment Center posted on January 5, 2001, under Position Reference #A0204003006D in the absence of discriminatory motive for the following reasons:

   a. Plaintiff was interviewed for the position which requires a determination by the Human Resources Consultant that Plaintiff was qualified.  (Stagg Dec., App. A, Tab I at Tab. 1)

   b. The Hospital's failure to apply the Staff Reduction Policy provisions of priority consideration and provide Plaintiff a period of ninety days to adequately perform her newly assigned duties was overt in Ms. Stagg's hiring decision because the Human Resources Consultant assigned to work with Ms. Staff in filling the position was Ciaschini.  Ciaschini was aware that Plaintiff's position was subject to elimination on March 31, 2001.  (Letter, Ex. 14) (Stagg Dec., App. A, Tab I at Tab 2) (Policy, Ex. 24)

92

    c. The Hiring Manager's initial selection, Tiffany Rowe, transferred to another position in December of 2000 leaving the position vacant. (Connecticut Health System Transfer Form, Ex. 42) (ER/CN re: Rowe, Ex. 43)

    d. Ms. Stagg's statement that Ciaschini made no attempt to influence her hiring decision is not credible when the Hospital's Recruiting and Selection Policy states, as a guideline for managers: "Make the final selection in consultation with the Human Resources Consultant"; and as a guideline for Human Resources Consultants: "Make a final selection recommendation to the manager and advise on appropriate hiring rate of pay." (Policy, Ex. 24) (Stagg Dec. ¶7, App. A, Tab I)

    e. Ciaschini's silence on the fact that Plaintiff's position was subject to staff reduction provides adequate inference of Ciaschini's discriminatory, and retaliatory, intent. (Policy, Ex. 23)

65. Plaintiff would have been offered the position of Patient Administrative Associate in the Cardiology Center 10 posted on January 11, 2001, under Position Reference #A025961062B. (Synhorst Dec., App. A, Tab A at Tab 4) in the absence of the retaliatory written warning issued to Plaintiff on February 13, 2001:

    a. Plaintiff was eligible for priority consideration under the Staff Reduction Policy. (Policy, Ex. 23) (Pl.'s Dec. ¶¶45-47, Tab A)

    b. Plaintiff was more qualified that the successful applicant, Pamela Garcia , who was discharged for excessive absenteeism. (ERCN re: Pamela Garcia, Ex. 54)

66.     Plaintiff would have been offered the position on Bliss Wing-10 East in February of 2001, in the absence of the retaliatory written warning issued to Plaintiff on February 13, 2001:

    a.  Plaintiff was interviewed for the position which requires a determination by the Human Resources Consultant that Plaintiff was qualified.  (Allard Dec. ¶¶3,5, App. A, Tab N)

    b.  Ms. Allard's impression from the interview that Plaintiff "did not necessarily have the requisite experience for the position" (Allard Dec ¶6, App. A, Tab N) would have qualified Plaintiff for the position under the Staff Reduction Policy giving priority consideration and a ninety (90) day period to adequately perform the new duties.  (Policy, Ex. 23)

67.     Defendant Sandra Niles ("Niles") held a supervisory role in relation to Plaintiff and the Transportation ("Transport") Aides assigned to the Conklin Building entrance.  (Def. O'Connell Dec., App. A, Tab B at Tab 1) (Pl.'s Dec. ¶¶6, 8, 9, 10, 12, 31, 91, 117, Tab A)

68.     Niles' participation in Plaintiff's interview placed Niles in a supervisory position to Plaintiff.  (Pl.'s Dec. ¶6, Tab A)

69.     O'Connell's directive, in a memorandum dated July 30, 1999, that "all vacation requests and early or late arrivals will be granted only with the permission of myself [O'Connell] or Sandra Niles" demonstrated Niles' supervisory authority over Plaintiff.  The memorandum further directed that "all vacation requests and early dismissals will be documented on a vacation request form and given to myself or Sandra Niles."  (Def. O'Connell Dec., App. A, Tab B at Tab 1)

70.     Plaintiff understood that Niles had supervisory authority over Plaintiff because (a) Niles was stationed in the Conklin Building entrance for several hours during most days of the work week, (b) gave Plaintiff directives on a daily basis, and (c) there were periods when Plaintiff did not see Susan O'Connell for weeks. (Pl.'s Dec. ¶9, Tab A)

71.     O'Connell considered Niles as her "back-up" in her supervisory duties. (Pl.'s Dec. ¶9, Tab A)

72.     The following comments from Niles subjected Plaintiff to discriminatory, terms, conditions, and privileges of employment and are direct evidence of discriminatory motive on the part of O'Connell and her supervisory "back-up" Niles:

- Niles, in the first week of Plaintiff's work at the Conklin Building entrance, made consistent remarks about Plaintiff's use of the bus for transport to work, and questioned how Plaintiff could manage without a car;

- Niles, during the twenty-one (21) months that Plaintiff worked at the Conklin Building and prior to Plaintiff's complaint, made numerous statements about Plaintiff's residence in Hartford, Niles' aversion to ever living in Hartford, and Niles' intent just to work, not live, in Hartford;

- Niles asked Plaintiff for details about the bus Plaintiff used for transport to work;

- In the Summer of 1999, as Plaintiff was walking back to her work area, she passed Niles in a tunnel connecting the Cancer Center to the Conklin Building and Niles commented that she wished she could be as dark as Plaintiff;

- Niles told Plaintiff that Plaintiff should wear a darker make-up foundation since the make-up foundation that Plaintiff was using was too light;

- Niles told Plaintiff that Tina Turner could not be black as Plaintiff admired Tina Turner's physical appearance;

- Niles told Plaintiff that the black characters in the musical "Porgy and Bess" looked ridiculous in the way they dressed and danced;

- Niles told Plaintiff that she believed black people all had kinky hair, similar to "brillo,";

- In coordinating a Cancer Center event for survivors, Niles told Plaintiff that the

95

- majority of the cancer center patients were white and they would probably not enjoy jazz music, as jazz was ethnic, and people of a certain class did not enjoy jazz; and

- Niles commented to Plaintiff that the lighter skinned cancer center valet drivers of Arabic ethnicity were more attractive and she could not understand how people from Africa could appear so different.

(Pl.'s Dec. ¶14, Tab A)

73. Plaintiff did not complain about Niles' racial comments until January 23, 2001, because Plaintiff was concerned about her job and knew that Niles was O'Connell's back-up although the remarks did offend Plaintiff and she could no longer ignore them in January of 2001 when Plaintiff began to acknowledge that she was being discriminated against by O'Connell, Ciaschini, and Niles. (Pl.'s Dec. ¶¶15-16, 117, Tab A) (Def. Ciaschini Dec., App. A, Tab C at Tab 4) (Def. Ciaschini Notes, Ex. 5)

74. Ciaschini retaliated against Plaintiff for the January 23, 2001, letter of compliant by not informing Susan Stagg, the hiring manager for the Patient Administrative Care positions in the Care Continuum-Assessment Center, that Plaintiff should be given priority consideration for the position and by telling Ms. Stagg explicitly that Plaintiff was not to be given priority consideration. (Pl.'s Dec. ¶¶, 73-74, Tab A) (Stagg Dec., App. A, Tab I at Tab 2) ((Def. Ciaschini Dec., App. A, Tab C at Tab 4)

75. O'Connell suspended Plaintiff on February 9, 2001, in retaliation against Plaintiff for Plaintiff's written complaint on January 23, 2001, in which Plaintiff conveyed her belief to Ciaschini that "there is collusion on the part of Susan O'Connell, Sandra Niles, and very possibly links in the human resources department of this organization to encourage me to resign, and unfortunately I believe it is racially motivated." (Def. Ciaschini Dec., January 23, 2001, Letter, App. A, Tab C at Tab 4) (Def. O'Connell Dec. ¶11, App. A, Tab C)

76.     Ciaschini, unlike Judy Brady, the Human Resources Consultant who had participated in the recruitment and selection of Plaintiff for the AAI position at the Conklin Building entrance, denied that Plaintiff should be given priority in her transfer applications. (Pl.'s Dec. ¶¶7, 57, 73-74, Tab A) (Pl.'s Transfer Application, Ex. 3) (Pl.'s ERCN, Ex. 2

77.     Plaintiff's position as an AAI at the Conklin Building entrance did not require her to physically transport patients. (AAI Role Description, Ex. 4) (Pl.'s Dec. ¶¶10, 12, 23, 28, Tab A) (Medical Notes, Ex. 6) (OHS Referral Form, Ex. 7)

78.     Even though O'Connell hired Plaintiff for the AAI position at the Conklin Building entrance in March of 1999, by July of 1999 O'Connell's attitude toward Plaintiff had changed when Plaintiff was not as deferential to white employees as O'Connell had expected. (Pl.'s Dec. ¶¶10, 12, 23, 28, 32-36, Tab A)

79.     Ciaschini violated Hospital confidentiality provisions when she sent a copy of a letter to O'Connell which was addressed to Plaintiff and discussed Plaintiff's transfer applications in violation of the policy that prohibits such disclosure to an employee's supervisor without the express consent of the employee. (Hospital Career Opportunities Policy, Ex. 31) (Pl.'s Dec. ¶64, Tab A)

80.     Ciaschini's release of the January 22, 2000[sic][25], letter to O'Connell casts the confidentiality provision of the Hospital's Career Opportunities Policy in doubt as regards Plaintiff's applications and casts Ciaschini's and O'Connell's adherence to the confidentiality provisions in doubt. (Pl.'s Dec. ¶64, Tab A) (Letter, Ex. 14)

---

[25] Plaintiff received the letter in January of 2001. (Pl.'s Dec. ¶69, Tab A)

97

81. While Plaintiff was employed at the Hospital, no one ever made her aware of any customer complaint made against her despite the high traffic number of people entering and exiting the entrance each day. (Pl.'s Dec. ¶¶88, 89, Tab A)

82. O'Connell's attitude toward Plaintiff changed between March 22, 1999, and August 6, 1999, when Plaintiff asserted her position that the AAI Role Description and duties did not include the physical duties of transporting patients. Plaintiff indicated that she would not perform the role of a Transport Aide because it was not part of her job description and because Plaintiff had a preexisting back condition. (Pl.'s Dec. ¶28, Tab A) (January 12, 2001, O'Connell Memorandum, Ex. 9)

                                                     PLAINTIFF
                                                     SARAIYA SOLOMON

BY: _____
      Rachel M. Baird
      (Fed. Bar No. 12131)
      Law Office of Rachel M. Baird
      Stonegate Professional Building
      379 Prospect Street
      Torrington CT 06790-5239
      Tel:  (860) 626-9991
      Fax:  (860) 626-9992
      E-mail: bairdlawoffice@aol.com

**CERTIFICATION**

I HEREBY CERTIFY THAT the foregoing Plaintiff's Local Rule 56(a)2 Statement with its Tabs A through C and Exhibits 1 through 69, was mailed, first-class, postage paid, on April 5, 2005, to counsel for the Defendants at the following address:

Brenda Eckert
Gregg P. Goumas
Shipman & Goodwin LLP
One Constitution Plz
Hartford CT 06103-1919

*Counsel for Hartford Hospital, et al*

_____
Rachel M. Baird