## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARAIYA SOLOMON, | : | |
| | : | |
| Plaintiff, | : | CASE NO.:  3:02-cv-1116(EBB) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HOSPITAL, | : | |
| GLADYS M. CIASCHINI, | : | |
| SUSAN A. O'CONNELL, and | : | |
| SANDRA NILES, | : | |
| | : | |
| Defendants. | : | JULY 7, 2005 |

## PLAINTIFF'S SURREPLY BRIEF

Plaintiff Saraiya Solomon, by and through her undersigned counsel, hereby submits a

Surreply Brief to: (1) Clarify the applicability of two standards of law relied upon by the

Defendants Hartford Hospital, Gladys M. Ciaschini,  Susan A. O'Connell, and Sandra Niles

("Defendants") in their Reply Brief; (2) augment facts and exhibits already in the record using

information included in the Reply Brief and accompanying declarations; and (3) challenge the

authenticity of an Employee Record Change Notice included as an exhibit to the Reply Brief but

not disclosed in the course of discovery.

## I.    STANDARDS OF LAW

   A.    "Real Evidence"

First, Defendants do not argue that the record contains no evidence of race discrimination

or that the evidence of race discrimination is irrelevant; they argue that the record is "bereft" of

any "real evidence."  (Defs.' Reply Br. at 1)  In this respect, Defendants accuse the Plaintiff of an

inadequacy that is not recognized as a legal concept.[1]

---

[1] Specifically, Defendants characterize the record as "bereft of any real evidence of race discrimination."  (Defs.'
Reply Br. at 1)  The Federal Rules of Evidence do not provide a definition for "real evidence."  Instead, the rules

B.     Proof on the Merits

Second, Defendants claim that Plaintiff demonstrates her inability to prove her case on the merits by her "misplaced reliance on the Hospital's human resource policies." (Defs.' Reply Br. at 4) (capitalization omitted)[2]  In this respect, Defendants hold Plaintiff to the inapplicable standard at summary judgment of proving her case on the merits.[3]

## II.     GENUINE ISSUES OF MATERIAL FACT

A.     The Human Resources Policies and Procedures

The Defendants' reply to the portion of Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Pl.'s Memorandum") concerning Hartford Hospital ("Hospital")'s Human Resource Policies and Procedures includes three type of responses:

- First, the Defendants deny the accuracy or content of Hospital business records and the implications of each individual Defendants' actions.

- Second, the Defendants ascribe their actions to discretion.

- Third, the Defendants justify their actions by citing to procedures that do not exist in writing.

In their Reply Brief, the Defendants address their application of the Staff Reduction Policy, the Severance Policy, and the Recruiting and Selection Policy to the terms and conditions of Plaintiff's employment.  It is undisputed that Defendants Gladys M. Ciaschini ("Ciaschini") and Susan A. O'Connell ("O'Connell"), by letter dated March 29, 2001, informed Plaintiff that she would "be eligible for severance pay for a period of two weeks based on your [Plaintiff's]

---

provide that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  Evidence without this tendency is irrelevant.  Fed. R. Evid. 402.

[2] The argument that a plaintiff's reference to a defendant's inequitable and inexplicable application of policies is misplaced in a race discrimination case does not comport with the underlying purpose of anti-discrimination laws.

[3] At summary judgment, the proper inquiry is whether there is a genuine issue of material fact for determination by a reasonable fact finder at trial.  Fed. R. Civ. P. 56(c).  As one aspect of her proof, Plaintiff contended in her opposition that the terms and conditions of Plaintiff's employment, which did not comport with the Hospital's written polices, provided adequate measure of inference of discrimination for a reasonable fact finder at trial.

years of service."[4]  (Declaration of Gladys Ciaschini (hereinafter, "Ciaschini Dec.") ¶ 6, Defs.'

Reply Br., Tab B)  It is undisputed that the Severance Pay Policy sets forth the amount of

severance pay, based on years of service, an employee receives when the employee is terminated

in accordance with the Staff Reduction and/or Reorganization Policy.  (Severance Pay Policy,

Pl.'s Local Rule ("LR") 56(a)2 Statement, Ex. 51)  No other written Hospital policy or procedure

provides a terminated employee with severance pay and benefits.  (Policies, Pl.'s LR 56(a)2,

Exs. 23-26, 31, 51, 64-65, 67)

        However, Richard McAloon ("Mr. McAloon"), the Hospital's Vice President of Human

Resources and Support Services, in arguing that the Staff Reduction Policy did not apply to

Plaintiff,[5] explains, "[T]he Hospital sometimes exercises its discretion and provides these

[severance] benefits even when former employees are not eligible to receive them under existing

Hospital policy."  (Declaration of Richard McAloon (hereinafter, "McAloon Dec.") ¶ 5, Defs.'

Reply Br., Tab A)  Mr. McAloon's representation that the Hospital used discretion to award

Plaintiff severance benefits that she was not eligible for nor entitled to is inconsistent with the

Hospital's own representation to Plaintiff, in the March 29, 2001, letter, that she was eligible for

severance pay and benefits.  It also opens each decision made by the Hospital regarding any

other application of policy to the terms and conditions of Plaintiff's employment to genuine

questions that ask whether discretion was used and if it was or was not in any particular decision

concerning Plaintiff what led to the decision to exercise, or not exercise, discretion in that

particular instance.

---

[4] See Pl.'s Mem. of Law in Supp. of Summ. J. ("Pl.'s Mem."), § II(C)(ii) at 46-48.
[5] It is important, from the perspective of the Defendants, to argue that the Staff Reduction Policy did not apply to Plaintiff.  The Staff Reduction Policy entitles eligible employees to preferential treatment under the Recruiting and Selection Policy and to benefits under the Severance Policy.  To avoid the inferences of race discrimination and retaliation that arise from the Hospital's failure to provide Plaintiff the preferential treatment that she was entitled to under the Recruiting and Selection Policy, Defendants deny that Plaintiff was entitled or eligible for benefits under the Severance Policy despite information to the contrary in the Hospital's records and what actually occurred.  See Pl.'s Mem., § II(A)(iii) at 15-17.

3

Mr. McAloon's representation is inconsistent, as well, with the Hospital's payroll record concerning Plaintiff's termination which designates Plaintiff's termination as "staff reduction." (Hospital Payroll Record re: Plaintiff, Pl.'s LR 56(a)2 Statement, Ex. 1)[6] Ciaschini provides a detailed, second-hand,[7] uncorroborated account of an unidentified Human Resources Associate (HRA)'s thoughts and actions in entering the staff reduction code on Plaintiff's payroll record.[8] (Ciaschini Dec. ¶ 7, Defs.' Reply Br., Tab B)  Mr. McAloon provides a document entitled, "Code Table for Terminations ["Table"]," dated May 20, 2005, which includes categories designated as "1," "A," "AA," and "B" through "Z."  (McAloon Dec. ¶ 12, Defs.' Reply Br., Tab A at Tab 4)[9]  Assuming that the Table was used by the HRA, without conceding that there is any admissible evidence in the record to find that it was used, the Table does contain other categories that the HRA could have entered into the computer such as "Other" and "Temporary Completed" if in fact Plaintiff was not eligible for staff reduction and her position was temporary.  (McAloon Dec. ¶ 12, Defs.' Reply Br., Tab A at Tab 4)

Mr. McAloon describes in detail an evolution of the Staff Reduction Policy to support his claim that the policy did not apply to Plaintiff.  (McAloon Dec. ¶¶ 7-9, Defs.' Reply Br., Tab A) He equates Plaintiff's position to "jobs created by grant-funded projects, which also have a limited duration based on the term of the grant and are not covered by the Staff Reduction policy."  (McAloon Dec. ¶ 10, Defs.' Reply Br., Tab A)  He states that "[c]ontrary to the terms of the Staff Reduction Policy, these CORE project positions were not being eliminated 'due to lack of work, decreased patient census and for other economic reasons.'"  (McAloon Dec. ¶ 10,

---

[6] See Pl.'s Mem., § II(C)(iii) at 48-49.
[7] The details may be more attenuated than "second-hand" as there is no detail in Ciaschini's declaration concerning how or when she obtained the information.
[8] See n.21, *infra*, for Plaintiff's argument that such hearsay evidence is not admissible.
[9] Regardless, the document is not admissible because Plaintiff was terminated in March of 2001, the document is dated May 20, 2005, and there is no evidence that the Human Resources Associate relied on this document.

Defs.' Reply Br., Tab A)  However, at footnote 8 of the Defendants' Reply Brief, the Defendants

admit that the CORE project was extended for one year because there was work, i.e., the

construction was not yet completed.  The CORE project ended the next year because there was

no work, i.e., the construction was completed.  (Defs.' Reply Br. at 7 n.8)  This is of general

application to at-will employment.  The pertinent question is where the cut-off point lies to

determine whose position is limited in duration and whose position is not because potentially

everyone who is an at-will employee has a position that is limited in duration.  The Hospital's

own policies make this distinction and the distinction lies between temporary employees and

full-time employees.  Plaintiff was not a temporary employee.[10]  (Admissions by Defendants, Ex.

1 at ¶¶ 1, 2) (Declaration of Rachel M. Baird (hereinafter, "Baird Dec.") ¶ 2, Tab A)  Although

Defendants attempt to place Plaintiff in a temporary category, she was not and the requisition for

her position clearly refutes Mr. McAloon's equation of her position to a grant funded position as

well.[11]  (Hartford Hospital Employment Requisition ("Requisition"), Ex. 2)    The Requisition

for Plaintiff's position requested "a newly budgeted approved addition to staff."  (Requisition,

Ex. 2) (Baird Dec. ¶ 3, Tab A)  In fact, at the box designated for the entry of termination dates

for temporary positions, the Requisition describes Plaintiff's position as full-time and does not

---

[10] Ciaschini and O'Connell refer to Plaintiff's position as temporary.  (Ciaschini Dec. ¶ 3, Defs.' Reply Br., Tab B) (O'Connell Dec. ¶¶ 3, 10,  Defs.' Mem. of Law in Supp. of Summ. J.("Defs.' Mem."), App. A, Tab B)  However, Plaintiff was not a temporary employee and her position was not temporary.  (Recruiting and Selection Policy, Pl.'s LR 56(a)2 Statement, Ex. 24 at 3) (Admissions by Defendants, Ex. 1 at ¶¶ 1, 2) (McAloon Dec. ¶ 6, Defs.' Reply Br., Tab A)  The requisition completed by O'Connell to fill Plaintiff's position did not indicate that it was a temporary requisition.  In fact, the box designated for the entry of a termination date for temporary positions is blank despite the requirement that "temporary positions must have termination date."  (Hartford Hospital Employment Requisition, Ex. 2)  Therefore, O'Connell, despite submitting a form that she signed which clearly refutes any argument that Plaintiff's position was temporary, as defined by Hospital policy, continues to refer to Plaintiff's position as temporary.  Ciaschini commits the same error.  It is unclear whether the error arises from unfamiliarity with Hospital policy, an inability to recall applicable forms, or misrepresentation, but O'Connell's twenty year career at the Hospital and exemplary evaluations are a matter of record.  (O'Connell Eval., Pl.'s LR 56(a)2 Statement, Ex. 66)

[11] Specifically, the Hartford Hospital Employment Requisition form contains seven categories of jobs:  (1) "a newly budgeted approved addition to staff," (2) "special project or additional workload (temporary requisitions only)," (3) "LOA [leave of absence] coverage," (4) "this position supported by a grant/contract," (5) "research position," (6) "a staff replacement,"  and (7) "other."  (Hartford Hospital Employment Requisition, Ex. 2)

include any date for termination of the position. The box designated for the entry of a termination date for temporary positions is blank despite the requirement that "temporary positions must have termination date." (Requisition, Ex. 2)

Mr. McAloon's representation that Plaintiff's position was "comparable to jobs created by grant funded projects, which also have a limited duration based on the term of the grant and are not covered by the Staff Reduction Policy[,]" is not consistent with written Hospital policy, the Requisition, or the representations made by O'Connell when she completed the Requisition. (McAloon Dec. ¶ 10, Defs.' Reply Br., Tab A) The position is not grant-funded. If it was a hybrid of a grant-funded position or did not meet all the requirements of "a newly budgeted approved addition to staff" then this could have been noted in the "other" category. It was not. (Requisition, Ex. 2)[12]

The fact remains that a severance date of April 14, 2001, was entered into the computer because Plaintiff had worked at the Hospital between one (1) and three (3) years as a full-time, regular employee and was eligible for and entitled to two (2) weeks severance pay due to the elimination of her position by staff reduction. (Severance Pay Policy, Pl.'s LR 56(a)2 Statement, Ex. 51) (Pl.'s LR 56(a)2 Statement, Ex. 1) In his declaration, Mr. McAloon fails to describe how

---

[12] In addition, Mr. McAloon creates a new category of Hospital position that does not exist in written policy or on the Requisition and that new category includes positions that have been identified for elimination from their inception. He argues that these types of positions, which do not exist in written policy, are not subject to the Staff Reduction Policy. (McAloon Dec. ¶ 10, Defs.' Reply Br., Tab A) See McAloon Dec. ¶ 10, Defs.' Reply Br., Tab A ("In addition, the Staff Reduction policy provides that 'if it becomes necessary to reduce the number of employees in a department, the director of that department conducts an analysis of functions performed by that department and identifies those functions that can be reduced or eliminated.' Moreover, these positions were all part of the CORE project which ceased to exist when the CORE building project was completed. Because the Staff Reduction policy did not apply, none of the employees who were in these CORE project positions, including Ms. Solomon, were entitled to priority consideration when applying for other positions within the Hospital.") But see Defs.' Reply Br. at 7 n.8. The actual termination date that was envisioned at the time of the inception of Plaintiff's position was inaccurate and, in fact, someone at the Hospital analyzed the need for a continuation of Plaintiff's position and based that need on whether there was still work due to the delay in construction. If the construction had been delayed beyond March 30, 2001, the date of Plaintiff's last day of work, then there would have been further analysis to determine the needs of the CORE project. However, since the construction was complete, the Hospital performed a needs analysis and determined that Plaintiff's position at the entrance building to the Conklin Building was eliminated.

it was determined what amount of severance pay Plaintiff would receive, if in fact it was discretionary and unrelated to any policy, and it is a coincidence without credibility that (1) there was a determination by Mr. McAloon that Plaintiff would receive severance pay, even though she was not eligible or entitled, and (2) at the same time, an unknown HRA just happened to incorrectly enter the termination code as "staff reduction."  Similarly, it is unclear from Ciaschini's declaration and Mr. McAloon's declaration when they met or if they met to determine that there would be such a discretionary award of severance pay and whether it was discussed that Ciaschini and O'Connell would hide that fact from Plaintiff by drafting the March 29, 2001, letter and making no mention of any discretion exercised by the Hospital but to the contrary informing Plaintiff that she was eligible for the severance pay in accordance with the number of years she had worked at the Hospital.  (Ciaschini Dec. ¶ 6, Defs.' Reply Br., Tab B at Tab 1)

The Defendants accuse Plaintiff of holding the Hospital to "a strict reading of its Recruiting and Selection Policy" and state that Plaintiff ignores "a crucial and undisputable fact – the record reveals that she lacked the minimum qualifications for at least two of these positions."  (Defs.' Reply Br. at 9)  The two positions,[13] Financial Counselor and Human Resources Associate, are addressed at sections II(A)(iii)(2) and (3) of Plaintiff's Memorandum. (Pl.'s Mem. at 21-23)  First, if there is not a "strict reading" of policy, a term which in effect is an acknowledgement by Defendants that Plaintiff has correctly interpreted the policy language but Defendants do not want to be held accountable for the representations set forth in the language, then there is no Hospital policy.  Each employee may apply his or her own

---

[13] In her Memorandum, Plaintiff addresses her applications for transfer to the positions of Administrative Associate I in Hemodialysis, Financial Counselor in Patient Accounts, Human Resources Associate in Human Resources, Patient Administrative Associate and Administrative Associate II in Care Continuum, Administrative Associate II in Research, Positions requiring Spanish-English bi-lingual skills, and Positions denied due to the February 13, 2001, Written Warning.  (Pl.'s Mem. at 2 and 15-36)

interpretation to the policy if that particular employee does not agree with the language by using the justification that the polices do not need to be strictly followed. Second, if there is no policy or there is no need to interpret policy strictly then the Defendants' argument that Plaintiff did not meet the minimum qualifications required by the Performance Improvement Process is meaningless because Teri Duarte and Bill Bell, the management employees who interviewed Plaintiff for the positions of Financial Counselor and HRA, respectively, could have ignored the strict language of the Performance Management Process and authorized Plaintiff's transfer. In fact, Mr. Bell told Plaintiff that he had recently hired people in the department low on experience and could not take on another. (Pl.'s Mem. at 22) (Pl.'s Dec. ¶ 59, Pl.'s LR 56(a)2 Statement, Tab A) Therefore, if the Hospital refutes a strict reading of its policies and relies on unwritten policy as well as discretion to deviate from the policies, the inquiry becomes why the Hospital did not exercise its discretion to select Plaintiff for one of these two positions even if the Hospital determined that Plaintiff did not meet the minimum qualifications.

The inferences drawn, both creating genuine issues of material fact for a fact finder's determination of discriminatory motive whether considered together or separately, from Mr. McAloon's declaration and Ciaschini's declaration are that (1) the Hospital has no policies and determines its actions on a case by case basis and (2) Mr. McAloon, Ciaschini, and O'Connell, similar to Monica Kowalski[14] in her declaration submitted with the Defendants' Memorandum, provide a false pretext for their actions through misrepresentation, denying the accuracy or content of Hospital business records and the implications of the individual Defendants' actions,

---

[14] See Pl.'s Mem., § II(A)(iii)(1) at 17-21 and § II(B)(1)(iii) at 52-53. ("The hiring manager for the AAI position in the Hemodialysis Unit, Ms. Kowalski, provided false information in support of the Hospital's motion for summary judgment when she swore that a black female, Lovie DeGourville, had held the position when she had not.") (Declaration of Monica Kowalski ¶ 5, Defs.' Mem., App. A, Tab D) (Evaluation re: Ms. Degourville for FY 2001, Pl.'s L.R. 56(a)2 Statement, Ex. 37) Defendants' characterization of this representation as a "mistake" diminishes the importance of any declaration made to the Court under penalty of perjury, ignores the fact that Ms. Kowalski was Ms. DeGourville's supervisor, and ignores the fact that the Hospital's business records did not even reflect that Ms. DeGourville held the position of AAI. (Defs.' Reply Br. at 9 n.9)

ascribing their actions to discretion, and justifying their actions by citing to procedures that do not exist in writing.[15]

B.   Preferential Treatment; the July 30, 1999, Written Warning

The Defendants attempt to blame Plaintiff for their discriminatory acts in the Reply Brief.

First, Ciaschini asserts that Plaintiff "never asserted to me [Ciaschini] that her [Plaintiff's] transfer applications should be entitled to any kind of preferential treatment." (Ciaschini Dec. ¶ 5, Defs.' Reply Br., Tab B)  The same Defendants who are not aware of Hospital policies regarding temporary employees or temporary positions and purport not to know which termination categories are being entered by unidentified Human Resources Associates accuse Plaintiff of failing to properly apply the Hospital's policies.[16]  Preferential treatment under the Staff Reduction Policy is the Hospital's policy and the Hospital cannot divert responsibility for its inequitable and discriminatory application to the impacted employee.  There is no condition in the policy that access to preferential treatment is conditioned on an employee's knowledge, request, or assertion of right to such treatment.  An employee either has a right to preferential treatment or does not.  If the policy did provide that an employee must request preferential treatment when submitting an application for transfer then there would also be a

---

[15] An additional example of Mr. McAloon's reference to policies that do not exist in writing is his representation that "[i]n certain circumstances, Hospital managers will suspend an employee with pay pending further investigation or further consultation with the Department of Human Resources regarding the appropriate disciplinary action to be taken, if any, in connection with possible employee misconduct.  This practice is referred to as 'administrative suspension.'"  (McAloon Dec. ¶ 13, Defs.' Reply Br., Tab A)  However, the written hospital policies addressing "Vacation Time Accrual," "Holiday Time Accrual," "Sick Time Accrual," "Leave of Absence," and "Time Cards and Timekeeping" do not reference any "administrative suspension."  (Policies, Pl.'s LR 56(a)2 Statement, Ex. 65)  Although the recognized time card entries are set forth under letters "A" through "K," including "Excused hours without pay," there is no category for excused hours with pay.  (Policies, Pl.'s LR 56(a)2 Statement, Ex. 65)  Therefore it is unknown how an administrative suspension would reflect on a Hospital time card and Hospital written policy offers no guidance.  Plaintiff's applicable time card for the period in question does not contain any notation for "administrative suspension" and O'Connell, as Plaintiff's supervisor, would have had responsibility to authorize approval of the time card.  The card did not reflect an administrative suspension for the time in question when Plaintiff was suspended, without pay, on February 9, 2001.  (Time Cards and Timekeeping Policy, Pl.'s LR 56(a)2 Statement, Ex. 65)  See Pl.'s Mem., § II(B) at 37-45.

[16] See n.10, supra.

notice requirement, otherwise some employees would know to ask for the preferential treatment, and other employees would not know about the policy. Plaintiff was not aware of the policy until she filed a complaint in the instant matter and received documents in the course of discovery. (Pl.'s Dec. ¶ 128, Pl.'s LR 56(a)2 Statement, Tab A)

A second example of Defendants' diversion of blame to the Plaintiff for the Hospital's discriminatory acts is the July 30, 1999, Formal Improvement Document.[17]  Apparently, O'Connell was not even aware until January 23, 2001, that O'Connell had failed to ensure that a letter was placed in Plaintiff's personnel file closing issues raised in the July 30, 1999, memorandum. (E-mails, January 23, 2001, Pl.'s LR 56(a)2 Statement, Ex. 8)  The issue of the July 30, 1999, memorandum was not resolved until January 23, 2001, when Ciaschini noted the absence of a required document in Plaintiff's file and requested a document from O'Connell terminating Plaintiff's involvement in the PIP  (E-mails, January 23, 2001, Pl.'s LR 56(a)2 Statement, Ex. 8)  Presently, Defendants argue that Plaintiff has no proof that the "warning resulted in any material change in the terms and conditions of her employment such that it would

---

[17] Defendants accuse Plaintiff of going "to great lengths to characterize the July 30th document as a 'Memo' rather than a 'Written Warning.'" (Defs.' Reply Br. at 3 n.2)  However Plaintiff simply relies on the evidence.  First, the Hospital's written Performance Improvement Process policy which provides for "Formal Improvement Documentation" at Step 2 of the process never refers to a "Written Warning."  (Performance Improvement Process (PIP), Ciaschini Dec., Defs.' Mem , App. A, Tab C at Tab 16)  Second, a "Final Written Warning" is described as Step 3 of the process, but since O'Connell states in the July 30, 1999, memorandum that failure to meet the goals expressed therein will advance Plaintiff to Step 3, the July 30, 1999, memorandum cannot be a Step 3 document.  Third, O'Connell commences the Expectations and Goals section of the July 30, 1999, memorandum by stating, "This memo ... " (O'Connell Dec., Defs.' Mem, App. A, Tab B at Tab 1) (emphasis added)  Fourth, O'Connell refers to the document as a Performance Management Memo dated July 30, 1999.  (January 12, 2001, Memorandum, Pl.'s LR 56(a)2 Statement, Ex. 9) (emphasis added)  Fifth, O'Connell referred to the document as a memo in her testimony at the Commission on Human Rights and Opportunities.  (Pl.'s Dec. ¶ 41, Pl.'s LR 56(a)2 Statement, Tab A)  Therefore, the warning was not "easy to identify" as claimed by Defendants because not even the Defendants were sure what to call the document or what amount of time Plaintiff needed to spend in the PIP.  (Defs.' Reply Br. at 3) (E-mails and January 12, 200[1] Mem., Pl.'s LR 56(a)2 Statement, Exs. 8, 9, respectively)  When O'Connell issued the "Performance Improvement Process, Written Warning" to Plaintiff dated February 13, 2001, she made sure in that document that Plaintiff's time period in the PIP would be thirty-four (34) days.  (Ciaschini Dec., Defs.' Mem., App. A, Tab C at Tab 15 at 2) ("For the next thirty-four workdays your performance will meet this competency or you will advance to the next level in the Performance Improvement Process.")  The July 30, 1999, memorandum contained no similar language even though the PIP process states that certain benefits and opportunities will be withheld from an employee "for a period of time equivalent to the time spent in the formal Employee Improvement Process."  (Ciaschini Dec., Defs.' Mem., App. A, Tab C at Tab 16)

amount to an adverse employment action." (Defs.' Reply Br. at 3)  The proof is in the Hospital's policies which state that an employee's "opportunities for pay increases, lump sum awards, promotion, transfer and tuition reimbursement will be delayed for a period of time equivalent to the period spent in the Employee Improvement Process." (Ciaschini Dec., Defs.' Mem., App. A, Tab C at Tab 16)  The fact that Plaintiff never knew that the July 30, 1999, memorandum constituted a warning, which it did not under Hospital policy but assuming for the purposes of this case that the Hospital now contends that it does based on one of the Hospital's unwritten policies or self-described discretionary decisions, does not mean that the consequences of being in such a disciplinary program through January 23, 2001, did not result in or more of the consequences described under the Hospital's own policy. (Pl.'s Dec. ¶¶ 23-24, 32, 39-42, Pl.'s LR 56(a)2 Statement, Tab A) (PIP, Defs.' Mem., Ciaschini Dec., App.A, Tab. C at Tab 16)

       C.     The Bi-Lingual Skills Requirement

      It is undisputed that Plaintiff is not bi-lingual in the Spanish and English languages. (Defs.' Reply Br. at 12)  Defendants claim that this means that she cannot base any discrimination claim on her failure to obtain Hospital positions requiring such bi-lingual skills. (Defs.' Reply Br. at 12)  However, it is undisputed as well that the Hospital's determination of which positions require bi-lingual skills is not based on any data or policy supporting or addressing the need for such a requirement. (Admissions by Defendants, Pl.'s LR 56(a)2 Statement, ¶¶ 143-144, 146-148, 150-151, Ex. 45)  Defendants argue that language is not an immutable characteristic of race. (Defs.' Reply Br. at 13)  Plaintiff concedes that there is little or no authority, supporting either Plaintiff's position or Defendants' position, with regard to whether one may make a disparate impact race discrimination claim based on a bi-lingual requirement. (Newspaper Article, Ex. 3) (Baird Dec. ¶ 4, Tab A) Plaintiff simply asserts that the

ability to speak Spanish is a requirement that disproportionately impacts individuals who are not

"[o]f or relating to a Spanish-speaking people or culture."

http://dictionary.reference.com/search?q=hispanic.  That non-Hispanics, such as Plaintiff, who is

black and does not speak Spanish, are not "of or relating to a Spanish speaking people or culture"

is an assertion that Plaintiff sets forth to support her claim.  This claim is similar to an allegation

that a job requirement that has no support in data or policy but requires successful applicants to

be taller than 6 feet would disproportionately impact women.  The fact that a bi-lingual Spanish

and English speaking requirement disproportionately impacts more than one race, i.e, those races

that are non-Hispanic, does not diminish Plaintiff's claim that she was disproportionately

impacted because she is both black and non-Hispanic.

     D.     <u>The February 9, 2001, Suspension</u>[18]

     Plaintiff never "demanded that [Defendant Sandra] Niles not have any communication

with her [Plaintiff]."[19]  (Defs.' Reply Br. at 13)  In making this assertion, Defendants rely on

Plaintiff's response to Local Rule 56(a)1 Statement No. 32, however No. 32 only asked Plaintiff

to admit or deny that Niles has made certain statements about Plaintiff not that Plaintiff had in

fact made those statements.  While it is true that Plaintiff conceded that Niles made a complaint,

this is distinguishable from Plaintiff admitting that Plaintiff made the statements attributed to her

in Niles complaint.[20]  Therefore, although Defendants argue that this is not in dispute, the record

does not agree.  (Defs.' Reply Br. at 13)

---

[18] <u>See</u> Pl.'s Mem., § II(B) at 45-49.

[19] <u>See</u> Pl.'s Dec. ¶ 91, Pl.'s LR 56(a)2 Statement, Tab A ("In late January of 2001, and after Niles had spoken to Ciaschini about me regarding my indication to Niles that I would refrain from speaking to Niles unless the conversation was job related, I needed to call Niles on the phone in the normal course of my duties to ask her if there were any wheelchairs in the Cancer Center to transport a patient.")

[20] Defs.' LR 56(a)1 Statement at No. 32 provides:  "On January 19, 2001, Sandra Niles ("Niles"), who worked in the Radiation Oncology Department in an administrative capacity, made a written complaint to Ciaschini about an encounter she had with Solomon earlier that day.  Niles' complaint stated as follows:

The Defendants argue that the Hospital's policy on building collaborative relationships applied to all employees and assert that Plaintiff fails to point to any similarly situated employees of another race who engaged in similar conduct but were treated differently.  (Defs.' Reply Br. at 14 and 15 n.9)  Plaintiff's memorandum, among other things, argues that Robert Lindyer, a white male, was not very collaborative when he spoke sternly to Plaintiff.  Nonetheless Mr. Lindyer was viewed as the victim of Plaintiff's failure to say "Hello" when he reported Plaintiff to a white supervisor and he was not held responsible in any manner for not being collaborative. (Pl.'s Mem. at 37-45)  Therefore, the inferences drawn, both creating genuine issues of material fact for a fact finder's determination of discriminatory motive, whether considered together or separately, are that (1) the policy on collaboration did not apply to Robert Lindyer, either because the policy did not apply to employees in general or because Robert Lindyer was white, and (2) it was an exercise of discretion by the Hospital not to hold Robert Lindyer to the same standard as Plaintiff.

---

*This morning, 6:30 A.M. in the cafeteria while I was having breakfast by myself. Saraja [sic] Solomon approached me at my table.  She said "I am going to be working in this hospital and I am telling you this one time, you do not talk to me in any way.  Do not speak to [sic] about anything I am doing personal or business. I do not like you and you do not like me.  Did you get that clear?"  I said "Yes I certainly do" She turned and repeated something else like "Are you sure you understand?*
*I do not know what provoked this.  Yesterday I passed her [sic] She was working on a project from the Cancer Center and I went up to her desk and remarked how interesting it looked with the lap top.  She turned to me and said "Was I out gossiping?", I said I was at lunch.  I ignored her remark, not sure what she meant.  She then said she will be working in administration shortly.  I did not say anything, just have a nice day and left. said anything. [sic]*

Ciaschini Dec. ¶6, App. A, Tab C."
Plaintiff responded, "Admit with clarification.  Plaintiff denies that she and Sandra Niles ("Niles") spoke in the cafeteria on January 19, 2001, and avers that the conversation took place on January 18, 2001."

## III.    REPLY BRIEF DECLARATIONS AND EXHIBITS[21]

Defendants' Reply Brief attaches four declarations at Tabs A through D of individuals who work at the Hospital, including Richard McAloon, Ciaschini, Juan Urena, and Alex Moreau.[22]

Ciaschini references and appends a document entitled Employee Record Change Notice (ERCN) to her declaration.  (Ciaschini Dec. ¶ 7, Defs.' Reply Br., Tab B at Tab 3)  The ERCN is a Hospital business record documenting an employee's personal information, salary history, education/skills, status changes, leave of absence information, and advanced vacation. (Ciaschini Dec. ¶ 7, Defs.' Reply Brief, Tab B at Tab 3)  Plaintiff received ERCNs from Defendants responsive to her discovery requests, some of which appear as exhibits to Plaintiff's Local Rule 56(a)2 Statement.  (ERCN, Pl.'s LR 56(a)2 Statement, Exs. 2, 16-20, 34-35, 39, 41, 43-44, 54, 63, and 69)  With respect to Plaintiff, Defendants provided an ERCN in response to her request for "copies of any and all documents related to Plaintiff's employment at Defendant Hartford Hospital, including, but not limited to, those documents contained in a personnel file

---

[21] In her Local Rule 56(a)2 Statement, Plaintiff objected to statements containing the hearsay of individuals who did not submit declarations or affidavits for the record, including Niles, Virginia Hernandez-Green, Pam Badalato, and an unidentified Hospital staff member.[21] Specifically, Plaintiff objected to statements attributed to Niles at Nos. 33, 42, 45, 48, and 50; attributed to Virginia Hernandez-Green at No. 40; attributed to an unidentified staff member at 68; attributed to Pam Badalato at 69; attributed to Beth Grieg at 111, 113-116, 118-122, 124, and 127.  (Pl.'s LR 56(a)2 Statement)

[22] Although Alex Moreau submits a declaration, he does not address or refute Plaintiff's allegation at ¶ 78 of the Second Amended Complaint.  (doc. #49)  Paragraph 78 alleges, "Defendants engaged in a pattern of intentionally acting to prevent plaintiff from transfer, promotion, or hire to any position in the hospital knowing that their actions would result in plaintiff's loss of employment at the hospital on March 31, 2001.

a. Alex Moreau, a transport aide assigned to the Conklin Building entrance, told plaintiff that defendant O'Connell was the impediment to plaintiff's transfer.

b. Mr. Moreau told plaintiff that defendant O'Connell had told Virginia Hernandez-Green that defendant O'Connell would not give plaintiff a favorable recommendation concerning plaintiff's transfer and that all defendant O'Connell had to do to help someone in the organization was pick up the phone.

c. On or about January 2001, defendant Niles told the wife of a cancer center patient that plaintiff would not be working at the hospital after March 31, 2001, because it was "their" plan from a year ago not to recommend plaintiff for new or open positions within the hospital because "they" did not like plaintiff and thought she was "an uppity black bitch."

d. In a letter dated February 2, 2001, plaintiff informed defendant Ciaschini of the remarks listed in 75[78](a) through (c), above."

and those documents contained in payroll file." (Pl.'s ERCN, Pl.'s LR 56(a)2 Statement, Ex. 2)

(Production Requests No. 1, Ex. 4) (Baird Dec. ¶ 5, Tab A)  However, Plaintiff did not receive

the ERCN appended at Tab 3 ("Tab 3 ERCN") to Ciaschini's Reply Brief declaration. (Ciaschini

Dec., Defs.' Reply Br., Tab 3) (Baird Dec. ¶ 6, Tab A)  Tab 3 ERCN does not contain a date with

Ciaschini's signature.   Neither O'Connell nor Ciaschini mention the document in their

declarations attached to Defendants' Memorandum.  (Ciaschini Dec., Defs.' Mem., App. A, Tab

C) (O'Connell Dec., Defs.'s Mem., App. A, Tab B)  In her Reply Brief declaration, Ciaschini

does not state that she was present when O'Connell drafted Tab 3 ERCN.  The statements in Tab

3 ERCN are so contrary to Plaintiff's evaluations and the notations on her transfer applications to

raise further question regarding its authenticity.[23]  For example, contained in Defendants' Local

Rule 56(a)1 Statement is the following undisputed issue of material fact at No. 25:

> O'Connell conducted performance evaluations of Solomon on
> October 21, 1999 and October 24, 2000.  In the October 21, 1999
> review, O'Connell gave Solomon an overall rating of "Effective"
> and increased Solomon's hourly wage from $9.88 to $10.41.  In
> the October 24, 2000 review, O'Connell gave Solomon an overall
> rating of "Exemplary" and increased Solomon's hourly wage from
> $10.41 to $11.01.  Compl./Ans. ¶¶67, 68.

Following Plaintiff's unsuccessful attempt to transfer to the position of Patient Administrative

Associate, a Human Resource Consultant noted the reason on Plaintiff's transfer application why

Plaintiff was not referred for the position:  "FY 2000 Review – exemplary – because of the letter

in her file that were [was] put there after 2/2/01."  (Declaration of Patricia Synhorst (hereinafter,

"Synhorst Dec.") ¶ 9, Defs.' Mem., App. A, Tab A at Tab 5)  Finally, Tab 3 ERCN does not

contain a stamp which indicates that the information contained in the document was entered by a

HRA.  (Ciaschini Dec., Defs.' Reply Br., Tab B at Tab 3)  This is distinguishable from the

---

[23] Tab 3 ERCN rates Plaintiff's performance, conduct, and attitude as "poor" and her attendance and personnel skills as "fair." (Ciaschini Dec., Defs.' Reply Br., Tab B at Tab 3)

ERCN submitted when employee Kelvin Griffith was terminated.  (ERCN re: Kelvin Griffith, Pl.'s LR 56(a)2 Statement, Ex. 10)  Mr. Griffith's ERCN reflecting his termination does contain a stamp, with initials, verifying that the ERCN was submitted and entered on certain dates.  In this respect a genuine issue of material facts exists concerning the motivations underlying the preparation of the Tab 3 ERCN and its authenticity.

Respectfully submitted,

PLAINTIFF
SARAIYA SOLOMON

By:     /s/  Rachel M. Baird                       .
Rachel M. Baird
(ct12131)
Law Office of Rachel M. Baird
Stonegate Professional Building
379 Prospect Street
Torrington CT 06790-5239
Tel:  (860) 626-9991
Fax:  (860) 626-9992
E-mail: bairdlawoffice@aol.com

## CERTIFICATION

I HEREBY CERTIFY THAT the foregoing Plaintiff's Surreply Brief, declaration in support at Tab A, and Exhibits 1 through 4, were mailed, first-class, postage paid, on July 13, 2005, to counsel for the Defendants at the following address:

Brenda Eckert
Gregg P. Goumas
Shipman & Goodwin LLP
One Constitution Plz
Hartford CT 06103-1919

 /s/  Rachel M. Baird                       .
Rachel M. Baird