UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SARAIYA SOLOMON,                    :
            Plaintiff,             :
                                   :
        v.                         :    3:02 CV 1116 (EBB)
                                   :
HARTFORD HOSPITAL ET AL.,          :
            Defendants.            :

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

_____Plaintiff commenced this action on June 27, 2002 (Doc. No. 1),
which Complaint was superceded by an Amended Complaint on August
26, 2002 (Doc. No. 15), against the following four defendants:
Hartford Hospital; Gladys M. Ciaschini, Human Resources Consultant;
Susan A. O'Connell, Manager in the Radiation and Oncology
Department; and Sandra Niles, Administrator at the Gray Cancer
Center.  Defendants filed their Answer and affirmative defenses on
September 18, 2002 (Doc. No. 19).  Plaintiff filed a Second Amended
Complaint on March 30, 2004 (Doc. No. 49) in which plaintiff
alleges the following nineteen counts: disparate treatment race
discrimination against defendant Hartford Hospital in violation of
42 U.S.C. § 2000e-2(a)["Title VII"](Counts One, Three, Nine and
Eleven); equal rights violations against all defendants in
violation of 42 U.S.C. §§ 1981, 1981b (Counts Two, Four, Six, Ten
and Twelve); unlawful retaliation in violation of 42 U.S.C. §
2000e-3(a) and Connecticut Fair Employment Practices Act ["CFEPA"],
CONN. GEN. STAT. § 46a-60(a)(4), against defendant Hartford Hospital
(Counts Five and Fourteen); disparate impact race discrimination

against defendant Hartford Hospital under 42 U.S.C. §§ 2000e-2(a) and (k)(Counts Seven and Eight); race discrimination against defendant Hartford Hospital, CONN. GEN. STAT. § 46a-60(a)(1)(Count Thirteen); intentional and negligent infliction of emotional distress against all defendants (Counts Fifteen and Sixteen); breach of implied contract of employment against defendant Hartford Hospital (Count Seventeen); breach of implied covenant of good faith and fair dealing against defendant Hartford Hospital (Count Eighteen); and tortious interference with contract and prospective economic advantage against the individual defendants (Count Nineteen).[1]  Defendants filed their Answer and amended affirmative defenses on May 12, 2004 (Doc. No. 56).

On May 27, 2004, this case was transferred from Senior United States District Judge Gerard L. Goettel to this Senior United States District Judge.  (Doc. No. 57).  On November 22, 2004, defendants filed the pending Motion for Summary Judgment (Doc. No. 68), Local Rule 56(a)1 Statement of Facts (Doc. No. 70), brief in support (Doc. Nos. 68 & 75), and two appendices in support (Doc.

---

[1] Plaintiff does not oppose defendants' Motion for Summary Judgment with respect to Counts Fifteen through Nineteen.  (Doc. No. 89, at 1 n. 1; see also Doc. No. 90, at 1 n.1).  Accordingly, defendants' motion for summary judgment with respect to plaintiff's claims of intentional and negligent infliction of emotional distress against all defendants, breach of implied contract of employment against defendant Hartford Hospital, breach of implied covenant of good faith and fair dealing against defendant Hartford Hospital, and tortious interference with contract and prospective economic advantage against the individual defendants is **granted, absent objection**.

2

Nos. 71-72).[2]    Plaintiff then filed her brief in opposition to

defendants' Motion for Summary Judgment (Doc. No. 89)[3] and Local

---

[2]Attached to Appendix A (Doc. No. 71) are the following fourteen declarations: declaration of Patricia Synhorst ["Synhorst Dec."], dated November 18, 2004, (Exh. A), with Tabs A-1 through A-7 attached; Declaration of Susan O'Connell ["O'Connell Dec."], dated November 13, 2004 (Exh. B), with Tabs B-1 through B-5 attached; Declaration of Gladys Ciaschini ["Ciaschini Dec."], dated November 17, 2004 (Exh. C) with Tabs C-1 through C-20 attached; Declaration of Monica Kowalski ["Kowalski Dec."], dated November 18, 2004 (Exh. D), with Tabs D-1 through D-3 attached; Declaration of William Bell ["Bell Dec."], dated October 27, 2004 (Exh. E), with Tabs E-1 through E-3; Declaration of Susan Maxwell ["Maxwell Dec."], dated November 17, 2004 (Exh. F), with Tabs F-1 through F-3 attached; Declaration of Laurine Bow ["Bow Dec."], dated November 17, 2004 (Exh. G), with Tabs G-1 and G-2 attached; Declaration of Patricia Sobieski ["Sobieski Dec."], dated November 18, 2004 (Exh. H), with Tabs H-1 through H-4 attached; Declaration of Susan Stagg ["Stagg Dec."], dated November 17, 2004 (Exh. I), with Tabs I-1 through I-4 attached; Declaration of Richard McAloon ["McAloon Dec."], dated November 18, 2004 (Exh. J), with Tabs J-1 through J-2 attached; Declaration of Lisa Maurice ["Maurice Dec."], dated November 11, 2004 (Exh. K), with Tabs K-1 through K-4 attached; Declaration of Beverly Davis, dated October 28, 2004 (Exh. L), with Tabs L-1 and L-2 attached; Declaration of Teri Duarte ["Duarte Dec."], dated October 27, 2004 (Exh. M), with Tabs —1 and —2 attached; and Declaration of Lea Allard ["Allard Dec."], dated October 21, 2004 (Exh. N), with Tab —1 attached.

        Attached to Appendix B (Doc. No. 72) are the following fourteen exhibits: copy of deposition transcripts of Saraiya Solomon ["Solomon Depo."], taken December 4, 2003 and January 21, 2004 (Exh. A); copy of defendant Hartford Hospital's policy on performance management, dated June 1998 ["Performance Management Policy"] (Exh. B); copy of plaintiff's notes detailing alleged harassment ["Harassment Notes"] (Exh. C); copy of plaintiff's response to defendants' first set of interrogatories, dated March 4, 2003 (Exh. D); and copies of case law (Exhs. E-N).

[3]Attached to plaintiff's Local Rule 56(a)2 Statement (Doc. No. 90) are the following seventy-two exhibits: copy of plaintiff's payroll activity window, dated August 9, 1997 to April 14, 2001 ["Staff Reduction Activity Window"](Exh. 1); copy of plaintiff's Employee Record/Change Notice, dated effective March 22, 1999 (Exh. 2); copy of plaintiff's transfer application, dated February 22, 1999 (Exh. 3); copy of job description for Administrative Associate I (Exh. 4); copy of defendant Ciaschini's notes, dated January 19, 22, & 23, 2000 (Exh. 5); copies of medical notes of Dr. Michael L. Yoel ["Yoel Notes"], dated August 11 and 18, 1999 (Exh. 6); copy of Occupational Health Service Referral Form ["OHS Form"], dated August 26, 1999 (Exh. 7); copies of emails between defendants Ciaschini and O'Connell, dated January 23, 2001 (Exh. 8); copy of memorandum from defendant O'Connell to Human Resources, dated January 12, 2001 (Exh. 9); copy of Employee Record/Change Notice for Kelvin Griffith (Exh. 10); copies of plaintiff's credentials (Exh. 11); summary of plaintiff's job training in May 1999 (Exh. 12); copy of defendant Ciaschini's handwritten notes (Exh. 13); copy of plaintiff's transfer application, dated January 30, 2001 (Exh. 15); copy of Employee Record/Change Notice for Alex Moreau, dated effective January 8, 2001 (Exh. 16); copy of Employee Record/Change Notice for Virginia Hernandez-Green, dated effective November 21, 1999 (Exh. 17); copy of Employee Record/Change Notice for

Virginia Hernandez-Green , dated effective March 28, 1999 (Exh. 18); copy of
Employee Record/Change Notice for Juan Urena, dated effective December 19,
1999 (Exh. 19); copy of Employee Record/Change Notice for Juan Urena, dated
effective May 8, 2000 (Exh. 20); copies of plaintiff's time cards, dated
February 3, 10, & 17, 2001 ["Plaintiff's Time Cards"] (Exh. 21); copy of
memorandum from defendant Jan Lynch to plaintiff, dated March 1, 2001 (Exh.
22); copy of defendant Hartford Hospital's staff reduction policy, dated June
1998 (Exh. 23); copy of defendant Hartford Hospital's recruiting and selection
policy ["Recruiting and Selection Policy"], dated June 1998 (Exh. 24); copy of
defendant Hartford Hospital's Rehires Policy, dated June 1998 ["Hospital
Rehires Policy"] (Exh. 25); copy of defendant Hartford Hospital's Separation
of Employment Policy, dated June 1998 (Exh. 26); copy of defendant Hartford
Hospital's Posting of Position Reference No. A020420002D, dated September 15,
2000 and plaintiff's Application for Promotion/Transfer dated September 21,
2000 (Exh. 27); copy of defendant Hartford Hospital's Posting of Position
Reference No. A0204003006D, dated January 5, 2001 and plaintiff's Application
for Promotion/Transfer dated January 5, 2001 (Exh. 28); copy of defendants'
objections and supplemental responses to plaintiff's first set of requests for
admissions, dated March 18, 2004 (Exh. 29); audio tapes of Connecticut
Commission on Human Rights and Opportunities Hearing ["CHRO Tapes"], dated
November 28, 2001 (Exh. 30); copy of defendant Hartford Hospital's career
opportunities policy, dated June 1998 (Exh. 31); copy of transfer application
for Terri A. Durler, dated July 28, 2000 ["Durler Application"](Exh. 32); copy
of defendant Hartford Hospital's Objections and Responses to Plaintiff's
Second Request for Production of Documents, dated October 31, 2003 (Exh. 33);
copy of Employee Record/Change Notice for Jennifer Vazquez, dated effective
December 17, 2000 (Exh. 34); copy of Employee Record/Change Notice for
Jennifer Vazquez, dated effective February 1, 2003 ["ECRN re: Vazquez"](Exh.
35); copy of Application for Promotion/Transfer for Lovie DeGourville
["DeGourville Application"], dated June 26, 2000 (Exh. 36); copy of
performance evaluation for Lovie DeGourville, dated October 18, 2000 (Exh.
37); copy of performance evaluation for Lovie Kelsey, dated November 15, 2001
(Exh. 38); copy of Employee Record/Change Notice for Lovie Kelsey ["Kelsey
ERCN"] (Exh. 39); copy of defendant Hartford Hospital's Verified Answer to
plaintiff's complaint filed with CHRO, dated May 16, 2001 (Exh. 40); copy of
Employee Record/Change Notice for Dawn Packman, dated August 21, 2002 (Exh.
41); copy of transfer application for Tiffany Rowe, dated March 27, 2000 (Exh.
42); copy of Employee Record/Change Notice for Tiffany Rowe, dated effective
December 1, 2000 (Exh. 43); copy of Employee Record/Change Notice for Novette
Grant, dated effective January 23, 2004 (Exh. 44); copy of defendants'
objections and responses to plaintiff's first set of requests for admissions,
dated September 19, 2003 (Exh. 45); copy of defendant Hartford Hospital's
equal employment opportunity/affirmative action policy, dated June 1998 (Exh.
46); copy of defendant Hartford Hospital's Posting of Position Reference No.
A030089003E, dated September 22, 2000 (Exh. 47); copy of defendant Ciaschini's
resume (Exh. 48); copy of defendant O'Connell's objections and responses to
plaintiff's interrogatories, dated October 24, 2003 (Exh. 49); copy of
Hartford Health Care Corporation employment application for Brenda Laureano-
Geer, dated October 2, 2000 (Exh. 50); copy of defendant Hartford Hospital's
Severance Policy, dated June, 1998 ["Hospital's Severance Policy"] (Exh. 51);
copy of performance evaluation for Brenda Laureano-Geer, dated October 22,
2001 (Exh. 52); copy of job description for Human Resources Consultant, dated
May 24, 1996 (Exh. 53); copy of Employee Record/Change Notice for Pamela
Garcia, dated March 17, 2003 (Exh. 54); copy of defendants' objections and
responses to plaintiff's requests for admissions, dated October 31, 2003 (Exh.
55); copy of resume for Emy J. Lopez (Exh. 56); copy of Juan Urena's payroll

Rule 56(a)2 Statement of Facts (Doc. No. 90) on April 5, 2005. Thereafter, defendants filed their reply brief (Doc. No. 100)[4] on June 9, 2005, as to which plaintiff filed her surreply brief (Doc. No. 108; <u>see</u> Doc. No. 107)[5] on July 7, 2005.

        For the reasons set forth below, defendants' Motion for Summary Judgment (Doc. No. 68) is <u>granted in part and denied in part</u>.

### I. FACTUAL BACKGROUND

    The following factual summary is based on defendants' Local Rule 56(a)1 Statement of Facts, filed November 22, 2004 ["Defendants' Statement"] and accompanying affidavits, depositions and exhibits, and Plaintiff's Local Rule 56(a)2 Statement of Facts,

---

activity window, dated September 17, 2001 to December 22, 2001 (Exh. 57); copy of Juan Urena's payroll activity window dated August 17, 1999 to December 18, 1999 (Exh. 58); copy of Juan Urena's payroll activity window dated December 19, 1999 to May 7, 2000 (Exh. 59); copy of Juan Urena's payroll activity window dated May 8, 2000 to September 16, 2001 (Exh. 60); copy of interview notes for Emy J. Lopez, dated September 26, 2000 (Exh. 61); copy of interview notes for plaintiff, undated (Exh. 62); copy of Employee Record/Change Notice for Alex Moreau, dated effective May 20, 2001 (Exh. 63); copy of defendant Hartford Hospital's vacation time policy, dated June 1998 (Exh. 64); copy of defendant Hartford Hospital's time cards and timekeeping policy, dated June 1998 (Exh. 65); copy of Performance Appraisal Processing Form for defendant O'Connell (Exh. 66); copy of defendant Hartford Hospital's Reorganization and Staff Reduction policy, dated June 2001 (Exh. 67); copy of change of name form for Lovie DeGourville to Lovie Kelsey ["Name Change Form"], dated August 31, 2001 (Exh. 68); and copy of Employee Record/Change Notice for Jennifer Vazquez, dated effective January 28, 2001 (Exh. 69); declaration of Saraiya Solomon ["Solomon Dec."], dated March 30, 2005 (Tab A); declaration of Aziza I. Solomon, dated February 19, 2005 (Tab B); declaration of Rachel M. Baird, dated April 5, 2005 (Tab C).

[4]Attached to defendants' reply brief (Doc. No. 100) are the following four exhibits: declaration of Richard McAloon ["McAloon Dec."], dated June 1, 2005, with Tabs A-1 through A-5; declaration of Gladys Ciaschini, dated June 2, 2005 (Tab B), with Tabs B-1 through B-3; declaration of Juan Urena, dated June 1, 2005 (Tab C); and declaration of Alex Moreau, dated June 1, 2005 (Tab D).

[5]Attached to plaintiff's surreply brief (Doc. No. 108) is the declaration of Rachel M. Baird, dated July 13, 2005, with Tabs A-1 through A-4 attached.

filed April 5, 2005 ["Plaintiff's Statement"], and documents cited therein, and consequently does not represent factual findings of the Court.

Plaintiff is a black female who was employed by defendant Hartford Hospital from August 9, 1997 through March 31, 2001. (Defendants' Statement ¶ 1; Plaintiff's Statement ¶ 1). Plaintiff began her employment as a part-time desk receptionist, with the title of an Administrative Associate I ["AAI"]. (Defendants' Statement ¶ 2; Plaintiff's Statement ¶ 2). Prior to her hiring in July 1997, plaintiff completed an employment application that explained that her relationship with the hospital was not contractual and that she could quit or be terminated by the hospital at any time for any reason. (Defendants' Statement ¶¶ 3 & 12; Plaintiff's Statement ¶¶ 3 & 12; Doc. No. 71, Synhorst Dec. ¶ 5).

On or about March 22, 1999, plaintiff transferred from the main lobby of the hospital to begin work as an AAI at the entrance of the Conklin building. (Defendants' Statement ¶ 4; Plaintiff's Statement ¶ 4). Defendant Susan O'Connell, a manager in the Radiation Oncology Department within the Gray Cancer Center at Hartford Hospital, hired plaintiff and two transport aides, Kelvin Griffith, who is black, and Virginia Hernandez-Green, who is Hispanic, to work at the Conklin entrance during the construction of the CORE building project. (Defendants' Statement ¶¶ 5-6, 9;

6

Plaintiff's Statement ¶¶ 5-6, 9; Doc. No. 71, O'Connell Dec. ¶¶ 3-4). During the CORE building project, the entrance to the Gray Cancer Center was closed and plaintiff's job was to receive detoured patients and direct them to the Gray Cancer Center. (Defendants' Statement ¶¶ 7-8; Plaintiff's Statement ¶¶ 7-8; Doc. No. 71, O'Connell Dec. ¶ 3). Prior to plaintiff's acceptance of this position, plaintiff's employer informed her that the position was scheduled to end when the CORE building project concluded and the entrance to the Gray Cancer Center reopened. (Defendants' Statement ¶¶ 10-11; Plaintiff's Statement ¶¶ 10-11; Doc. No. 71, O'Connell Dec. ¶ 3). During all times relevant to the events alleged in this action, defendant Hospital maintained a Performance Management Policy. (Defendants' Statement ¶ 13; Plaintiff's Statement ¶ 13; Doc. No. 71, Ciaschini Dec. ¶ 20; Doc. No. 71, Tab C-16).

Defendant O'Connell issued plaintiff a document, dated July 30, 1999, stating that in March 1999 defendant O'Connell met with the staff of the Cancer Center and informed each member that they needed to be present for work from 7:00 a.m. to 5:30 p.m. and that members would need to cover for one another in the event of an absence.[6] (Defendants' Statement ¶ 18; Plaintiff's Statement ¶ 18;

---

[6]While defendants characterize the document as a "Written Warning," plaintiff correctly notes that it was a "Formal Improvement Documentation" pursuant to Step 2 of the Performance Improvement Process ["PIP"]. (Defendants' Statement ¶ 18; Plaintiff's Statement ¶ 18; Doc. No. 71, O'Connell Dec. ¶ 4; Doc. No. 71, Tab C-16 (Performance Management Policy). See Plaintiff's Statement ¶ 15, n.3; Plaintiff's Statement ¶ 17; Doc. No. 71, Tab B-1 (July 30, 1999

Doc. No. 71, O'Connell Dec. ¶ 4; Doc. No. 72, Tab B-1(Performance Management Policy)). Defendant O'Connell further explained that she issued the document to plaintiff and Griffith because she believed the two employees had not been providing the necessary transport assistance at the entrance of the Conklin building. (Defendants' Statement ¶ 19; Plaintiff's Statement ¶ 19; Doc. No. 71, O'Connell Dec. ¶ 4). On August 6, 1999, defendant O'Connell provided plaintiff with a memorandum stating that, due to plaintiff's claimed back condition, which plaintiff contends prevented her from providing the necessary transport assistance, plaintiff was not expected to push wheelchairs for a period of two weeks, but would be required to do so beginning August 23 unless plaintiff provided a doctor's note indicating the extent of her limitation. (Defendants' Statement ¶ 22; Plaintiff's Statement ¶ 22; Doc. No. 90, Solomon Depo. at 34. <u>See also</u> Doc. No. 90, Yoel Notes. <u>See also</u> Doc. No. 90, Exh. 7 (OHS Form)). Thereafter, plaintiff provided documentation from her health care provider and from the Hospital's Occupational Health Department, verifying her back condition, and defendant O'Connell exempted plaintiff from physically transporting patients. (Defendants' Statement ¶ 23; Plaintiff's Statement ¶ 23; Doc. No. 71, O'Connell Dec. ¶ 5).

In a memorandum sent by defendant O'Connell to defendant Hospital's Department of Human Resources a year and a half later,

---

Performance Management Documentation)).

O'Connell stated that "[regarding] the [p]erformance [m]anagement [m]emos dated 7/30/99 + 8/6/99[,] [t]he issues regarding coverage, time cards, vacation and illness have been resolved. [Plaintiff's] back injury" is an "ongoing issue" "prevent[ing] [plaintiff] from lifting and pushing." (Defendants' Statement ¶ 24; Plaintiff's Statement ¶ 24; Doc. No. 71, O'Connell Dec. ¶ 4). Thereafter, defendant O'Connell evaluated plaintiff's work performance in October 1999 and October 2000, rating plaintiff "[e]ffective" and "[e]xemplary", respectively, and awarded plaintiff an increase in hourly wages with each evaluation. (Defendants' Statement ¶ 25; Plaintiff's Statement ¶ 25). Because plaintiff was not in a position to complete the patient transport duties, defendant O'Connell did not consider the July 30, 1999 document or the August 6, 1999 memorandum in these performance evaluations. (Defendants' Statement ¶ 26; Plaintiff's Statement ¶ 26; Doc. No. 71, O'Connell Dec. ¶ 5; Doc. No. 90, Solomon Dec. ¶¶ 31-32). In the October 1999 review, defendant O'Connell also ranked plaintiff as "[n]eeds [i]mprovement" in "[r]elationships" and "[c]ommunication." (Defendants' Statement ¶ 27; Plaintiff's Statement ¶ 27; Doc. No. 71, O'Connell Dec. ¶ 6.1[7]). In response, plaintiff wrote a letter to defendant O'Connell on or about October 21, 1999, in which she stated that she believed the ranking resulted from personality

---

[7]O'Connell's Declaration contains two paragraphs numbered six. Hereinafter, the first paragraph six will be cited as Doc. No. 71, O'Connell Dec. ¶ 6.1 and the second paragraph six will be cited as Doc. No. 71, O'Connell Dec. ¶ 6.2.

conflicts that would not affect her job performance.  (Defendants'
Statement ¶ 28; Plaintiff's Statement ¶ 28; Doc. No. 71, O'Connell
Dec. ¶ 5).

In or about February 2000, the Hospital's Women's Ambulatory
Health Department sought to hire a Patient Administrative Associate
["PAA"].  Susan Maxwell, the Unit Director for the department, was
the hiring manager.[8]  (Defendants' Statement ¶¶ 87-88; Plaintiff's
Statement ¶¶ 87-88; Doc. No. 71, Maxwell Dec. ¶ 2-3.  See also Doc.
No. 71, Tab F-1 (job posting)).  Maxwell removed plaintiff from
consideration[9] because plaintiff is not bilingual; Maxwell did not
consult defendant Ciaschini before doing so.  (Defendants'
Statement ¶¶ 91-93; Plaintiff's Statement ¶¶ 91-93; Doc. No. 71,
Maxwell Dec. ¶ 4; Doc. No. 72, Solomon Depo. at 231.  See also Doc.
No. 71, Tab F-2 (plaintiff's application materials)).  Maxwell
hired Margie Gonzalez, who is bilingual in English and Spanish.
(Defendants' Statement ¶ 94; Plaintiff's Statement ¶ 94; Doc. No.
71, Maxwell Dec. ¶ 5.  See also Doc. No. 71, Tab F-3 (Gonzalez's

---

[8]Plaintiff concedes that her claims of adverse action that occurred prior to
the 180 day statute of limitations relating to her March 19, 2001 complaint
with the Connecticut Commission on Human Rights and Opportunities are time-
barred.  (Doc. No. 89, at 13 n.5).  This includes her claims relating to her
application to transfer to (a) a Patient Administrative Associate position in
the Women's Ambulatory Health Services; (b) a position at the Connecticut
Children's Medical Center; and (c) the Patient Accounts Department.  (Id.  See
also Plaintiff's Statement ¶¶ 131 & 147).

[9]For each of the positions to which plaintiff applied, plaintiff asserts that
defendants fail to incorporate any consideration for the Hospital's Staff
Reduction Policy, the purpose of which is to "reduce the number of part-time
and full-time employees due to lack of work, decreased patient census and for
other economic reasons."  (See Doc. No. 90, Plaintiff Dec. ¶ 76; Doc. No. 100,
McAloon Dec.).  See Section II.D. infra.

application materials)).

In or about March 2000, the Hospital's Research Department sought to hire an Administrative Associate III ["AAIII"] and Laurine Bow, the Associate Director for Research at the Hospital, was the sole decision maker with respect to the position. (Defendants' Statement ¶¶ 95-96; Plaintiff's Statement ¶¶ 95-96; Doc. No. 71, Bow Dec. ¶¶ 2-3. See also Doc. No. 71, Tab G-1 (AAIII Role Description)). This position required someone experienced in Microsoft Word, Excel and Access, as well as databases.[10] (Defendants' Statement ¶ 97; Plaintiff's Statement ¶ 97; Doc. No. 71, Bow Dec. ¶ 4. See also Doc. No. 71, Tab G-1). Bow interviewed plaintiff and Tiffany Rowe for the position and chose Rowe. (Defendants' Statement ¶ 98-100; Plaintiff's Statement ¶¶ 98-100; Doc. No. 71, Bow Dec. ¶ 3-5. See also Doc. No. 71, Tab G-2 (Rowe's application and resume)). Bow did not communicate with defendants O'Connell, Niles or Ciaschini with regard to the decision. (Id.).

In or about June 2000, Monica Kowalski, the Office Manager in the Hemodialysis Unit, sought to hire a person with medical background and knowledge of medical terminology and task-based computer programs to serve as an AAI for that unit. (Defendants' Statement ¶¶ 75-76; Plaintiff's Statement ¶¶ 75-76; Doc. No. 71, Kowalski Dec. ¶¶ 2, 4. See also Doc. No. 71, Tab D-1 (job posting)).

---

[10] See Section II.D. infra.

In or about August 2000, William Bell, a Hospital Human Resources Consultant, interviewed plaintiff for a Human Resources Associate position, a position requiring two years of previous experience in human resources personnel. (Defendants' Statement ¶¶ 81-82; Plaintiff's Statement ¶¶ 81-82; Doc. No. 71, Bell Dec. ¶¶ 3-4. See also Doc. No. 71, Tab E-1 (job posting)). Dawn Packman, who is white and had at least two years previous experience in human resources personnel, obtained the position. (Defendants' Statement ¶¶ 84-85; Plaintiff's Statement ¶¶ 84-85; Doc. No. 71, Bell Dec. ¶ 6. See also Doc. No. 71, Tab E-3 (Packman's application and resume)). Bell had no contact with either defendant O'Connell or defendant Niles before eliminating plaintiff from consideration. (Defendants' Statement ¶ 86; Plaintiff's Statement ¶ 86; Doc. No. 71, Bell Dec. ¶ 6).

In or about October 2000, Hartford Hospital's Case Coordination area in the Care Continuum Department created three new Administrative Associate II ["AAII"] positions, one of which it did not post because it had been designated by the Department of Human Resources for Doreen Forrest, a black employee who required a light-duty accommodation after returning from workers' compensation leave. (Defendants' Statement ¶¶ 102-03; Plaintiff's Statement ¶¶ 102-03; Doc. No. 71, Sobieski Dec. ¶ 3. See also Doc. No. 71, Tab H-1 (job postings for two of the three positions)). Both remaining positions involved arranging accommodations and

12

assistance for discharged patients with various community agencies over the telephone. (Defendants' Statement ¶ 107; Plaintiff's Statement ¶ 107; Doc. No. 71, Sobieski Dec. ¶ 4). Plaintiff was interviewed by Patricia Sobieski, Manager of the Case Coordination area in the Care Continuum Department, for the AAII positions. (Defendant's Statement ¶ 101, 108; Plaintiff's Statement ¶ 101, 108; Doc. No. 90, Solomon Dec. ¶ 61; Doc. No. 71, Sobieski Dec. ¶¶ 2, 5). Case Coordination selected Emy Lopez, an Hispanic woman who had worked in the Women's Health Department for approximately six months after working for several years in the emergency department, for one of the positions. (Defendants' Statement ¶¶ 110-11; Plaintiff's Statement ¶¶ 110-11; Doc. No. 71, Sobieski Dec. ¶ 6. See also Doc. No. 71, Tab H-3 (Lopez's application)). Sobieski felt Lopez's knowledge of the emergency department staff would assist her transition and provide her useful clinical patient and family contact. (Defendants' Statement ¶¶ 112-13; Plaintiff's Statement ¶¶ 112-13; Doc. No. 71, Sobieski Dec. ¶ 6). Sobieski also considered Lopez proficient in the computer programs utilized by Case Coordination. (Defendants' Statement ¶ 114; Plaintiff's Statement ¶ 114; Doc. No. 71, Sobieski Dec. ¶ 6).

Elizabeth Kirol, who is white, was selected for the other available AAII position. (Defendants' Statement ¶ 117; Plaintiff's Statement ¶ 117; Doc. No. 71, Sobieski Dec. ¶ 7. See also Doc. No. 71, Tab H-4 (Kirol's application)). Kirol worked at the

hospital for almost thirteen years – twelve as a PAA and approximately one year in the Medical Records Department. (Defendants' Statement ¶ 118; Plaintiff's Statement ¶ 118; Doc. No. 71, Sobieski Dec. ¶ 7). Sobieski viewed Kirol's knowledge of the Hospital as an asset and considered Kirol proficient in the computer programs used by Case Coordination. (Defendants' Statement ¶¶ 119-20, 122; Plaintiff's Statement ¶¶ 119-20, 122; Doc. No. 71, Sobieski Dec. ¶ 7). Sobieski also believed Kirol's experience in record retrieval was vital to functioning as an AAII. (Defendants' Statement ¶ 121; Plaintiff's Statement ¶ 121; Doc. No. 71, Sobieski Dec. ¶ 7). Sobieski believed that Lopez's and Kirol's qualifications for the AAII position surpassed plaintiff's. (Defendants' Statement ¶ 124; Plaintiff's Statement ¶ 124; Doc. No. 71, Sobieski Dec. ¶ 8). Sobieski did not know either defendant O'Connell or Niles and did not communicate with them in making the decision. (Defendants' Statement ¶ 125; Plaintiff's Statement ¶ 125; Doc. No. 71, Sobieski Dec. ¶ 9).

On or about September 15, 2000, the Hospital's Care Continuum Assessment Center posted vacancies for two full-time and two part-time PAAs. (Defendants' Statement ¶ 128; Plaintiff's Statement ¶ 128; Doc. No. 71, Synhorst Dec. ¶ 6. See also Doc. No. 71, Tab A-2 (job postings)). Plaintiff interviewed for each of these vacancies with Beth Grieg, but was not offered a position. (Defendants' Statement ¶ 129; Plaintiff's Statement ¶ 129; Doc. No. 71, Synhorst

14

Dec. ¶ 7. <u>See also</u> Doc. No. 71, Tab A-3 (plaintiff's application)). Since September 2000, a variety of individuals have held these PAA positions, including four or five blacks, two Hispanics, and two whites. (Defendants' Statement ¶ 130; Plaintiff's Statement ¶ 130; Doc. No. 71, Stagg Dec. ¶ 8).

In November 2000, Teri Duarte was the Team Leader in the Patient Accounts Department when it sought to hire a Financial Counselor. (Defendants' Statement ¶¶ 165-66; Plaintiff's Statement ¶¶ 165-66; Doc. No. 71, Duarte Dec. ¶ 2. <u>See also</u> Doc. No. 71, Tab M-1 (job posting)). Duarte and Elizabeth Lawson, another team leader in the Patient Accounts Department, interviewed plaintiff for the position. (Defendants' Statement ¶ 168; Plaintiff's Statement ¶ 168; Doc. No. 71, Duarte Dec. ¶ 5). The position required two to three years of experience in hospital or insurance billing, and the Department specifically sought someone with patient registration experience, payor insurance experience and computer knowledge. (Defendants' Statement ¶ 167; Plaintiff's Statement ¶ 167; Doc. No. 71, Duarte Dec. ¶ 4).[11] Though plaintiff was proficient in Microsoft Word and familiar with Excel and Powerpoint, she had no experience in hospital or insurance billing and lacked experience in patient registration and payor insurance. (Defendants' Statement ¶ 169; Plaintiff's Statement ¶ 169; Doc. No. 71, Duarte Dec. ¶ 6; Doc. No. 90, Solomon Dec. ¶ 62). Sharlyn

---

[11]<u>See</u> Section II.D. <u>infra</u>.

Pacheco, an Hispanic woman, obtained the position. (Defendants'
Statement ¶ 170; Plaintiff's Statement ¶ 170; Doc. No. 71, Duarte
Dec. ¶ 7. See also Doc. No. 71, Tab M-2 (Pacheco's resume)).

On December 26, 2000, defendant Gladys Ciaschini, a Human
Resources Consultant in the Human Resources Department, met with
plaintiff to discuss the conclusion of her assignment in the
Conklin building and advised plaintiff to secure another position
within the hospital prior to March 31, 2001 or plaintiff's
employment would be terminated. (Defendants' Statement ¶ 29;
Plaintiff's Statement ¶ 29; Doc. No. 71, Ciaschini Dec. ¶ 3). In
January, defendant Ciaschini met with plaintiff, along with
defendant O'Connell on speaker phone, and again informed plaintiff
that, unless she found another position in the hospital, her
employment would end on March 31, 2001. (Defendants' Statement ¶
30; Plaintiff's Statement ¶ 30; Doc. No. 71, Ciaschini Dec. ¶ 4).
Defendant O'Connell offered to serve as an employment reference to
assist plaintiff in finding another position; plaintiff never asked
defendant O'Connell to serve as a reference. (Defendants'
Statement ¶ 31; Plaintiff's Statement ¶ 31; Doc. No. 72, Solomon
Depo. at 338-39; Doc. No. 71, O'Connell Dec. ¶ 6.2).

On or about January 18, 2001, defendant Ciaschini referred
plaintiff to two PAA positions, but plaintiff was not considered
because she is not bilingual. (Defendants' Statement ¶¶ 171-73;
Plaintiff's Statement ¶¶ 171-73; Doc. No. 71, Ciaschini Dec. ¶ 5.

<u>See also</u> Doc. No. 71, Tab C-1 (plaintiff's application and resume)).  Also in January 2001, Susan Stagg interviewed plaintiff for two available PAA positions in the Care Continuum Assessment Center, which required applicants to have a high school diploma, prior experience in a patient care environment, the ability to navigate hospital-based computer programs, and the ability to perform phlebotomies and obtain quality Echocardiograms ["EKGs"]. (Defendants' Statement ¶¶ 174-75; Plaintiff's Statement ¶¶ 174-75; Doc. No. 71, Stagg Dec. ¶ 3.  <u>See also</u> Doc. No. 71, Tab I-1 (plaintiff's transfer application); Doc. No. 71, Tab I-2 (job posting)).[12]  Stagg ultimately filled the positions with Phyllis Watson, a black employee, and Janina Kornas, a white employee. (Defendants' Statement ¶ 176; Plaintiff's Statement ¶ 176; Doc. No. 71, Stagg Dec. ¶ 5).  Watson did not possess any active experience in phlebotomy, but did have experience with EKGs and monitors that plaintiff did not.   (Defendants' Statement ¶ 178; Plaintiff's Statement ¶ 178; Doc. No. 71, Stagg Dec. ¶ 6.  <u>See also</u> Doc. No. 71, Tab I-4 (Watson's transfer application)).  Kornas had three to four years active work experience in phlebotomy and knowledge of EKGs and vital signs.  (Defendants' Statement ¶ 177; Plaintiff's Statement ¶ 177; Doc. No. 71, Stagg Dec. ¶ 6.  <u>See also</u> Doc. No. 71, Tab I-3 (Korna's application)).

---

[12] <u>See</u> Section II.D. <u>infra</u>.

Also on or about January 18 or 19, 2001, plaintiff encountered defendant Sandra Niles, who worked in the Radiation Oncology Department in an administrative capacity. Plaintiff told Niles that she did not want to speak to her and did not like her. (Defendants' Statement ¶ 32; Plaintiff's Statement ¶ 32; Doc. No. 71, Ciaschini Dec. ¶ 6; Doc. No. 90, Solomon Dec. ¶ 16. See also Doc. No. 71, Tab C-2 (copy of Niles' statement)). Niles filed a complaint about the incident that same day. (Id.). On January 22, 2001, defendant Ciaschini met with plaintiff to discuss defendant Niles' complaint. (Defendants' Statement ¶ 34; Plaintiff's Statement ¶ 34; Doc. No. 71, Ciaschini Dec. ¶ 7). In the meeting, plaintiff affirmed that the complaint was accurate, but denied that the interaction was threatening or harassing. (Id.). The Hospital did not impose any formal discipline on plaintiff. (Defendants' Statement ¶ 35; Plaintiff's Statement ¶ 35; Doc. No. 71, Ciaschini Dec. ¶ 7. See also Doc. No. 71, Tab C-3 (Ciaschini notes documenting these events)).

On January 24, 2001, defendant Ciaschini received a letter from plaintiff, dated the day before, in which plaintiff stated that defendant Niles had, over the course of twenty months, repeatedly made condescending remarks about the fact that plaintiff traveled to work by bus and about plaintiff's skin color. (Defendants' Statement ¶ 36; Plaintiff's Statement ¶ 36; Doc. No. 71, Ciaschini Dec. ¶ 8. See also Doc. No. 71, Tab C-4 (copy of

18

January 23 letter)). Plaintiff also mentioned that a co-worker had indicated that defendant O'Connell was preventing plaintiff from transferring within the hospital and that defendant Niles had told a patient of the Cancer Center that plaintiff would not be employed after March 2001. (Defendants' Statement ¶ 37; Plaintiff's Statement ¶ 37; Doc. No. 71, Ciaschini Dec. ¶ 8. See also Doc. No. 71, Tab C-4). This letter marked the first time plaintiff informed defendant Ciaschini of her belief that defendant Niles' remarks were racially motivated. (Defendants' Statement ¶ 38; Plaintiff's Statement ¶ 38; Doc. No. 71, Ciaschini Dec. ¶ 8. See also Doc. No. 71, Tab C-4). Plaintiff sent another letter to defendant Ciaschini on February 2, 2001 stating that a former co-worker had heard a rumor that defendant O'Connell planned to derail plaintiff's opportunity for a transfer and that defendant Niles told a patient that plaintiff would not be employed after March 2001. (Defendants' Statement ¶ 39; Plaintiff's Statement ¶ 39; Doc. No. 71, Ciaschini Dec. ¶ 10. See also Doc. No. 71, Tab C-6 (copy of February 2 letter)). Defendant Ciaschini then investigated the source of plaintiff's allegations and, in a letter dated February 16, 2001, Ciaschini informed plaintiff of the results of such investigation.[13]

---

[13] The results of the investigation, communicated to Plaintiff by letter, were as follows: After receiving Plaintiff's February 2, 2001 letter regarding the alleged statements made to Alex Moreau (a former co-worker), Ciaschini interviewed Virginia Hernandez-Green, the alleged source of those statements, who denied making any comments to Moreau about Plaintiff's transfer. Ciaschini also interviewed O'Connell and she denied making any of the alleged statements about Plaintiff's transfer. O'Connell stated that she had never been contacted for a reference in connection with any of Plaintiff's internal transfer applications. Defendants' Statement ¶¶ 40-41; Plaintiff's Statement

(Defendants' Statement ¶¶ 40-41; Plaintiff's Statement ¶¶ 40-41; Doc. No. 71, Ciaschini Dec. ¶ 11).

On or after January 29, 2001, defendant Ciaschini received a letter from plaintiff stating that, when plaintiff received her Hospital paycheck on January 25, 2001, the envelope containing the check had not been sealed; plaintiff considered this to be "another form of harassment." (Defendants' Statement ¶ 43; Plaintiff's Statement ¶ 43; Doc. No. 71, Ciaschini Dec. ¶ 13. See also Doc. No. 71, Tab C-8 (copy of January 29 letter)). Plaintiff called the payroll department about the sealed envelope and was told that the outsourced company that completes payroll occasionally fails to seal the envelope. (Id.). In response to plaintiff's complaint, defendant Ciaschini interviewed Jan Lynch, the hospital employee responsible for distributing the checks for plaintiff's department, and she denied opening the envelope. (Defendants' Statement ¶ 44; Plaintiff's Statement ¶ 44; Doc. No. 71, Ciaschini Dec. ¶ 13). Defendant Ciaschini concluded that the payroll department failed to adequately seal the envelope and informed plaintiff of that determination in a letter dated February 16, 2001. (Defendants' Statement ¶ 44; Plaintiff's Statement ¶ 44; Doc. No. 71, Ciaschini Dec. ¶ 13. See also Doc. No. 71, Tab C-7 (copy of February 16 letter)).

---

¶¶ 40-41; Doc. No. 71, Ciaschini Dec. ¶ 11.

Also at this time, plaintiff met with defendants Ciaschini and O'Connell regarding plaintiff's patient communications, namely, that plaintiff would put patients on the phone to speak directly with Niles, rather than plaintiff speaking with defendant Niles. (Defendants' Statement ¶ 46; Plaintiff's Statement ¶ 46; Doc. No. 71, Ciaschini Dec. ¶ 12). Defendants Ciaschini and O'Connell informed plaintiff that her duties required that she speak directly to defendant Niles and that she should not give the phone to patients in order to avoid speaking with defendant Niles. (Defendants Statement ¶ 46; Plaintiff's Statement ¶ 46; Doc. No. 71, Ciaschini Dec. ¶ 12). Plaintiff then sent defendant Ciaschini another letter, dated February 2, 2001, in which plaintiff claimed that she recently had asked defendant Niles for assistance and that Niles had "bl[own] her off." (Defendants' Statement ¶ 47; Plaintiff's Statement ¶ 47; Doc. No. 71, Ciaschini Dec. ¶ 14. See also Doc. No. 71, Tab C-9 (copy of February 2 letter)). Ciaschini investigated plaintiff's claim and informed plaintiff of the results in a letter dated February 16, 2001.[14] (Defendants' Statement ¶ 48; Plaintiff's Statement ¶ 48; Doc. No. 71, Ciaschini

---

[14]The results of the investigation, communicated to Plaintiff by letter, were as follows: After receiving Plaintiff's letter of February 2, 2001, Ciaschini spoke with Niles, who denied being abrupt to Plaintiff on the occasion in question. Niles claimed that she had no one she could send to Plaintiff to assist with patient transportation at that time and she advised Plaintiff to call Patient Transport for assistance. In her letter to Plaintiff, Ciaschini concluded that, as there were no witnesses to the exchange, it was impossible for Ciaschini to determine whose version of events was more accurate. Defendants' Statement ¶ 48; Plaintiff's Statement ¶ 48; Doc. No. 71, Ciaschini Dec. ¶ 14.

Dec. ¶ 14).

On February 9, 2001, plaintiff gave defendant Ciaschini a document detailing the "condescending remarks and racial slurs" plaintiff claimed Niles had made over the previous twenty-one months. (Defendants' Statement ¶ 49; Plaintiff's Statement ¶ 49; Doc. No. 71, Ciaschini Dec. ¶ 15. See also Doc. No. 71, Tab C-10 (Harassment Notes)). Ciaschini met with Niles and asked her if she made any of the statements that plaintiff alleged, and Ciaschini informed plaintiff of the results of her investigation in a letter dated February 16, 2001. (Defendants' Statement ¶ 50; Plaintiff's Statement ¶ 50; Doc. No. 71, Ciaschini Dec. ¶ 15. See also Tab C-10 (February 16 letter)). At the hearing before the Connecticut Commission on Human Rights and Opportunities ["CHRO"], plaintiff testified that, in her opinion, some of the individual comments could imply racism, but, when considered together, certainly implied racism. (Defendants' Statement ¶ 51; Plaintiff's Statement ¶ 51; Doc. No. 72, Solomon Depo. at 241). Plaintiff further testified that she never informed defendant Niles that she considered the comments offensive and that she was not overly concerned with the comments. (Defendants' Statement ¶¶ 52-53; Plaintiff's Statement ¶¶ 52-53; Doc. No. 72, Solomon Depo. at 246, 322). Plaintiff testified that, although she did not appreciate the comments, they never made her angry. (Id.). Plaintiff also testified that defendants Ciaschini and O'Connell never made any

racist or racial comments toward her. (Defendants' Statement ¶ 55; Plaintiff's Statement ¶ 55; Doc. No. 72, Solomon Depo. at 314).

Also on February 9, 2001, defendant O'Connell said "hello" to plaintiff and plaintiff did not respond back verbally. (Defendants' Statement ¶ 58; Plaintiff's Statement ¶ 58; Doc. No. 72, Solomon Depo. at 211-12; Doc. No. 71, O'Connell Dec. ¶ 9; Doc. No. 71, Ciaschini Dec. ¶ 18). Defendant O'Connell then spoke in private with plaintiff and reminded plaintiff of another, similar incident that had occurred earlier that week; plaintiff admitted that on the prior occasion she acted similarly towards another Cancer Center employee. (Defendants' Statement ¶¶ 59-60; Plaintiff's Statement ¶¶ 59-60; Doc. No. 72; Doc. No. 71, O'Connell Dec. ¶ 9; Doc. No. 71, Ciaschini Dec. ¶ 18). Defendant O'Connell then suspended plaintiff for the remainder of the day.(Defendants' Statement ¶ 61; Plaintiff's Statement ¶ 61; Doc. No. 71, O'Connell Dec. ¶ 9). In a letter to defendant Ciaschini on February 12, 2001, plaintiff described her encounter with defendant O'Connell and explained that the earlier "hello" incident involved an employee she had never met. (Defendants' Statement ¶ 64; Plaintiff's Statement ¶ 64; Doc. No. 71, Ciaschini Dec. ¶ 18. See also Doc. No. 71, Tab C-13 (February 12, 2001 letter from Solomon describing this interaction)). Plaintiff articulated in the letter that she disagreed with defendant O'Connell that she was required to speak with hospital personnel when they said "hello," and that

she believed she was only required to speak to other employees when her job required. (Id.).

On February 13, 2001, defendant O'Connell issued plaintiff a "Performance Improvement Process, Written Warning" explaining that plaintiff's "refusal to communicate with Hospital personnel prevent[ed] [her] from meeting the Relationship Competency that all [Hospital] employees must meet" and was the basis of her suspension the previous Friday.[15]  (Defendants' Statement ¶ 65; Plaintiff's Statement ¶ 65; Doc. No. 71, O'Connell Dec. ¶ 10.  See also Doc. No. 71, Tab B-5 (written warning)).  Defendant O'Connell then cited several incidents that precipitated her conclusion that plaintiff had failed to comply with the hospital's Relationship Competency requirement: (1) on several occasions in January and February 2001, plaintiff refused to acknowledge Jan Lynch when entering and leaving Lynch's office; (2) on February 8, 2001, plaintiff entered Robert Lindyer's office and did not verbally respond to Lindyer's "hello"; (3) on February 5, 2001, Susan Wright said "good morning

---

[15]Hartford Hospital's Mission, Vision and Values statement provides, in relevant part:

> Communication - We strive to acquire and understand information and share it clearly and effectively.

> Relationships - We develop and strengthen collaborative relationships with all our customers, including our patients, their families, our employees, volunteers, medical staff and business partners.

(Defendants' Statement ¶ 62; Plaintiff's Statement ¶ 62; Doc. No. 71, Ciaschini Dec. ¶ 19).  Plaintiff assumes, based on "having read somewhere in the policy manual," that this mission applies to all employees.  (Defendants' Statement ¶ 63; Plaintiff's Statement ¶ 63; Doc. No. 72, Solomon Depo. at 200-01).

Saraiya," to which plaintiff did not respond; (4) on February 8, 2001, plaintiff entered Lynch's office and failed to acknowledge any of the several other employees present there, simply repeating "excuse me" while she attempted to place a laptop computer on a chair; (5) the February 9, 2001 "hello" incident; and (6) on February 12, 2001, plaintiff passed by defendant O'Connell's office twice and failed both times to respond when O'Connell said "hello." (Defendants' Statement ¶ 66; Plaintiff's Statement ¶ 66; Doc. No. 71, O'Connell Dec. ¶ 10.  <u>See also</u> Doc. No. 71, Tab B-5 (written warning)).

Around this time, in February 2001, plaintiff submitted a transfer application for a PAA position in the Cardiology Department that was initially screened by the Department of Human Resources and then referred to the hiring manager in the Cardiology Department.  (Defendants' Statement ¶¶ 180-81; Plaintiff's Statement ¶¶ 180-81; Doc. No. 71, Ciaschini Dec. ¶ 22.  <u>See also</u> Doc. No. 71, Tab C-17 (job posting); Doc. No. 71, Tab C-18 (application)).  As a result of a February 13, 2001 written warning, plaintiff was ineligible for that position or for any transfer to another position in the hospital for thirty-four work days while she completed the hospital's "performance improvement process." (Defendants' Statement ¶¶ 182-84; Plaintiff's Statement

¶¶ 182-84; Doc. No. 71, Ciaschini Dec. ¶ 21-22).[16]

Also in February 2001, Bliss Wing-10 East sought to hire a PAA who could read heart monitors, understand and transcribe physician's orders and prescriptions and order laboratory tests and EKGs, and who possessed a working knowledge of computers and good communication skills.  Lea Allard was the hiring manager for the position.  (Defendants' Statement ¶¶ 185-87; Plaintiff's Statement ¶¶ 185-87; Doc. No. 71, Allard Dec. ¶¶ 2-4).  Allard interviewed plaintiff on February 21, 2001, but hired Linda Connors, a white female, because she had training relevant to the position. (Defendants' Statement ¶¶ 188-91; Plaintiff's Statement ¶¶ 188-91; Doc. No. 71, Allard Dec. ¶¶ 6-7.  See also Doc. No. 71, Tab N-1 (Connor's Resume)).  Allard did not discuss plaintiff's application with defendant O'Connell or Niles.  (Defendants' Statement ¶ 192; Plaintiff's Statement ¶ 192; Doc. No. 71, Allard Dec. ¶ 8).

When payroll was distributed on March 1, 2001, plaintiff and a white Cancer Center employee did not receive their checks. Plaintiff received her check on March 2, 2001 after an error was discovered and plaintiff's timecard was provided to payroll. (Defendants' Statement ¶¶ 68-71; Plaintiff's Statement ¶¶ 68-71;

---

[16]The Hospital's Performance Management Policy provides:

> Opportunities for pay increases, lump sum awards, promotion, transfer and tuition reimbursement will be delayed while the employee is in the Performance Improvement process.  (Steps 2-4).  If the formal process is successful, any resulting pay increase will not be retroactive.

(Doc. No. 71, Tab C-16 at 3 (Performance Management Policy)).

Doc. No. 71, O'Connell Dec. ¶ 11).

Plaintiff filed a complaint with the CHRO on March 19, 2001, and plaintiff first received defendant Hospital's Performance Management Policy when defendant Hospital filed a verified answer to that complaint. (Defendants' Statement ¶¶ 14-15; Plaintiff's Statement ¶¶ 14-15; Doc. No. 72, Solomon Depo. at 286).

In a letter dated March 29, 2001, defendants O'Connell and Ciaschini reminded plaintiff that her position would be eliminated on March 31, 2001. (Defendants' Statement ¶ 74; Plaintiff's Statement ¶ 74; Doc. No. 71, Ciaschini Dec. ¶ 23; <u>see also</u> Doc. No. 71, Tab C-20 (March 29, 2001 letter)).

## II. DISCUSSION

The standard for summary judgment is well established. The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Upon motion, following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party

> who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

27

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." FED. R. CIV. P. 56(c). Rule 56(e) specifically provides that a party opposing summary judgment, however, "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id.</u> at 255 (citation omitted). "On summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970); <u>quoting United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment." <u>R.B. Ventures, Ltd. v. Shane</u>, 112 F.3d 54, 59 (2d Cir. 1997)(citations and internal quotation marks omitted). Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact." <u>Adickes</u>, 398 U.S. at 153 (1970).

28

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248 (citation omitted). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case. . . . Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)(citations and internal quotation marks omitted). Summary judgment may still be appropriate in discrimination cases where a plaintiff's argument is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct. . . ." Tojzan v. N.Y. Presbyterian Hosp., No. 00-CV-6105, 2003 U.S. Dist. LEXIS 5138, at *9 (S.D.N.Y. March 31, 2003). See also Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

### A. COUNTS ONE, TWO, THREE, FOUR, NINE, TEN, ELEVEN, TWELVE AND THIRTEEN:  PLAINTIFF'S CLAIMS OF DISPARATE TREATMENT RACE DISCRIMINATION UNDER TITLE VII, 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981 AND CFEPA, CONN. GEN. STAT. § 46a-60(a)(1)

Defendants contend that plaintiff's complaint of disparate treatment based on the July 30, 1999 letter fails because the applicable statute of limitations has passed and, alternatively, because that letter did not result in any material change to plaintiff's employment and was sent for the legitimate, non-discriminatory reason that plaintiff was not appropriately performing her job.  (Doc. No. 75 at 16-19).  Defendants also assert that any arguments relating to the February 9, 2001 suspension and the February 13, 2001 written warning also fail because there is no evidence of race discrimination and both events addressed plaintiff's inability to work effectively with co-workers. (Doc. No. 75 at 19-23).

Plaintiff responds that the disciplinary period relating to the July 30, 1999 letter remained in effect until January 12, 2001, placing it within the applicable statute of limitations and that the letter "ignited a change in O'Connell's perspective towards" plaintiff and such change manifested itself in O'Connell's treatment of plaintiff after plaintiff asserted her positions to O'Connell in July 1999 and when other white employees felt plaintiff was not as deferential as they would expect.  (Doc. No. 89 at 11).