Defendant argues that the statute of limitations began to run from the receipt of the warning because such warnings are an easily identifiable discriminatory act and plaintiff presents no evidence that the letter drastically altered her working environment. (Doc. No. 100 at 3-4). Plaintiff responds that, because the letter was primarily characterized as a memorandum and not a warning, it was not easily identifiable as a potential discriminatory act. (Doc. No. 108 at 10-11). Plaintiff also contends that the issue of the July 30, 1999 letter was not resolved until January 23, 2001 when defendant Ciaschini noted the absence of this required document in plaintiff's file. (Id.).

### 1. The July 30, 1999 Letter

Defendant O'Connell issued plaintiff a "Formal Improvement Documentation," dated July 30, 1999, which stated that in March 1999 defendant O'Connell met with the staff of the Cancer Center and informed each member that they needed to be present at their positions from 7:00 a.m. to 5:30 p.m. and that members would need to cover for one another in the event of an absence.[17] (Doc. No. 71, O'Connell Dec. ¶ 4. See also Doc. No. 71, Tab B-1 (Performance

---

[17]This letter was a "Formal Improvement Documentation," pursuant to Step 2 of the PIP. See note 6 supra.

The Employee Performance Improvement Process consists of Steps 1 through 4. (Doc. No. 71, Tab C-16, at 2). The steps are: (1) verbal counseling, (2) formal improvement documentation, (3) final written warning, and (4) suspension or discharge. (Id.). Plaintiff's receipt of the July 30, 1999 memorandum placed plaintiff at Step 2 of the PIP. (See Doc. No. 71, Tab B-1). When employees are elevated to Step 3, they will be advised that if a problem continues they may be suspended. (Doc. No. 71, Tab C-16). Employees may be suspended at Step 4. (Id.).

31

Management Document)).  Although plaintiff contends that she "was not aware" that the July 30, 1999 document regarding Performance Management constituted a disciplinary action under Step 2 of the Hospital's Performance Improvement Process ["PIP"] until December 26, 2000 when she met with Ciaschini, the July 30, 1999 document explicitly states that "[f]ailure to meet the above goals will immediately advance you to Step #3" of the PIP.[18]  (Doc. No. 71, Tab B-1 (Performance Management Documentation)).  Thus, plaintiff should have "identified the alleged discriminatory act" for statute of limitations purposes.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (citations omitted).

The July 1999 letter marked a shift in defendant O'Connell's view of plaintiff and, thus, constituted a "discrete retaliatory or discriminatory act."  National R.R. Passenger Corp., 536 U.S. at 110.  Such an act "'occur[s]' on the day it 'happen[s].'"  Id. Moreover, the term "unlawful employment practice," as used in 42 U.S.C. § 2000e-5(e), applies to a single occurrence, even when that occurrence has connections to other acts and "each discrete discriminatory act starts a new clock for filing charges alleging that act."  Id. at 113 (citation omitted).  Accordingly, the clock began to run for filing charges on the date plaintiff received the

---

[18]See note 15 supra.

July 30, 1999 communication.[19]

Plaintiff filed her CHRO and EEOC complaints on March 19, 2001. Plaintiff's claim is time-barred because plaintiff received the July 30, 1999 letter more than 300 days before her EEOC complaint, see Coger v. State of Connecticut, 309 F. Supp. 2d 274, 282 (D. Conn. 2004); see also 42 U.S.C. § 2000e-5(e), and more than 180 days before her CHRO complaint. See Cavuoto v. Oxford Health Plans, Inc., No. 3:99-CV-446, 2000 WL 888263, at *4 n.4 (D. Conn. June 22, 2000). See also CONN. GEN. STAT. § 46a-82(e).

Moreover, this conclusion notwithstanding, plaintiff admits that, following the July 30th letter, defendant O'Connell granted plaintiff discretionary pay raises.[20] (See Defendants' Statement ¶ 25; Plaintiff's Statement ¶ 25; Doc. No. 71). Thus, although the July 30, 1999 letter was not officially removed from plaintiff's file until January 12, 2001 (Doc. No. 89 at 11), the letter did not lead to any material change in the terms and conditions of plaintiff's employment. Additionally, this July 30, 1999 letter was issued by defendant O'Connell, who hired plaintiff, and was

---

[19]Moreover, plaintiff has not alleged, and there is no evidence to support, that any of her subsequent transfer applications were denied based on the July 30, 1999 documentation; thus there is no basis for a continuing violation argument.

[20]Plaintiff contends that, pursuant to the PIP, receipt of a "[f]ormal [i]mprovement [d]ocumentation" would result in a "delay in opportunities for pay increases . . . for the time period spent in PIP Steps 2-4." (Doc. No. 89, at 8; Doc. No. 71, Tab C-16). However, due to plaintiff's back problems, the July 30, 1999 letter was not considered in plaintiff's two subsequent performance reviews. (Defendants' Statement ¶ 26; Plaintiff's Statement ¶ 26; Doc. No. 71, O'Connell Dec. ¶ 5. See also Doc. No. 90, Solomon Dec. ¶¶ 31-32).

issued to both plaintiff and Kelvin Griffith after the two were "failing to . . . [provide] full transport coverage" during illness and vacations of co-workers and after another Transport Aide was transferred to another position.  (Doc. No. 71, O'Connell Dec. ¶ 4). There is no evidence of discriminatory animus for the issuance of this warning.

### 2.  The February 9, 2001 suspension and the February 13, 2001 written warning

42 U.S.C. § 2000e-2(a) provides:

> [i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race . . . or . . . limit, segregate, or classify . . . employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race. . . .

Plaintiff may demonstrate disparate treatment "by showing that [she] has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race. . . ."[21]  <u>Feingold v. New York</u>, 366 F.3d 138, 149 (2d Cir. 2004). Examples of adverse employment actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir.

---

[21]The Second Circuit has held that the prima facie elements of an employment discrimination case under Title VII also apply to a claim under 42 U.S.C. § 1981. <u>Choudhury v. Polytechnic Institute of New York</u>, 735 F.2d 38, 44 (2d Cir. 1984). <u>See also</u> <u>Almonte v. The Coca-Cola Bottling Co. of New York</u>, 959 F. Supp. 569, 572 (D. Conn. 1997). <u>Cf.</u> <u>Arnold v. Yale New Haven Hospital</u>, 213 F. Supp. 2d 142, 151 (D. Conn. 2002)(same analysis applies to claims under CFEPA).

1999)(citations omitted). Once plaintiff satisfies her prima facie burden, the burden of production shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)(citations omitted). See also Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 44. See generally McDonnell Douglas v. Green, 411 U.S. 792 (1973). Once defendant asserts a legitimate reason, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment decision. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Plaintiff contends that O'Connell's imposition of a thirty-four day disciplinary period following the imposition of the February 13, 2001 written warning is direct evidence of discrimination resulting in an adverse action. (Doc. No. 89, at 45). Plaintiff relies on an allegation asserted by one of her co-workers that defendant O'Connell was impeding plaintiff's transfer and that O'Connell informed another co-worker that she would not give plaintiff a favorable recommendation, thus presumably giving rise to an inference that O'Connell was preventing plaintiff from securing further employment at defendant Hospital. (See Second Amended Complaint, ¶¶ 77(a)-(b)). Defendant Ciaschini investigated plaintiff's allegations, and the individuals against whom plaintiff

made allegations denied ever making such statements. (Doc. No. 71,
Tab C-7).  Plaintiff has offered no other evidence supporting her
claims.

Additionally, on February 9, 2001, defendant O'Connell said
"hello" to plaintiff, who did not verbally respond, and then
individually met with plaintiff to discuss her behavior, as another
similar incident had occurred earlier that week.  (Doc. No. 72,
Solomon Depo. at 98, 211-12; Doc. No. 71, O'Connell Dec. ¶ 9; Doc.
No. 71, Ciaschini Dec. ¶ 18).  Defendant O'Connell then suspended
plaintiff for the remainder of the day.  (Doc. No. 71, O'Connell
Dec. ¶ 9).  Days later, on February 13, 2001, defendant Ciaschini
wrote plaintiff a letter explaining that plaintiff was being
advanced in the Hospital's PIP and outlined repeated instances
where plaintiff refused to communicate with Hospital staff.  (Doc.
No. 71, Ciaschini Dec. ¶ 19, Doc. No. 71, Tab C-15 (February 13,
2001 PIP, Written Warning)).

Plaintiff claims several statements made by a co-worker and a
patient support her claim that the suspension and warning letter
were racially motivated.  (Doc. No. 71, Tab C-6 (February 2, 2001
letter to Ciaschini)).  The string of correspondence between
plaintiff and defendant Ciaschini, however, demonstrates that
plaintiff initiated a confrontation with defendant Niles, proceeded
to actively ignore co-workers, and became openly abrasive with
defendant Ciaschini when she attempted to resolve the problem.

36

(Doc. No. 71, Tabs C-2-15).

That conclusion notwithstanding, the evidence supports defendants' legitimate, non-discriminatory reason for both actions. Defendant Hartford Hospital's Mission, Vision and Values statement requires the Hospital and its employees to "develop and strengthen collaborative relationships with all of [its] customers, including [its] patients, their families, [its] employees, volunteers, medical staff and business partners." (Doc. No. 71, Tab C-14). Defendant's written warning, dated February 13, 2001, explicitly stated that, "[t]o remain in your role, you must meet the HH Code of Conduct and Performance Management Competencies." (Doc. No. 71, Tab C-15). The competency at issue was the "Relationships" statement cited above and quoted to plaintiff in this written warning. (Id.). Plaintiff's claim that she does not have to respond to her supervisors and other employees unless her job dictates that she do so (see Doc. No. 71, Tab C-13) directly contravenes the policy of the defendant Hospital and plaintiff testified that she assumes, based on "having read somewhere in the policy manual," that this mission applies to all employees. (Defendants' Statement ¶ 63; Plaintiff's Statement ¶ 63; Doc. No. 72, Solomon Depo. at 200-01).

In an attempt to refute defendant's legitimate, non-discriminatory reason for the suspension and warning letter, plaintiff contends that defendant O'Connell, in suspending

37

plaintiff, did not precisely follow the Employee PIP and suspended plaintiff without pay.[22]  When plaintiff was suspended on February 9, 2001, plaintiff used six hours of her vacation time so that she would be paid for the entire day.  (Doc. No. 90, Plaintiff's Time Cards).   According to plaintiff, this demonstrates that she understood that she was being suspended without pay.  (Doc. No. 89 at 39).   Defendant O'Connell, however, avers that plaintiff was "administratively suspended"[23] and it was defendant O'Connell's intention to suspend plaintiff with pay.  (Doc. No. 71, O'Connell Dec. ¶ 9; Doc. No. 100, McAloon Dec. ¶ 13).   When O'Connell reviewed the vacation time used by plaintiff that week, defendant O'Connell was "under the impression" plaintiff used the vacation hours earlier in the week and did not apply them to the Friday suspension.  (Doc. No. 71, O'Connell Dec. ¶ 9).

It is undisputed that plaintiff used the six hours of her vacation time on her own initiative, in response to her presumption that she was suspended without pay.  There is nothing before the Court to suggest that defendant O'Connell intended to suspend plaintiff without pay.  Moreover, in light of the foregoing,

---

[22]See note 15 supra.  Plaintiff's receipt of the July 30, 1999 memorandum placed plaintiff at Step 2 of the PIP.  (See Doc. No. 71, Tab B-1). Plaintiff claims defendant O'Connell skipped Step 3 and proceeded immediately to suspension without pay, in contravention of the PIP.  (Id.).

[23]Administrative suspension occurs "[i]n certain circumstances, [when] Hospital managers . . . suspend an employee with pay pending further investigation or further consultation with the Department of Human Resources regarding the appropriate disciplinary action to be taken, if any, in connection with possible employee misconduct."  (Doc. No. 100, McAloon Dec. ¶ 13).

plaintiff's unsupported contention is insufficient to overcome defendants' legitimate, non-discriminatory reason for giving plaintiff a written warning and for suspending plaintiff.

> B. COUNTS ONE, TWO AND THIRTEEN: PLAINTIFF'S CLAIMS OF A HOSTILE WORK ENVIRONMENT UNDER TITLE VII, 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981, AND CFEPA, CONN. GEN. STAT. § 46a-60(a)(1)

Defendants assert that plaintiff's claims against all defendants for a hostile work environment must fail because plaintiff's working environment was not objectively hostile and defendant Niles' alleged comments could only constitute episodic incidents of racial enmity, which are insufficient to satisfy plaintiff's burden. (Doc. No. 75 at 46-52). Plaintiff does not respond to defendants' assertions.[24]

To prevail on a hostile work environment claim, plaintiff must show that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . ." Feingold, 366 F.3d at 149 (citations and internal quotations omitted). Such a workplace is

---

[24]Although the Second Circuit has made clear that when a nonmoving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial," Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted), in her filings, plaintiff has failed to respond to certain portions of defendants' motion. Plaintiff's failure to respond to defendants' arguments seeking dismissal of plaintiff's hostile work environment claim and plaintiff's claim for disparate impact race discrimination alleged in Count Seven results in a waiver of such counts. See Shrestha v. State Credit Adjustment Bureau, Inc., 117 F. Supp. 2d 142, 147, n.1 (D. Conn. 2001). However, for the purpose of completeness, defendants' arguments will be addressed briefly.

"permeated with 'discriminatory intimidation, ridicule and insult'
. . . [and] is 'sufficiently severe or pervasive to alter the
conditions of the victim's employment. . . .'" <u>Harris v. Forklift
Systems, Inc.</u>, 510 U.S. 17, 21 (1993)(citation omitted). Whether
a work environment meets this standard depends on a totality of
circumstances, including "the frequency of the discriminatory
conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance." <u>Id.</u>
at 23. Proving the existence of a hostile work environment
requires a showing that the "conduct at issue is so severe or
pervasive as to create an objectively hostile or abusive work
environment, and . . . the victim subjectively perceives the
environment to be abusive." <u>Richardson v. New York State Dept. of
Corr. Serv.</u>, 180 F.3d 426, 436 (2d Cir. 1999)(internal quotation
marks and citations omitted). Whether an environment is
objectively hostile depends on "whether a reasonable person who is
the target of the discrimination would find the working conditions
so severe or pervasive as to alter the terms and conditions of
employment for the worse." <u>Id</u>.

Acts of discrimination involving racist comments, slurs and
jokes must constitute "more than a few isolated incidents . . .
there must be a steady barrage of opprobrious racial comments."
<u>Schwapp</u>, 118 F.3d at 110 (internal citations and quotations

40

omitted).  "Isolated incidents or episodic conduct will not support a hostile work environment claim." <u>Richardson</u>, 180 F.3d at 437. <u>See also</u> <u>Kotcher v. Rosa & Sullivan Appliance Ctr.</u>, 957 F.2d 59, 62 (2d Cir. 1992)(discussing sporadic conduct in the context of sex discrimination). However, "even a single episode of harassment, if severe enough, can establish a hostile work environment. . . ." <u>Torres v. Pisano</u>, 116 F.3d 625, 631 n.4 (2d Cir. 1997). "[T]he quantity, frequency, and severity of those slurs . . . [must be] considered cumulatively in order to obtain a realistic view of the work environment. . . ." <u>Schwapp</u>, 118 F. 3d at 111 (internal quotation marks and citations omitted).

Plaintiff acknowledges that defendants O'Connell and Ciaschini never made any racist remarks toward her. (Doc. No. 72, Solomon Depo. at 314). Her claim, then, rests solely on the comments allegedly made by defendant Niles.[25] Niles' alleged comments were made over a period of twenty months, were sporadic and did not always involve race. (Doc. No. 71, Ciaschini Dec. ¶ 8. <u>See also</u> Doc. No. 71, Tab C-10). Furthermore, plaintiff testified that she did not "really care" about the comments, they did not "really

---

[25]Defendant Niles' allegedly commented: about plaintiff's residence in Hartford and defendant Nile's aversion to living in Hartford; about plaintiff's traveling to work by bus; that she [Niles] wished she was as dark as plaintiff; that plaintiff should wear a darker make-up foundation; that Tina Turner could not be black; that the characters in <u>Porgy and Bess</u> looked ridiculous in the way they dressed and danced; that she [Niles] believed black people all had "kinky" hair; that Cancer Center patients would not enjoy jazz music because most were white and jazz was ethnic; and that the lighter skinned Cancer Center valet drivers of Arabic ethnicity were more attractive and that she could not understand how people from Africa could appear so different.  (Doc. No. 71, Tab C-10 (February 9, 2001 letter to Ciaschini)).

bother" her and, although she did not "appreciate [her] comments," they never made her angry. (Doc. No. 72, Solomon Depo. at 246, 322). The evidence presented is insufficient to demonstrate that plaintiff's work environment was either objectively or subjectively hostile where the statements were infrequent and, by plaintiff's own admission, not severe enough to create an abusive working environment.

### C. COUNTS SEVEN AND EIGHT: DISPARATE IMPACT RACE DISCRIMINATION UNDER TITLE VII, 42 U.S.C. §§ 2000e-2(a) AND (k)

Defendants assert that plaintiff's claims of disparate impact race discrimination must fail because plaintiff cannot demonstrate a Hospital policy that required black employees to engage in non-job related conversation with white employees, but did not require black employees to engage in non-job related conversation with other black employees (Count Seven), and that the bilingual requirement for several of the positions plaintiff sought could not give rise to a disparate impact based on race (Count Eight). (Doc. No. 75, at 57-60). Furthermore, defendants stress that plaintiff provides no evidence, "statistical or otherwise," to support either assertion. (Doc. No. 75, at 57-59)(emphasis omitted). Plaintiff does not respond to defendants' assertions regarding Count Seven[26] and instead focuses on Count Eight, arguing that the Hospital did not have a formalized, written policy for determining whether a

---

[26]See note 22 supra.

vacant position required an applicant to be bilingual, thus giving rise to a disparate impact on non-Hispanic applicants. (Doc. No. 89, at 26-30; Doc. No. 108, at 11-12). In response, defendants note that plaintiff still does not provide any authority or evidence for her proposition that the bilingual requirement has a disparate impact on members of another race. (Doc. No. 100, at 12-13).

To state a prima facie case of disparate impact discrimination under Title VII, plaintiff must demonstrate that a specific policy or practice of the defendant had a disproportionate impact on plaintiff's protected class. 42 U.S.C. § 2000e-2(k)(1)(A); Jackson v. University of New Haven, 228 F. Supp. 2d 156, 163 (D. Conn. 2002). Plaintiff must, therefore, "(1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001); Jackson, 228 F. Supp. 2d at 164. Statistical evidence is generally used to demonstrate the disparity and must be sufficiently substantial to raise an inference of causation. Jackson, 228 F. Supp. 2d at 163 (citations omitted).

Plaintiff alleges that the Hospital "used an employment practice that required black employees to engage in non-job related conversation with white employees using discipline to enforce this requirement, but did not require black employees to engage in non-

43

job related conversation with other black employees . . . ."
(Second Amended Complaint, ¶ 127).  Plaintiff does not produce any
evidence, statistical or otherwise, to support the assertion that
such a practice or policy exists and does not contest defendants'
arguments to that effect.  Consequently, because plaintiff cannot
meet her prima facie burden to show that such a policy exists, she
cannot show a disparate impact on a protected class or that there
exists a causal relationship between the policy and the disparity.

Plaintiff also claims that the Hospital "used an employment
practice that required Spanish and English lingual skills as
qualification for certain administrative positions," and that "this
requirement or preference . . . is an employment practice that
causes a disparate impact on individuals of plaintiff's race."
(Second Amended Complaint, ¶¶ 136, 141).  Both parties observe that
there is no case from any federal court that considers the question
of whether a bilingual requirement could give rise to a disparate
impact claim based on race. (See Doc. No. 75, at 59; Doc. No. 108,
at 11).  Plaintiff generally asserts that the Hospital has
implemented this requirement based on no data or research, which
lends the hiring process to "abuse and discretionary application."
(Doc. No. 89, at 27).

However, it has been recognized that even in the context of
national origin discrimination, to which linguistics appears to be
more closely linked than to race, a hiring preference for bilingual

ability does not constitute discrimination under Title VII. See Richardson v. CenterCare, Inc., No. 02-CV-9212, 2004 U.S. Dist. Lexis 19606, at *6 (S.D.N.Y. Sept. 30, 2004)("such preference does not give rise to a constitutional or statutory discrimination claim")(multiple citations omitted). Plaintiff identifies a policy implemented by defendant in its hiring process, but provides no evidence that it causes a disparate impact on members of a racially protected class as language is not an immutable characteristic of race.

It is undisputed that plaintiff is not bilingual in English and Spanish and therefore not qualified for the three positions that she contends she was denied because the positions required such a skill. (Doc. No. 89, at 27-29). Plaintiff argues that, notwithstanding Ciaschini's awareness that plaintiff was not bilingual and Ciaschini's access to Human Resources documents stating the qualifications for open positions, she referred plaintiff to two positions and then informed plaintiff in a "terse and spiteful manner" that plaintiff did not have the requisite skills. (Doc. No. 89 at 29). Plaintiff claims that Ciaschini "took retaliatory pleasure in informing [p]laintiff that [p]laintiff was not part of the select few who had bilingual skills and therefore would not be eligible to even interview for those positions." (Id. at 29-30). Absent evidence of disparity, plaintiff cannot demonstrate that such disparity is causally

45

connected to the Hospital policy.  <u>Robinson</u>, 267 F.3d at 160.

<u>    D. COUNTS TEN, ELEVEN AND FOURTEEN: UNLAWFUL RETALIATION
    UNDER TITLE VII, 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981
    AND CFEPA, CONN. GEN. STAT. § 46a-60(a)(4)</u>

Plaintiff alleges that after submitting her written complaints on January 23, 2001 and February 9, 2001, and after she informed defendant Ciaschini of her intent to file her complaint with the CHRO on February 12, 2001, she was retaliated against by defendants O'Connell and Ciaschini in the following ways: (1) she was suspended without pay on February 9, 2001 (Second Amended Complaint, ¶¶ 107, 123); (2) she was issued a written warning on February 13, 2001, depriving her of the ability to transfer to another position during the last thirty-four days of her Hospital employment prior to her position being eliminated (<u>id.</u>, ¶¶ 108-12); (3) she received her paycheck in an unsealed envelope on January 25, 2001 (<u>id.</u>, ¶¶ 118-19); (4) she experienced a one-day delay in receiving her paycheck for the March 1, 2001 payroll (<u>id.</u>, ¶¶ 120-22); and (5) she was prevented from transferring to another position (<u>see</u> Doc. No. 89 at 30-49).

Defendants contend that plaintiff's retaliation claims fail because defendants had a non-discriminatory reason for suspending plaintiff, and that the issuance of a written warning or the delivery of her paycheck in an unsealed envelope or one day late did not amount to a materially adverse change in the terms and conditions of her employment.  (Doc. No. 75 at 52-57).

46

Additionally, defendants note that plaintiff does not refute defendants' legitimate, non-discriminatory reason for disciplining plaintiff and placing her in the PIP. (Doc. No. 100 at 13-16).

Plaintiff asserts that her disciplinary reprimands and failed attempts to transfer following her January 23, 2001 letter complaining of race discrimination provide an inference of unlawful retaliation sufficient to survive summary judgment. (Doc. No. 89 at 30-49). Moreover, plaintiff contends that she was entitled to priority consideration under the Hospital's Recruitment and Selection Policy and was not hired despite a preference for plaintiff as an internal candidate. (See generally Doc. No. 89).

For each of the positions to which plaintiff applied, see Sections II.D.1 & E infra, plaintiff asserts that defendants failed to adhere to the Hospital's Staff Reduction Policy, governing the reduction of "part-time and full-time employees due to lack of work, decreased patient census and for other economic reasons." (Doc. No. 89, at 48-49. See Doc. No. 90, Plaintiff Dec. ¶ 76 (Staff Reduction Policy); Doc. No. 100, Tab A-1(Reduction In Force Policy). See also Doc. No. 100, Tab A-1 (Reduction in Force Policy)). This policy is implemented "[i]f it becomes necessary to reduce the number of employees in a department".[27] (Doc. No. 90, Staff Reduction Policy). The Hospital's Vice President of Human

---

[27]The term department refers to "designated departments (i.e. Engineering, Pharmacy, etc.) and to clinically similar patient units (i.e. Cardiology, Surgery, Medicine, etc.)." (Doc. No. 90, Staff Reduction Policy).

47

Resources avers that this policy did not apply to the elimination of plaintiff's position and other positions in the CORE project as these positions were for a limited duration,[28] and the policy, by its own terms, "does not apply to employees in grant funded positions, standby, per diem, or temporary employees." (Id.; Doc. No. 100, McAloon Dec. ¶ 9). Plaintiff, however, contends that the policy designates that "[a]ny employees affected by position reductions, and not at Step 2 or higher of the [PIP]," will be given priority consideration for open positions at any level in any department of the hospital." (Doc. No. 89 at 47. See Doc. No. 90, Staff Reduction Policy).[29]    Even if the policy were to apply to

---

[28]Plaintiff's position was always scheduled to conclude with the completion of the CORE project. (Doc. No. 100, McAloon Dec. ¶ 10). When plaintiff was hired by defendant O'Connell, she was informed that her position was temporary and would end when the CORE building project was completed. Thus, her position would end effective March 31, 2001. (Doc. No. 71, O'Connell Dec. ¶ 3. See Doc. No. 90, Solomon Dec. ¶ 2). The positions in the CORE building project were funded for a specific purpose of limited duration. (See Doc. No. 100, McAloon Dec. ¶ 10).

The Court notes, however, that although defendants allude to a conclusion that plaintiff's position was "temporary," plaintiff's transfer applications did not have the notation "temporary position, needs to apply by application" as did Emy Lopez's internal transfer application for the AAII position in Care Continuum. (See Doc. No. 71, Tab H-3. See also Doc. No. 108 at 5-6). Lopez was considered a temporary employee at that time as she had been employed in her position for less than six months. (Id.). Plaintiff was employed by defendant Hospital in her position as an AAI at the entrance of the Conklin Building from March 22, 1999 to March 31, 2001. (Defendants' Statement ¶¶ 1& 4; Plaintiff's Statement ¶¶ 1& 4). Plaintiff was encouraged by defendants to apply for other posted positions within the Hospital, pursuant to the Hospital's Transfer Policy, so that she would be able to continue her employment after the elimination of the CORE project. (Doc. No. 71, Ciaschini Dec. ¶ 3; Doc. No. 100, McAloon Dec. ¶ 6. See also Doc. No. 71, McAloon Dec. ¶ 7; Doc. No. 71, Tab J-1 (Transferability Document)).

[29]Plaintiff also contends that she was subject to the Staff Reduction policy because the Hospital's Human Resources computer system reflected that the reason for her termination was "Staff Reduction" (Doc. No. 89 at 48) and she was provided with severance pay and an offer of assistance in resume preparation and job search techniques at the time of her termination. (Id. at 46-47).

plaintiff's position, the policy explicitly requires that priority consideration be given only for positions for which the candidates meet the qualifications.  (Doc. No. 90, Staff Reduction Policy). Moreover, even if the elimination of plaintiff's position was covered by the Staff Reduction policy, she would not be eligible to apply for other positions after she was placed in Step 2 of the PIP.  (See Doc. No. 100, n.17; Doc. No. 90, Staff Reduction

---

According to defendant, Ciaschini's assistant entered "Staff Reduction" because it was the termination code that most accurately reflected the underlying reason for plaintiff's termination.  (Doc. No. 100 at 7).  McAloon averred that such a designation does not establish that Solomon's employment was terminated pursuant to the Staff Reduction policy.  (Doc. No. 100, McAloon Dec. ¶ 12).

Plaintiff also contends that she was eliminated pursuant to the Staff Reduction policy because she received severance pay and an offer of assistance in resume preparation pursuant to the Severance Pay policy (Doc. No. 89 at 46-47.  See also Doc. No. 90, Staff Reduction Activity Window).  The Staff Reduction policy does not mandate the payment of severance; rather, pursuant to the terms of the policy, employees who are in Step 2 or higher of the PIP "may be eligible" for severance and will be provided assistance in resume preparation and job search techniques.  (Doc. No. 90, Staff Reduction Policy). Plaintiff asserts that, because she was terminated due to "staff reduction," she should have been subject to the Hospital Rehires Policy (see Doc. No. 90, Hospital Rehires Policy) which provides that former employees applying for rehire "will be evaluated on the same basis as other applicants."  (Id.  See Doc. No. 89 at 48-49).  Moreover, according to plaintiff, although her staff reduction activity window indicated that she was terminated, according to Hospital policy, she was "laid off" pursuant to the terms of the Separation of Employment Policy.  (Doc. No. 89 at 49).

McAloon averred that in some situations, it is the Hospital's practice to provide benefits such as severance pay and an offer of assistance in resume preparation to former employees even when they are not called for (Doc. No. 100, McAloon Dec. ¶ 11) and, in this case, the Hospital exercised its discretion and provided them to plaintiff even though she was not entitled to them.  (Doc. No. 71, Ciaschini Dec. ¶ 4).  Additionally, according to defendant, because the elimination of plaintiff's position was not subject to the Staff Reduction policy, it is not necessary to address whether the Hospital was obligated to consider her for re-hire, and because of plaintiff's "lack of collegiality toward her co-workers leading up to the issuance of the written warning, [defendant] O'Connell would not recommend her for re-hire." (Doc. No. 100, at 15-16). Moreover, even if the elimination of plaintiff's position was covered by the Staff Reduction policy, she would not be eligible to apply for other positions because she was in Step 2 of the PIP.  (See Doc. No. 100, n.17; Doc. No. 90, Staff Reduction Policy).

Policy).

Additionally, if plaintiff did not possess the requisite minimum qualifications for the positions, defendant Ciaschini did not make a final selection recommendation for plaintiff to the hiring manager pursuant to the Recruiting and Selection Policy.[30] Thus, the remaining issue is whether plaintiff was retaliated against for filing her complaints with her employer.

Title VII prohibits employers from discriminating against an employee "because [such employee] has opposed any practice made an unlawful employment practice by this subchapter. . . ." 42 U.S.C. § 2000e-3(a).   Title VII is violated in this respect when an employer engages in an adverse employment action with a retaliatory motive, regardless of whether retaliation is the sole motive. Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).   To establish a prima facie case of retaliation, plaintiff must show that: "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took [an] adverse [employment] action against [the] plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003)(internal quotation marks and citation omitted).

---

[30]Plaintiff has failed to present evidence that any of the individual hiring managers discriminated against her in the hiring process.

50

Plaintiff may demonstrate the causal connection indirectly "by showing that the protected activity was followed closely by the discriminatory treatment." Richardson, 180 F.3d at 447 (citations omitted).  Retaliation claims are subject to the same burden-shifting analysis outlined in Section II.A supra.  See Terry, 336 F.3d at 141.  See generally McDonnell Douglas, 411 U.S. 792.  If defendant proffers a legitimate, non-discriminatory reason for its actions, plaintiff must demonstrate sufficient potential proof that those explanations are pretextual.  See Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998)(multiple citations omitted).

Of the five positions to which plaintiff sought to transfer, plaintiff was denied employment for only one position, the PAA position in the Care Continuum Assessment Center, after submitting her January 23, 2001 written complaint.  Plaintiff applied for the remaining positions prior to submitting her written complaints on January 23, 2001 and February 9, 2001 and prior to informing defendant Ciaschini of her intent to file her complaint with the CHRO on February 12, 2001. ___

    1. PAA Position in Care Continuum Assessment Center

Plaintiff submitted a transfer application for one of two PAA positions[31] on January 5, 2001 and was interviewed on January 22,

_____

[31]As part of her retaliation claim, plaintiff asserts that she was entitled to but not given priority consideration pursuant to the Hospital's Staff Reduction Policy.  For the reasons previously stated, plaintiff's argument is without merit.