2001. (Doc. No. 89 at 30-31; Doc. No. 71, Stagg Dec. ¶ 3. See also Doc. No. 71, Tab I-2 (January 5, 2001 position posting); Doc. No. 90, Solomon Dec. ¶ 72). Plaintiff submitted her first written complaint on January 23, 2001, and was thereafter rejected for both positions in the Care Continuum Assessment Center. (See Doc. No. 71, Stagg Dec. ¶¶ 5-6). The positions required that applicants have a high school diploma, prior experience in patient care environments, solid interpersonal skills, the ability to navigate hospital based computer programs, and the ability to perform phlebotomies and obtain quality EKGs. (Doc. No. 71, Stagg Dec. ¶ 4; Doc. No. 71, Tab I-2 (Job Posting)). Stagg ultimately filled the positions with Phyllis Watson, who is black, and Janina Kornas, who is white, because she believed both candidates were better qualified than plaintiff. (Doc. No. 71, Stagg Dec. ¶¶ 5-6). Kornas had three to four years active work experience in phlebotomy and knowledge of EKGs and vital signs, whereas plaintiff only had a certificate in phlebotomy and no experience with EKGs and monitors. (Doc. No. 71, Stagg Dec. ¶ 6; Doc. No. 71, Tab I-4 (Wilson Application and Resume)). Though Watson did not possess any active experience in phlebotomy, she did have experience with EKGs and monitors that plaintiff did not. (Id.) Although defendants' failure to hire plaintiff closely followed plaintiff's January 23, 2001 complaint, defendants have offered a legitimate, non-discriminatory reason for not hiring plaintiff.

52

Plaintiff attempts to refute defendants' assertions by arguing that Stagg's declaration is unreliable because she asserts that defendant Ciaschini "made no attempt to influence [her] hiring decision[,]" in contradiction to the Hospital Recruitment and Selection Policy stating that Human Resource Consultants, such as defendant Ciaschini, must "[m]ake a final selection recommendation" to hiring managers. (Doc. No. 89, at 31. See Doc. No. 71, Stagg Dec. ¶ 7; Doc. No. 90, Recruiting and Selection Policy). Moreover, plaintiff contends that she was entitled to "priority consideration [under the Staff Reduction policy] and a ninety (90) day period to adequately perform her job duties." (Doc. No. 89 at 31). However, for the reasons just stated, and in light of plaintiff's failure to present evidence that any of the individual hiring managers discriminated against her in the hiring process, plaintiff's assertions fail.

### 2. February 9 and February 13, 2001 Written Warnings

Plaintiff also claims her February 9, 2001 suspension and February 13, 2001 written warning were both forms of retaliation. For the reasons stated in Section II.A supra, defendants have proffered a legitimate, non-discriminatory reason for these actions. Thus, the burden lies on plaintiff to demonstrate that defendants' explanation is merely a pretext for retaliatory motive. In an attempt to satisfy this burden, plaintiff responds that defendant O'Connell, in suspending plaintiff, did not precisely

53

follow the PIP and suspended plaintiff without pay.[32]  This assertion, which is also addressed in Section II.A.2 supra, does not support plaintiff's assertion that defendants' motivation for the suspension and letter were pretextual.

### 3. January and March 2001 Paychecks

Plaintiff also alleges that she was retaliated against when she had problems with her paychecks in January and March 2001. On January 29, 2001, defendant Ciaschini received a letter from plaintiff which stated that the envelope for plaintiff's January 25, 2001 had not been sealed and she considered this a form of harassment.  Plaintiff called the payroll department about the sealed envelope and was told that the outsourced company that completes payroll occasionally fails to seal the envelope. (Doc. No. 71, Ciaschini Dec. ¶ 13).  In response to plaintiff's complaint, defendant Ciaschini interviewed the hospital employee responsible for distributing the checks for plaintiff's department, who denied opening the envelope.  (Doc. No. 71, Ciaschini Dec. ¶ 13).  Defendant Ciaschini drew the conclusion that the payroll department failed to adequately seal the envelope and informed plaintiff of that determination in a letter dated February 16, 2001.  (Doc. No. 71, Ciaschini Dec. ¶ 13).  The second payroll problem occurred on March 1, 2001, when plaintiff did not receive

---

[32]Plaintiff claims defendant O'Connell skipped Step 3 of the PIP and proceeded immediately to Step 4 suspension, in contravention of the PIP.  However, as noted in Section II.A.2 supra, the suspension was administrative and not intended to be without pay.  (Doc. No. 100, McAloon Dec. ¶ 13).

54

her check. Instead, plaintiff received her check on March 2, 2001, after an error was discovered and plaintiff's timecard was provided to payroll. (Doc. No. 71, O'Connell Dec. ¶ 11).

Other than the temporal proximity to plaintiff's January 23, 2001 letter, there is no indication that either of these events were motivated by retaliation. Concerning the unsealed envelope, plaintiff personally contacted the payroll company and was informed that, on occasion, envelopes were accidently left unsealed. Furthermore, defendant Ciaschini investigated the event and drew the same conclusion. The evidence indicates that the second paycheck incident was the result of mere error in plaintiff's timecard submission and, though plaintiff did not receive her paycheck as scheduled on March 1, she did receive it the next day, once the error was resolved.

Even if the evidence indicated that these two events were an exercise in retaliation, they do not rise to the level of an adverse employment action. Such an action requires a material change in plaintiff's terms and conditions of employment and is generally indicated by termination, demotion, wage decreases, benefit loss, diminished responsibilities or similar activities. <u>See</u> <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000). Plaintiff does not provide any evidence to indicate that either paycheck conveyed a termination or demotion or resulted in a dramatic alteration of her terms or conditions of employment.

55

These incidents are better described as mere administrative problems and inconveniences rather than adverse employment actions. See Lawrence v. Fashion Inst. of Tech., No. 01-CV-7395, 2002 U.S. Dist. LEXIS 23916, at *24 (S.D.N.Y. 2002)("trouble collecting a paycheck, while an inconvenience, is not an adverse employment action.")(citation omitted).

> E. COUNTS THREE, FOUR AND THIRTEEN: FAILURE TO HIRE UNDER TITLE VII, 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981 AND CFEPA, CONN. GEN. STAT. § 46a-60(a)(1)

With respect to plaintiff's failure to hire claims, defendants assert that plaintiff's claims fail because plaintiff was generally unqualified for the positions she sought. (Doc. No. 75 at 23-46). Defendants further contend that the positions ultimately went to candidates with better qualifications. (Id.).

According to plaintiff, her efforts to transfer to open positions of AAI in Hemodialysis, Financial Counselor in Patients Accounts, Human Resource Associate in Human Resources, PAA and AAII in Care Continuum, and AAIII in Research, provide adequate inference of disparate treatment race discrimination under the law. (Doc. No. 89 at 15-16). Plaintiff asserts that she is a black female and thus a member of a protected group, and she was qualified for each of these positions as the Human Resources Consultant assigned to the recruitment and selection process referred plaintiff as a qualified candidate to each of these

56

positions.[33]   (Doc. No. 89 at 51-52).  However, because of the temporary nature of plaintiff's position, plaintiff was encouraged by defendants to apply for other posted positions within the Hospital, pursuant to the Hospital's Transfer Policy, so that she would be able to continue her employment after the elimination of the CORE project.  (Doc. No. 71, Ciaschini Dec. ¶ 3; Doc. No. 100, McAloon Dec. ¶ 6.  See also Doc. No. 71, McAloon Dec. ¶ 7; Doc. No. 7, Tab J-1 (Transferability Document)).  Pursuant to the Hospital's Transfer Policy, plaintiff was considered an internal candidate but the policy does not dictate additional consideration.  (Doc. No. 71, Tab J-1 (Transferability Document)).

   To establish a prima facie case of failure to hire based on discrimination under Title VII, plaintiff must show that (1) she was within a protected group, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) that action took place under circumstances giving rise to an inference of discrimination.  McDonnell Douglas, 411 U.S. at 802.  See also Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001).  The burden-shifting analysis outlined in Section II.A. supra applies here as well.  See McDonnell Douglas, 411 U.S. at

---

[33]Plaintiff asserts that she was denied priority consideration for internal transfers despite the Hospital's Staff Reduction Policy, that the Hospital ignored its own Recruitment and Selection policy, and that external applicants were hired on several occasions over plaintiff, despite plaintiff's entitlement to priority consideration and despite a preference for plaintiff as an internal candidate.  (Doc. No. 89 at 16-35). For the reasons stated in Section II.D. supra, plaintiff's claim is without merit.

57

802. Plaintiff has met her burden to show that she is a member of a protected class, as she is a black female, and that she suffered an adverse employment action in that she was not hired for any of these positions. However, the issue remains whether plaintiff was qualified for each of the positions and whether defendants' failure to hire plaintiff took place under circumstances giving rise to an inference of discrimination.

### 1. AAII Position in Research Department

In or about March 2000, the Hospital's Research Department sought to hire an AAIII; plaintiff applied and was not selected. (Defendants' Statement ¶¶ 95, 99; Plaintiff's Statement ¶¶ 95, 99; Doc. No. 71, Bow Dec. ¶¶ 2-3. See also Doc. No. 71, Tab G-1 (AAIII Role Description)). Defendant correctly observes that, insofar as plaintiff applied for this position on March 10, 2000, the claims brought under Title VII and CFEPA are barred by the applicable statute of limitations. (Doc. No. 75 at 29, 16, 27). As discussed above, a 300-day statute of limitations applies to claims brought under Title VII, see Coger, 309 F. Supp. 2d at 282, while a 180-day statute of limitations applies to claims brought under CFEPA. See CONN. GEN. STAT. § 46a-82(e).[34]

---

[34] Plaintiff filed her charge of discrimination with the CHRO on March 19, 2001. Accordingly, this Court can only hear claims under Title VII that occurred on or after May 23, 2000 - 300 days before the CHRO charge was filed. Additionally, the Court can only consider claims under CFEPA that occurred on or after September 20, 2000 - 180 days before the CHRO charge was filed.

58

Moreover, plaintiff's disparate treatment claim for failure to hire plaintiff for the AAIII position also fails on the merits. The AAIII position required someone experienced in Microsoft Word, Excel and Access, as well as databases.[35] (Defendants' Statement ¶ 97; Plaintiff's Statement ¶ 97. See also Doc. No. 71, Tab G-1 (AAIII Role Description)). Laurine Bow, the Associate Director for Research at the Hospital, was the sole decision-maker with respect to the position. (Defendants' Statement ¶¶ 95-96; Plaintiff's Statement ¶¶ 95-96; Doc. No. 71, Bow Dec. ¶ 3). Bow interviewed plaintiff and Tiffany Rowe for the position and chose Rowe as the more qualified applicant. (Defendants' Statement ¶ 98-100; Plaintiff's Statement ¶¶ 98-100; Doc. No. 71, Bow Dec. ¶ 3-5. See also Doc. No. 71, Tab G-2 (Rowe's application and resume)). Plaintiff contends, however, that the Hospital denied plaintiff the position even though she was entitled to "priority consideration" and was qualified for the position (Doc. No. 89 at 25-26). For the reasons stated in Section II.D. supra, plaintiff's claim for priority consideration is without merit.

### 2. AAI Position in Hemodialysis

On or about June 2000, Monica Kowalski, the Office Manager in the Hemodialysis Unit, sought to hire a person with medical background and knowledge of medical terminology and task-based computer programs to serve as an AAI for that unit. (Defendants'

---

[35] See Section II.D. supra.

59

Statement ¶¶ 75-76; Plaintiff's Statement ¶¶ 75-76; Doc. No. 71, Kowalski Dec. ¶¶ 2, 4. <u>See also</u> Doc. No. 71, Tab D-1 (job posting)). Plaintiff applied for the position but was not selected. As discussed above, plaintiff's claim under CFEPA for the denial of plaintiff's application for this position is barred by the statute of limitations as the denial of her transfer occurred more than 180 days before the CHRO charge was filed. Although plaintiff contends that this claim is not barred because she was denied the position a total of three times and the position remained unfilled until May 16, 2001, plaintiff's underlying claim for priority consideration has been rejected in Section II.D. <u>supra</u>.

Defendant Kowalski asserts that plaintiff was unqualified[36] for this position as the position required someone with a medical background, knowledge of medical terminology, and knowledge of task-based hospital computer programs, and it was desirable for AAI candidates to have nursing unit experience, knowledge of the lab ordering process, hospital billing, and the use of a computer program used for medical record retrieval. (<u>See</u> Doc. No. 71, Kowalski Dec. ¶ 5). According to defendants, Lovie DeGourville, a black woman, was ultimately hired for the position, undermining any inference of racial discrimination. (Doc. No. 71, Kowalski Dec. ¶

---

[36] However, defendant Kowalski's testimony at the CHRO hearing was that plaintiff was not as qualified as the person ultimately hired. (Doc. No. 91, CHRO Tape, Tape 3, Side 1).

5). Defendants also assert that, even if the evidence gave rise to an inference of discrimination, hiring DeGourville provides a legitimate non-discriminatory reason for not hiring plaintiff because DeGourville was better qualified. (Id.; Doc. No. 75 at 25).

However, contrary to defendants' assertions, plaintiff contends that the original hire for the position was Terri Durler, an external candidate, who never accepted the position. (Doc. No. 89 at 18; Doc. No. 90, Durler Application). Additionally, according to plaintiff, Jennifer Vazquez transferred to this position on December 17, 2000, after she was offered the position by defendant Kowalski; Vazquez was then transferred to a Hospital Associate position on January 28, 2001. (Doc. No. 89 at 18; Doc. No. 90, ECRN re: Vazquez).

Because plaintiff has satisfied her burden of showing that she suffered an "adverse job action under circumstances giving rise to an inference of discrimination on the basis of race . . .[,] " Feingold, 366 F.3d at 149, the burden of production shifts to defendants to articulate a legitimate non-discriminatory reason for the adverse employment action. See St. Mary's Honor Ctr., 509 U.S. at 507. Once defendant asserts a legitimate reason, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment decision. Reeves v. Sanderson Plumbing Products,

Inc., 530 U.S. 133, 143 (2000).

While there is an application for the AAI position for Lovie DeGourville, dated June 26, 2000, the field regarding DeGourville's offer and acceptance of the position is blank. (Doc. No. 90, DeGourville Application; Doc. No. 71, Tab D-3). Furthermore, DeGourville's September 27, 2002 Employee Record/Change Notice, under the name Lovie Kelsey,[37] lists her positions held from June 4, 1999 through October 31, 2001 as Administrative Associate II and Patient Care Technician. (Doc. No. 90, Kelsey ERCN). There is no indication that she ever assumed the role of AAI in Hemodialysis. This discrepancy undermines defendant's assertion that it filled the position with a black applicant who was more qualified than plaintiff. Moreover, although defendant Kowalski avers that plaintiff was not qualified for the AAI position, she testified at the administrative proceeding that she was not as qualified as the chosen applicant. (Doc. No. 90, Solomon Dec. ¶ 52; CHRO Tapes, Tape 3, Side 1).[38]

Defendants have not refuted the inference of discrimination because they do not offer a legitimate explanation for the discrepancy. Because courts must be "particularly cautious about

---

[37] During her employ, DeGourville changed her last name to Kelsey. (Doc. No. 90, Name Change Form).

[38] Based upon the exhibits submitted by plaintiff, it is clear that DeGourville was a highly regarded employee, as she received "exemplary" ratings in her performance evaluations in 2001. (Doc. No. 90, Exhs. 37-38). Her evaluation, dated November 15, 2001, states at the bottom that on April 29, 2001 she "transferred from cardiology to dialysis," but by the date of the evaluation, she was employed in the "Interventional E.P." (Doc. No. 90, Exh. 38).

granting summary judgment to an employer in a discrimination case" because of the lack of direct evidence of discrimination, Schwapp, 118 F.3d 106, 110 (2d Cir. 1997)(citations and internal quotation marks omitted), this Court concludes that there remains a material question as to defendants' motivations in the failure to hire plaintiff for this position.

### 3. Human Resources Associate in Human Resources Department

In or about August 2000, William Bell, a Hospital Human Resources Consultant, interviewed plaintiff for a Human Resources Associate position, a position requiring two years of previous experience in human resources personnel. (Defendants' Statement ¶¶ 81-82; Plaintiff's Statement ¶¶ 81-82; Doc. No. 71, Bell Dec. ¶¶ 3-4. See also Doc. No. 71, Tab E-1 (job posting)). Plaintiff applied for the position but Dawn Packman, who is white and had at least two years previous experience in human resources personnel, was hired. (Defendants' Statement ¶¶ 84-85; Plaintiff's Statement ¶¶ 84-85; Doc. No. 71, Bell Dec. ¶ 6. See also Doc. No. 71, Tab E-3 (Packman's application and resume)).

As discussed above, plaintiff's claim under CFEPA for the denial of her application for this position is barred by the statute of limitations as the denial of her transfer occurred more than 180 days before the CHRO charge was filed.

According to defendant, plaintiff was not qualified for this position as it required two years of experience in human resources

63

personnel that plaintiff did not have. (Doc. No. 75, at 26). Plaintiff contends that, "[i]n certain cases, Mr. Bell deemed it within his discretion to hire individuals low on experience but in [p]laintiff's case[,] he did not exercise that discretion even though [p]laintiff's position was subject to elimination and she was entitled to priority consideration." (Doc. No. 89 at 22-23).

Plaintiff fails to state a prima facie case of discrimination based on this application as plaintiff was not qualified for the position when she applied, and, for the reasons stated in Section II.D. supra, plaintiff was not entitled to priority consideration.

### 4. Financial Counselor Position in Patient Accounts Department

In November 2000, Teri Duarte was the Team Leader in the Patient Accounts Department when it sought to hire a Financial Counselor. (Defendants' Statement ¶¶ 165-66; Plaintiff's Statement ¶¶ 165-66; Duarte Dec. ¶ 2. See also Doc. No. 70, Tab M-1 (job posting)). Duarte and Elizabeth Lawson, another team leader in the Patient Accounts Department, interviewed plaintiff for the position. (Defendants' Statement ¶ 168; Plaintiff's Statement ¶ 168; Duarte Dec. ¶ 5). The position required two to three years of experience in hospital or insurance billing, and the department specifically sought someone with patient registration experience, payor insurance experience and computer knowledge. (Defendants' Statement ¶ 167; Plaintiff's Statement ¶ 167; Doc. No. 71, Duarte

64

Dec. ¶ 4).[39] Though plaintiff was proficient in Microsoft Word and familiar with Excel and Powerpoint, she had no experience in hospital or insurance billing and lacked experience in patient registration and payor insurance. (Defendants' Statement ¶ 169; Plaintiff's Statement ¶ 169; Doc. No. 71, Duarte Dec. ¶ 6; Solomon Dec. ¶ 62). Sharlyn Pacheco, a Hispanic woman, was hired for the position. (Defendants' Statement ¶ 170; Plaintiff's Statement ¶ 170; Doc. No. 71, Duarte Dec. ¶ 7. See also Doc. No. 71, Tab M-2 (Pacheco's application)).

Although plaintiff contends that she would not have been referred for an interview if she was not qualified for the position (Doc. No. 89 at 22), the evidence before the Court reveals that plaintiff was not the most qualified person for this job. Thus, even if plaintiff was able to establish a prima facie case of discrimination, the Hospital had a legitimate non-discriminatory reason for not hiring her and there is no evidence that the Hospital's decision to hire a more qualified candidate over plaintiff gives rise to an inference of discrimination.

### 5. PAA and AAII Positions in Care Continuum

In or about October 2000, Hartford Hospital's Case Coordination area in the Care Continuum Department created three new AAII positions, one of which it did not post because it had been designated by the Department of Human Resources for Doreen

---

[39] See Section II.D. supra.

65

Forrest, a black employee who required a light-duty accommodation after returning from workers' compensation leave. (Defendants' Statement ¶¶ 102-103; Plaintiff's Statement ¶¶ 102-103; Doc. No. 71, Sobieski Dec. ¶ 3. See also Doc. No. 71, Tab H-1 (job postings for two of the three positions)). Both remaining positions involved arranging accommodations and assistance for discharged patients with various community agencies over the telephone. (Doc. No. 75, at 30; Defendants' Statement ¶ 107; Plaintiff's Statement ¶ 107; Doc. No. 71, Sobieski Dec. ¶ 4). Plaintiff was interviewed by Patricia Sobieski, Manager of the Case Coordination area in the Care Continuum Department, for the AAII positions. (Defendant's Statement ¶ 108; Plaintiff's Statement ¶ 108; Doc. No. 90, Solomon Dec. ¶ 72; Doc. No. 71, Sobieski Dec. ¶ 5).

Case Coordination filled one of the positions with Emy Lopez, an Hispanic woman who had worked in the Women's Health Department for approximately six months after working for several years in the emergency department. (Defendants' Statement ¶¶ 110-11; Plaintiff's Statement ¶¶ 110-11; Doc. No. 71, Sobieski Dec. ¶ 6. See also Doc. No. 71, Tab H-3 (Lopez's application)). Patricia Sobieski, Manager of the Case Coordination area in the Care Continuum Department, felt Lopez's knowledge of the emergency department staff would assist her transition and provide her useful clinical patient and family contact. (Defendants' Statement ¶¶ 101, 112-13; Plaintiff's Statement ¶¶ 101, 112-13; Doc. No. 71,

Sobieski Dec. ¶ 6). Sobieski also considered Lopez proficient in the computer programs utilized by Case Coordination. (Defendants' Statement ¶ 114; Plaintiff's Statement ¶ 114; Doc. No. 71, Sobieski Dec. ¶ 6).

Case Coordination filled the other available AAII position with Elizabeth Kirol, who is white. (Defendants' Statement ¶ 117; Plaintiff's Statement ¶ 117; Doc. No. 71, Sobieski Dec. ¶ 7. See also Doc. No. 71, Tab H-4 (Kirol's application)). Kirol worked at the hospital for almost thirteen years – twelve as a PAA and approximately one year in the Medical Records Department. (Defendants' Statement ¶ 118; Plaintiff's Statement ¶ 118; Doc. No. 71, Sobieski Dec. ¶ 7). Sobieski viewed Kirol's knowledge of the Hospital as an asset and considered Kirol proficient in the computer programs used by Case Coordination. (Defendants' Statement ¶¶ 119-20; Plaintiff's Statement ¶¶ 119-20; Doc. No. 71, Sobieski Dec. ¶ 7). Sobieski also believed Kirol's experience in record retrieval was vital to functioning as an AAII. (Defendants' Statement ¶ 121; Plaintiff's Statement ¶ 121; Doc. No. 71, Sobieski Dec. ¶ 7). Additionally, Sobieski believed that Lopez's and Kirol's qualifications for the AAII position surpassed plaintiff's. (Defendants' Statement ¶ 124; Plaintiff's Statement ¶ 124; Doc. No. 71, Sobieski Dec. ¶ 8).

Plaintiff again contends that she was qualified for each of these positions (see Doc. No. 89 at 23-25), but, assuming arguendo

that she could satisfy her prima facie case, defendants have offered a legitimate, non-discriminatory reason for failing to hire her as, in light of the foregoing, plaintiff was not the most qualified applicant.[40]

---

[40]Additionally, the Hospital posted notice of a vacant position for a PAA in the Cardiology Department on January 11, 2001 requiring a high school diploma, the ability to work effectively as part of a team, excellent communication and interpersonal skills, the ability to participate in unit activities that support the Cardiology Department's goals, and the ability to interpret arrhythmias. (Doc. No. 71, Synhorst Dec. ¶ 8). Plaintiff applied for the position, but was rejected based on her February 13, 2001 letter, establishing plaintiff's prima facie case that defendants' failure to hire plaintiff for this position was motivated by the letter. (See Doc. No. 71, Synhorst Dec. ¶ 11; Doc. No. 71, Tab A-3 (Plaintiff's Transfer Application)). Defendants, however, offer a non-discriminatory reason for the rejection stating that the warning letter had placed plaintiff in the PIP, making her ineligible for transfer within the hospital. O'Connell placed plaintiff in the PIP for thirty-four work days because it was the number of days plaintiff had remaining before the elimination of her position. (Doc. No. 71, O'Connell Dec. ¶ 10). Plaintiff acknowledges that the PIP does not specify a guideline for determining the length of time an employee is subject to the PIP, and, because one of the purposes behind the PIP is "to remedy performance deficiencies quickly and decisively," O'Connell's implementation of a thirty-four day period did not violate an established Hospital policy. (Doc. No. 89 at 45-46; Doc. No. 71, Tab C-16 (Performance Management)). Plaintiff does not attempt to refute this non-discriminatory explanation.

   Approximately one month later, Lea Allard interviewed plaintiff for a position on the Bliss Wing on or about February 21, 2001. (Doc. No. 71, Allard Dec. ¶ 5). The position required a candidate to know how to read heart monitors, understand and transcribe physician's orders and prescriptions, order laboratory tests, order EKGs and other physical tests, have a working knowledge of computers, and have good communication skills. (Doc. No. 71, Allard Dec. ¶ 4). Allard eventually hired Linda Connors, a white female who had cross-trained on many of the PAA responsibilities, because she considered Connors more qualified for the position. (Doc. No. 71, Allard Dec. ¶¶ 6-7; see also Tab N-1 (Connor's resume)). Plaintiff does not provide any evidence of retaliatory motivation or evidence that hiring Connors was a pretext for retaliation.

## IV. CONCLUSION

Accordingly, for the reasons stated above, defendants' Motion for Summary Judgment (Doc. No. 68) is DENIED with respect to plaintiff's allegations of failure to hire her for the AAI position in hemodialysis in Counts Three and Four (Title VII and § 1981), see Section II.E.2 supra, and is GRANTED in all other respects, see Sections II.A-D, E.1, and E.3-5 supra.

SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this ____ day of September, 2005.